## UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF MISSISSIPPI
## SOUTHERN DIVISION

NETCHOICE, LLC,

*Plaintiff*,

v.

LYNN FITCH, in her official capacity as
Attorney General of Mississippi,

*Defendant*.

Civil Action No. ___1:24cv170HSO-BWR___

### COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

NetChoice, LLC brings this civil action against Defendant for declaratory and injunctive relief and alleges as follows:

### INTRODUCTION

1.      Mississippi is the latest State to attempt to unconstitutionally regulate minors' access to online speech—and impair adults' access along the way. Mississippi House Bill 1126 (the "Act") restricts protected speech for minors, adults, and websites, violating bedrock principles of constitutional law and unanimous precedent from across the Nation.[1] As the U.S. Supreme Court has repeatedly held, "minors are entitled to a significant measure of First Amendment protection." *See Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 794 (2011) (cleaned up; quoting *Erznoznik v. Jacksonville*, 422 U.S. 205, 212-13 (1975)). And the government may not impede adults' access to speech in its effort to regulate what it deems acceptable speech for minors. *Ashcroft v. ACLU*, 542 U.S. 656, 667 (2004); *Reno v. ACLU*, 521 U.S. 844, 882 (1997). That is why numerous courts have enjoined state laws that similarly would restrict minors and adults' access to lawful online speech. *NetChoice, LLC v. Yost*, 2024 WL 555904 (S.D. Ohio Feb. 12, 2024) (enjoining parental-

---

[1] This Complaint refers to websites, applications, and other digital services as "websites."

consent law); *NetChoice, LLC v. Bonta*, 2023 WL 6135551 (N.D. Cal. Sept. 18, 2023) (enjoining age-estimation and parental-consent law); *NetChoice, LLC v. Griffin*, 2023 WL 5660155 (W.D. Ark. Aug. 31, 2023) (enjoining age-verification and parental-consent law). This Court should do the same here.

2.      The websites regulated by the Act allow both minors and adults to "engage in a wide array of . . . activity on topics 'as diverse as human thought'"—activity that is "protected by the First Amendment" from government interference. *Griffin*, 2023 WL 5660155, at *5 (quoting *Packingham v. North Carolina*, 582 U.S. 98, 105 (2017)). The Act would fundamentally change all of that. It would place multiple restrictions on minors and adults' ability to access covered websites, block access altogether (in some cases), and directly regulate the protected speech that websites can disseminate.

3.      Accordingly, the Act—in whole and in part—is unlawful for multiple reasons.[2]

4.      *First*, the Act's requirement that covered websites verify the ages of all Mississippi account holders (both minors and adults), § 4(1),[3] violates the First Amendment. *Griffin*, 2023 WL 5660155, at *21 (rejecting similar requirement); *Bonta*, 2023 WL 6135551, at *13 (enjoining age-estimation requirement). This requirement mandates that minors and adults alike verify their ages—which may include handing over personal information or identification that many are unwilling or unable to provide—as a precondition to access and engage in protected speech. Such requirements abridge the freedom of speech and thus violate the First Amendment. *See, e.g., Ashcroft*, 542 U.S. at 667, 673; *Reno*, 521 U.S. at 882.

---

[2] This lawsuit challenges only Sections 1-8 of the Act (and it uses the term "Act" to refer only to the challenged provisions).

[3] All similar references are references to sections of House Bill 1126. *See* Ex. 1.

5.      *Second*, the Act's requirement that a minor obtain parental consent as a prerequisite to creating an account (and thus accessing protected speech) on any covered website, § 4(2), violates the First Amendment. *Yost*, 2024 WL 555904, at *12, *14 (rejecting similar requirement); *Griffin*, 2023 WL 5660155, at *15, *21 (same). Governments cannot require minors to secure parental consent before accessing or engaging in protected speech. *See Yost*, 2024 WL 555904, at *12 (citing *Brown*, 564 U.S. at 795 n.3).

6.      *Third*, the Act's vague requirement that covered websites "prevent or mitigate" minors' "exposure" to certain content- and viewpoint-based categories of speech, § 6(1), violates the First Amendment and is preempted by 47 U.S.C. § 230. The Act would replace covered websites' own voluntary (and extensive) "content moderation" efforts to address objectionable speech with state-mandated censorship. Furthermore, the broad, subjective, and vague categories of speech that the Act requires websites to monitor and censor could reach everything from classic literature, such as *Romeo and Juliet* and *The Bell Jar*, to modern media like pop songs by Taylor Swift. This requirement will chill the dissemination of yet more speech on covered websites. Such overbroad prior restraints of speech violate the First Amendment. Moreover, Congress expressly preempted state laws requiring websites to monitor or block speech—or imposing liability for imperfect content moderation. 47 U.S.C. § 230(c)(1), (e)(3).

7.      Each of these provisions independently triggers strict scrutiny. Moreover, they all trigger strict scrutiny because they depend on the Act's content- and speaker-based central coverage definition establishing which "digital service provider[s]" are covered by the Act. § 3(1). None of the Act's provisions can satisfy strict scrutiny, or any level of heightened scrutiny, because they are not appropriately tailored to any substantial or compelling interest.

8.      Finally, the Act's central "digital service provider" definition, § 3(1), is unconstitutionally vague, leaving many websites across the Internet uncertain about whether they must shoulder the Act's burdens or face arbitrary and unpredictable enforcement.

9.      For these reasons and more, this Court should enjoin Defendant from enforcing the Act, §§ 1-8, and declare the Act unlawful.

### PARTIES & STANDING

10.      Plaintiff NetChoice, LLC is a District of Columbia nonprofit trade association for Internet companies.[4] NetChoice's mission is to promote online commerce and speech and to increase consumer access and options via the Internet, while also minimizing the burdens that would prevent businesses from making the Internet more accessible and useful.

11.      NetChoice has standing to bring its challenges on at least three grounds.

12.      First, NetChoice has associational standing to challenge the Act, because: (1) some of NetChoice's members have individual standing to sue in their own right; (2) challenging the Act is germane to NetChoice's purpose; and (3) members' individual participation is unnecessary in this purely legal challenge. *See Texas Democratic Party v. Benkiser*, 459 F.3d 582, 587 (5th Cir. 2006); *Yost*, 2024 WL 555904, at *3-5; *Bonta*, 2023 WL 6135551, at *4; *Griffin*, 2023 WL 5660155, at *9-10.

13.      Based on the Act's definitions, § 3, the Act regulates some services offered by the following NetChoice members: (1) Dreamwidth; (2) Google, which owns and operates YouTube; (3) Meta, which owns and operates Facebook and Instagram; (4) Nextdoor; (5) Pinterest; (6) Snap Inc., which owns and operates Snapchat; and (7) X. Although the Act does not regulate all

---

[4] NetChoice's members are listed at NetChoice, About Us, https://perma.cc/J3EZ-7EZV.

4

NetChoice members, this Complaint refers to members with services that the Act regulates as "members."

14.     Second, NetChoice also has standing to assert the First Amendment rights of members' current and prospective users. *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 392-93 (1988); *Yost*, 2024 WL 555904, at *5-6; *Bonta*, 2023 WL 6135551, at *4; *Griffin*, 2023 WL 5660155, at *11-12.[5]

15.     Third, NetChoice also has standing on its own behalf to challenge the Act. NetChoice has incurred costs and will continue to divert finite resources to address the Act's implications and compliance costs for Internet companies.

16.     Defendant Lynn Fitch is the Mississippi Attorney General. She is a Mississippi resident and is sued in her official capacity. The Act provides that a violation of the Act is an unfair and deceptive trade practice enforceable by the Office of the Attorney General. § 8; *see* Miss. Code §§ 75-24-9, 75-24-19.

## JURISDICTION & VENUE

17.     This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343(a). This Court has authority to grant legal and equitable relief under 42 U.S.C. § 1983, injunctive relief under 28 U.S.C. § 1651, and declaratory relief under 28 U.S.C. § 2201(a).

18.     This Court has personal jurisdiction over Defendant, because she resides in and/or conducts a substantial proportion of her official business in Mississippi. Venue is proper in this

---

[5] When discussing the Act's requirements, this Complaint uses the terms "minor," "adult," "account holder," and "user" to refer only to minors, adults, account holders, and users who are residents of Mississippi. Likewise, this Complaint generally employs the term "user" to encompass both what the Act refers to as "users" and "account holder[s]." *See* §§ 3, 4(2). Plaintiff and its members reserve the right to argue that their compliance obligations for "users" (under the Act) are different than their compliance obligations for "account holders," and are different from the burdens discussed in this Complaint.

District under 28 U.S.C. § 1391(b) because the only Defendant resides in, and the events giving rise to this civil action occurred in, Mississippi.

## BACKGROUND

19.     **NetChoice members' covered websites disseminate, facilitate, and promote speech protected by the First Amendment.** NetChoice's members operate websites that both "publish," *Reno*, 521 U.S. at 853, and "disseminate" protected speech on many subjects, *303 Creative LLC v. Elenis*, 600 U.S. 570, 594 (2023). The websites do so by displaying unique combinations of text, audio, graphic, and/or video "content" that is generated by users and by the members themselves. The speech on these websites includes expression at the heart of the First Amendment's protections for art, literature, politics, religion, and "entertain[ment]." *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 501 (1952).

20.     NetChoice's members allow their users to "gain access to information and communicate with one another about it on any subject that might come to mind." *Griffin*, 2023 WL 5660155, at *5 (quoting *Packingham*, 582 U.S. at 107). For example, Dreamwidth allows users to share their writing, artwork, and innermost thoughts. "On Facebook, . . . users can debate religion and politics with their friends and neighbors or share vacation photos." *Packingham*, 582 U.S. at 104. Instagram allows people to post and view photos and videos, comment on them, learn about and advocate for the causes they care about, showcase their art or athletic talent, and hear from their local government officials. On Nextdoor, users can connect with neighbors, share local news, and borrow tools. Pinterest allows users to explore recipes, home decor, and more. Snapchat is designed to allow users to have digital conversations with friends and family in ways that replicate real-life interactions. On X, "users can petition their elected representatives and otherwise engage with them in a direct manner." *Id.* at 104-05. And YouTube endeavors to show people the world,

from travel documentaries to step-by-step cooking instructions. All of NetChoice members' covered websites allow users to interact socially.

21.     Like many other covered websites, many NetChoice members require users to create an account before they can access some or all of the protected speech and speech-facilitating functionalities available on their websites.

22.     **Minors' use of covered websites.** Minors—like adults—use covered websites to engage in speech that is entitled to First Amendment protection from government interference, including: interacting socially with family and friends, raising money for field trips, showcasing their creative and athletic talents, hearing from and talking to local government officials, entertaining and being entertained, and forming new communities.

23.     **Existing options for parental control and oversight.** Parents have many existing options to regulate whether and how their minor children use the Internet.

24.     Parents can decide whether and when to let their minor children use computers, tablets, smartphones, and other devices to access the Internet.

25.     Cellular and broadband Internet providers offer families tools to block certain online services on devices using a particular cellular, Wi-Fi, or broadband network (such as that used in the minor's home). *See, e.g.*, Verizon, Verizon Smart Family, https://perma.cc/58AX-N4CH; AT&T, AT&T Secure Family, https://perma.cc/D9YP-DEL4; T-Mobile, Family Controls and Privacy, https://perma.cc/Q6ZZ-RVLZ; Comcast Xfinity, Set Up Parental Controls for the Internet, https://perma.cc/7FL6-8MYE.

26.     Internet browsers also allow parents to control what online services their children may access. *See, e.g.*, Mozilla, Block and Unblock Websites with Parental Controls on Firefox, https://perma.cc/7RPQ-CTZV. For example, some browsers offer a "kids mode" or enable parents

to see what online services their children are accessing the most. *See* Google, Safety Center, https://perma.cc/64XL-BKLY; Microsoft, Learn More About Kids Mode in Microsoft Edge, https://tinyurl.com/mr3avxd8. Parents can also use widely available third-party software and browser extensions to reinforce these tools. *See, e.g.*, Kim Key, *The Best Parental Control Software for 2024*, PCMag (Dec. 15, 2023), https://perma.cc/LB3Q-7FJ2.

27.     Wireless routers often have settings allowing parents to block particular websites, filter content, monitor Internet usage, and control time spent on the Internet. *See, e.g.*, Netgear, Netgear Smart Parental Controls, https://perma.cc/P3PP-GBH5; tp-link, How to Configure Parental Controls on the Wi-Fi Routers (Case 1), https://perma.cc/8DUU-L75W.

28.     Device manufacturers provide even more parental controls, allowing parents to limit the time spent on the device, curtail the applications that can be used on the device, filter online content, and control privacy settings. *See* Apple, Use Parental Controls on Your Child's iPhone and iPad, https://perma.cc/9YVV-FZWU; Google Family Link, Help Keep Your Family Safer Online, https://perma.cc/5QDP-WKXR; Microsoft, Getting Started with Microsoft Family Safety, https://perma.cc/E5ES-YE9H; Samsung, Parental Controls Available on Your Galaxy Phone or Tablet, https://perma.cc/WN3N-HL6S.

29.     Numerous third-party applications also allow parents to control and monitor their children's online activities. *See, e.g.*, Alyson Behr, *The Best Parental Control Apps in 2024, Tested by Our Editors*, CNN underscored (Mar. 11, 2024), https://perma.cc/RCW5-EUM6.

30.     In addition, NetChoice members provide parents with tools and options to help parents manage their children's online activities. For example, Facebook and Instagram offer supervision tools and resources that empower parents and teens to work together to set time limits and schedule breaks; allow parents to see whom their teen follows and who follows their teen; allow

parents to see which accounts their teen is currently blocking; enable parents to view their teen's account settings for sensitive content, privacy, and messaging; and empower teens to notify their parents when they block or report someone. Similarly, Snapchat's "Family Center" allows parents to see which friends the teen has been recently communicating with on Snapchat, view their list of friends, restrict sensitive content, and report abuse.

31.     All NetChoice members prohibit minors under 13 from accessing their main services, although some offer separate experiences for users under 13 geared for that age group. For example, YouTube offers two services (YouTube Kids and a "Supervised Experience" on YouTube) for minors younger than 13 with parental consent. These services allow parents to select content settings, set screen time limits, and otherwise oversee their children's use of the services.

32.     **Covered websites' dedication to beneficial user experiences and use of effective content moderation.** NetChoice's members expend vast resources to improve their services and curate the content that users post on their websites to best ensure that it is appropriate for users, especially with respect to minors.

33.     Covered websites publish a wide variety of diverse content for many different audiences, but they face the common problem of how to address objectionable and harmful content. *See* NetChoice, By the Numbers: What Content Social Media Removes and Why 1, https://perma.cc/RJA9-79D4 ("By the Numbers"). To address these issues, NetChoice members use content-moderation tools to restrict content they consider potentially harmful while promoting positive and age-appropriate content.

34.     Objectionable content comes in many different forms. Some of that content is clearly illegal, such as child sexual abuse material ("CSAM"). *See id.* at 2. Other content, like hate speech and graphic violence, is lawful but still considered objectionable by many. *See id.* at 10-13.

And some speech simply violates a particular website's rules for what speech it wants to disseminate within its own online community. *E.g.*, Nextdoor, Teens on Nextdoor, https://perma.cc/P2N4-EUHG ("Nextdoor is intended primarily for neighbors to share community-related information.").

35.     NetChoice's members do not seek to disseminate objectionable and harmful speech. On the contrary, they actively work to prohibit and prevent objectionable and harmful speech on their websites. NetChoice's members have developed robust content-moderation policies and processes for detecting, prohibiting, and removing (or otherwise restricting access to) much of the speech seemingly covered by the Act. And NetChoice has fought to preserve members' ability to moderate such content by challenging laws that seek to undermine those abilities.[6]

36.     NetChoice members' content-moderation policies and processes are effective. They address objectionable and harmful content before many (if any) users encounter that content. Indeed, a NetChoice report concluded that the "rate of violative content removed from platforms and the level at which it is removed prior to being seen by users makes clear companies are successfully prioritizing the safety of their users." By the Numbers at 13.

37.     NetChoice's members are also continually working to develop new and improved technologies to identify objectionable and harmful content. *E.g.*, Google, Fighting Child Sexual Abuse Online, https://perma.cc/8FGE-CMA9.

**MISSISSIPPI HOUSE BILL 1126**

38.     Mississippi's Governor signed House Bill 1126 into law on April 30, 2024. The Act's provisions regulating NetChoice's members take effect on July 1, 2024.

---

[6] *E.g.*, *NetChoice, LLC v. Paxton*, 49 F.4th 439, 485-86 (5th Cir. 2022), *cert. granted in part NetChoice, LLC v. Paxton*, 144 S. Ct. 477 (2023); *NetChoice, LLC v. Att'y Gen., Fla.*, 34 F.4th 1196, 1229-30 (11th Cir. 2022), *cert. granted in part sub nom. Moody v. NetChoice, LLC*, 144 S. Ct. 478 (2023)

39. **The Act's content- and speaker-based central coverage definition of "digital service provider" (§§ 2(a)-(b), 3).** The Act's central coverage definition applies to a broad, but vaguely defined range of "digital service provider[s]" across the Internet. At the same time, it expressly excludes entire categories of websites that provide access to certain state-favored content, like that involving news, sports, commerce, gaming, and career development services.

40. Specifically, the Act regulates businesses that meet the Act's definition of "digital service provider," and "who provide[] a digital service that":

> (a) Connects users in a manner that allows users to socially interact with other users on the digital service;
>
> (b) Allows a user to create a public, semi-public or private profile for purposes of signing into and using the digital service; and
>
> (c) Allows a user to create or post content that can be viewed by other users of the digital service, including sharing content on:
>
>> (i) A message board;
>>
>> (ii) A chat room; or
>>
>> (iii) A landing page, video channel or main feed that presents to a user content created and posted by other users.

§ 3(1).

41. A "digital service provider" is any "person who: (i) [o]wns or operates a digital service ['a website, an application, a program, or software that collects or processes personal identifying information with Internet connectivity']; (ii) [d]etermines the purpose of collecting and processing the personal identifying information of users of the digital service; and (iii) [d]etermines the means used to collect and process [such] information of users of the digital service." § 2(a)-(b).

42. Beyond defining covered websites based on content such as social interaction, the Act also excludes websites based on content, because it "does not apply to":

(a) A digital service provider who processes or maintains user data in connection with the employment, promotion, reassignment or retention of the user as an employee or independent contractor, to the extent that the user's data is processed or maintained for that purpose;

(b) A digital service provider's provision of a digital service that facilitates e-mail or direct messaging services, if the digital service facilitates only those services;

(c) A digital service provider's provision of a digital service that:

(i) Primarily functions to provide a user with access to news, sports, commerce, online video games or content primarily generated or selected by the digital service provider; and

(ii) Allows chat, comment or other interactive functionality that is incidental to the digital service; or

(d) A digital service provider's provision of a digital service that primarily functions to provide a user with access to career development opportunities, including:

(i) Professional networking;

(ii) Job skills;

(iii) Learning certifications;

(iv) Job posting; and

(v) Application services.

§ 3(2). Moreover, the Act exempts an "Internet service provider, [or the] provider's affiliate or subsidiary, search engine or cloud service provider" if the entity "solely provides access or connection, including through transmission, download, intermediate storage, access software or other services, to an Internet website or other information or content: (a) [o]n the Internet; or (b) [o]n a facility, system or network not under the control of the [entity or its affiliate or subsidiary]." § 3(3); *see Griffin*, 2023 WL 5660155, at *2-3 (summarizing similar exemptions in a similar law).

43.     **The Act's age-verification requirement (§ 4(1)).** The Act requires covered websites to "make commercially reasonable efforts to verify the age of the person creating an account with a level of certainty appropriate to the risks that arise from the information management practices of the digital service provider." § 4(1).

44.     The Act therefore requires covered websites to verify every account holder's age—including adults—as a precondition to those account holders' ability to create an account to access protected speech on members' websites. Yet many people may not wish to provide proof of age to gain access to the covered websites. And some people will be unable to do so.

45.     **The Act's parental consent requirement (§ 4(2)).** The Act also contains a parental-consent requirement: "A digital service provider shall not permit an account holder who is a known minor to be an account holder unless the known minor has the express consent from a parent or guardian." § 4(2). The Act defines "[k]nown minor" as "a child who is younger than eighteen (18) . . . who has not had the disabilities of minority removed for general purposes, and who the digital service provider knows to be a minor." § 2(d). Thus, the Act requires covered websites to obtain express parental consent as a precondition for known minors to be able to create or maintain an account—and therefore access protected speech on covered websites. As discussed above, the Act requires covered websites to age-verify all users, and thus to know who is and is not a minor.

46.     The Act includes a non-exhaustive list of "[a]cceptable methods of obtaining express consent," including:

(a) Providing a form for the minor's parent or guardian to sign and return to the digital service provider by common carrier, facsimile, or electronic scan;

(b) Providing a toll-free telephone number for the known minor's parent or guardian to call to consent;

(c) Coordinating a call with a known minor's parent or guardian over video conferencing technology;

(d) Collecting information related to the government-issued identification of the known minor's parent or guardian and deleting that information after confirming the identity of the known minor's parent or guardian;

(e) Allowing the known minor's parent or guardian to provide consent by responding to an email and taking additional steps to verify the identity of the known minor's parent or guardian;

(f) Any other commercially reasonable method of obtaining consent in light of available technology.

§ 4(2).

47.     The Act does not account for the difficulty in verifying a parent-child relationship. *See Griffin*, 2023 WL 5660155, at *4 ("[I]t is not clear what, if anything, [a website] must do to prove a parental relationship exists"); *id.* ("[T]he biggest challenge . . . with parental consent is actually establishing . . . the parental relationship." (quoting expert testimony)). These difficulties are compounded when, *e.g.*, families are nontraditional, family members have differences in last name or address, parents disagree with each other about consent, minors are unsafe at home, or parental rights have been terminated.

48.     **The Act's monitoring-and-censorship requirements (§ 6).** The Act requires covered websites to monitor and censor content- and viewpoint-based categories of speech. Specifically, it requires a "digital service provider," "[i]n relation to a known minor's use of a digital service," to "make commercially reasonable efforts to develop and implement a strategy to prevent or mitigate the known minor's exposure to harmful material [as defined by state law] and other content that promotes or facilitates" enumerated categories of speech. § 6(1).

49.     In short, the Act requires covered websites to monitor and censor speech, much of which is protected by the First Amendment, potentially even including *Romeo and Juliet* and *The Bell Jar*. The Act's broad, vague, and subjective categories of prohibited speech will chill dissemination of protected speech because covered websites will be forced to moderate all content that even arguably implicates the Act's categories to avoid enforcement and the risk of significant monetary penalties.

14

50. *First*, the Act requires covered websites to "prevent or mitigate" minors' "exposure to . . . content that promotes or facilitates the following harms to minors":

(a) Consistent with evidence-informed medical information, the following: self-harm, eating disorders, substance use disorders, and suicidal behaviors;

(b) Patterns of use that indicate or encourage substance abuse or use of illegal drugs;

(c) Stalking, physical violence, online bullying, or harassment;

(d) Grooming, trafficking, child pornography, or other sexual exploitation or abuse;

(e) Incitement of violence; or

(f) Any other illegal activity.

§ 6(1). The Act does not define any of these terms, nor does it limit them to speech that is unprotected by the First Amendment. Rather, most of the categories are viewpoint-based and are subjective as applied in many individual cases.

51. *Second*, the Act requires covered websites to "prevent or mitigate" minors' "exposure to harmful material." § 6(1). The Act defines "harmful material" by reference to another provision of the state Code defining obscenity for minors. § 2(c) (citing Miss. Code § 11-77-3(d)).

52. Prohibited speech under the Act can include political speech, critically acclaimed literary works, and everyday communications. Many books, movies, and musical works at least arguably "promote[] or facilitate[]"—

- "Self-harm, eating disorders, substance use disorders, and suicidal behaviors": the biblical story of Samson (Judges 16:23-31), William Shakespeare's *Romeo and Juliet* (1597) and *Hamlet* (1603), art showing the suicide of Lucretia (*e.g.*, Rembrandt, 1664), David Hume's *Of Suicide* (1783), Tolstoy's *Anna Karenina* (1878), Kate Chopin's *The Awakening* (1899), Sylvia Plath's *The Bell Jar* (1963), the debate about assisted dying (*e.g.*, Peter Singer, *Practical Ethics* (1979)), films like *Zoolander* (2001) and *The Devil Wears Prada* (2006), and television shows like *13 Reasons Why* (2017-20).

- "Substance abuse or use of illegal drugs": Sir Arthur Conan Doyle's *The Adventures of Sherlock Holmes* (1892), F. Scott Fitzgerald's *The Great Gatsby* (1925), J.D. Salinger's *The Catcher in the Rye* (1951), the film *The Sandlot* (1993), the novel *The Perks of Being a Wallflower* (1999) and the film adaptation (2012), Toby Keith's *Weed with Willie* (2003), The Weeknd's Kids'-Choice-Award-nominated song *Can't Feel My Face* (2015), and songs on Taylor Swift's *The Tortured Poets Department* (2024).

- "Stalking, physical violence, online bullying, or harassment": *The Phantom of the Opera* (1910, 2004), the musical *Chicago* (1975, 2002), The Police's *Every Breath You Take* (1983), Carrie Underwood's *Before He Cheats* (2006), the television series *Kitchen Nightmares* (2007-14), numerous horror movies (*Halloween* (1978), *Scream* (1996), *I Know What You Did Last Summer* (1997)), and entire categories at large bookstores, *e.g.*, Stalking – Fiction, Barnes & Noble, https://perma.cc/EW45-UYVD.

- "Grooming, trafficking, child pornography, or other sexual exploitation or abuse": As the Supreme Court has recognized, even "teenage sexual activity and the sexual abuse of children" has "inspired countless literary works" protected by the First Amendment, such as "Romeo and Juliet" and the Oscar-winning movie "American Beauty." *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 247-48 (2002).

- "Incitement of violence": The Declaration of Independence itself was a call to arms against the British Crown. And invocations of violence can be found throughout literature. *Brown*, 564 U.S. at 796-98.

- "Any other illegal activity": A great deal of conduct is (and has been) illegal in Mississippi and other jurisdictions. Things that could be considered promoting illegal activity are ubiquitous in modern media, from heists and thefts in franchises like *Ocean's Eleven* (1960-present), *National Treasure* (2004-present), and *Despicable Me* (2010-present), to improvised traps and explosives in *The Goonies* (1985) and *Home Alone* (1990), to video games involving street racing such as the *Need for Speed* series (1994-present), to the latest pop hits like *Fortnight* by Taylor Swift (2024), in which the song's character muses about killing her husband and lover's wife. Indeed, even social media posts expressing support for defacing works of art and spraying graffiti could be promoting illegal activity.

53.     An even broader problem with the Act is that what qualifies for enforcement will often be open to debate, because the meaning conveyed by the speech at issue can depend on context, nuance, and the subjective understanding of users.

54.     Although content that is prohibited by the Act overlaps with the content that NetChoice's members address under their own voluntary content-moderation policies, that overlap does not justify the Act's restrictions. *First*, the Act is a *governmental* demand to monitor and censor speech, which violates both the websites and their users' constitutional rights in a way that voluntary private content moderation does not—and indeed cannot. *Second*, the Act is overinclusive because it sweeps in substantially more protected and valuable speech than do members' current policies. Nothing in the Act limits the Act's scope to unprotected speech. *Third*, the threat of

liability will inevitably chill the dissemination of an even broader range of speech. That is because websites have no way to know whether Defendant will conclude that a particular content-moderation policy complies with the Act's requirement for websites to "develop and implement a strategy to prevent or mitigate" exposure to certain content. § 6(1). That uncertainty about liability will push websites to adopt broader policies and more aggressive content-moderation enforcement strategies, all of which will chill dissemination of protected speech.

55.     The Act also contains a vague exception, which provides that "[n]othing in" the monitoring-and-censorship requirements "shall be construed to require a digital service provider to prevent or preclude":

> (a) Any minor from deliberately and independently searching for, or specifically requesting, content; or
>
> (b) The digital service provider or individuals on the digital service from providing resources for the prevention or mitigation of the harms described in subsection (1), including evidence-informed information and clinical resources.

§ 6(2). The Act does not explain how covered websites are supposed to prevent exposure to the State's list of prohibited categories of speech without also preventing minors from being able to "deliberately and independently search[] for" such content.

56.     **The Act's enforcement provisions (§§ 7, 8; Miss. Code §§ 75-24-19, 75-24-20).** The Act allows for large penalties, which will chill covered websites' dissemination of speech.

57.     The Act amends the Mississippi Code to provide that a violation of the Act is an unfair and deceptive trade practice. § 8 (amending Miss. Code § 75-24-5). A knowing and willful use of an unfair or deceptive trade practice (or a violation of an injunction for a previous unfair or deceptive trade practice) is subject to a civil penalty of up to $10,000 per violation. Miss. Code § 75-24-19(1). Moreover, a knowing and willful violation is also a criminal act, punishable through

increasing fines and imprisonment. *Id.* § 75-24-20. The Act also creates a private right of action that allows parents to seek declaratory or injunctive relief (but not monetary relief). § 7.

## CLAIMS

58.    Each of NetChoice's claims raises a traditional facial challenge, because "no set of circumstances exists under which" the challenged provisions of the Act "would be valid." *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 615 (2021) ("*AFP*") (citation omitted). Alternatively, each of NetChoice's First Amendment claims also raises a First Amendment overbreadth facial challenge, because "a substantial number of" the Act's challenged "applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Id.* (citation omitted).

59.    Each First Amendment challenge raises the rights of both NetChoice's members and those individuals who use or could prospectively use NetChoice members' websites.

## COUNT I
## 42 U.S.C. § 1983
## VIOLATION OF THE FIRST AMENDMENT, AS INCORPORATED AGAINST THE STATES BY THE FOURTEENTH AMENDMENT
## (CENTRAL COVERAGE DEFINITION – MISSISSIPPI HB1126 §§ 1-8)

60.    Plaintiff incorporates all prior paragraphs as though fully set forth herein.

61.    As incorporated against the States by the Fourteenth Amendment, the First Amendment's Free Speech and Free Press Clauses provide that governments "shall make no law . . . abridging the freedom of speech, or of the press." U.S. Const. amend. I. The First Amendment protects "publish[ing]," *Reno*, 521 U.S. at 853; "disseminat[ing]," *303 Creative*, 600 U.S. at 594; and "creating, distributing, [and] consuming" protected speech, *Brown*, 564 U.S. at 792 n.1. And those rights protect all manner of private entities. *Lovell v. City of Griffin*, 303 U.S. 444, 452 (1938).

62.    The Act's restrictions and burdens on speech fail any form of First Amendment scrutiny because the Act's central coverage definition is unconstitutionally content- and speaker-

based. The "Government's content-based burdens must satisfy the same rigorous scrutiny as its content-based bans." *Sorrell v. IMS Health, Inc.*, 564 U.S. 552, 566 (2011) (citation omitted). The State cannot articulate a sufficient governmental interest supporting the Act, and—even if it could—the Act is not properly tailored to satisfy any form of heightened First Amendment scrutiny.

63.     **The entire Act triggers strict scrutiny.** The Act triggers strict scrutiny because its provisions defining which "digital service provider[s]" are covered, §§ 2(a)-(b), 3, are content- and speaker-based.

64.     The First Amendment's "most basic" principle is that "government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Brown*, 564 U.S. at 790-91 (citation omitted). A law "is facially content based . . . if it applies to particular speech because of the topic discussed or the idea or message expressed." *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 69 (2022) (citation omitted). Government cannot use "subtler forms of discrimination that achieve identical results based on function or purpose." *Id.* at 74. "Content-based laws . . . are presumptively unconstitutional." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015).

65.     The Act's central coverage definition is content-based because it draws lines based on the subject of the speech available on a particular website. For instance, the Act both includes websites based on whether they allow users to interact "socially," § 3(1)(a), and excludes websites that "[p]rimarily function to provide a user with access to news, sports, commerce, online video games," § 3(2)(c)(i), and "career development opportunities," § 3(2)(d). Thus, both the Act's general definition of what is covered and each of its exclusions are based on the subject matter presented on a particular website. "That is about as content-based as it gets." *Barr v. Am. Ass'n of Pol.*

*Consultants, Inc.*, 140 S. Ct. 2335, 2346 (2020) (controlling plurality op.) (content-based exceptions trigger strict scrutiny).

66.     The Act's central coverage definition is speaker-based because it discriminates based on who is disseminating speech. "[L]aws that single out the press, or certain elements thereof, for special treatment pose a particular danger of abuse by the State, and so are always subject to at least some degree of heightened First Amendment scrutiny." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 640-41 (1994) (cleaned up). The First Amendment limits state power to enforce "restrictions distinguishing among different speakers, allowing speech by some but not others." *Citizens United v. FEC*, 558 U.S. 310, 340 (2010).

67.     The Act's central coverage definition is also speaker-based because it singles out for favorable treatment websites that include "content primarily generated or selected by the digital service provider" while burdening otherwise similar websites that disseminate user-generated content, § 3(2)(c)(i), even if those websites also post or create their own content (as many covered websites do). It likewise favors websites that "provide a user with access to news, sports, commerce, online video games," § 3(2)(c)(i), and "career development opportunities," § 3(2)(d).

68.     The Act is also speaker-based because it burdens minors more than adults.

69.     Because the Act's central coverage definition is both content- and speaker-based, so too is the entire Act, as well as each individual provision of the Act.

70.     The entire Act, as well as each individual provision of the Act that restricts or burdens protected speech, therefore triggers and fails strict scrutiny.[7]

---

[7] Section 5 of the Act relies on the same content- and speaker-based definition and fails strict scrutiny for the same reasons discussed *infra*.

71.   **The entire Act fails strict scrutiny.** Strict scrutiny requires a State to use "the least restrictive means of achieving a compelling state interest." *AFP*, 594 U.S. at 607 (citation omitted).

72.   The State lacks a compelling government interest supporting the Act.

73.   Although "a State possesses legitimate power to protect children from harm," "that does not include a free-floating power to restrict the ideas to which children may be exposed." *Brown*, 564 U.S. at 794.

74.   Under the First Amendment, Defendant has the burden to "specifically identify" how the Act addresses an "actual problem in need of solving." *Id.* at 799 (citation omitted). Strict scrutiny demands that "the curtailment of free speech must be actually necessary to the solution." *Id.* Here, Defendant must demonstrate that there is a problem in need of a *governmental* solution, as compared to private or familial solutions. Defendant also must show that any such governmental solution is the governmental solution that has the least restrictive effect on speech possible. Defendant cannot carry either burden. Parents have a wealth of resources to help oversee their minor children online, and those resources provide families more flexibility than the State's one-size-fits-all mandate. The Supreme Court has repeatedly endorsed similar parental controls over governmental intervention. *See, e.g.*, *Ashcroft*, 542 U.S. at 666-67; *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 826 (2000).

75.   The State cannot "specifically identify" how the Act's content- and speaker-based scope responds to "an actual problem in need of solving." *Brown*, 564 U.S. at 799 (cleaned up). Nor can it demonstrate why the Legislature ignored the viable alternatives available to parents.

76.   The Act is neither properly tailored nor narrowly tailored to any articulated interest. It "is either underinclusive or overinclusive, or both, for all the purported government interests at stake." *Yost*, 2024 WL 555904, at *13.

77.    The Act is overinclusive because it sweeps in all kinds of websites, without tailoring sufficient to match whatever governmental interests Defendant may assert.

78.    The Act is also overinclusive because it regulates all manner of protected speech, including political and religious speech that lies at the very heart of the First Amendment.

79.    The Act's one-size-fits-all approach is overbroad because it treats all minors alike, from websites' youngest users to seventeen-year-olds, regardless of differences in those minors' developmental stage. *See Reno*, 521 U.S. at 865-66; *Am. Booksellers Ass'n*, 484 U.S. at 396.

80.    The Act is also underinclusive because it contains myriad exemptions, some of which result in allowing access to the exact same speech on a different website. For example, a 15-year-old can read a news article on the New York Times' website (or even on LinkedIn) but cannot read that same article on Facebook without parental consent. A 16-year-old athlete can watch sports videos on ESPN but cannot share self-edited football recruiting highlight videos on Instagram without parental consent. And a 17-year-old can listen to a Beyoncé song on Spotify but cannot listen to that same song on YouTube without parental consent (or possibly not at all depending on the content of the lyrics). These exemptions undermine any contention that the State is addressing a serious issue. *See Brown*, 564 U.S. at 802; *Griffin*, 2023 WL 5660155, at *19.

81.    The Act's central coverage definition is integral to the entire Act. §§ 1-8. Without this central definition, no other provision in the Act could operate, and thus the entire Act requires invalidation.

82.    Unless declared invalid and enjoined, the Act, §§ 1-8, will unlawfully deprive Plaintiff's members and Internet users of their fundamental First Amendment rights and will irreparably harm Plaintiff, its members, and Internet users.

**COUNT II**
**42 U.S.C. § 1983**
**VOID FOR VAGUENESS UNDER THE FIRST AND FOURTEENTH AMENDMENTS**
**(CENTRAL COVERAGE DEFINITION – MISSISSIPPI HB1126 §§ 1-8)**

83.     Plaintiff incorporates all prior paragraphs as though fully set forth herein.

84.     The Act's central coverage definition of "digital service provider," §§ 2(a)-(b), 3, is unconstitutionally vague, and it violates principles of free speech and due process.

85.     "A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *FCC v. Fox TV Stations, Inc.*, 567 U.S. 239, 253 (2012). And a law is unconstitutionally vague if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008). The constitutional standard for vagueness is heightened for speech restrictions under the First Amendment: "When speech is involved, rigorous adherence to" requirements of clarity in regulation "is necessary to ensure that ambiguity does not chill protected speech." *Fox*, 567 U.S. at 253-54.

86.     The Act's central coverage definition fails to provide this necessary notice. The Act does not define what it means for a website to "allow[] users to socially interact." § 3(1)(a). It is difficult or impossible to banish only the "social[]" aspects of human interaction, or to know where the line is between "social" and, say, "business" or "professional" interaction. Almost by definition, any medium that allows interaction of any kind necessarily allows social interaction, too. Thus, almost all websites that enable any kind of interaction among users could plausibly be covered by the Act if they meet the Act's other coverage requirements.

87.     Nor does the Act explain what it means to exclude websites that "[p]rimarily function[]" to provide users with "access to" certain categories of speech such as "news, sports,

commerce, [and] online video games." § 3(2)(c)(i). Some websites allow people to use the services for multiple reasons, or for different purposes at different times. For example, some people may "[p]rimarily" use a covered website for exempted "gam[ing]" purposes, while others may use the website for "post[ing]" or "interact[ive]" purposes. § 3(1)(a), (c), (2)(c)(i). The primary function of websites can thus vary from user to user, and covered websites have no realistic way to know how the website functions for each user.

88.     Moreover, the Act excludes certain websites that provide "chat, comment, or other interactive functionality that is incidental to" certain "digital service[s]." § 3(2)(c)(ii). Just like "primarily function," "incidental to" is also vague, and the Act provides no guidance as to its meaning.

89.     Many websites will have no way of knowing what these "term[s]" mean, even though they are "critical to determining which entities fall within [the Act]'s scope." *Griffin*, 2023 WL 5660155, at *13. Therefore, the Act "leav[es] companies to choose between risking unpredictable and arbitrary enforcement . . . and trying to implement the Act's costly . . . requirements. Such ambiguity renders a law unconstitutional." *Id.*; *see Fox*, 567 U.S. at 253.

90.     Because of this vagueness, the Act's central coverage definition violates the First Amendment and the Due Process Clause of the Fourteenth Amendment.

91.     The Act's central coverage definition is integral to the entire Act. §§ 1-8. Without this central definition, no other provision in the Act could operate, and thus the entire Act requires invalidation.

92.     Unless declared invalid and enjoined, the Act, §§ 1-8, will unlawfully deprive Plaintiff's members and Internet users of their First Amendment and Due Process rights and will irreparably harm Plaintiff, its members, and Internet users.

## COUNT III
## 42 U.S.C. § 1983
## VIOLATION OF THE FIRST AMENDMENT, AS INCORPORATED AGAINST THE STATES BY THE FOURTEENTH AMENDMENT
## (AGE VERIFICATION – MISSISSIPPI HB1126 § 4(1))

93.     Plaintiff incorporates all prior paragraphs as though fully set forth herein.

94.     The Act's age-verification requirement, § 4(1), is unconstitutional and cannot satisfy any form of First Amendment scrutiny.

95.     Governments cannot require people to provide identification or personal information to access protected speech. *See, e.g.*, *Ashcroft*, 542 U.S. at 667; *Reno*, 521 U.S. at 874 (similar).

96.     These principles apply equally to minors, as requiring age-verification to access websites "obviously burdens minors' First Amendment Rights." *Griffin*, 2023 WL 5660155, at *17.

97.     "Requiring adult users to produce state-approved documentation to prove their age and/or submit to biometric age-verification testing imposes significant burdens on adult access to constitutionally protected speech and 'discourages users from accessing the regulated sites.'" *Id.* (cleaned up; quoting *Reno*, 521 U.S. at 856). So too for minors. *Id.* Those who are not deterred must "forgo the anonymity otherwise available on the internet" as the state-imposed price of admission. *Id.* (quoting *Am. Booksellers Found. v. Dean*, 342 F.3d 96, 99 (2d Cir. 2003)); *see ACLU v. Mukasey*, 534 F.3d 181, 197 (3d Cir. 2008) (laws cannot force individuals "to relinquish their anonymity to access protected speech").

98.     The age-verification provision triggers strict scrutiny because it relies on the Act's central coverage definition.

99.     The age-verification provision independently triggers strict scrutiny.

100.    The State cannot demonstrate what purported problem this provision responds to, how the provision is necessary to solve the problem, or why the existing and plentiful choices of private tools available to parents are insufficient to address any purported problem.

101.    The age-verification requirement is also not properly tailored.

102.    The Act's age-verification requirement is integral to the entire Act. §§ 1-8. Without this provision, no other provision in the Act could operate. The age-verification provision is not severable and thus the entire Act is invalid.

103.    Unless declared invalid and enjoined, the Act's age-verification provision, § 4(1), will unlawfully deprive Plaintiff's members and Internet users of their fundamental First Amendment rights and will irreparably harm Plaintiff, its members, and Internet users.

## COUNT IV
### 42 U.S.C. § 1983
### VIOLATION OF THE FIRST AMENDMENT, AS INCORPORATED AGAINST THE STATES BY THE FOURTEENTH AMENDMENT
### (PARENTAL CONSENT – MISSISSIPPI HB1126 § 4(2))

104.    Plaintiff incorporates all prior paragraphs as though fully set forth herein.

105.    The Act's parental-consent requirement, § 4(2), is unconstitutional and cannot satisfy any form of First Amendment scrutiny.

106.    Minors have robust First Amendment rights, and websites that publish and disseminate speech have the right to publish and disseminate speech to minors absent governmental restraint. Although States have power to protect minors, that power "does not include a free-floating power to restrict the ideas to which children may be exposed." *Brown*, 564 U.S. at 794.

107.    The Act requires covered websites and users to secure parental consent before allowing users to create or maintain an account and, therefore, before users can access protected speech. § 4(2). But governments cannot require minors to secure parental consent as a precondition to accessing and engaging in protected speech. *See Brown*, 564 U.S. at 795 n.3.

26

108.   Minors' protections should apply with special force to the covered websites here, which disseminate and facilitate a broad range of valuable speech. That, in part, is why courts have held that parental-consent requirements for minors to use "social media" websites violate the First Amendment. *Yost*, 2024 WL 555904, at \*12; *Griffin*, 2023 WL 5660155, at \*18.

109.   The parental-consent provision triggers strict scrutiny because it relies on the Act's central coverage definition.

110.   The parental-consent provision independently triggers strict scrutiny. *Yost*, 2024 WL 555904, at \*12.

111.   The State cannot demonstrate what purported problem this provision responds to, how the provision is necessary to solve the problem, or why the existing and plentiful choices of private tools available to parents are insufficient to address any purported problem.

112.   The parental-consent requirement is also not properly tailored.

113.   As just one example, the Act is underinclusive because, if the government is concerned about minors accessing covered websites due to particular purported risks or harms of doing so, it makes no sense to allow minors to be exposed to such harms so long as they have parental consent. *See Brown*, 564 U.S. at 802; *Yost*, 2024 WL 555904, at \*12; *Griffin*, 2023 WL 5660155, at \*18.

114.   Unless declared invalid and enjoined, the Act's parental-consent requirement, § 4(2), will unlawfully deprive Plaintiff's members and Internet users of their fundamental First Amendment rights and will irreparably harm Plaintiff, its members, and Internet users.

**COUNT V**
**42 U.S.C. § 1983**
**VIOLATION OF THE FIRST AMENDMENT, AS INCORPORATED AGAINST THE**
**STATES BY THE FOURTEENTH AMENDMENT**
**(MONITORING AND CENSORSHIP – MISSISSIPPI HB1126 § 6)**

115.   Plaintiff incorporates all prior paragraphs as though fully set forth herein.

27

116.    The Act's monitoring-and-censorship requirements, § 6, are prohibited by the First Amendment.

117.    The Act's monitoring-and-censorship requirements are an unconstitutional prior restraint. "[P]rior restraints on speech and publication are the most serious and the least tolerable infringement on First Amendment rights." *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976); *see Freedman v. Maryland*, 380 U.S. 51, 57 (1965); *Bantam Books v. Sullivan*, 372 U.S. 58, 70 (1963). They are subject to "the most exacting scrutiny." *Smith v. Daily Mail Publ'g. Co.*, 443 U.S. 97, 102 (1979). The Act's monitoring-and-censorship requirements are a prior restraint on the ability of covered websites *and* their users to publish, engage in, and disseminate speech.

118.    Furthermore, the Supreme Court has warned that requiring private entities to constantly screen and monitor the speech they disseminate causes chilling effects on such protected speech—even when the regulation ostensibly targets only unprotected speech. *Smith v. California*, 361 U.S. 147, 152-53 (1959).

119.    For these reasons, "any system of prior restraints of expression . . .bear[s] a heavy presumption against its constitutional validity." *Bantam Books*, 372 U.S. at 70. The State cannot overcome that presumption here.

120.    The Act's monitoring-and-censorship requirements trigger strict scrutiny because they rely on the Act's central coverage definition.

121.    The Act's monitoring-and-censorship requirements independently trigger strict scrutiny because they discriminate based on overbroad content- and viewpoint-based categories.

122.    *First*, the Act restricts certain content-based categories of prohibited speech "based on its communicative content." *Reed*, 576 U.S. at 163 (collecting cases).

123.    *Second*, the Act targets particular viewpoints based on the State's "subjective judgment that the content of protected speech is offensive or inappropriate." *Robinson v. Hunt Cnty.*, 921 F.3d 440, 447 (5th Cir. 2019) (citing *Matal v. Tam*, 582 U.S. 218, 243-44 (2017)). The Act regulates speech that "*promotes*" or "*facilitates*" particular categories of expression. § 6(1) (emphasis added). Thus, for example, the Act regulates speech that "promotes" "substance abuse," such as a song expressing the view that binge drinking is good. § 6. Likewise, under the Act, speech seeking to promote the legalization of cannabis in Mississippi (the "use of illegal drugs," § 6(1)(b)) would have to be censored but content advocating for keeping it illegal is allowed.

124.    "[I]t is all but dispositive" that such a law is unconstitutional if the "law is content based and, in practice, viewpoint discriminatory." *Sorrell*, 564 U.S. at 571. As the Supreme Court recently reiterated: "At the heart of the First Amendment's Free Speech Clause is the recognition that viewpoint discrimination is uniquely harmful to a free and democratic society." *Nat'l Rifle Ass'n v. Vullo*, 2024 WL 2751216, at *6 (U.S. May 30, 2024).

125.    *Third*, the Act's restrictions are overbroad because they go beyond regulating unprotected speech, which will result in chilling a broad amount of protected speech. The "government [cannot] proscribe unprotected content through a regulation that simultaneously encompasses a substantial amount of protected content." *Seals v. McBee*, 898 F.3d 587, 596 (5th Cir. 2018).

126.    The Act applies to a significant amount of protected and valuable speech, such as well-known works of art and literature. But First Amendment protection does not end there. Rather, the First Amendment protects all manner of speech, including even speech that promotes social ills and illegal activities. *E.g.*, *Hess v. Indiana*, 414 U.S. 105, 108 (1973); *Cohen v. California*, 403 U.S. 15, 16 n.1 (1971).

127.    Even the Act's prohibition of "harmful material," or obscenity as to minors, is over-broad because it does not differentiate between speech that may be obscene to 17-year-olds and speech that may be obscene to younger minors. Such a comparison is required for any obscenity-for-minors regulation to pass constitutional muster. *E.g.*, *Am. Booksellers*, 484 U.S. at 396; *Reno*, 521 U.S. at 866; *Bonta*, 2023 WL 6135551, at \*15.

128.    To avoid enforcement and penalties, many covered websites seeking to comply with the Act will be forced to censor practically most, if not all, content that even comes close to the categories of speech regulated by the Act.

129.    Moreover, the Act's one-size-fits all approach will lead to websites defaulting to monitoring-and-censorship policies and procedures that allow content fit only for the youngest and most sensitive users. *See Bonta*, 2023 WL 6135551, at \*13. This will harm adults too, not just minors. Many websites do not have the ability to "age-gate" content, which means that, to implement such requirements, they would have to limit speech for all users—adults included.

130.    Faced with that possibility, many websites may choose to block minors' access altogether, which would further injure those minors and prevent them from engaging in or accessing protected speech. *Id.*

131.    For these reasons, the Act's monitoring-and-censorship requirements reach "a substantial amount of constitutionally protected" speech, rendering them "substantially overbroad" and "facially invalid." *City of Houston v. Hill*, 482 U.S. 451, 458 (1987).

132.    The Act's monitoring-and-censorship requirements fail strict scrutiny. The Act itself and the Act's monitoring-and-censorship requirements also fail any other form of First Amendment heightened scrutiny, such as exacting or intermediate scrutiny.

133.    The State lacks a compelling (or otherwise overriding) interest in regulating pro-

tected speech. Specifically, the State lacks any legally cognizable interest in "protect[ing] the

young from ideas or images that a legislative body thinks unsuitable for them." *Erznoznik*, 422

U.S. at 213-14. "[D]isgust is not a valid basis for restricting expression" of protected speech.

*Brown*, 564 U.S. at 798. And even when regulating unprotected speech, the State may not pick and

choose specific viewpoints to disfavor. *R.A.V. v. City of St. Paul*, 505 U.S. 377, 383-84 (1992).

Regardless, the Legislature did not include any findings or purposes in the Act to justify these

burdensome requirements.

134.    The monitoring-and-censorship requirements are not narrowly tailored. Rather,

they are both over- and underinclusive in numerous ways, as shown by the non-exhaustive reasons

discussed below.

135.    *First*, the State has less restrictive alternative means to combat the social ills it seeks

to regulate indirectly through these requirements, such as state criminal laws. "The normal method

of deterring unlawful conduct is to impose an appropriate punishment on the person who engages

in it." *Bartnicki v. Vopper*, 532 U.S. 514, 529 (2001). For example, Mississippi already penalizes,

or otherwise regulates, the harmful conduct related to the speech that the Act seeks to censor:

- "A person who wilfully, or in any manner, advises, encourages, abets, or assists another
  person to take, or in taking, the latter's life, or in attempting to take the latter's life, is
  guilty of [a] felony." Miss. Code § 97-3-49; *see also id.* § 37-3-101 (requiring suicide-
  prevention policies in local school districts).

- "[I]t is unlawful for any person knowingly or intentionally . . . [t]o sell, barter, transfer,
  manufacture, distribute, dispense or possess with intent to sell, barter, transfer, manu-
  facture, distribute or dispense, a controlled substance." *Id.* § 41-29-139(a); *see also id.*
  § 41-29-139(d)(3) (prohibiting providing drug paraphernalia to a minor); *id.* § 41-29-
  323 (establishing substance abuse programs).

- "It is unlawful for a person" to "commit[] the offense of cyberstalking," which includes
  "[e]lectronically mail[ing] or electronically communicat[ing] to another repeatedly,
  whether or not conversation ensues, for the purpose of threatening, terrifying or har-
  assing any person." *Id.* § 97-45-15; *see also id.* § 97-3-107 (prohibiting stalking).

- Mississippi law also criminalizes various harms to minors, *see, e.g.*, *id.* § 97-5-27 (prohibiting disseminating sexually oriented material to minors and "computer luring" of a minor); *id.* § 97-5-33 (prohibiting any visual depiction of a child engaging in sexual conduct); criminalizes other forms of exploitation and violence, *see, e.g.*, *id.* § 97-3-2 (prohibiting certain "crimes of violence"); *id.* § 97-3-54.1 (prohibiting human trafficking); and criminalizes distribution of obscene materials, *id.* § 97-29-101.

136.    Furthermore, Mississippi law already imposes criminal liability for aiding or abetting crimes, *e.g.*, *Bryant v. State*, 319 So. 3d 1208, 1211 (Miss. Ct. App. 2021), including actions taken "with the purpose of promoting or facilitating the commission" of a crime, *Hollins v. State*, 799 So. 2d 118, 123 (Miss. Ct. App. 2001).

137.    In addition, parents have many different means of overseeing their children's Internet use.

138.    *Second*, the monitoring-and-censorship requirements are underinclusive. Minors still have access to harmful speech on the Internet that the Act does not cover—not only on websites that do not offer interactive functionality at all, but also on interactive websites that fall within the Act's exceptions for "sports, commerce, online video games or content primarily generated or selected by the digital service provider." § 3(2)(c)(1). The same is true of potentially harmful speech that minors may encounter in other mediums beyond the Internet, such as books or television. And the Act is also underinclusive because it *may* allow minors to be exposed to potentially objectionable or harmful content if they "deliberately and independently search[] for" or "specifically request[] it." § 6(2)(a). That provision indicates that Mississippi does not object to minors accessing the censored categories of speech so long as they just ask for them. But "a law cannot be regarded as protecting an interest of the highest order . . . when it leaves appreciable damage to that supposedly vital interest unprohibited." *Reed*, 576 U.S. at 172 (cleaned up).

139.    *Third*, the monitoring-and-censorship requirements are overinclusive because they do not distinguish between requirements for websites' youngest users and their 17-year-old users.

140.     Unless declared invalid and enjoined, the Act's monitoring-and-censorship require-ments, § 6, will unlawfully deprive Plaintiff's members and Internet users of their fundamental First Amendment rights and will irreparably harm Plaintiff, its members, and Internet users.

**COUNT VI**
**42 U.S.C. § 1983**
**VOID FOR VAGUENESS UNDER THE FIRST AND FOURTEENTH AMENDMENTS**
**(MONITORING AND CENSORSHIP – MISSISSIPPI HB1126 § 6)**

141.     Plaintiff incorporates all prior paragraphs as though fully set forth herein.

142.     The Act's monitoring-and-censorship requirements, § 6, are unconstitutionally vague, and that vagueness will chill the publication of protected speech.

143.     *First*, the Act's mandate to prevent minors' "exposure to" content, and its excep-tions for minors seeking out content, make websites' compliance obligations unclear. The Act states that covered websites must "prevent or mitigate the known minor's exposure to" prohibited content. § 6(1). Yet it also allows minors to "deliberately and independently search[] for, or spe-cifically request[] content." *Id.* § 6(2)(a). It is not clear how covered websites are supposed to comply with the former without restricting the latter. This vague requirement will chill protected speech.

144.     *Second*, the Act does not define key terms, including what it means for speech to "promote[]" or "facilitate[]" particular harms. § 6(1); *Baggett v. Bullitt*, 377 U.S. 360, 371-72 (1964) (law regulating speech unconstitutional for vagueness because it hinged on "promote").

145.     Nor does the Act define categories of prohibited content, including "eating disor-ders," "substance abuse," "bullying," "harassment," "grooming," and "other illegal activity." § 6(1)(a)-(f). Without definitions, websites will not know what content they should censor and monitor, and they will likely err on the side of over-censoring, thus chilling protected speech.

146.     *Third*, the categories of prohibited speech are too subjective to provide websites with notice of what speech they are required to monitor and censor. For instance, what "promotes" or "facilitates" substance abuse or bullying is a highly subjective question on which people of reasonable minds will differ. This vagueness will give the State too much discretion and will lead to arbitrary and discriminatory enforcement. *Williams*, 553 U.S. at 304. And websites will likely err on the side of caution, censoring more protected speech.

147.     Unless declared invalid and enjoined, the Act's monitoring-and-censorship requirements, § 6, will unlawfully deprive Plaintiff's members and Internet users of their fundamental First Amendment rights and will irreparably harm Plaintiff, its members, and Internet users.

**COUNT VII**
**42 U.S.C. § 1983**
**FEDERAL STATUTORY PREEMPTION UNDER 47 U.S.C. § 230,**
**42 U.S.C. § 1983, AND *EX PARTE YOUNG* EQUITABLE CAUSE OF ACTION**
**(MONITORING AND CENSORSHIP – MISSISSIPPI HB1126 § 6)**

148.     Plaintiff incorporates all prior paragraphs as though fully set forth herein.

149.     Plaintiff may assert federal preemption under 42 U.S.C. § 1983 and *Ex parte Young*, 209 U.S. 123 (1908).

150.     Federal law in 47 U.S.C. § 230 preempts the Act's monitoring-and-censorship requirements, § 6, and any resulting liability under the Act.

151.     Covered websites are "interactive computer services," 47 U.S.C. § 230(f)(2), that disseminate "information provided by another information content provider," *id.* § 230(c)(1).

152.     Congress enacted Section 230 to provide all websites with protections from liability for the user-generated speech on their websites: "No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." *Id.* Section 230 also protects websites from limits on their ability to remove or restrict user-submitted content. *Id.* § 230(c)(2). To eliminate any doubt, Section 230

expressly preempts state laws to the contrary. *Id.* § 230(e)(3). "An important purpose of § 230 was to encourage service providers to self-regulate the dissemination of offensive material over their services. Preserving [Section 230] immunity, even when a service user or provider retains the power to delete offensive communications, ensures that such entities are not punished for regulating themselves." *Batzel v. Smith*, 333 F.3d 1018, 1040 n.6 (9th Cir. 2003) (Gould, J., concurring in part and dissenting in part).

153.    Section 230 protects websites' "decisions *relating to the monitoring, screening, and deletion of content* from its network." *Doe v. MySpace, Inc.*, 528 F.3d 413, 420 (5th Cir. 2008) (emphasis added) (quoting *Green v. Am. Online*, 318 F.3d 465, 471 (3d Cir. 2003)); *see Free Speech Coal., Inc. v. Paxton*, 95 F.4th 263, 284-85 (5th Cir. 2024) (Section 230 protects websites "from liability stemming from attempts to 'restrict' unwanted material"), *petition for cert. filed* Apr. 12, 2024 (No. 23-1122); *La'Tiejira v. Facebook, Inc.*, 272 F. Supp. 3d 981, 993-94 (S.D. Tex. 2017) (similar).

154.    Section 230 protects websites from liability for content that they do not moderate or remove. "[T]hat is the point of Section 230: to immunize web service providers for harm caused by unremoved speech on their website." *Free Speech Coal.*, 95 F.4th at 285. Therefore, Section 230 protects websites from "all claims stemming from their *publication of information created by third parties.*" *Id.* at 286 (cleaned up).

155.    The Act's monitoring-and-censorship requirements are "inconsistent" with Section 230(c)(1) because they would permit lawsuits and impose liability on covered websites for failing to monitor, screen, filter, or otherwise censor third-party content. 47 U.S.C. § 230(e)(3). Moreover, to the extent Defendant pursues enforcement based on websites publishing speech prohibited by the Act that is generated by users, that enforcement would unlawfully "treat[]" websites "as the

publisher or speaker of [] information provided by another information content provider." *Id.*
§ 230(c)(1).

156.    Unless declared preempted, the Act's monitoring-and-censorship requirements, § 6,
will irreparably harm Plaintiff, its members, and Internet users.

## COUNT VIII
## EQUITABLE RELIEF

157.    Plaintiff incorporates all prior paragraphs as though fully set forth herein.

158.    The Act as a whole (§§ 1-8) and the individual challenged provisions of the Act
violate federal law and deprive Plaintiff, its members, and its members' users of enforceable fed-
eral rights. Federal courts have the power to enjoin unlawful actions by state officials. *Armstrong
v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326 (2015).

159.    This Court can and should exercise its equitable power to enter an injunction pro-
hibiting Defendant from enforcing the Act and all the challenged provisions of the Act.

## COUNT IX
## 42 U.S.C. § 1983 AND 28 U.S.C. § 2201
## DECLARATORY RELIEF

160.    Plaintiff incorporates all prior paragraphs as though fully set forth herein.

161.    The Act, §§ 1-8, violates the First Amendment and the Due Process Clause of the
Fourteenth Amendment to the Constitution and thereby deprives Plaintiff, its covered members,
and Internet users of enforceable rights. The Act is unlawful and unenforceable because the entire
Act relies on an unconstitutional central coverage definition of covered "digital service pro-
vider[s]." § 3(1).

162.    Sections 3, 4, and 6 of the Act are unlawful and unenforceable, together and sepa-
rately, because they violate the First Amendment to the Constitution and thereby deprive Plaintiff,
its covered members, and Internet users of enforceable rights.

163.    Sections 3 and 6 of the Act are unlawful and unenforceable because they are unconstitutionally vague in violation of the First Amendment and the Due Process Clause of the Fourteenth Amendment to the Constitution and thereby deprive Plaintiff, its covered members, and Internet users of enforceable rights.

164.    Section 6 of the Act is unlawful and unenforceable because it is preempted by federal law.

165.    The unlawful portions of the Act are not severable from the rest of the Act. The entire Act, §§ 1-8, is therefore unlawful and unenforceable.

166.    With exceptions not relevant here, in any "case of actual controversy within [their] jurisdiction," federal courts have the power to "declare the rights and other legal relations of any interested party seeking such declaration." 28 U.S.C. § 2201(a).

167.    This Court can and should exercise its equitable power to enter a declaration that the entire Act is unconstitutional and otherwise unlawful.

168.    This Court can and should exercise its equitable power to enter a declaration that each of the Act's challenged provisions is unconstitutional and otherwise unlawful.

## PRAYER FOR RELIEF

Plaintiff requests an order and judgment:

a.  declaring that Mississippi House Bill 1126 §§ 1-8 are unlawful;

b.  declaring that Mississippi House Bill 1126 §§ 1-8 violate the First Amendment to the Constitution, as incorporated against the States by the Fourteenth Amendment;

c.  declaring that Mississippi House Bill 1126 §§ 1-8 are void for vagueness under the First Amendment, as incorporated against the States by the Fourteenth Amendment, and the Due Process Clause of the Fourteenth Amendment to the Constitution;

d.  declaring that Mississippi House Bill 1126 §§ 3, 4, and 6 violate the First Amendment to the Constitution, as incorporated against the States by the Fourteenth Amendment;

e.  declaring that Mississippi House Bill 1126 §§ 3 and 6 are void for vagueness in violation of the First Amendment, as incorporated against the States by the Fourteenth

Amendment, and the Due Process Clause of the Fourteenth Amendment to the Constitution.

f.  declaring that Mississippi House Bill 1126 § 6 is preempted by federal law;

g.  enjoining Defendant and her agents, employees, and all persons acting under her direction or control from taking any action to enforce the Act or the challenged portions of the Act;

h.  entering judgment in favor of Plaintiff;

i.  awarding Plaintiff its attorneys' fees and costs incurred in bringing this action, including attorneys' fees and costs under 42 U.S.C. § 1988(b) for successful 42 U.S.C. § 1983 claims against state officials; and

j.  awarding Plaintiff all other such relief as the Court deems proper and just.

Dated: June 7, 2024                     Respectfully submitted,

*s/ J. William Manuel*
J. William Manuel (MBN 9891)
Stephen L. Thomas (MBN 8309)
BRADLEY ARANT BOULT CUMMINGS LLP
One Jackson Place
188 E. Capitol Street, Suite 1000
Jackson, MS 39201
Telephone: (601) 948-8000
Facsimile: (601) 948-3000
wmanuel@bradley.com
sthomas@bradley.com

*Attorneys for Plaintiff NetChoice, LLC*