# Exhibit 2 –
Declaration of Carl Szabo

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION**

| | |
|---|---|
| NETCHOICE, LLC, <br><br> *Plaintiff,* <br><br> v. <br><br> LYNN FITCH, in her official capacity as Attorney General of Mississippi, <br><br> *Defendant.* | Civil Action No. _____ |

**DECLARATION OF CARL SZABO IN SUPPORT OF
PLAINTIFF NETCHOICE'S MOTION FOR PRELIMINARY INJUNCTION
<u>AND TEMPORARY RESTRAINING ORDER</u>**

I, Carl Szabo, declare as follows:

1.      I am the Vice President and General Counsel of Plaintiff NetChoice, LLC ("NetChoice"). In addition to providing legal counsel to NetChoice, I coordinate NetChoice's advocacy before legislative bodies, courts, and government agencies to promote NetChoice's mission of advancing free enterprise and free expression on the Internet. My role at NetChoice has made me broadly familiar with member companies' business practices, the benefits they provide the public, and their efforts to keep minors safe online. My role has also made me familiar with other websites, applications, and digital services more broadly.[1]

2.      I submit this declaration in support of Plaintiff's Motion for Preliminary Injunction and Temporary Restraining Order. I am over the age of 18 and am competent to make the statements herein. I have personal knowledge of the facts set forth in this declaration and, if called and sworn as a witness, could and would competently testify to them.

## I.      About NetChoice.

3.      NetChoice is a national trade association of online businesses that share the goal of promoting free speech and free enterprise on the Internet. NetChoice is a 501(c)(6) nonprofit organization. As our website explains, NetChoice "works to make the Internet safe for free enterprise and free expression" and engages at the local, state, national, and international levels to ensure a bright digital future.[2] In particular, we are dedicated to preserving the Internet as a vibrant marketplace for communication, commerce, and the exchange of ideas.

---

[1] This Declaration will refer to all digital services covered by the Act as "covered websites," unless necessary to distinguish among different kinds of digital services. Similarly, this Declaration will use "members" to refer to NetChoice members with services regulated by the Act, unless otherwise noted.

[2] NetChoice, Home, https://perma.cc/7TK7-RSKH.

4. For over two decades, NetChoice has worked to promote online speech and commerce and to increase consumer access and options through the Internet, while minimizing burdens on businesses to help make the Internet more accessible and useful for both businesses and consumers. Our members include a broad array of popular online services, including: Airbnb, Alibaba.com, Amazon.com, AOL, Dreamwidth, eBay, Etsy, Expedia, Fluid Truck, Google, HomeAway, Hotels.com, Lime, Lyft, Meta, Netflix, Nextdoor, Oath, OfferUp, Orbitz, PayPal, Pindrop, Pinterest, PrizePicks, Snap Inc., StubHub, Swimply, TravelTech, Travelocity, Trivago, Turo, VRBO, VSBLTY, Waymo, Wing, X (formerly known as Twitter), and Yahoo!.[3] Many of these members operate websites that are among the Internet's most popular destinations, disseminating billions of user-generated posts. Other members' websites serve comparatively smaller communities.

5. NetChoice has over two decades of experience advocating for online businesses and for the principles of free speech and free enterprise on the Internet. That experience, combined with the practical applications of the law and declarations submitted by our members, leads us to conclude that Mississippi House Bill 1126 ("the Act"), were it to take effect, would irreparably harm our members and those who interact with members' websites.

## II. NetChoice members' websites are full of valuable expression and communities that provide people—minors and adults alike—with profound benefits.

6. NetChoice members' websites are full of a wide range of valuable expression and communities. Whether it is to practice their religious beliefs, engage in political discourse, seek cross-cultural dialogue, supplement their education, or learn new skills, people across the nation and world (minors and adults alike) use these websites every day to explore protected speech. They do so in a wide variety of ways—socially (to connect with friends from school and church, form

---

[3] NetChoice, About Us, https://perma.cc/3LLE-2M9J.

groups, or find communities of those with likeminded interests), demonstratively (to showcase their creative, artistic, or athletic talents), informatively (to keep up with the news or current events), politically (to participate in public discussion or raise awareness about social causes), educationally (to get help with math problems, learn about financial literacy, or listen to college course lectures), and myriad other ways.

7.    In general, members' websites publish, disseminate, create, curate, or distribute protected speech, or all of the above. They do this by displaying text, audio, graphics, or video to users. Members' websites (like other Internet websites) disseminate different expressive content in different ways to serve different user bases. As stated in their public policies, some of the content on the websites is generated by the websites themselves. *See, e.g.*, YouTube Help, How YouTube Evaluates    Educational,    Documentary,    Scientific,    and    Artistic    (EDSA)    Content, https://perma.cc/R8EB-QQL5 (YouTube may append "warning[s]" to certain content). Likewise, some of the content is advertisements. *See, e.g.*, YouTube Help, Ads on Videos You Watch, https://perma.cc/8Z29-MX9M. And, according to their publicly stated policies, much of this content is generated by users, who sometimes use these websites to share content with a website-specific list of "friends" (or "connections") and sometimes use these websites to share with the world at large. *See, e.g.*, Instagram, Sharing Photos and Videos, https://tinyurl.com/ycky7v54.

## III.    Parents have many tools to oversee and control their minor children online, and NetChoice members go to great lengths to protect minors.

8.    Parents and guardians have many overlapping and complementary choices to oversee and control their minor children's use of the Internet, including controlling whether their minor children have access to Internet-connected devices in the first place.

a.    **Network-Level Restrictions.** Many, if not most, cell service and broadband Internet providers have designed and advertised tools for parents to block Internet access altogether, to

3

block certain apps, sites, and contacts from their children's phones, and to restrict screen time on their children's devices. *See, e.g.*, Verizon, Verizon Smart Family, https://perma.cc/8WCF-PNM3; AT&T, Secure Family, https://perma.cc/LZ5U-JUEV; T-Mobile, Family Controls and Privacy, https://perma.cc/XM67-U88Y; Comcast Xfinity, Set Up Parental Controls for the Internet, https://perma.cc/Z7EU-ZA5M. Similarly, there is much publicly accessible information about the many wireless routers that offer parental control settings that parents can use to block specific online services, allow only the specific online services that a parent specifies, limit the time that their children spend on the Internet, set individualized content filters, and monitor the online services that their children visit. *See, e.g.*, Molly Price & Ry Crist, *How to Set Up and Use Your Wi-Fi Router's Parental Controls*, CNET (Feb. 11, 2021), https://perma.cc/Z5N4-WBSH; Netgear, Netgear Smart Parental Controls, https://perma.cc/P3PP-GBH5; tp-link, How to Configure Parental Controls on the Wi-Fi Routers (Case 1), https://perma.cc/E57T-S75D.

b.　　**Device-Level Restrictions.** Many devices themselves contain ways parents can restrict their use. Many of the most popular mobile phone and tablet manufacturers like Apple, Google, Microsoft, and Samsung publicize the ways they allow parents to limit screen time across their devices and provide parents with tools to control what applications their children can use, set age-related restrictions on those applications, filter content, and control privacy settings. *See, e.g.*, Apple, Use Parental Controls on Your Child's iPhone and iPad, https://perma.cc/RH62-SVKD; Google, Family Link, Help Keep Your Family Safer Online, https://perma.cc/EM7J-24NW; Microsoft, Getting Started with Microsoft Family Safety, https://perma.cc/Y6AR-PJ59; Samsung, Parental Controls Available on Your Galaxy Phone or Tablet, https://perma.cc/44MT-RJN8. There are also many third-party applications parents can install on their children's devices to monitor their activity, set limits on screen time, and filter content—as publicized in mainstream

publications. *See, e.g.,* Alyson Behr, *The Best Parental Control Apps in 2024, Tested By Our Editors*, CNN underscored (Mar. 11, 2024), https://perma.cc/2B2G-7HAU.

c.      **Browser-Level Restrictions.** There are also parental controls on Internet browsers that allow parents to control what online services their children may access. *See, e.g.*, Mozilla, Block and Unblock Websites with Parental Controls on Firefox, https://perma.cc/83YE-3XA9. Some browsers offer a "kids mode" or allow parents to see what online services their children are accessing the most. *See* Google, Safety Center, https://perma.cc/V3XB-KYKU; Microsoft, Learn More About Kids Mode in Microsoft Edge, https://perma.cc/6K6G-HRUT. Third-party software and browser extensions are also widely available to reinforce these tools. *See, e.g.*, Kim Key, *The Best Parental Control Software for 2024*, PCMag (Dec. 15, 2023), https://perma.cc/LRM3-8BXM. Browsers also provide all users with "some control over the information websites collect." FTC, How Websites and Apps Collect and Use Your Information, https://perma.cc/RGG6-JKSC.

d.      **App-Level Restrictions.** Some NetChoice members have developed their own tools that allow parents to set further restrictions on their minor children's use of the websites. For example, Meta has developed its "Family Center," which provides for parental supervision on Instagram. Meta, Family Center, https://tinyurl.com/2trb5b58. Using these tools, parents can, among other things, (1) see their minor children's followers and who their minor children are following; (2) see how long the minor spends on Instagram; and (3) set time limits and scheduled breaks. Similarly, Pinterest provides parents of minors "under 16" the ability to "set[] up a 4-digit passcode" that "lock[s] certain settings related to account management, privacy and data, and social permissions on [a] teen's Pinterest account." Pinterest, Resources for Parents and Caregivers of Teens, https://perma.cc/PVJ4-ENXZ ("Pinterest Parent Resources"). And for teenage users, Snapchat provides parents and guardians the "Family Center," where parents and guardian can:

- See which Snapchat friends their teens have sent messages, photos, or videos to in the last seven days, in a way that still protects their privacy by not revealing the actual contents of their conversations (Snaps and messages);

- See a complete list of their teens' existing friends and easily view new friends their teens have added, making it easy to start conversations about who their new contacts are;

- Limit their teen's ability to view certain content in the Stories and Spotlight tabs; and

- Easily and confidentially report any accounts parents may be concerned about directly to our 24/7 Trust and Safety team.

Snapchat Support, What is Family Center?, https://tinyurl.com/yck6j6sz.

9.    NetChoice members take the safety of all users seriously and place a special emphasis on minors' safety, including through the following means:

a.    **Limiting access by age.** All NetChoice members prohibit minors younger than 13 from accessing their main services. Some members, however, offer separate experiences for users under 13 geared for that specific age group.

b.    **Minor-Specific Policies.** Some NetChoice members have policies or practices specifically for minors' accounts on their websites. Instagram, for instance, states that it imposes default restrictions that make it more difficult for people under 16 years old to come across potentially sensitive content. *See* Instagram, Updates to the Sensitive Content Control, https://tinyurl.com/47fcwb5b. Similarly, YouTube publicizes that it "place[s] an age-restriction on" certain content that "may be . . . not appropriate for viewers under 18." YouTube Help, Age-Restricted Content, https://perma.cc/L9GF-YEN7.[4]

10.    Any minor-specific policies and parental tools exist alongside the websites' generally applicable "content-moderation" policies. NetChoice members have chosen to balance

---

[4] This Declaration cites portions of NetChoice members' policies. Those policies are lengthy and nuanced, so this Declaration does not purport to fully summarize the policies. To aid readability, quotes from some policies have capitalization adjusted.

disseminating large amounts of user-authored expression while also limiting publication of speech that NetChoice members consider harmful, objectionable, or simply not conducive to their communities. NetChoice members publish and enforce varied content-moderation policies that address the publication of such prohibited content. Based on NetChoice's research, the "rate of violative content removed from platforms and the level at which it is removed prior to being seen by users makes clear companies are successfully prioritizing the safety of their users." NetChoice, By the Numbers: What Content Social Media Removes and Why 13 (2021), https://perma.cc/7E63-ECRT ("By the Numbers").

11.     To that end, many NetChoice's members already have policies in place to block or limit the publication of content that the Act regulates.

12.     Expression that "promotes or facilitates . . . [c]onsistent with evidence-informed medical information, the following: self-harm, eating disorders, substance use disorders, and suicidal behaviors." Act § 6(1)(a). NetChoice's members already have policies about this prohibited speech, sometimes in nearly identical terms:

**a. Dreamwidth:** Dreamwidth **does not allow** "Content that is harmful, threatening, abusive, hateful, invasive to the privacy and publicity rights of any person, or that violates any applicable local, state, national, or international law, including any regulation having the force of law." Dreamwidth, Terms of Service, https://perma.cc/G39R-LTR6.

**b. Google (YouTube):** YouTube **does not allow** "content on YouTube that promotes suicide, self-harm, or eating disorders, that is intended to shock or disgust, or that poses a considerable risk to viewers." YouTube Help, Suicide, Self-Harm, and Eating Disorders Policy, https://perma.cc/Z83H-WNAG.

**c. Meta (Facebook and Instagram):** Meta **prohibits** speech that "intentionally or unintentionally celebrate[s] or promote[s] suicide, self-injury or eating disorders." Meta Transparency Center, Suicide, Self-Injury, and Eating Disorders, https://tinyurl.com/4hd222bp. But Meta does "allow people to discuss these topics because [Meta] want[s] [its] services to be a space where people can share their experiences, raise awareness about these issues, and seek support from one another." *Id.* Thus, Meta **prohibits** "content that promotes, encourages, coordinates, or provides instructions for suicide, self-injury, or eating disorders." *Id.* But Meta may allow "content that depicts older instances of self-harm such as healed cuts or other non-

7

graphic self-injury imagery in a self-injury, suicide or recovery context" (although sometimes this content appears behind "sensitivity screen[s]"). *Id.*

**d. Nextdoor:** Nextdoor has resources available for suicide and self-harm prevention. Nextdoor Help Center, Suicide & Self-Harm Prevention, tinyurl.com/3ywcfykt.

**e. Pinterest:** Pinterest **prohibits** "content that displays, rationalizes or encourages suicide, self-injury, [or] eating disorders." Pinterest, Community Guidelines, https://perma.cc/73Z6-KMDD. Accordingly, Pinterest expressly **prohibits**: "self-harm instructions," "suicidal thinking and quotes," "graphic or otherwise triggering imagery or descriptions of self-harm," "promotion of self-harm," "images of accessories used to self-harm," "negative self-talk and insensitive humor about self-harming behavior," and "suicide pacts, challenges and hoaxes," among other things. *Id.*

**f. Snap:** Snap **prohibits** "the glorification of self-harm, including the promotion of self-injury, suicide, or eating disorders." Snap Privacy and Safety Hub, Community Guidelines, https://perma.cc/A4SB-Y8MK; *see* Snap Privacy and Safety Hub, Threats, Violence, & Harm, https://perma.cc/H4VT-G2V7 (noting that Snap **prohibits** "content . . . that encourages or glorifies self-harm, such as suicide, self-mutilation, or eating disorders").

**g. X:** X prohibits "promot[ing] or encourage[ing] suicide or self-harm," including "eating disorders" and "sharing information, strategies, methods or instructions that would assist people to engage in self-harm and suicide." X, X Help Center: Suicide and Self-Harm Policy, https://perma.cc/SKD8-YS5Y.

13.     Expression that "promotes or facilitates . . . [p]atterns of use that indicate or encourage substance abuse or use of illegal drugs." Act § 6(1)(b). NetChoice's members already have policies concerning substance use and abuse.

**a. Dreamwidth:** Dreamwidth **does not allow** "Content that is harmful, threatening, abusive, hateful, invasive to the privacy and publicity rights of any person, or that violates any applicable local, state, national, or international law, including any regulation having the force of law." Dreamwidth, Terms of Service, https://perma.cc/G39R-LTR6.

**b. Google (YouTube):** YouTube **prohibits** various kinds of speech related to substance abuse. YouTube **prohibits** (1) "non-educational" "displays of hard drug use"; (2) "making hard drugs"; (3) "minors using alcohol or drugs"; (4) "selling hard drugs"; and (5) "selling soft drugs." YouTube Help, Illegal or Regulated Goods or Services Policies, https://perma.cc/J5DW-7K7Z. Likewise, YouTube **prohibits** "content instructing how to purchase drugs on the dark web" and "content that promotes a product that contains drugs, nicotine, or a controlled substance." *Id.* Additionally, YouTube **prohibits** expression that "aims to directly sell, link to, or facilitate access to" "alcohol," "controlled narcotics and other drugs," "nicotine, including vaping products," and "pharmaceuticals without a prescription." *Id.*

8

**c. Meta (Facebook and Instagram):** Meta **prohibits** various kinds of content related to substance use, including content that "coordinates or promotes (by which we mean speaks positively about, encourages the use of, or provides instructions to use or make) non-medical drugs." Meta Transparency Center, Restricted Goods and Services, https://tinyurl.com/3rhuf5cy. Meta also **prohibits** content that "admits to personal use without acknowledgment of or reference to recovery, treatment, or other assistance to combat usage," but even with such an acknowledgement or reference, this content "may not speak positively about, encourage use of, coordinate or provide instructions to make or use non-medical drugs." *Id.*

**d. Nextdoor:** Nextdoor **prohibits** "purchase, trade, sale or distribution" of "alcohol, including homebrews," "drug paraphernalia," "marijuana and CBD," "prescription drugs and prescription medical devices," "tobacco," and "other controlled substances." Nextdoor Help Center, List of Prohibited Goods and Services, tinyurl.com/mph2zbz6. Nextdoor also **prohibits** "selling, soliciting, or offering any illegal goods or services." Nextdoor Help Center, Do Not Engage in Harmful Activity, https://tinyurl.com/2sb3ffe5.

**e. Pinterest:** Pinterest **prohibits** "content that displays, rationalizes or encourages . . . substance abuse." Pinterest, Community Guidelines, https://perma.cc/73Z6-KMDD. Pinterest also **prohibits** "trading or selling . . . products or substances that can cause harm when used, altered or manufactured irresponsibly," including "alcohol, tobacco, drugs . . . including chemical precursors and pill presses, punches and dies." *Id.*

**f. Snap:** Snap **prohibits** "promoting, facilitating, or participating in criminal activity, such as buying, selling, exchanging, or facilitating sales of illegal or regulated drugs." Snap Privacy and Safety Hub, Community Guidelines, https://perma.cc/A4SB-Y8MK.

**g. X:** X **prohibits** "selling, buying, or facilitating transactions in illegal goods or services," including "drugs and controlled substances." X, X Help Center: Illegal or Certain Regulated Goods or Services, https://perma.cc/3JNZ-PB2L. And for advertisers specifically, "X prohibits the promotion of drugs and drug paraphernalia." X Business, Drugs and Drug Paraphernalia, https://perma.cc/Z8SM-3MYE.

14.    Expression that "promotes or facilitates . . . [s]talking, physical violence, online bullying, or harassment." Act § 6(1)(c). NetChoice's members already have policies about stalking, bullying, and harassment.

**a. Dreamwidth:** Dreamwidth **does not allow** "Content that is harmful, threatening, abusive, hateful, invasive to the privacy and publicity rights of any person, or that violates any applicable local, state, national, or international law, including any regulation having the force of law." Dreamwidth, Terms of Service, https://perma.cc/G39R-LTR6.

**b. Google (YouTube):** YouTube **prohibits** expression that "threaten[s] someone's physical safety" or "targets someone with prolonged insults or slurs based on their physical traits or protected group status." YouTube Help, Harassment & Cyberbullying Policies, https://perma.cc/DWQ7-HFM3. In particular, YouTube **prohibits** expression "uploaded with

9

the intent to shame, deceive or insult a minor." *Id.* YouTube also prohibits "content that promotes violence or hatred against individuals or groups based on" certain attributes. YouTube Help, Hate Speech Policy, https://perma.cc/N7N3-UCLL.

**c. Meta (Facebook and Instagram):** Meta **prohibits** "bullying and harassment," using a sophisticated, multi-tier policy that covers everything from "making threats and releasing personally identifiable information, to "sending threatening messages and making unwanted malicious contact," to "content that's meant to degrade or shame." Meta Transparency Center, Bullying and Harassment, https://tinyurl.com/37yp8mcv. These "policies provide heightened protection for anyone under the age 18, regardless of user status." *Id.*

**d. Nextdoor:** Nextdoor **prohibits** "attacking, berating, bullying, belittling, insulting, harassing, threatening, trolling, or swearing at others or their views," as well as "public shaming." Nextdoor Help Center, Be Respectful to Your Neighbors, tinyurl.com/bdhu5fpj. Nextdoor also **prohibits** "threatening someone and/or their pet's safety," "posting comments that encourage violence against others," and "threatening someone's privacy or security." Nextdoor Help Center, Do Not Engage in Harmful Activity, https://tinyurl.com/2sb3ffe5.

**e. Pinterest:** Pinterest **prohibits** content that "insult[s], hurt[s] or antagonize[s] individuals or groups of people," including "criticisms involving name-calling, profanity and other insulting language or imagery." Pinterest, Community Guidelines, https://perma.cc/73Z6-KMDD. Pinterest also **prohibits** "harassing content or behavior" in messages. *Id.*

**f. Snap:** Snap **prohibits** all "bullying or harassment," including "all forms of sexual harassment," such as "sending unwanted sexually explicit, suggestive, or nude images to other users." Snap Privacy and Safety Hub, Community Guidelines, https://perma.cc/A4SB-Y8MK.

**g. X:** X **prohibits** "target[ing] others with abuse or harassment, or encourg[ing] other people to do so." X, X Help Center: Abuse and Harassment, https://perma.cc/9DQZ-A4Z2.

15. Expression that "promotes or facilitates . . . [g]rooming, trafficking, child pornography, or other sexual exploitation or abuse." Act § 6(1)(d). NetChoice's members already have policies about this content.

**a. Dreamwidth:** Dreamwidth **does not allow** "Content that is harmful, threatening, abusive, hateful, invasive to the privacy and publicity rights of any person, or that violates any applicable local, state, national, or international law, including any regulation having the force of law." Dreamwidth, Terms of Service, https://perma.cc/G39R-LTR6. Dreamwidth's policies also require users to agree that "[i]f Content is deemed illegal by any law having jurisdiction over" a user, the user "agree[s] that [Dreamwidth] may submit any necessary information to the proper authorities." *Id.*

**b. Google (YouTube):** YouTube **prohibits** all "sexually explicit content featuring minors and content that sexually exploits minors." YouTube Help, Child Safety Policy, https://perma.cc/Q4PQ-GP7M. YouTube "report[s] content containing child sexual abuse

10

imagery to the National Center for Missing and Exploited Children, who work with global law enforcement agencies." *Id.*

**c. Meta (Facebook and Instagram):** Meta **prohibits** a vast range of "content or activity that sexually exploits or endangers children," including: "child sexual exploitation," "solicitation," "inappropriate interactions with children," "exploitative intimate imagery and sextortion," "sexualization of children," "child nudity," and "non-sexual child abuse." Meta Transparency Center, Child Sexual Exploitation, Abuse, and Nudity, https://tinyurl.com/4nkp4ysz. Meta also prohibits "content that praises, supports, promotes, advocates for, provides instructions for or encourages participation in non-sexual child abuse." *Id.*

**d. Nextdoor:** Nextdoor's policies against off-topic and sexual content **prohibit** the kind of content covered by this requirement. *See, e.g.*, Nextdoor Help Center, Do Not Engage in Harmful Activity, https://tinyurl.com/2sb3ffe5 ("No graphic, violent, sexually explicit, or adult content."). Notably, Nextdoor has relatively few instances of CSAM. In 2022, for instance, Nextdoor made only six reports to the National Center for Missing & Exploited Children. *See* Nextdoor, Transparency Report 2023 at 9, https://tinyurl.com/3pzfmkxt.

**e. Pinterest:** Pinterest **prohibits** "child sexual exploitation of any kind" and "enforce[s] a strict, zero-tolerance policy for any content—including imagery, video, or text— or accounts that might exploit or endanger minors." Pinterest, Community Guidelines, https://perma.cc/73Z6-KMDD. "Pinterest prohibits not just illegal child sexual abuse material (CSAM), but goes a step further to prohibit any content that contributes to the sexualization of minors, including in imagery and text. We also work closely with the National Center for Missing and Exploited Children (NCMEC) to combat this type of activity, and report content violations as required under the law." *Id.* Accordingly, Pinterest "remove[s]": (1) "Illegal child sexual abuse material"; (2) "Sexualization or sexual exploitation of minors, like grooming, sexual remarks or inappropriate imagery–including in the form of cartoons and anime"; (3) "Nude and sexual imagery involving minors"; (4) "Content that facilitates unsolicited contact with minors, such as email addresses, phone numbers and physical addresses, to prevent contact intending to start an exploitative relationship"; (5) "Comments on imagery of minors that are inappropriate or sexualized"; and (6) "The intentional misuse of content depicting minors that is otherwise non-violating. For example, we will deactivate users who save otherwise non-violating content into collections or in other contexts that suggest the intent is sexualization of minors." *Id.*

**f. Snap:** Snap **prohibits** "any activity that involves sexual exploitation or abuse of a minor, including sharing child sexual exploitation or abuse imagery, grooming, or sexual extortion (sextortion), or the sexualization of children." Snap Privacy and Safety Hub, Community Guidelines, https://perma.cc/A4SB-Y8MK. Snap "report[s] all identified instances of child sexual exploitation to authorities, including attempts to engage in such conduct." *Id.*; *see also* Snap Privacy and Safety Hub, Illegal or Regulated Activities, https://perma.cc/J9YV-MXQM. (noting that Snap **prohibits** "promoting or facilitating any form of exploitation, including human trafficking or sex trafficking").

**g. X:** X has "**zero tolerance** towards any material that features or promotes child sexual exploitation." X, X Help Center: Child Sexual Exploitation Policy, https://perma.cc/GEJ3-

11

BT7T. X includes a long list of enumerated examples of this policy, which is better summarized by what it does *not* include: "Discussions related to child sexual exploitation are permitted, provided they don't normalise, promote or glorify child sexual exploitation **in any way**." *Id.*

16.     Expression that "promotes or facilitates . . . [i]ncitement of violence." Act § 6(1)(e).

NetChoice members have policies addressing content inciting or otherwise encouraging violence.

**a. Dreamwidth:** Dreamwidth **does not allow** "Content that is harmful, threatening, abusive, hateful, invasive to the privacy and publicity rights of any person, or that violates any applicable local, state, national, or international law, including any regulation having the force of law." Dreamwidth, Terms of Service, https://perma.cc/G39R-LTR6.

**b. Google (YouTube):** YouTube **prohibits** content that "incit[es] others to commit violent acts against individuals or a defined group of people." YouTube Help, Violent or Graphic Content Policies, https://perma.cc/7S8N-VY9G. YouTube also prohibits "content that promotes violence or hatred against individuals or groups based on" certain attributes. YouTube Help, Hate Speech Policy, https://perma.cc/N7N3-UCLL.

**c. Meta (Facebook and Instagram):** Meta **prohibits** "language that incites or facilitates violence and credible threats to public or personal safety." Meta Transparency Center, Violence and Incitement, https://tinyurl.com/54f53zz2. Meta's policies also contain "additional protections for . . . all children" and for "persons or groups based on their protected characteristics." *Id.*

**d. Nextdoor:** Nextdoor **prohibits** "threatening someone and/or their pet's safety," "posting comments that encourage violence against others," and "threatening someone's privacy or security." Nextdoor Help Center, Do Not Engage in Harmful Activity, https://tinyurl.com/2sb3ffe5.

**e. Pinterest:** Pinterest **prohibits** "threats or language that glorifies violence," "false or misleading content that encourages turning individuals, groups of people, places or organizations into targets of . . . physical violence," "content that shows the use of violence," and "content and accounts that encourage, praise, promote, or provide aid to dangerous actors or groups and their activities." Pinterest, Community Guidelines, https://perma.cc/73Z6-KMDD.

**f. Snap:** Snap **prohibits** "[e]ncouraging or engaging in violent or dangerous behavior." Snap Privacy and Safety Hub, Threats, Violence, & Harm, https://perma.cc/H4VT-G2V7. Snap also **prohibits** "content that glorifies, or risks inciting, violent or harmful behavior toward people or animals." *Id.*

**g. X:** X **prohibits** "[i]nciting, promoting or encouraging others to commit acts of violence or harm, including encouraging others to hurt themselves or inciting others to commit atrocity crimes such as crimes against humanity, war crimes or genocide." X, X Help Center: Violent Content, https://perma.cc/B5QF-NAMF.

17.     Expression that "promotes or facilitates . . . [a]ny other illegal conduct." Act § 6(1)(f). NetChoice members have policies addressing content about illegal conduct. In addition to the content encompassed by the policies above, NetChoice members have various policies that address content involving illegal conduct. Of note, NetChoice members operate across the United States and internationally, and what may be legal in one jurisdiction may be illegal in another.

      **a. Dreamwidth:** Dreamwidth **does not allow** "Content . . . that violates any applicable local, state, national, or international law, including any regulation having the force of law." Dreamwidth, Terms of Service, https://perma.cc/G39R-LTR6.

      **b. Google (YouTube):** YouTube **prohibits** "content that encourages dangerous or il-legal activities that risk serious physical harm or death." YouTube Help, Harmful or Dangerous Content Policy, https://perma.cc/72R6-Q7SZ. YouTube also prohibits "content intended to sell certain regulated goods and services," such as "stolen credit cards," "controlled narcotics and other drugs," "explosives," and "counterfeit documents," among many other things. YouTube Help, Illegal or Regulated Goods or Services Policies, https://perma.cc/J5DW-7K7Z.

      **c. Meta (Facebook and Instagram):** Facebook's "Community Standards" **prohibit** a range of content related to illegal activity, including "coordinating harm and promoting crime," "fraud and deception," and "sexual exploitation" of adults and children. Meta Transparency Center, Facebook Community Standards, https://tinyurl.com/bdfv546u. Instagram requires us-ers to "follow the law," and it **prohibits** content that "support[s] or prais[es] terrorism, orga-nized crime, or hate groups," among other things. Instagram Help Center, Community Guide-lines, https://tinyurl.com/2ct6zums. In general, Meta also has a policy of **restricting** reported content that "goes against local law." Meta Transparency Center, Content Restrictions Based on Local Law, https://tinyurl.com/7ycnsw32. Meta also **prohibits** ads that "constitute, facili-tate, or promote illegal products, services or activities." Meta Transparency Center, Illegal Products or Services, https://tinyurl.com/mueju4ph.

      **d. Nextdoor:** Nextdoor's community guidelines **prohibit** various forms of illegal ac-tivity, including specific prohibitions against threats, fraud and "selling, soliciting, or offering any illegal goods or services, even if they do not explicitly appear on the prohibited list." Nextdoor Help Center, Do Not Engage in Harmful Activity, https://tinyurl.com/2sb3ffe5; *see* Nextdoor Help Center, Reasons for Reporting Content, https://tinyurl.com/3ecr4mav (similar).

      **e. Pinterest:** Pinterest **prohibits** "content and accounts that encourage, praise, [or] pro-mote" various illegal enterprises, including "terrorist organizations[,] gangs and other criminal organizations." Pinterest, Community Guidelines, https://perma.cc/73Z6-KMDD. Pinterest also **prohibits** various kinds of  specific illegal activities, such as "exploitation of people or animals" and "other illegal commercial exploitation." *Id.* Pinterest's community guidelines state that users are **not allowed** to "do anything or post any content that violates laws or regu-lations." *Id.*; *see id.* ("Be sure to follow all relevant laws and regulations.")

13

**f. Snap:** Snap users are **not allowed** to "use Snapchat for any illegal activity." Snap Privacy and Safety Hub, Illegal or Regulated Activities, https://perma.cc/J9YV-MXQM. Accordingly, Snap **prohibits** "promoting, facilitating, or participating in criminal activity, such as buying, selling, exchanging, or facilitating sales of illegal or regulated drugs, contraband (such as child sexual abuse or exploitation imagery), weapons, or counterfeit goods or documents." *Id.* Snap also **prohibits** "prohibit the illegal promotion of regulated goods or industries, including unauthorized promotion of gambling, tobacco products, and alcohol." *Id.*

**g. X:** X's policies **prohibit** users from "us[ing] our service for any unlawful purpose or in furtherance of illegal activities." X, X Help Center: The X Rules, https://perma.cc/5CPH-46ZE. "This includes selling, buying, or facilitating transactions in illegal goods or services, as well as certain types of regulated goods or services." *Id.*; *see also* X, X Help Center: Illegal or Certain Regulated Goods or Services, https://perma.cc/3JNZ-PB2L.

18.    "Harmful Material." Act § 6(1). Even if not classified as "obscenity for minors" or "harmful material," NetChoice's members already have policies in place to prohibit publishing obscenity to minors or all users.

**a. Dreamwidth:** Dreamwidth **does not allow** "Content that is harmful, threatening, abusive, hateful, invasive to the privacy and publicity rights of any person, or that violates any applicable local, state, national, or international law, including any regulation having the force of law." Dreamwidth, Terms of Service, https://perma.cc/G39R-LTR6. Although Dreamwidth allows adult content, it allows users to set age restriction filters marking posts as "Adult Content," which cannot be accessed by persons who are under 18 years old. Dreamwidth, How Do I Set Age Restriction Filters on My Journal or Entry?, https://perma.cc/88N6-AM9A. Dreamwidth also allows users to utilize a "Safe Search Filter" and settings requiring a confirmation notice before displaying adult content. Dreamwidth, What Is "Adult Content"? How Can I Keep From Seeing It?, https://perma.cc/82WS-TVGR.

**b. Google (YouTube):** YouTube **prohibits** "explicit content meant to be sexually gratifying," including the "depiction of clothed or unclothed genitals, breasts, or buttocks that are meant for sexual gratification." YouTube Help, Nudity and Sexual Content Policy, https://perma.cc/7HVY-MMZW. YouTube also prohibits "pornography, the depiction of sexual acts, or fetishes that are meant for sexual gratification." *Id.*

**c. Meta (Facebook and Instagram):** Meta **prohibits** "imagery of adult nudity" and "imagery of sexual activity," including even "implicit sexual activity and stimulation." Meta Transparency Center, Adult Nudity and Sexual Activity, tinyurl.com/bddt8hcz. For other content, such as "real-world art, where imagery depicts . . . sexual activity," Meta **restricts** content by "limit[ing] the ability to view the content to adults, ages 18 and older." *Id.*

**d. Nextdoor:** Nextdoor **prohibits** "sexually explicit or suggestive content," "adult content," "photos that contain nudity," and "any content that facilitates, encourages, or coordinates commercial sexual services." Nextdoor Help Center, Do Not Engage in Harmful Activity, https://tinyurl.com/2sb3ffe5. Nextdoor also **prohibits** "sexual content," including "adult toys

14

or products," "pornography," and "prostitution or escort services." Nextdoor Help Center, List of Prohibited Goods and Services, tinyurl.com/mph2zbz6.

**e. Pinterest:** Pinterest **prohibits** "adult content, including pornography and most nudity." Pinterest, Community Guidelines, https://perma.cc/73Z6-KMDD. Consequently, Pinterest "remove[s] or limit[s] the distribution of mature and explicit content," including "nudity"; "sexualized content, even if the people are clothed or partially clothed"; "graphic depictions of sexual activity in imagery or text"; and "fetish imagery." *Id.* Pinterest does not prohibit all nudity, however. *See id.* "For instance, nudity in paintings and sculptures and in science and historical contexts is okay. Content about breastfeeding and mastectomies is also allowed." *Id.*

**f. Snap:** Snap **prohibits** "promoting, distributing, or sharing pornographic content, as well as commercial activities that relate to pornography or sexual interactions (whether online or offline)." Snap Privacy and Safety Hub, Community Guidelines, https://perma.cc/A4SB-Y8MK.  But "breastfeeding and other depictions of nudity in non-sexual contexts are generally permitted." *Id.*

**g. X:** X **restricts** users' ability to "share . . . adult nudity or sexual behavior," requiring that such material be "properly labeled and not prominently displayed" in "highly visible places such as profile photos or banners" or "live video." X, X Help Center: Adult Content, https://perma.cc/C2XJ-7Q9N. Though X permits adult users to view nudity and even pornographic content, it restricts minors' access to such material. *Id.*; *see also* X, X Help Center: Notices on X and What They Mean, https://perma.cc/7XRC-ZP96. Moreover, X **prohibits** all "[n]on-consensual nudity," "[p]romoting or soliciting sexual services," "[c]hild sexual exploitation," "[v]iolent sexual conduct," "[u]nwanted sexual content & graphic objectification," and "[b]estiality and necrophilia." X, X Help Center: Adult Content, https://perma.cc/C2XJ-7Q9N.

19.    NetChoice's members also have policies against other forms of harmful, objectionable, or just off-topic speech:

**a. Dreamwidth:** Dreamwidth **does not allow** "Content that is harmful, threatening, abusive, hateful, invasive to the privacy and publicity rights of any person, or that violates any applicable local, state, national, or international law, including any regulation having the force of law." Dreamwidth, Terms of Service, https://perma.cc/G39R-LTR6. Dreamwidth's policies also require users to agree that "[i]f Content is deemed illegal by any law having jurisdiction over" a user, the user "agree[s] that [Dreamwidth] may submit any necessary information to the proper authorities." *Id.* Moreover, Dreamwidth has the "right" in its "sole discretion, to remove . . . any Content from the service." *Id.*

**b. Google (YouTube):** Among other things, YouTube has policies that **prohibit** and otherwise address (1) "vulgar language," YouTube Help, Vulgar Language Policy, https://perma.cc/N9T5-8BHA; (2) "hate speech," YouTube Help, Hate Speech Policy, https://perma.cc/N7N3-UCLL; and (3) "violent or gory content intended to shock or disgust viewers," YouTube Help, Violent or Graphic Content Policies, https://perma.cc/7S8N-VY9G.

**c. Meta (Facebook and Instagram):** Among other things, Meta **prohibits** hate speech. Meta Transparency Center, Hate Speech, https://tinyurl.com/49wbtpev. As part of this broad prohibition, Meta prohibits the use of slurs—though Meta "recognize[s]" there are situations in which slurs may be permissible because "people sometimes share content that includes slurs or someone else's hate speech in order to condemn the speech or report on it" and slurs can be "used self-referentially or in an empowering way." *Id.*

**d. Nextdoor:** Among other things, Nextdoor **prohibits** "racist behavior, discrimination, and hate speech of any kind." Nextdoor Help Center, Policies to Prevent Racism & Discrimination, https://tinyurl.com/bpa5cjsa. More generally, "Nextdoor is intended primarily for neighbors to share community-related information," which means that "discussions about personal interests in the main newsfeed should be limited unless they are directly related to the neighborhood." Nextdoor Help Center, Teens on Nextdoor, https://tinyurl.com/vsme8zcj.

**e. Pinterest:** Among other things, Pinterest **prohibits** "hateful content [and] the people and groups that promote hateful activities," "content that shows the use of violence," "irresponsible and harmful animal tourism or otherwise exploitative practices like organized animal fighting," and "harmful pranks or challenges that risk imminent physical harm or extreme emotional distress, especially if showing or encouraging the participation of minors." Pinterest, Community Guidelines, https://perma.cc/73Z6-KMDD.

**f. Snap:** Among other things, Snap **prohibits** "fraud and other deceptive practices" and "spreading false information that causes harm or is malicious, such as denying the existence of tragic events, unsubstantiated medical claims, undermining the integrity of civic processes, or manipulating content for false or misleading purposes." Snap Privacy and Safety Hub, Community Guidelines, https://perma.cc/A4SB-Y8MK; *see* Snap Privacy and Safety Hub, Harmful False or Deceptive Information, https://perma.cc/T2NB-NLEZ (similar).

**g. X:** Among other things, X **prohibits** (1) various kinds of "hateful conduct," X, X Help Center: Hateful Conduct, https://perma.cc/TT9D-9E38; (2) "hoping for others to die, suffer illnesses, tragic incidents, or experience other physically harmful consequences," X, X Help Center: Violent Content, https://perma.cc/B5QF-NAMF; and (3) "Posts that include manifestos or other similar material produced by perpetrators [of violent acts] . . . , even if the context is not abusive," X, X Help Center: Perpetrators of Violent Attacks, https://perma.cc/WX9Y-6BB2.

20.    All of that said, content moderation is very difficult to do perfectly, especially at the scale of many of NetChoice's members. There are literally countless pieces of content on the Internet, and not all content is suitable for all audiences on all websites in all contexts. Thus, content moderation requires the removal of large amounts of objectionable content from members' websites. NetChoice has produced a report detailing members' successes in moderating the vast

16

scope of objectionable and harmful content that specific member companies have blocked or removed from their websites. *See* By the Numbers.

21.    For instance, in just a six-month span from July to December 2020, Facebook (≈5.7 billion), Instagram (≈65.3 million), Pinterest (≈2.1 million), Snapchat (≈5.5 million), YouTube (≈17.2 million), and X (≈4.5 million) removed approximately 5.9 *billion* posts. *See id.*at 2. Nearly half of those removals (approximately 2.9 billion removals) were for spam. *See id.* at 4.

22.    Members work to remove violative content quickly before many (if any) users see the content. *See id.* at 13. "Platforms enable users to report posts and accounts, but social media companies acknowledge that taking down content is not sufficient if the content in question reaches a wide audience prior to removal. Because of this, companies report not only the number of posts removed but also the degree to which they were seen prior to removal. While platforms enable users to report posts and accounts, the aim of limiting exposure requires that a combination of artificial intelligence and human reviewers take down violating content as quickly as possible after it was posted. . . . This proactive approach to removal mitigates the threat of spam, violent, or otherwise offensive content being spread beyond the account responsible for the original post." *Id.* at 5. NetChoice's members have been largely successful, especially for the most harmful content. *See id.* at 5-6. For example, on Facebook, "[t]he proactive rate for severe violations such as child sexual exploitation, terrorist organizations, and violent or graphic content were all 99-100%." That means this content was "found or flagged by Facebook prior to being reported by users." *Id.*

23.    Regardless of the scale of the websites, content moderation is often difficult for multiple reasons. For example, websites disseminate different forms of content that raise their own content-moderation difficulties. These different forms of content include text, audio, and video. Furthermore, content moderation often requires contextual determinations. Whether a given piece

17

of content violates a website's policies can turn on a complicated interaction between the intent of the user, the content itself, the social and cultural context, the context on the service, and the effect on the reader. Further complicating this task is that many members operate worldwide, and thus must take into account different languages and cultures. Consequently, overreliance on automated systems of content moderation may result in overinclusive removal of content that may not violate websites' policies. Alternatively, removing—or restricting access to—too little violative content may make the websites less hospitable to users and advertisers. Finally, malicious actors always attempt to find ways to avoid moderation to upload violative content; so websites must constantly innovate.

**IV.   The Act's effect on NetChoice members and the Internet.**

24.   I understand that the Act was signed into law on April 30, 2024, and that the Act takes effect July 1, 2024.

25.   The Act regulates "digital service provider[s]." Act § 3. A "digital service" is "a website, an application, a program, or software that collects or processes personal identifying information with Internet connectivity." Act § 2(a). A "digital service provider" is any "person who: (i) [o]wns or operates a digital service; (ii) [d]etermines the purpose of collecting and processing the personal identifying information of users of the digital service; and (iii) [d]etermines the means used to collect and process [such] information of users of the digital service." Act § 2(b).

26.   According to these definitions, the Act appears to cover at least the following NetChoice members: (1) Dreamwidth; (2) Google, which owns and operates YouTube; (3) Meta, which owns and operates Facebook and Instagram; (4) Nextdoor; (5) Pinterest; (6) Snap Inc., which owns and operates Snapchat; and (7) X.

27.   The Act also covers many other websites across the Internet, including websites that adults and minors use for myriad purposes including art, education, gaming, general interest,

18

information gathering, professional activities, research, political engagement, and participation in religious services and communities. It appears the Act could sweep in countless websites, message boards, and community forums that are a home for discussion on every topic under the sun—everything from politics and religion to classical music, backpacking, homeschooling, board games, woodworking, gardening, knitting, and hundreds of other subjects.

28.     Many of the Act's requirements and definitions are vague and difficult for NetChoice members (and other websites) to gauge.

29.     The Act's requirements are burdensome, will make it more difficult for NetChoice members to provide their websites to minors and adults, and will burden minors and adults' access to highly valuable and protected speech.

30.     The compliance burdens are made all the more difficult by the fact that the Legislature gave regulated companies only two months to comply with the Act's requirements. The systems that the Act requires covered websites to adopt will take many covered websites much longer than two months to research, design, develop, test, and implement at scale.

31.     **Parental consent and age verification (Act § 4).** The Act's requirement that covered websites may not permit minors to be "account holder[s]" on their services without "express consent from a parent or guardian" will prove costly and difficult for NetChoice members to implement. Act § 4(2). This parental-consent requirement will impede minors and adults' access to protected speech. The Act further requires that covered websites "shall make commercially reasonable efforts to verify the age of the person creating an account with a level of certainty appropriate to the risks that arise from the information management practices of the digital service provider." Act § 4(1). This requirement to "verify . . . age[s]" will likewise impede minors and adults' access to valuable and protected speech. *Id.* On most members' services—as on many other

19

covered websites—having an account is necessary to access either some or all of the protected speech and functionality on the service. Accordingly, each of these requirements burdens access to protected speech. These requirements also pose at least four major hurdles for covered websites.

     a.     Most websites do not have compliance mechanisms in place to process parental consent or to "verify . . . age[s]." *Id.* Designing and maintaining comprehensive and foolproof systems to comply with the Act will be extremely costly, time-consuming, and resource-intensive.

     b.     As part of implementing mechanisms to comply with the Act, covered websites will be required to obtain and store sensitive personal identifying information about minors and their parents or guardians. This will significantly amplify the risks of data security breaches, necessitating even more investment in heightened cybersecurity measures.

     c.     Verifying a genuine parent-child relationship will require covered websites to identify both the minor and the parent (or guardian), just as "verify[ing] . . . age[s]" will require covered websites to identify the account holder. *Id.* It is impossible to do any of this without significantly infringing the privacy rights of both minors and parents (or guardians). As just one example of the many difficulties in securing parental consent, the law does not account for situations in which a person's status as a parent (or guardian) is opaque or disputed.

     d.     New processes at sign up inevitably affect account holder growth, as cumbersome registration processes can dissuade people from signing up. Any decline in account holder sign-ups or current accounts will have a ripple effect on companies' advertising revenues, brand partnerships, and overall vitality. And of course, decline in usage means that fewer people avail themselves of the valuable speech available on the websites.

     32.    **Monitoring and censorship (Act § 6).** The Act's requirement for covered websites to "make commercially reasonable efforts to develop and implement a strategy to prevent or

20

mitigate the known minor's exposure to" certain prohibited categories of speech, Act § 6, will be difficult to comply with and will chill dissemination of speech.

a.      Members enforce policies designed to address the same broad categories of harmful and objectionable speech that the Act seeks to regulate. But there is no guarantee that members' understanding and enforcement of their own policies will match Defendant's understanding of the Act's requirements. That is especially true because both private content moderation and the Act require subjective determinations for which there will be areas of disagreement. While members have the flexibility to take into account contextual considerations in individual cases, the Act is written in more absolute terms. The Act's plain terms seem to require websites to "prevent . . . exposure" not only to protected speech, but also to valuable works of art, literature, and pop culture that are suitable for at least some minors. Uncertainty about how broadly the Act extends—and how Defendant will interpret the Act—may spur members to engage in over-inclusive moderation that would block valuable content from all users.

b.      My understanding is that not all covered websites have the ability to "age-gate," meaning that they are unable to separate the content available on adults' accounts from content available on minors' accounts. Therefore, for these websites, the restrictions on what content they may disseminate to minors will apply equally to adults. In other words, the Act would require those websites to block protected works of art, literature, and pop culture for adults as well, and to disseminate only a single, constrained range of speech to everyone.

c.      The Act's two exceptions are little help. Specifically, the Act provides that "[n]othing in" the monitoring-and-censorship requirement "shall be construed to require a digital service provider to prevent or preclude": "(a) Any minor from deliberately and independently searching for, or specifically requesting, content; or (b) The digital service provider or individuals

21

on the digital service from providing resources for the prevention or mitigation of the [enumerated] harms . . . , including evidence-informed information and clinical resources." Act § 6(2). This will only create more compliance hurdles for covered websites, as they must figure out how to simultaneously "prevent exposure to" particular speech while also allowing minors to seek out that speech. Further complicating matters, the Act does not explain what it means for minors to "deliberately and independently search[]" for prohibited speech. Nor does the Act explain what kinds of results websites are allowed to provide in response to a search. Instead, the Act says only that websites are not required to prevent the search itself. Furthermore, members cannot be sure that Defendant will agree that particular authorities are appropriate "resources for the prevention or mitigation." In this way, the Act also implies a false dichotomy between content that promotes certain activities versus content that helps prevents or mitigate that activity. Communication is not that simple. Much content is neutral toward a topic—neither promoting nor preventing it. For fear of massive liability, many websites will likely engage in overinclusive content moderation.

33.     NetChoice members would be irreparably harmed if they were required to comply with the Act's burdensome requirements. For one thing, the Act's extremely broad and vague proscriptions make perfect compliance unobtainable for most websites. Any website that even attempts to comply with the Act will incur substantial, unrecoverable costs in reconfiguring their service. All websites face significant uncertainty about their compliance with the Act given the Act's many ambiguities. NetChoice members' account holders and users (both minors and adults, current and prospective) will also suffer irreparable harms, as the Act will place burdens on their access to protected and valuable speech. Moreover, the Act directly requires websites to stop providing their current range of services and content to their current range of users and account holders, and it forces that same result indirectly through its threats of civil and criminal liability.

22

34. NetChoice itself has been irreparably harmed as it has incurred costs and will continue to divert finite resources to address the Act's implications for Internet companies.

\*        \*        \*

35. If the Act takes effect on July 1, 2024, NetChoice's mission to protect free speech and free enterprise online would be directly and substantially hurt—as would its affected member companies and their minor and adult account holders and users (both current and prospective).

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct to the best of my knowledge.

Executed on __**June 5, 2024**__ in Washington DC.

_____

Carl Szabo

23