# Exhibit 5 –

# Declaration of Denise Paolucci

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION**

<table>
<tr><td>

NETCHOICE, LLC,

*Plaintiff*,

v.

LYNN FITCH, in her official capacity as
Attorney General of Mississippi,

*Defendant*.

</td><td>

Civil Action No. _____

</td></tr>
</table>

**DECLARATION OF DENISE PAOLUCCI IN SUPPORT OF
PLAINTIFF NETCHOICE'S MOTION FOR PRELIMINARY INJUNCTION
AND TEMPORARY RESTRAINING ORDER**

I, Denise Paolucci, declare:

1.    I am the co-owner of Dreamwidth Studios, LLC, which operates the website dreamwidth.org. I have co-owned and operated Dreamwidth since the site's inception and have worked in multiple roles for the website, including as the head of the Trust and Safety team, which handles reports of abuse and violations of policy on the site, and head of product development. I make this declaration from personal knowledge and a review of Dreamwidth's records kept in the ordinary course of business.

2.    Dreamwidth is an open source social networking, content management, and personal publishing website, in operation since 2009. Registering an account requires a user to choose a username, provide an email address, and explicitly agree to the provisions of our Terms of Service. Dreamwidth's registered users can create public profiles that contain multiple pieces of information about themselves, post content to their "Journal" and comment on others' posts; create, join, and post content in "Communities" that function as Journals intended to focus on a specific discussion topic to which multiple users can contribute; send direct messages to users who in accordance with the privacy settings those users have chosen, post and comment in shared community forums, and construct and populate and browse a feed that presents the user with aggregated content posted by other users they have chosen to follow. Dreamwidth operates according to a set of Guiding Principles and a Diversity Statement that encapsulate our business philosophy. *See* https://www.dreamwidth.org/legal/principles;       https://www.dreamwidth.org/legal/diversity. Dreamwidth provides a number of privacy, security, and content-control features, allowing our users a high degree of control over their own data and their own online experience. Our users can choose who sees their content, restrict access to their content in multiple ways, and control the visibility of everything they post to the site.

1

3.      ***Business model and data sharing.*** Dreamwidth does not accept any form of advertising and does not engage in the sale, trade, or brokering of user data. Our revenue comes entirely from our "freemium" model, where approximately 20% of our users pay a fee to access extra services and fund the site for the approximately 80% of our active users who use the site on an unpaid basis. We do not accept payment to promote posts, change the order or priority of content, or to target content or posts to a subset of users. We do not offer any algorithmic sorting or display of user timelines that adjusts the display of content based on a prediction that a particular user will be more or less interested in a particular piece of content, and we do not collect or store the data about user behavior that would allow us to make those predictions. Our Privacy Policy (https://www.dreamwidth.org/legal/privacy) and Guiding Principles promise users that we will collect the minimum amount of personally-identifying data about them that is necessary in order to operate the service.

4.      Dreamwidth.org has approximately 4 million registered accounts, and has approximately 2 million unique visitors annually. We operate on an extremely limited budget, and are staffed by myself and the company's other co-owner, two part-time employees, and approximately 200 volunteers.

5.      Creating an account is necessary to use most of the website's speech-facilitating functionality and to view much of the content, although we do not require visitors to the site to create an account. Primarily, users must create an account to *post* content and to share their expression with an audience of their choosing. Viewing content is more mixed. For example, searching for individual posts that contain certain phrases or keywords is limited to registered users only. But users have a lot of control over who sees and can interact with their content. In accordance with our principles regarding individual control over account settings and content, individual users

can choose to restrict the visibility of their content only to specific users they have affirmatively granted access to the content, on a per-post basis. Users can choose to restrict the visibility of contact information on their profile only to registered users, to specific users they have affirmatively granted access to the contact information, or to no one at all. Users can choose who can comment on their posts, with the options being all site visitors including those who do not have a site account, registered accounts only, specific users they have affirmatively granted access to comment to their posts, or no one at all. In addition to the public and private post settings, the owner of a Community can also choose to restrict posts only to members of the Community, and can also either allow any registered user to join the Community to see the content posted to it or only allow registered users they have affirmatively granted access to join the Community. Visitors to the site who have not created an account can read public posts made by specific users, access an aggregate feed of the most recent public posts made to the site, look up users who have indicated that they are interested in certain topics or keywords, or ask to be shown a random active account. The default settings for content visibility and access permissions, which apply unless a user overrides them for a particular post or for their account as a whole, are for posts to be visible to every site visitor, for registered users only to be able to comment in reply to a post, and for profile contact information to be visible only to registered users. The majority of our users use the ability to change post privacy settings in their account on a per-post basis, and post a mixture of publicly available and visibility-restricted content. There is no single prevailing configuration for Community accounts: our users have found a wide range of settings beneficial depending on the purpose of the Community. In any use case, whether a Journal or a Community, visitors to the site who haven't registered an account are only able to access a limited subset of the speech available on the site and are only able to contribute to a small subset of discussions happening on the site.

6.      Dreamwidth does not deliberately target minors as an audience, and our intended audience is adults looking for a social media service that will respect their privacy. However, in order to ensure compliance with the Children's Online Privacy Protection Act (COPPA), we do collect a date of birth from all users at registration. When a user signs up for a Dreamwidth account, they must enter a username, an email address that can be verified through an automatic email link, a password, and a birthdate. The birthdate field displays a notice that "This information is required by law" and "You must enter your real birthdate". In accordance with COPPA, we have chosen not to create a system that will attempt to verify parental consent for children under the age of 13 to maintain an account on the service. Therefore, we do not accept registration from users whose birthdate provided at registration indicates they are under 13 years old.

7.      Accounts owned by users whose birthdate indicates they are under the age of 18 have further restrictions placed on those accounts for the purposes of user safety, such as the inability to view any post or account that a user or Dreamwidth itself has marked as inappropriate for viewing by minors, and restricted visibility in some search results.

8.      Dreamwidth does not collect address or location data of our users, at the time of account registration, login, or posting. We utilize a limited form of our network provider's geolocation service to block connections from certain countries that have been the source of elevated levels of network abuse, but we do not associate that geolocation data with specific accounts, and this geolocation and blocking happens before the connection even reaches us. Users are able to voluntarily provide their location information if they choose to do so in order to display it on their profile. Approximately 560 Dreamwidth users have chosen to voluntarily identify themselves as residents of Mississippi, and at least one of those users has provided a birthdate indicating they are or will be under the age of 18 on the date Mississippi House Bill 1126 is set to take effect. Because

4

we do not store our upstream provider's geolocation data, associate it with individual user accounts, or perform geolocation on our users once their connection reaches our site, this figure does not count users who may be located in the state of Mississippi but have not chosen to provide their location information. There is no way for us to identify how many additional users may be located in the state of Mississippi but have chosen not to provide their location information.

9.      Because we have users located in the state of Mississippi and because we meet the definitions of "digital service provider" as set forth in the Act, it is my understanding that Dreamwidth will be required to comply with the Act. We cannot comply with the Act without making significant, sweeping changes to the site that we do not have the resources to make and without collecting additional personally identifying data about each account that we do not currently collect. The short, two-month timeframe the Act provides before digital service providers must comply with the Act makes it particularly impossible to make those changes within the necessary timeframe. The changes the Act would require us to make to the software that runs our site would take months, if not years, of work at our current development capacity. The ongoing support burden the Act would impose upon us would also be impossible for us to meet at our current level of staffing, and we do not have the financial capabilities to add more staff.

10.      *Age Verification.* To the best of my knowledge, there is no technology—much less any technology available to a site with Dreamwidth's limited resources—that can identify users who are under the age of 18. The only method that can determine a user's age to a sufficient degree of confidence is to require every user, no matter what age they claim to be, to upload government-issued identification, deanonymizing themselves and jeopardizing their privacy. There is no age verification system that is not also a deanonymization and identity verification system.

5

11.     Because we do not perform geolocation on our users, we are unable to determine which of our users are located in Mississippi. To identify which of our users are located in Mississippi and whose age we must establish, either we must (a) begin performing and storing geolocation data lookups on every individual user account to determine which users' connections to the site originate from Mississippi, whom we must therefore presume to be residents of Mississippi who must undergo deanonymization and identity verification; (b) deanonymize and perform identity verification on all users, no matter where their connection originates; or (c) utilize our network provider's geolocation service to prevent *any* connection originating in the state of Mississippi from reaching our servers to avoid the potential that the person using that connection is under the age of 18.

12.     Because people can move at any time and can travel to states they don't reside in, a single deanonymization and identity verification at the time of account creation would be insufficient to comply with the Act. To protect against the possibility that someone under the age of 18 had moved to Mississippi after creating an account, or the possibility that someone under the age of 18 residing in Mississippi was creating an account while on vacation to another state or by using a location-concealing VPN service to enhance their online privacy, we would need to perform regular deanonymization and identity verification checks of all users. This will place a significant burden and chilling effect on the speech and conduct of every person who uses Dreamwidth's services, not only people under the age of 18 in Mississippi or even only on adult Mississippi residents.

13.     The Act prevents digital service providers from collecting, but does not define, "precise geolocation data" of a known minor. In the absence of a working definition of "precise geolocation data", we are uncertain what level, accuracy, or granularity of geolocation is or would

6

be acceptable for us to use in order to determine which of our users are located in the state of Mississippi and subject to the Act. My interpretation of the Act is that in order to comply with it, we would need to collect additional geolocation data about our users that we do not want to collect, but also that the law prevents us from collecting some geolocation data at an undefined level of specificity. Reading the law does not allow me to determine what measures I am permitted to implement in order to comply with the law. Even if we were to assume the working definition as implemented in other states' privacy laws (data sufficient to place a user within 1750 feet) we cannot be sure if this is sufficient to comply with the Act, nor can we be sufficiently confident this would identify every user of the site located in Mississippi.

14.     Dreamwidth's users are extremely privacy-conscious. Our users frequently cite our business practices, our commitment to refrain from selling or sharing their personal data, and our refusal to even gather any data that is not directly necessary to provide our services as the reason they've chosen to use our website. For the state of Mississippi to force us to begin collecting account-level geolocation data alone, much less to perform deanonymization and identity verification on every account, would alienate our users, violate the promises we have made to them, and be contrary to our principles. We do not want to be forced to collect this data, and our users do not want to be forced to provide it to us.

15.     Because of our strong commitment to privacy and anonymity, a large percentage of our userbase consists of marginalized people who experience heightened personal security concerns online. A nonexhaustive list of these groups include: (a) Russian or Chinese activists protesting their government's human rights abuses, who are comfortable using our site because we do not cooperate with their government's mandated censorship and do not require them to provide us

personally identifying information that may be discoverable by their government; (b) disabled people who are looking for community or seeking to share information on their conditions, who are comfortable using our site because we do not require them to provide us personally identifying information that may be used against them by doctors, insurance companies, employers, etc., and because we employ significant effort to make sure the site is accessible to multiple conflicting disability access needs; (c) blind people who can use our site easily because of the significant effort we employ to ensure the site is one of the most screenreader-accessible products on the internet and because we minimize the steps it takes to create an account; (d) people of marginalized genders and sexualities, who are comfortable using our site because we don't accept advertising and therefore are not affected by companies who are more likely to treat LGBTQ content as age-inappropriate while heterosexual content is treated as acceptable. These groups and many others rely on our promise of privacy and anonymity to feel comfortable engaging in online speech. If Dreamwidth is forced to impose an identity verification requirement, it will have a significant chilling effect on these groups' willingness to engage in online speech. Our users frequently cite our commitment to preserving and defending their ability to speak anonymously and our refusal to engage in data brokering practices as a primary reason they use Dreamwidth rather than any other service.

16.     ***Content moderation and policies.*** For the purposes of this declaration, I define "content moderation" as "the administrative process by which we evaluate specific accounts, posts, and comments to determine whether they violate our Terms of Service and the actions we take to restrict or remove access to that content", and "content policies" as "the internal editorial guidelines we use to interpret the Terms of Service and make that determination about specific types of content."

8

17.     Content moderation on Dreamwidth consists of our users reporting content they feel may violate the Terms of Service to our Trust and Safety team, which consists of me and one of our part-time employees. When content is reported, we evaluate it against our content policies. If the content violates our content policies, we will "suspend" it. We are able to suspend individual posts or accounts as a whole. When a post or an account is suspended, it is invisible to anyone but the user who posted it. If the violation is minor and easily corrected by editing the post to remove the violation or by deleting a small number of posts to return the account as whole to compliance with the Terms of Service, we allow users to make those corrections, and we restore the account to visibility ("unsuspension") after we've confirmed they've made the required edits. If the vast majority of the account's content violates the Terms of Service, if we believe the account as a whole was created for the sole purpose of violating the Terms of Service or the user has no intention of complying with the Terms of Service, or if the account contains certain types of egregious violations such as content that advocates, promotes, or instructs readers on how to commit actions prohibited by United States law, the suspension is permanent and we will not restore the account under any circumstances.

18.     Because of our limited administrative and technical capacity, and because of our editorial philosophies and Guiding Principles, we cannot and do not proactively monitor or search for content posted by our users that requires content moderation, either on a manual or automated basis. If we become aware of accounts or posts that require content moderation through the ordinary course of business, we treat those accounts or posts as though they had been reported to us by a user and take the same actions we would take if they had been reported to us by a user. The only exception to our policy of not proactively searching for content that violates the Terms of Service are inauthentic accounts created for the purpose of abusing the network for the purpose of

9

unsolicited promotion or advertising, aka "spam", which we detect and remove through several approaches that combine automated detection with manual review. Controlling spam and engaging in content moderation resulting from user reports takes up the majority of the available time of the two people who do that work. Some level of automated spam detection is possible, because much of the spam we receive consists of posting repetitive and high-volume links to external sites that no legitimate user would ever link to: we are able to detect it on both an "abnormal volume of activity" basis and by identifying attempts to post links we have already determined to be spam. We cannot adopt this automated approach for content moderation, because there are no specific terms or keywords used in content that violates our content policies that are not also used in content that does not violate our content policies. Moderation of *speech* (rather than moderation of *behavior* such as spamming) must evaluate the entire context of the speech, and pure keyword detection results in overwhelmingly more false positives than legitimately violating content: for every true positive an automated detection system can identify, there may be hundreds of false positives that must be evaluated and dismissed. The significant rate of false positives for automated detection would prevent us from timely handling of user reports of potentially violating content, which are more accurate.

19.     Our internal content policies derive from our Guiding Principles and from the experience of my twenty-two year career in social media Trust and Safety. In general, our users agree to our Terms of Service, which make clear that we do not allow: "Content that is harmful, threatening, abusive, hateful, invasive to the privacy and publicity rights of any person, or that violates any applicable local, state, national, or international law, including any regulation having the force of law." https://www.dreamwidth.org/legal/tos. We do not make our specific content policies with the detailed criteria used to evaluate content and apply these restrictions publicly available. It is

my experience—and the general consensus of the members of the Trust and Safety profession as a whole, based on those I have discussed the question with and the professional literature I have read—that publicizing the exact criteria used to evaluate content results in users posting more content that approaches, but does not cross, the exact threshold of being prohibited. In other words, publicizing the exact criteria that we use in content moderation could allow users to "game" the rules.

20.     Content moderation is difficult, in part, because people who want to evade moderation often attempt to change their speech in plausibly-deniable ways that could have multiple interpretations. For example, many people on social media develop alternative vocabulary and signifiers to evade specific content policies and allow their posts to remain visible, a practice researchers and reporters have come to call "algospeak". For instance, automated detection systems on one popular website remove or restrict some videos that use the word "kill" or "suicide": to evade these detection systems, users began to use the euphemism "unalive" instead. Users often replace slurs with emoji that suggest the slur, words that rhyme with the slur, words that have similar sounds to the slur, or unrelated words that play on negative stereotypes about the group the slur is intended to reference. Individual groups also develop coded references intended to conceal their meaning from people who are not members of the group while maintaining a facially plausible alternative explanation for the use of the reference. For example, a user who chooses a username containing the number "88" may do so innocently because they were born in 1988, or they may be intending a coded reference to the white supremacist slogan "Heil Hitler", which is shortened to 88 because H is the 8th letter of the English alphabet. All of these linguistic signifiers develop quickly, spread rapidly, and can require a reader to be familiar with earlier steps in the substitution chain. While some of the signifiers are obvious to an outside reader, some of them

require deep knowledge of the vocabulary in question. A large part of content moderation work requires being current with the current euphemisms and substitutions for a wide range of content, including coded references to illegal drug consumption and sales, the creation and trading of child sex abuse material, white supremacist ideology, the advocacy of terrorist acts, and other forms of content a site wishes to prohibit. Interpreting content that is reported to us involves a number of complex judgment calls and nuance.

21.    Developing content policies is a complex, difficult process for which there is no easy or simple shortcut. Despite every effort we take to make our content policies as objective and specific as we can, evaluating specific content that is reported to us and determining whether it requires content moderation involves significant deliberation, extremely close reading and attention to nuance, and considerable subjective editorial discretion. Our general editorial philosophy in creating content policies is to allow for the maximum amount of legal speech as possible, but we also moderate speech that the Trust and Safety industry calls "lawful but awful": content that is legal but that we feel is harmful to the service and to society as a whole. What subset of "lawful but awful" content we subject to content moderation is a constantly evolving standard that we regularly revisit based on published scientific research, expert opinion, the opinions of our users (both in what types of content they report to us for investigation and in their feedback about our content policies), and the overall civic debate.

22.    The content the Act will require us to restrict from viewing by minors is a combination of some facially illegal content (which we already remove entirely from the service as required by law when reported to us but do not have the capacity to proactively detect in every instance) and "lawful but awful" content that our content policies already address, depending on how Defendant interprets the Act's requirements. Though the incidents of such content posted to

12

our website are extremely rare, we already remove content and close the accounts of people who engage in unprotected speech such as incitement to violence, material support of terrorist organizations, grooming, trafficking; the solicitation, suborning, or trading of child sex abuse material; sexual exploitation and abuse, material we judge likely to be found "obscene" under the balancing test first defined in *Miller v. California*, 413 U.S. 15 (1973); offers to buy, sell, or trade for illegal drugs; and all other forms of advocating, promoting, or instructing people how to commit illegal activity (as defined by the laws of our home state Maryland and of the United States as a whole.)

23.     However, several of the categories of speech the Act seeks to require us to restrict from viewing by minors—including speech related to self-harm, eating disorders, substance use disorders, suicidal behaviors, online bullying, and harassment—can include a wide range of speech that is not only protected, but valuable and suitable for minors (or at least for some). Our editorial philosophy in developing our content policies specifically seeks to center the ability of individuals, including minors, who struggle with these issues to have honest, open, and frank discussions of their experiences and struggles. Research into the effects of social media on minors confirm that this approach is particularly beneficial for minors who belong to racial, ethnic, sexual, and gender minorities (Charmaraman, L., Hernandez, J., & Hodes, R. (2022), *Marginalized and Understudied Populations Using Digital Media*, in J. Nesi, E. Telzer, & M. Prinstein (Eds.), Handbook of Adolescent Digital Media Use and Mental Health, Cambridge, Cambridge University Press, https://doi.org/10.1017/9781108976237.011) and can encourage minors who are experiencing mental health challenges to support each other and to seek out mental health care. (Hollis, C., Livingstone, S., & Sonuga-Barke, E. (2020). Editorial: *The role of digital technology in children and young people's mental health - a triple-edged sword?* Journal of child psychology and psychiatry, and allied disciplines, 61(8), 837-41, https://doi.org/10.1111/jcpp.13302).

24.     In developing our content policies regarding what subset of this category of speech we restrict, our goal is to minimize our intrusion on our users' speech that falls into these categories of speech that has a socially valuable and beneficial effect, despite describing the speaker's experience with unpleasant things or difficult struggles. Depending on the interpretations the Defendant uses for the Act, the Act's prohibition on showing minors content related to "harassment" could not only require us to remove speech that is itself harassment—which we already remove—but also speech that discusses how someone felt when experiencing harassment (which can provide support and validation to a minor experiencing harassment), explores how someone came to realize that their treatment was harassment (which can help a minor experiencing harassment realize that their treatment is unacceptable), or describes the steps someone took to recover their resilience and stability after experiencing harassment (which can provide an example to a minor experiencing harassment to prove that recovery is possible). The Act's prohibition on showing minors content related to "substance use disorders" could not only require us to remove speech that instructs people on how to obtain illegal drugs—which we already remove—but also speech that discusses how someone came to realize that their use of legal substances had become unhealthy or dependent (which can help a minor to come to the same realization or help them to avoid beginning the unhealthy patterns of use in the first place), or speech that validates the difficulty of the recovery process but affirms that recovery is possible and beneficial (which can help a minor who is experiencing substance use disorders to begin treatment and to continue treatment even if it is initially difficult or seems impossible).

25.     The Act references the difficulty in regulating this content in that it makes exception for "resources for the prevention or mitigation of the harms . . . including evidence-informed information and clinical resources", but it does not define any of the terms it uses or explain how

14

we could establish that a user's post contains evidence-informed information or clinical resources. Act § 6(2)(b). The Act would require us to prevent minors from being exposed to "content that promotes or facilitates . . . self-harm, eating disorders, substance use disorders, and suicidal behaviors", as defined by "evidence-informed medical information", but does not define "evidence-informed medical information" or offer us any guidance on how we should determine scientific and medical consensus, which expert opinions we should place weight on, or how to weigh the context of the content, its presentation, and its intended audience. *Id.* § 6(1)(a). The Act will require us to restrict "online bullying [and] harassment" and "patterns of use that indicate or encourage substance abuse or use of illegal drugs" from visibility to minors, but gives no guidance as to how to define or identify what it means by those terms. *Id.* § 6(1)(a)-(b). The uncertainty surrounding these terms, and the threat of state enforcement against us if the Defendant disagrees with our evaluations of the scientific evidence available to us, mean that we will no longer be able to utilize our best judgment about which subset of the protected speech concerning these topics is beneficial to minors and may remain and which subset is detrimental and must be removed. Instead, we will be forced to remove content based only on our best approximation of the beliefs of the Defendant, which will cover a great deal of speech we currently believe is beneficial and valuable to host and facilitate.

26.     In reading the Act, I do not know and cannot determine what, if any, changes to our content policies the state of Mississippi will require us to make in order to comply with the Act. Because I do not know and cannot determine what changes to our content policies complying with the Act will require, and because we do not have the ability to limit our content moderation actions to only residents of the state of Mississippi, we will be forced under threat of state enforcement to impose significantly greater restrictions on our users' speech than we would like to impose.

15

27.    ***Feature design and user safety***. In accordance with our Guiding Principles regarding privacy and individual control over how users' content is displayed to others, we have extremely limited forms of content recommendation systems. Registered users can choose to search for posts that contain specific words or phrases, but we do not display "suggested" or "related" posts when a user is viewing a post or comment. We have a single, limited form of suggesting accounts a user might be interested in: users can visit a separate page that ranks the accounts most frequently followed by people the user follows.

28.    We have two levels of flags for content restriction and rating. Users can apply these flags to individual posts or to their entire account, in which case each post made to the account will inherit the flag placed on the entire journal. The first level, "Viewer Discretion Advised", puts the content behind a click-through warning notice, customizable by the user, stating that the poster has advised that the content "should be viewed with discretion", along with any optional information a user provides about the reason they've restricted the content. (For instance, some users choose to restrict content because it contains "spoilers" for a TV show or film that has just aired, or because it contains photos that are not explicit but depict common phobias such as spiders or snakes.) There is no age restriction on who can reveal this content. The second level, "Adult Content", prevents users who are under the age of 18, as determined by the birthdate given at account creation, from viewing the content. Users whose birthdate given at account creation indicates they are over 18 will get a click-through warning notice reading "you are about to view content that [username] marked as inappropriate for anyone under the age of 18," along with any optional information a user provides about the reason they've restricted the content, though users over the age of 18 can disable these warnings in their account settings and choose to always view the content without a click-through warning.

29.    Each individual user can choose how to define what they consider "Adult Content" for the purposes of their account. For instance, users may use the label for posts that contain an above-average level of swearing, posts that link to news stories about graphic violence or display images of newsworthy graphic violence, or posts that discuss sexual activity in a way they feel is inappropriate for a non-adult audience. In general, we allow our users to define "Adult Content" as they see fit. However, if an account is reported to us as containing graphic visual depictions of sexual activity or sexualized nudity, and the account does not use the "Adult Content" label, we will apply that label as an administrative action. The voluntary compliance rate of our users in labeling posts and accounts that contain Adult Content is extremely high. Although we do not keep (and cannot reconstruct) records of how often we apply the Adult Content label to an account, my best estimate, as the only person who determines when to apply the administrative label to accounts, is that I need to do so fewer than twenty times a year.

30.    If visitors to the site have not created or are not logged into an account, we treat them as over the age of 18 for the purposes of displaying posts and accounts that contain the Adult Content flag: the content shows a click-through warning notice and the visitor must confirm they are over the age of 18 to access it. We have chosen to treat logged-out visitors as over the age of 18 because it is our experience that treating all logged-out visitors as though they are under 18 results in far fewer users properly using the Adult Content label for their account as a whole or for specific posts. This makes Dreamwidth less safe for our registered under-18 users—for which the Adult-Content-flagged content is *not* visible when those users are logged in.

31.    We provide an aggregate feed of the most recent public posts made to the site. This feed can be filtered, to some extent, to show a subset of posts based on labels ("tags") users have chosen to apply to their posts. We limit the tags that a user can use to filter this feed to only the

17

most-frequently-used tags. A user's posts do not appear on this feed if the user has marked the individual post as containing Adult Content, if the user has marked their entire account as containing Adult Content, or if the user has activated the account setting that prevents their posts from appearing on this feed.

32.     We have the administrative ability to mark a user's entire account as containing Adult Content and to activate the account setting that prevents a user's posts from appearing on the site-wide feed of most recent public posts. Because of our limited administrative and technical capacity, and because of our general belief that users are entitled to a wide amount of discretion in how they express themselves, we do not proactively monitor or search for accounts or posts containing Adult Content that are not labeled as Adult Content. Users are able to report accounts that contain Adult Content but are not labeled as Adult Content to our Trust and Safety department, at which point we evaluate the account and apply the Adult Content label as appropriate if the majority of the account contains Adult Content. We also apply the Adult Content label as appropriate to accounts we encounter on the site in the ordinary course of business where the majority of the account contains Adult Content but the account is not marked as such. We do not have the technical capacity to mark individual posts as containing Adult Content: we can only apply the label to the account as a whole. However, individual users have this post-by-post ability.

33.     ***Compliance burdens.*** Dreamwidth does not have any full-time employees. In addition to myself and my co-owner, both of whom operate Dreamwidth in our spare time, we have two part-time employees. We depend on a pool of approximately 200 volunteers, all of whom donate their time to make programmatic improvements to the site, provide technical support on a peer-to-peer basis, and protect the community from spam and malicious traffic. We do not have the resources to add more employees: because we are funded only by the users who choose to pay

18

us, not by advertising, our budget is severely constrained and we are unable to absorb additional expenses. We do not have the capacity to build identity-verification or parental-consent systems. And we both do not have the financial resources to engage a third-party service to do it on our behalf, but also object to that practice because it inherently involves the transfer of user data to a third party, something that is against our Guiding Principles.

34.    From my twenty-two year career in online Trust and Safety, both at Dreamwidth and at prior jobs, I know that confirming a parent-child relationship is significantly complicated, difficult to do accurately, and prone to multiple forms of "social engineering" attempts by unrelated third parties to coerce a site into disclosing protected user information or forcing users out of a community. For instance, because COPPA governs a website's ability to collect data on minors under the age of 13, a relatively common social engineering vector adopted by parties who maliciously wish to fool a website into closing a user's account is to write to the website and falsely claim the user is under the age of 13 and does not have parental consent to hold an account, even though the user is over the age of majority. Likewise, a relatively common social engineering vector adopted by parties who maliciously wish to obtain nonpublic information about a user's account is to write to the website and falsely claim to be the user's parent, requesting access to nonpublic data about the account. The provisions of the Act codify these tactics into law, and will provide malicious third parties unrelated to a user the ability to presumptively challenge the age and identity of any user. This not only creates a "heckler's veto" over any speech that proves unpopular or socially disfavored, allowing anyone the ability to force us to deanonymize any user whose speech offends someone and force them to prove that they are an adult, but will dramatically increase our support burden necessary to create and administer the system for these age challenges. We do not have the capacity to accept this additional support burden, nor do we have the financial

19

resources necessary to increase staffing to increase that capacity. Because of that, the Act threatens our ability to continue operating.

35.     From my twenty-two year career in online Trust and Safety, I know that familial relationships are often far more complicated than conventional wisdom believes, and identifying which person is a minor's parent or guardian with legal decision-making authority is often a complex task. For instance, if a minor has two divorced parents who disagree about whether their minor child should be permitted to hold an account on a website, the website must confirm the legal relationship between the parties and the minor involved, and determine which of the people at hand has the legal decision-making authority to provide sufficient parental consent. In a particularly contentious divorce, this can require a website to review divorce decrees, examine legal paperwork, and determine the authenticity and provenance of the documents supplied to them. Because someone who lives in Mississippi may have obtained their divorce from any one of the thousands of courts across the United States, or even from another country, before moving to Mississippi, this would require us to become experts in authenticating and interpreting court documents from anywhere in the world to verify which parent has legal authority to provide parental consent. We do not have the capacity to perform this authentication, nor do we have the financial resources necessary to increase staffing to increase that capacity. For this reason, too, the Act threatens our ability to continue operating.

36.     There is no national identity database that allows someone to verify a minor's identity, the legal relationship between a parent and a minor, or which parent has the authority to make binding decisions for a minor. There is no way to verify a user's identity beyond requiring the upload of government-issued identifying documents with corroborating photo or video confirmation, and many minors do not have photo ID. There is no way for a website to authenticate or verify

20

that the documents uploaded for identity verification purposes belong to the person who is uploading them, that the person who controls the account is the same person who provided the identifying documents, or that the documents are legitimate and not a forgery. Disputes about the identity of an account holder, their age, or the legal relationship between them and the person claiming to be their parent are complex, time-consuming, costly to investigate and resolve, and unfortunately common. The Act would only increase their number. We do not have the capacity to accept this additional support burden, nor do we have the financial resources necessary to increase staffing to increase that capacity.

37.    Because of the uncertainty and vagueness of the Act, the lack of useful definitions for many of its provisions, the impossibility of determining to any degree of certainty which users are residents of Mississippi without collecting additional personal data we do not currently collect, and the impossibility of determining which users are under the age of 18 without deanonymizing and forcibly identifying every user of our site, the Act will force us to err on the side of caution, require us to restrict access to the site beyond the restrictions we wish to place, require us to spend money far in excess of our available budget attempting to comply with the Act's burdensome and expensive dictates, require us to force our users to provide us significantly more personally-identifying data than we want to collect or they want us to have, generally require us to place significant burdens on the speech, conduct, and anonymity of both adults and minors, and will jeopardize our ability to continue offering the service at all.

*          *          *

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 30 day of May, 2024, in Baltimore, MD.

Denise Paolucci
Co-Owner, Dreamwidth Studios, LLC

22