**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**SOUTHERN DIVISION**

| | |
|---|---|
| NETCHOICE, LLC, <br><br> *Plaintiff*, <br><br> v. <br><br> LYNN FITCH, in her official capacity as <br> Attorney General of Mississippi, <br><br> *Defendant*. | Civil Action No. 1:24-cv-00170-HSO-BWR |

**PLAINTIFF NETCHOICE'S MEMORANDUM IN SUPPORT OF MOTION FOR**
**PRELIMINARY INJUNCTION AND TEMPORARY RESTRAINING ORDER**

# Table of Authorities

**Page(s)**

**Cases**

*303 Creative LLC v. Elenis*,
    600 U.S. 570 (2023)................................................................3, 7

*ACLU v. Mukasey*,
    534 F.3d 181 (3d Cir. 2008)...........................................................8

*Ala. Ass'n of Realtors v. HHS*,
    594 U.S. 758 (2021)......................................................................26

*Alexander v. United States*,
    509 U.S. 544 (1993)......................................................................11

*Am. Booksellers Found. v. Dean*,
    342 F.3d 96 (2d Cir. 2003)..............................................................8

*Ams. for Prosperity Found. v. Bonta*,
    594 U.S. 595 (2021)................................................................18, 19

*Ashcroft v. ACLU*,
    542 U.S. 656 (2004)............................................................. *passim*

*Ashcroft v. Free Speech Coal.*,
    535 U.S. 234 (2002)......................................................................13

*Baggett v. Bullitt*,
    377 U.S. 360 (1964)......................................................................15

*Bantam Books, Inc. v. Sullivan*,
    372 U.S. 58 (1963)..................................................................11, 22

*Barr v. Am. Ass'n of Pol. Consultants*,
    140 S. Ct. 2335 (2020).................................................................16

*Bartnicki v. Vopper*,
    532 U.S. 514 (2001)......................................................................22

*Batzel v. Smith*,
    333 F.3d 1018 (9th Cir. 2003) .......................................................24

*Book People, Inc. v. Wong*,
    91 F.4th 318 (5th Cir. 2024)..........................................................14

*Boos v. Barry*,
    485 U.S. 312 (1988)......................................................................17

*Brandenburg v. Ohio*,
    394 U.S. 444 (1969)...................................................................13

*Brown v. Ent. Merchs. Ass'n*,
    564 U.S. 786 (2011).......................................................... *passim*

*Butler v. Michigan*,
    352 U.S. 380 (1957)...................................................................20

*City of Boerne v. Flores*,
    521 U.S. 507 (1997)...................................................................18

*City of Houston v. Hill*,
    482 U.S. 451 (1987)..............................................................12, 16

*Cohen v. California*,
    403 U.S. 15 (1971).....................................................................18

*Doe v. MySpace, Inc.*,
    528 F.3d 413 (5th Cir. 2008) ...........................................3, 24, 25

*Erznoznik v. City of Jacksonville*,
    422 U.S. 205 (1975) .............................................................18, 19

*FCC v. Fox Television Stations, Inc.*,
    567 U.S. 239 (2009).............................................................15, 23

*FEC v. Cruz*,
    596 U.S. 289 (2022)...................................................................22

*Free Speech Coalition, Inc. v. Paxton*,
    95 F.4th 263 (5th Cir. 2024) ..............................................9, 24, 25

*Freedman v. Maryland*,
    380 U.S. 58 (1965).....................................................................11

*Grayned v. City of Rockford*,
    408 U.S. 104 (1972)...................................................................15

*Hess v. Indiana*,
    414 U.S. 105 (1973)...................................................................18

*HomeAway.com, Inc. v. City of Santa Monica*,
    918 F.3d 676 (9th Cir. 2019) ....................................................25

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*,
    515 U.S. 557 (1995)......................................................................7

*Interstate Cir., Inc. v. City of Dallas*,
    390 U.S. 676 (1968)............................................................14

*Joseph Burstyn, Inc. v. Wilson*,
    343 U.S. 495 (1952)..............................................................3

*Kolender v. Lawson*,
    461 U.S. 352 (1983)............................................................15

*La'Tiejira v. Facebook, Inc.*,
    272 F. Supp. 3d 981 (S.D. Tex. 2017) ...........................24, 25

*Lovell v. City of Griffin*,
    303 U.S. 444 (1938)..............................................................7

*Nat'l Inst. of Fam. & Life Advocs. v. Becerra*,
    585 U.S. 755 (2018)............................................................17

*Nat'l Rifle Ass'n of Am. v. Vullo*,
    No. 22-842, 2024 WL 2751216 (U.S. May 30, 2024) ............11

*Neb. Press Ass'n v. Stuart*,
    427 U.S. 539 (1976)............................................................11

*NetChoice, LLC v. Attorney Gen., Fla.*,
    34 F.4th 1196 (11th Cir. 2022) .............................................7

*NetChoice, LLC v. Bonta*,
    2023 WL 6135551 (N.D. Cal. Sept. 18, 2023) ........1, 7, 14, 21

*NetChoice, LLC v. Griffin*,
    2023 WL 5660155 (W.D. Ark. Aug. 31, 2023) ............. *passim*

*NetChoice, LLC v. Paxton*,
    49 F.4th 439 (5th Cir. 2022) .................................................7

*NetChoice, LLC v. Yost*,
    2024 WL 555904 (S.D. Ohio Feb. 12, 2024)................. *passim*

*Netflix, Inc. v. Babin*,
    88 F.4th 1080 (5th Cir. 2023) .............................................25

*Newsome v. Fairley*,
    2018 WL 4635688 (S.D. Miss. Sept. 27, 2018)......................6

*Nken v. Holder*,
    556 U.S. 418 (2009)............................................................26

*Opulent Life Church v. City of Holly Springs*,
697 F.3d 279 (5th Cir. 2012) ............................................26

*Packingham v. North Carolina*,
582 U.S. 98 (2017)....................................................2, 9, 18

*Reed v. Town of Gilbert*,
576 U.S. 155 (2015) ............................................................16

*Reno v. ACLU*,
521 U.S. 844 (1997).................................................. *passim*

*Roman Catholic Diocese of Brooklyn v. Cuomo*,
592 U.S. 14 (2020)..............................................................26

*Smith v. California*,
361 U.S. 147 (1959) ............................................................12

*Smith v. Daily Mail Pub. Co.*,
443 U.S. 97 (1979).......................................................11, 12

*Sorrell v. IMS Health Inc.*,
564 U.S. 552 (2011)........................................................7, 17

*Texans for Free Enter. v. Tex. Ethics Comm'n*,
732 F.3d 535 (5th Cir. 2013) ...............................................6

*Turner Broad. Sys. v. FCC*,
512 U.S. 622 (1994)............................................................17

*United States v. Hansen*,
599 U.S. 762 (2023).............................................................22

*United States v. Playboy Ent. Grp.*,
529 U.S. 803 (2000) ................................................18, 19, 20

*United States v. Stevens*,
559 U.S. 460 (2010).............................................................7

*United States v. Williams*,
553 U.S. 285 (2008) ............................................................23

*Virginia v. Am. Booksellers Ass'n*,
484 U.S. 383 (1988)....................................................7, 14, 21

**Statutes**

47 U.S.C. § 230...................................................2, 19, 24, 25

Miss. Code § 11-77-3 ...................................................................................6

Miss. Code § 75-24-9 ...................................................................................6

Miss. Code § 75-24-19 .................................................................................6

Miss. Code § 75-24-20 .................................................................................6

Miss. HB 1126, R.S., 2024 ..................................................................*passim*

Vicksburg, Miss. Code § 7.4-24 ................................................................13

**Literature and Other Media**

*13 Reasons Why* (Netflix 2017-20)..........................................................12

Arthur Conan Doyle, *The Adventures of Sherlock Holmes* (1892)................12

Carrie Underwood, *Before He Cheats* (Fame 2006)...................................13

F. Scott Fitzgerald, *The Great Gatsby* (1925)...........................................13

Fred Ebb & Bob Fosse, *Chicago* (Chapelle Music Co. 1975)......................13

J.D. Salinger, *The Catcher in the Rye* (1951) ...........................................13

Leo Tolstoy, *Anna Karenina* (1878).........................................................12

*National Treasure* (Walt Disney Pictures 2004) .......................................17

Peter Singer, *Practical Ethics* (3d ed. 2011).............................................12

Stephen Chbosky, *The Perks of Being a Wallflower* (1999) .......................13

Sylvia Plath, *The Bell Jar* (1963)............................................................12

Taylor Swift, *The Tortured Poets Department* (Republic 2024)...................13

The Beatles, *With A Little Help From My Friends* (EMI 1967)....................15

The Holy Bible, Judges 16:23-31 ..............................................................12

*The Little Rascals* (Universal Pictures 1994).............................................15

*The Phantom of the Opera* (Warner Bros. Pictures 2004)...........................13

The Police, *Every Breath You Take* (A&M 1983).......................................13

The Weeknd, *Can't Feel My Face* (Republic 2015)....................................13

Toby Keith, *Weed With Willie* (DreamWorks Records 2003)......................................................13

William Shakespeare, *Hamlet* (1603)...............................................................................................12

William Shakespeare, *Romeo and Juliet* (1597)..............................................................................12

**Table of Contents**

Introduction ................................................................................................................ 1

Background .............................................................................................................. 3

    A. Factual background ........................................................................................ 3

        1. NetChoice-member websites disseminate protected speech ................................. 3

        2. Parents have many tools to oversee how their children use the Internet. .............. 3

    B. Mississippi House Bill 1126 ............................................................................ 4

Argument ................................................................................................................. 6

    I. NetChoice is likely to succeed on the merits of its claims that the Act and its age-verification, parental-consent, and monitoring-and-censorship requirements violate the First Amendment—and that the monitoring-and-censorship requirements also violate the Due Process Clause. ...................................................................... 7

    A. The Act's age-verification, parental-consent, and monitoring-and-censorship requirements trigger First Amendment strict scrutiny, and the monitoring-and-censorship requirements also violate due process. ........................................ 7

        1. The Act's age-verification requirements to access protected speech for both minors and adults violate the First Amendment (§ 4(1)). .................................... 8

        2. The Act's parental-consent requirement for minors to access protected speech violates the First Amendment (§ 4(2)). ............................................................. 9

        3. The Act's monitoring-and-censorship requirements violate the First Amendment and the Due Process Clause (§ 6). ..................................................................... 10

        4. The Act is content-, viewpoint-, and speaker-based, which triggers First Amendment strict scrutiny. ................................................................................. 16

    B. The Act fails strict scrutiny and any other form of heightened First Amendment scrutiny. ............................................................................................................ 18

        1. The State lacks a sufficient governmental interest in restricting adults and minors' access to protected speech. ..................................................................... 18

        2. The Act is not properly tailored. ........................................................................ 19

            a. The entire Act is improperly tailored. ........................................................... 19

            b. The age-verification (§ 4(1)), parental consent (§ 4(2)), and monitoring-and-censorship requirements (§ 6) are improperly tailored for additional, independent reasons. ........................................................... 21

    II. NetChoice is likely to succeed on the merits of its claim that the Act's central definition of "digital service provider" is unconstitutionally vague. ..................... 22

    III. NetChoice is likely to succeed on the merits of its claim that the Act's monitoring-and-censorship requirements (§ 6) are preempted by 47 U.S.C. § 230. ............... 24

    IV. NetChoice meets all the remaining factors for a preliminary injunction. .................. 25

Conclusion ............................................................................................................... 26

**Introduction**

Mississippi House Bill 1126 ("Act") is the latest governmental attempt to violate founda-
tional constitutional principles by restricting minors' online access to protected speech. Enacted
on April 30, 2024, the Act uses content- and speaker-based regulations to restrict websites and
users' First Amendment activity by imposing: (1) age-verification (§ 4(1));[1] (2) parental-consent
(§ 4(2)); and (3) monitoring-and-censorship requirements (§ 6). Through these restrictions, the Act
unconstitutionally regulates (1) websites' "ability to publish and distribute speech *to minors* and
speech *by minors*"; (2) "minors' ability to both *produce speech* and *receive speech*"; and
(3) adults' access to protected speech. *NetChoice, LLC v. Yost*, 2024 WL 555904, at *6 (S.D. Ohio
Feb. 12, 2024). Accordingly, this Court should do the same as courts across the country and enjoin
this improper attempt to regulate online speech. *See, e.g.*, *id.* at *14; *NetChoice, LLC v. Bonta*,
2023 WL 6135551, at *13, *24 (N.D. Cal. Sept. 18, 2023); *NetChoice, LLC v. Griffin*, 2023 WL
5660155, at *21 (W.D. Ark. Aug. 31, 2023). NetChoice requests that this Court enter an injunction
that prohibits Defendant from enforcing the Act before the Act's July 1, 2024, effective date. If a
ruling by July 1, 2024, is not feasible, and if Defendant does not disclaim enforcement while this
motion is pending, then NetChoice requests the Court enter a temporary restraining order.

Minors "are entitled to a significant measure of First Amendment protection," and the gov-
ernment's power to protect them "does not include a free-floating power to restrict the ideas to
which children may be exposed." *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 794 (2011) (citation
omitted). Further, speech regulations for minors cannot infringe or burden adults' speech rights.
*Ashcroft v. ACLU*, 542 U.S. 656, 667 (2004); *Reno v. ACLU*, 521 U.S. 844, 881-82 (1997).

Americans' speech rights extend to the Internet, including NetChoice members' websites,

---

[1] All similar references are references to sections of House Bill 1126. *See* Ex. 1.

which offer the "capacity for communication of all kinds," *Packingham v. North Carolina*, 582 U.S. 98, 104 (2017) (citation omitted); and which allow their users to "engage in a wide array of protected First Amendment activity on topics as diverse as human thought," *Griffin*, 2023 WL 5660155, at *5 (cleaned up). Covered websites facilitate every American's access to a vast amount of speech, numbering in the "billions of 'posts' every day." *Yost*, 2024 WL 555904, at *1.[2]

The Act threatens to stifle this activity. Because the Act's central coverage definitions are content- and speaker-based, the Act's operative provisions trigger strict scrutiny. And the Act cannot satisfy that high standard. *First*, the Act's age-verification requirement (§ 4(1)) will unconstitutionally chill speech. *See Ashcroft*, 542 U.S. at 667 (invalidating age-verification requirement); *Reno*, 521 U.S. at 882 (same); *Griffin*, 2023 WL 5660155, at *17 (same). *Second*, the Act's parental-consent requirement (§ 4(2)) is unconstitutional because governments lack the "power to prevent children from hearing or saying anything *without their parents' prior consent.*" *Brown*, 564 U.S. at 795 n.3; *see Yost*, 2024 WL 555904, at *11-12 (rejecting similar parental-consent requirement); *Griffin*, 2023 WL 5660155, at *17 (same). *Third*, the Act's requirement that covered websites monitor and censor certain vague and subjective categories of protected speech on minors' accounts (§ 6) is an unconstitutional prior restraint. The State cannot replace private websites' voluntary "content moderation"—choices about whether and how to disseminate speech—with a mandate to censor speech based on its content or based on its viewpoint. But the Act does both. It would require covered websites to alter how they disseminate everything from classic literature, such as *Romeo and Juliet* and *The Bell Jar*, to contemporary Taylor Swift songs.

The Act's monitoring-and-censorship requirements are also preempted by 47 U.S.C. § 230

---

[2] This Motion uses "covered websites" to refer to the websites, applications, and other digital services that the Act covers.

("§ 230"). States cannot impose "monitoring" requirements on websites disseminating user-generated speech or otherwise impose liability for alleged "failure[s] to implement basic safety measures" that make them liable for purportedly facilitating users' access to objectionable third-party speech. *Doe v. MySpace, Inc.*, 528 F.3d 413, 418-20 (5th Cir. 2008) (citation omitted).

<strong>Background</strong>

**A.      Factual background**

**1.      NetChoice-member websites disseminate protected speech.**

NetChoice is a leading Internet trade association. Based on the Act's definitions, the Act regulates some of the services offered by the following NetChoice members: (1) Dreamwidth; (2) Google; (3) Meta; (4) Nextdoor; (5) Pinterest; (6) Snap Inc.; and (7) X. *See* Szabo Decl. ¶ 26. Although the Act does not regulate all NetChoice members, this Motion refers to members with services the Act regulates as "members." Each member operates a website that "publish[es]," *Reno*, 521 U.S. at 853; "disseminate[s]," *303 Creative LLC v. Elenis*, 600 U.S. 570, 594 (2023); "creat[es]," or "distribut[es]," *Brown*, 564 U.S. at 792 n.1, protected speech, Szabo Decl. ¶¶ 4-7. The members do so by displaying text, audio, images, or video ("content") to users. *Id.* ¶ 7.[3]

Teens (like adults) use these websites for protected expression, education, civic engagement, *id.*, and just plain "entertain[ment]." *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 501 (1952). They engage with news, politics, sports, extracurricular activities, educational opportunities, and information about career prospects. *See, e.g.*, Szabo Decl. ¶ 6.

**2.      Parents have many tools to oversee how their children use the Internet.**

Parents have many means of asserting control over their children's online experiences. *Id.*

---

[3] Except where noted otherwise, this Motion uses the term "user" to encompass both what the Act calls "users" and "account holders." When discussing the Act's requirements, this Motion also uses "minor," "adult," "account holder," and "user" to refer only to Mississippi minors, adults, account holders, and users covered by the Act.

¶ 8. Fundamentally, parents control what *devices* minors can access—and when. *Id.* Today's Internet-enabled devices have many parental-control options, including the ability to lock or limit specific apps and features, restrict the device settings to limit content and downloads, limit access to only approved websites, and set overall or time-of-day usage limits. *Id.* Parents also control the *networks* that minors use to connect to the Internet. *Id.* Wireless routers allow parents to manage which Internet websites minors can use (and at what times). *Id.* Cellular and broadband Internet providers offer similar controls. *Id.* Parents also have control over *software*. *Id.* Web browsers offer parental controls, and third-party parental control software is available for many devices. *Id.*

Many members have developed parental controls and protections for minors on their services. *E.g.*, *id.* ¶ 9; Veitch Decl. ¶¶ 6-17. These controls supplement the resources that members spend crafting and enforcing policies that aim to, among other things, prevent harmful or objectionable speech from reaching users. *E.g.*, Szabo Decl. ¶ 9. These policies address nudity and sexual content, self-harm, substance abuse, harassment and bullying, and child exploitation. *Id.* ¶¶ 12-19; Veitch Decl. ¶¶ 19-20; Pai Decl. ¶¶ 10-14; Paolucci Decl. ¶¶ 16-19, 22, 27-32. Members' content moderation is effective, especially considering the hurdles they face. Szabo Decl. ¶ 21.

B.     **Mississippi House Bill 1126**

**Content- and speaker-based definition of "digital service provider" (§§ 2(a)-(b), 3).**
The Act regulates "digital service provider[s]": any entity that "(i) Owns or operates a digital service [that is, 'a website, an application, a program, or software that collects or processes personal identifying information']; (ii) Determines the purpose of collecting and processing the personal identifying information of users . . . ; and (iii) Determines the means used to collect and process the personal identifying information of users of the digital service." § 2(a)-(b). The Act applies only to "digital services" that meet certain content-based criteria—namely, services that (§ 3(1)):

(a) Connect[] users in a manner that allows users to socially interact with other users on

4

the digital service; (b) Allow[] a user to create a public, semi-public or private profile for purposes of signing into and using the digital service; and (c) Allow[] a user to create or post content that can be viewed by other users of the digital service, including sharing content on: (i) A message board; (ii) A chat room; or (iii) A landing page, video channel or main feed that presents to a user content created and posted by other users.

The Act excludes many content-based "digital services" (§ 3(2)), including (as most relevant here):

(c) A . . . digital service that: (i) Primarily functions to provide a user with access to news, sports, commerce, online video games or content primarily generated or selected by the digital service provider; and (ii) Allows chat, comment or other interactive functionality that is incidental to the digital service; or

(d) A . . . digital service that primarily functions to provide a user with access to career development opportunities, including: (i) Professional networking; (ii) Job skills; (iii) Learning certifications; (iv) Job posting; and (v) Application services.[4]

**Age verification (§ 4(1)).** Covered websites "shall make commercially reasonable efforts to verify the age of the person creating an account with a level of certainty appropriate to the risks that arise from the information management practices of the digital service provider." § 4(1).[5]

**Parental consent (§ 4(2)).** Covered websites "shall not permit an account holder who is a known minor to be an account holder unless the known minor has the express consent from a parent or guardian." § 4(2). A "known minor" is any unemancipated minor "who the [covered website] knows to be a minor." § 2(d).[6] The Act enumerates five "acceptable methods of obtaining express consent" and a sixth catch-all category for "[a]ny other commercially reasonable method of obtaining consent in light of available technology." § 4(2).

**Monitoring and censorship (§ 6(1)).** Covered websites "shall make commercially reasonable efforts to develop and implement a strategy to prevent or mitigate [] known minor[s'] exp-

---

[4] The Act contains other exceptions for other employment services, "email or direct messaging services," internet service providers, search engines, and cloud providers. § 3(2)(a)-(b), (3).

[5] Many covered websites require users to create accounts to access some or all of the speech on the websites. *See* Szabo Decl. ¶ 31; Veitch Decl. ¶ 34; Paolucci Decl. ¶ 5.

[6] Because the Act requires covered websites "to verify the age of the person creating an account" § 4(1), the Act, in effect, requires covered websites to "know" the ages of their users.

osure to harmful material and other content that promotes or facilitates the[se] harms to minors":

> (a) Consistent with evidence-informed medical information, the following: self-harm, eating disorders, substance use disorders, and suicidal behaviors;
> (b) Patterns of use that indicate or encourage substance abuse or use of illegal drugs;
> (c) Stalking, physical violence, online bullying, or harassment;
> (d) Grooming, trafficking, child pornography, or other sexual exploitation or abuse;
> (e) Incitement of violence; or
> (f) Any other illegal activity.

§ 6(1). "Harmful material" is obscenity for minors. § 2(c) (referencing Miss. Code § 11-77-3(d)).

This provision contains two exceptions. "Nothing in" the Act "shall be construed . . . to prevent": "(a) Any minor from deliberately and independently searching for, or specifically requesting, content; or (b) . . . providing resources for the prevention or mitigation of the harms described [above], including evidence-informed information and clinical resources." § 6(2).

**Enforcement and penalties.** The Act designates violations as "unfair or deceptive trade practices." § 8. Defendant has the authority to seek injunctive relief, civil monetary penalties of up to $10,000 per violation, and even criminal liability. Miss. Code §§ 75-24-9, -19, -20.

## Argument

*Standard of review.* NetChoice is entitled to a preliminary injunction and/or a temporary restraining order because it can demonstrate: (1) a "substantial likelihood of success on the merits"; (2) a "substantial threat of irreparable injury"; (3) that the equities favor an injunction; and (4) that the injunction "serve[s] the public interest." *Texans for Free Enter. v. Tex. Ethics Comm'n*, 732 F.3d 535, 537 (5th Cir. 2013) (citation omitted); *Newsome v. Fairley*, 2018 WL 4635688, at *2 (S.D. Miss. Sept. 27, 2018) (standard is the same for temporary restraining orders when Defendant has notice).

*First Amendment principles.* The "freedom[s] of speech and the press . . . do not vary when a new and different medium for communication appears." *Brown*, 564 U.S. at 790 (cleaned up). "The press. . . comprehends every sort of publication which affords a vehicle of information and

opinion." *Lovell v. City of Griffin*, 303 U.S. 444, 452 (1938). "[N]o less can hold true when it comes to speech . . . conveyed over the Internet." *303 Creative*, 600 U.S. at 587. Websites' choices about whether and how to "disseminat[e]" speech are protected by the First Amendment. *See, e.g.*, *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 570 (2011). The First Amendment also protects entities that disseminate speech *created by others*. *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*, 515 U.S. 557, 570 (1995). These principles apply here.[7] In this First Amendment case, NetChoice has standing to assert harms to its members and their minor and adult users—current and prospective. *See, e.g.*, *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 392-93 (1988).[8]

For all claims, NetChoice raises a facial challenge: there is "no set of circumstances" where the challenged provisions "would be valid." *United States v. Stevens*, 559 U.S. 460, 472-73 (2010) (citation omitted). For the First Amendment claims, NetChoice also raises overbreadth challenges: "a substantial number of [the Act's] applications are unconstitutional." *Id.* (citation omitted).

I.    **NetChoice is likely to succeed on the merits of its claims that the Act and its age-verification, parental-consent, and monitoring-and-censorship requirements violate the First Amendment—and that the monitoring-and-censorship requirements also violate the Due Process Clause.**

      A.    **The Act's age-verification, parental-consent, and monitoring-and-censorship requirements trigger First Amendment strict scrutiny, and the monitoring-and-censorship requirements also violate due process.**

The Act's age-verification (§ 4(1)), parental-consent (§ 4(2)), and monitoring-and-

---

[7] The First Amendment protects websites' choices about whether and how to disseminate speech. *NetChoice, LLC v. Attorney Gen., Fla.*, 34 F.4th 1196, 1216 (11th Cir. 2022), *cert. granted in part Moody v. NetChoice, LLC*, 144 S. Ct. 478 (2023). A divided panel of the Fifth Circuit, however, concluded that certain websites like "Facebook, [X], and YouTube" lack the right to choose not to disseminate speech. *NetChoice, LLC v. Paxton*, 49 F.4th 439, 455 (5th Cir. 2022), *cert. granted in part NetChoice, LLC v. Paxton*, 144 S. Ct. 477 (2023). *Paxton* is distinguishable because the law there did not mandate censorship, and on other grounds. *Paxton* was also wrong, and NetChoice expects a decision from the Supreme Court in *Paxton* in the coming weeks.

[8] *See Yost*, 2024 WL 555904, at *4; *Bonta*, 2023 WL 6135551, at *4; *Griffin*, 2023 WL 5660155, at *11-12.

censorship requirements (§ 6) trigger First Amendment strict scrutiny.

As the Supreme Court has made clear, this country lacks a "longstanding tradition . . . of specially restricting children's access to" protected speech. *Brown*, 564 U.S. at 795. The "absence of any historical warrant or compelling justification for such restrictions . . . renders them invalid." *Id.* at 795 n.3. And Defendant cannot use the "unprecedented and mistaken" strategy of "creat[ing] new categories of unprotected speech" just for minors. *Id.* at 792, 794. Without "historical warrant," the Act is "invalid" under any standard of heightened scrutiny. *Id.* at 795 n.3.

1. **The Act's age-verification requirements to access protected speech for both minors and adults violate the First Amendment (§ 4(1)).**

The Act violates the First Amendment by requiring all users—adults and minors alike—to "verify" their "age[s]" to "creat[e] an account" on covered websites. § 4(1).

The Supreme Court has held that governments cannot require people to provide personal information or documentation—such as "identif[ication]" or "credit card information"—to access protected speech. *Ashcroft*, 542 U.S. at 667; *Reno*, 521 U.S. at 881-82. Last year, *Griffin* applied these principles to a similar law, concluding that "[i]t is likely that many" people "who otherwise would be interested in becoming account holders . . . will be deterred—and their speech chilled— as a result of [] age-verification." 2023 WL 5660155, at *17; *see* Pai Decl.¶¶ 20-33. Age verification forces users to "forgo the anonymity otherwise available on the internet." *Griffin*, 2023 WL 5660155, at *17 (quoting *Am. Booksellers Found. v. Dean*, 342 F.3d 96, 99 (2d Cir. 2003)); *see ACLU v. Mukasey*, 534 F.3d 181, 197 (3d Cir. 2008) (similar). In short, age verification can unlawfully *bar* access for those unwilling or unable to provide the requisite identification. *See, e.g.*, *Reno*, 521 U.S. at 856; Veitch Decl. ¶ 34.

Here too, this Act's age-verification requirement would impose an unconstitutional hurdle for all users to access protected speech. Users would need to provide information or documentation

before sharing creative writing on Dreamwidth, discussing their faith on a forum dedicated to religion, "petition[ing] their elected representatives " on X, "shar[ing] vacation photos . . . with their friends and neighbors" on Facebook, uploading math tutorials to YouTube, looking for neighborhood jobs on Nextdoor, and otherwise engaging in protected speech on the numerous websites covered by the Act. *Packingham*, 582 U.S. at 104-05. The First Amendment does not permit the government to restrict any of these activities.

The Fifth Circuit's recent decision in *Free Speech Coalition, Inc. v. Paxton* is not to the contrary. *See* 95 F.4th 263 (5th Cir. 2024), *petition for cert. filed* Apr. 12, 2024 (No. 23-1122). The Fifth Circuit there considered an age-verification requirement for "commercial pornographic websites," which disseminate speech *unprotected* for minors. *Id.* at 266. The court held that "regulations of the distribution *to minors* of materials obscene *for minors* are subject only to rational-basis review." *Id.* at 269. By contrast here, the Act regulates minors' access to a vast array of speech that is unquestionably protected for minors. The Act is thus subject to strict scrutiny.

       **2.    The Act's parental-consent requirement for minors to access protected speech violates the First Amendment (§ 4(2)).**

The Act also violates the First Amendment by requiring minors to secure parental consent before becoming "an account holder," and thus before accessing protected speech on covered websites. § 4(2); *see Yost*, 2024 WL 555904, at \*12 ("[L]aws that require parental consent for children to access constitutionally protected, non-obscene content, are subject to strict scrutiny.").

Minors have the First Amendment "right to speak or be spoken to without their parents' consent," and "the state" lacks the "power to prevent children from hearing or saying anything without their parents' prior consent." *Brown*, 564 U.S. at 795 n.3. Otherwise, governments would have authority to impose parental-consent requirements for "political rall[ies]" or "religious" services. *Id.* The Court has rejected that proposition. *Id.* After all, "minors are entitled to a significant

measure of First Amendment protection." *Id.* at 794 (cleaned up). Since *Brown*, courts have rejected similar parental-consent requirements, including provisions affecting NetChoice members. *See Yost*, 2024 WL 555904, at *11-12; *Griffin*, 2023 WL 5660155, at *17.

The Act fails for the same reasons. The parental-consent requirement would impose an unconstitutional hurdle between minors and "vast quantities of constitutionally protected speech." *Griffin*, 2023 WL 5660155, at *17. That problem is exacerbated because the Act does not address the difficulty in verifying the parent-child relationship. When enjoining a similar requirement, *Griffin* credited the *State's* expert testimony that "the biggest challenge . . . with parental consent is actually establishing . . . the parental relationship." *Id.* at *4. These difficulties are compounded when, for example, families are nontraditional (*e.g.*, foster families), parents disagree, minors are unsafe at home, or parental rights have been terminated. *See* Szabo Decl. ¶ 31; Paolucci Decl. ¶¶ 34-36. Facing liability, covered websites are likely to "err on the side of caution and require detailed proof of the parental relationship." *Griffin*, 2023 WL 5660155, at *15. Thus, "parents and guardians who otherwise would have freely given consent . . . will be dissuaded by the red tape" and the requirement to forego their own anonymity "and refuse consent—which will unnecessarily burden minors' access to constitutionally protected speech." *Id.* So, on top of everything, there will be many cases where a lack of parental *consent* does not reflect a lack of parental *approval*.

### 3.  The Act's monitoring-and-censorship requirements violate the First Amendment and the Due Process Clause (§ 6).

The Act's requirement for covered websites to "develop and implement a strategy to prevent or mitigate [a] known minor's exposure to" particular categories of speech violates the First Amendment. § 6. This provision would supplant covered websites' voluntary content moderation with a governmental mandate not to publish certain (vaguely defined and subjective) categories of speech—including protected speech. The government cannot censor this speech "directly," so it

10

cannot "coerce" websites to suppress "speech on [its] behalf." *Nat'l Rifle Ass'n of Am. v. Vullo*, 2024 WL 2751216, at *8 (U.S. May 30, 2024) (citation omitted). This provision has several constitutional defects.

**a.** This provision is a prior restraint, as it would prohibit covered websites from publishing disfavored speech to minors unless they meet state-imposed requirements. By requiring covered websites to "prevent . . . minor[s'] exposure" to prohibited speech, (§ 6(1)), the Act prohibits dissemination of speech before it occurs and before the government has proven that the speech may lawfully be suppressed. *See Alexander v. United States*, 509 U.S. 544, 550 (1993). Such prior restraints are the "least tolerable infringement on First Amendment rights." *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976). Rather than revive the external censorship boards that the Supreme Court rejected in *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58 (1963), the Act requires websites to adopt an internal, state-mandated "strategy" to avoid disseminating certain speech. That is no less censorship. Even prior restraints of *unprotected* speech must meet "the most exacting scrutiny." *Smith v. Daily Mail Pub. Co.*, 443 U.S. 97, 102 (1979) (collecting cases). Yet the Act's categories encompass both protected and (some kinds of) unprotected speech.

The Act's censorship requirements go far beyond the "informal" governmental "coercion, persuasion, and intimidation" that the Supreme Court has rejected. *Bantam Books*, 372 U.S. at 67; *see Vullo*, 2024 WL 2751216, at *8-11. The statute creates a formal command, backed by legal penalties, that covered websites ensure certain speech is not disseminated to minor users. Yet the Act lacks the "procedural safeguards" that the First Amendment requires of prior restraints. *Freedman v. Maryland*, 380 U.S. 58-59 (1965). Among these, the *government* (1) must "go to court to restrain" specific content; (2) "bears the burden of persua[ding]" the court that the restraint is lawful; and (3) "must also assure a prompt final judicial decision." *Id.* (cleaned up); *see Bantam Books*,

372 U.S. at 70-71. Because the Act fails strict scrutiny, it necessarily fails "the most exacting scrutiny" that courts use to analyze prior restraints. *Smith*, 443 U.S. at 102.

**b.** The "constitutional guarantees of the freedom of speech and of the press" "inhibit[]" the government from making covered websites "the strictest censors" of the speech on their websites. *Smith v. California*, 361 U.S. 147, 152-53 (1959). Requiring websites to screen all the speech that they disseminate to see if it meets the State's (vague and subjective) standards will necessarily chill speech—especially if Defendant interprets the Act to impose liability for imperfect content moderation. And websites' "burden would become the public's burden, for by restricting [a website's publication decisions,] the public's access to reading matter would be restricted." *Id.* at 153.

**c.** The monitoring-and-censorship provision reaches "a substantial amount of constitutionally protected speech[,]" rendering it substantially overbroad and "facially invalid." *City of Houston v. Hill*, 482 U.S. 451, 458 (1987). The First Amendment does not permit the State to enact "statute[s] patently capable of many unconstitutional applications, threatening those who validly exercise their rights of free expression." *Smith*, 361 U.S. at 151. The Act's broad categories of disfavored speech would arguably capture much of the art and literature that the First Amendment protects for adults and minors alike, including the examples below. *See* Compl. ¶ 52.

Many protected works of literature and philosophy "promote[] or facilitate[] . . . [s]elf-harm, eating disorders, substance use disorders, and suicidal behaviors." § 6(1)(a). Examples include the biblical story of Samson (Judges 16:23-31), *Romeo and Juliet* (1597) and *Hamlet* (1603), Tolstoy's *Anna Karenina* (1878), Sylvia Plath's *The Bell Jar* (1963), debates about assisted dying (*e.g.*, Peter Singer, *Practical Ethics* (1993)), and the TV series *13 Reasons Why* (2017-20).

Likewise, literature and popular culture are replete with protected speech that "promotes or facilitates . . . substance abuse or use of illegal drugs." § 6(1)(b). Examples include *The*

*Adventures of Sherlock Holmes* (1892), F. Scott Fitzgerald's *The Great Gatsby* (1925), J.D. Salinger's *The Catcher in the Rye* (1951), the novel *The Perks of Being a Wallflower* (1999), Toby Keith's *Weed With Willie* (2003), The Weeknd's Kids'-Choice-Award-nominated song *Can't Feel My Face* (2015), and songs on Taylor Swift's *The Tortured Poets Department* (2024).

Similarly, many protected works of art "promote[] or facilitate[] . . . [s]talking, physical violence, online bullying, or harassment." § 6(1)(c). Examples include *The Phantom of the Opera* (2004), the musical *Chicago* (1975), The Police's *Every Breath You Take* (1983), Carrie Underwood's *Before He Cheats* (2006), entire categories at large bookstores (Compl. ¶ 52), and nearly every war or horror movie ever made (to say nothing of many romantic comedies).

Members work tirelessly to detect and block content that "promotes or facilitates . . . [g]rooming, trafficking, child pornography, or other sexual exploitation or abuse." § 6(1)(d); *see* Szabo Decl. ¶ 15; Veitch Decl. ¶ 19. Yet even "teenage sexual activity and the sexual abuse of children" has "inspired countless literary works" such as "Romeo and Juliet" and the movie "American Beauty." *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 247 (2002).

Many works of art, literature, and political expression, and pop culture "promote[] or facilitate[] . . . [i]ncitement of violence." § 6(1)(e). Indeed, The Declaration of Independence was a call to arms against the British Crown. And it was concern about minors' exposure to violent video games that led to the Supreme Court's decision in *Brown*. 564 U.S. at 794. Short of actual incitement to "imminent lawless action [that] is likely to incite or produce such action," such speech is fully protected by the First Amendment. *Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969).

Countless forms of protected speech could "promote[] or facilitate[] . . . [a]ny other illegal activity." § 6(1)(f); *see* Compl. ¶ 52. Social media posts expressing support for defacing works of art and graffiti could promote illegal activity. So could travel videos telling tourists in New York

City to feel free to jaywalk. Worse, what is "illegal" will vary within Mississippi itself. For example, because it is "unlawful" for a minor to violate curfew in some cities, *e.g.*, Vicksburg, Miss., Code § 7.5-24, a website could violate the Act by failing to prevent a minor from "promoting" attendance at an evening movie. But other cities do not have curfew ordinances, *e.g.*, Oxford. These complexities only multiply for activity that is "illegal" outside of Mississippi. § 6(1)(f).

The final category of "harmful material" (obscenity for minors, § 2(c)) does not distinguish between content that is obscene to young children versus teenagers. Instead, the Act applies equally to "an infant, a five-year old, or a person just shy of age seventeen." *Bonta*, 2023 WL 6135551, at *15 (cleaned up). Even laws regulating unprotected obscenity for minors must account for the differences between minors of different ages. *See Am. Booksellers*, 484 U.S. at 396.

The Act's two exceptions to § 6's requirements raise yet more questions and thus do not cure the Act's overbreadth. They permit: (1) minors to "deliberately and independently search[]" for, or specifically request[]" speech; and (2) "resources for the prevention or mitigation of the harms." § 6(2). It is not clear how websites must verify and prove that a minor intentionally sought out such content. Similarly, it is not clear that minors can actually *view* otherwise-prohibited content; they only must be allowed to "search for" or "request" it. Finally, subjectivity is inherent in any determination about whether particular content constitutes an appropriate mitigation resource.

**d.** As a result, covered websites will need to align their content moderation with the State's requirements. As NetChoice's members have explained, members cannot be sure that any of their current policies will satisfy how Defendant will interpret the Act. Veitch Decl. ¶ 39; Paolucci Decl. ¶¶ 23-26. Thus, they must speculate regarding what speech the Attorney General would "classif[y]," *Interstate Cir., Inc. v. City of Dallas*, 390 U.S. 676, 688 (1968), as "promot[ing] . . . substance abuse" (for example), § 6(1). These determinations require "contextual analyses, weighing

and balancing many factors." *Book People, Inc. v. Wong*, 91 F.4th 318, 340 (5th Cir. 2024). Given the volume of speech on the Internet, covered websites will be required to simply guess at Defendant's subjective determinations for potentially *billions* of individual pieces of speech.

**e.** Further complicating that problem, the Act's requirements are unconstitutionally vague. For starters, virtually none of the prohibited topics are defined, so they cannot provide covered websites "sufficient definiteness" to ensure "that ordinary people can understand" what will give rise to liability. *Kolender v. Lawson*, 461 U.S. 352, 357 (1983). Rather, they risk "arbitrary or discriminatory" enforcement. *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012). Apart from that, a key consideration under the Act is whether content "promotes" certain social ills. § 6(1). The Supreme Court has held that a law that hinged on the word "promote" was invalid "because of vagueness." *Baggett v. Bullitt*, 377 U.S. 360, 371 (1964). As the Court explained, the "range of activities which are or might be deemed" to "promote" an idea "is very wide indeed" and provides no "ascertainable standard of conduct." *Id.* The Act's parallel usage of "facilitates" is no better. § 6(1).

These problems are exacerbated by the nature of websites' content moderation policies and decisions, where context, intent, and other factors are relevant to whether content "promotes or facilitates" something. Szabo Decl. ¶¶ 20, 23; Paolucci Decl. ¶¶ 20-21. And covered websites publish various forms of media in languages reflecting cultures from across the world. So all too often, whether content falls into one of the Act's prohibited categories will be a matter of perception—and thus risks being "completely subjective." *Grayned v. City of Rockford*, 408 U.S. 104, 113 (1972). Does *The Little Rascals* franchise promote illegal activity? Does the Beatles' song *With A Little Help From My Friends* promote illegal drugs? Covered websites now are legally required to make those (and countless other equally intractable determinations) in Mississippi. These vague

prohibitions "effectively grant[] [the State] the discretion to [assign liability] selectively on the basis of the content of the speech." *Hill*, 482 U.S. at 465 n.15; *see Reno*, 521 U.S. at 870 (similar).

### 4. The Act is content-, viewpoint-, and speaker-based, which triggers First Amendment strict scrutiny.

The Act's challenged provisions trigger strict scrutiny in additional ways. The Act's central coverage provisions (§§ 2(a)-(b)) are content- and speaker-based. The monitoring-and-censorship requirements (§ 6) also regulate based on content and viewpoint.

*Content-based distinctions.* The First Amendment's "most basic" principle is that "government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Brown*, 564 U.S. at 790-91 (citation omitted). "Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if" they satisfy "strict scrutiny." *Reed v. Town of Gilbert*, 576 U.S. 155, 163-64 (2015).

The Act's central coverage provisions are content-based, rendering all of the Act's operative provisions content-based. *Sorrell*, 564 U.S. at 566 ("[C]ontent-based burdens must satisfy the same rigorous scrutiny as . . . content-based bans.").[9] The Act covers websites based on whether they allow users to interact "socially." § 3(1)(a). It therefore excludes websites that allow users to interact only "professionally," or that do not allow interaction at all. The Act further excludes websites that "[p]rimarily function[] to provide a user with access to [1] news, [2] sports, [3] commerce, [4] online video games," and "[5] career development opportunities." § 3(2)(c)-(d). These distinctions are facially content-based, defined by their "subject matter" and thus their "content." *Reed*, 576 U.S. at 163; *see Barr v. Am. Ass'n of Pol. Consultants*, 140 S. Ct. 2335, 2347 (2020) (controlling plurality op.) (content-based exceptions render entire statute content-based).

---

[9] Section 5 of the Act relies on this same content- and speaker-based definition and fails strict scrutiny for the same reasons discussed below at pp.18-21.

The Act's monitoring-and-censorship requirements (§ 6) are doubly content-based, because they direct covered websites to "prevent or mitigate . . . minor[s'] exposure to" content-based subcategories within larger categories of protected speech that are themselves content-based (*e.g.*, "social[ ]" speech that "promotes" certain activity). For example, the Act would not prohibit a minor from watching *National Treasure* on Disney+ (even though that film might "promote" theft). But the Act could prevent that same minor from watching that same movie on YouTube (because YouTube allows some interaction among users). These categories are content-based even if the State purports to regulate only the *effects* of speech. *Boos v. Barry*, 485 U.S. 312, 321 (1988).

*Viewpoint-based.* The Act's monitoring-and-censorship requirements are also viewpoint-based: they regulate speech that "promotes" certain social ills, § 6(1), while expressly exempting speech that covers the same subject matter but focuses on "prevention or mitigation," § 6(2). The Supreme Court has held that a law is directly "aimed at a particular viewpoint" if it forbids "promot[ing]." *Sorrell*, 564 U.S. at 565. For example, content that "promotes . . . substance abuse" advocates the (highly objectionable but protected) viewpoint that substance abuse is good.

*Speaker-based.* The Supreme Court is also "deeply skeptical of laws that distinguish among different speakers, allowing speech by some but not others." *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 777-78 (2018) (cleaned up). Speaker-based laws "present serious First Amendment concerns" when they "discriminate . . . within a single medium" or "f[a]ll upon only a small number" of speakers. *Turner Broad. Sys. v. FCC*, 512 U.S. 622, 659 (1994). Therefore, "laws that single out the press, or certain elements thereof . . . are always subject to at least some degree of heightened First Amendment scrutiny." *Id.* at 640-41. Among all the websites that would otherwise qualify as "digital services," the Act applies only to those websites that allow users to "socially interact" and that disseminate user-generated content. § 3(1). It also includes

further speaker-based exceptions. § 3(2). Further, the Act treats adult speakers better than minor speakers by imposing more severe burdens on minors' ability to speak online. *See supra* pp.5-6.

**B.  The Act fails strict scrutiny and any other form of heightened First Amendment scrutiny.**

Because the Act triggers strict scrutiny several times over, Defendant must show that the State has "[1] adopt[ed] the least restrictive means of [2] achieving a compelling state interest." *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 607 (2021) ("*AFP*") (cleaned up). Strict scrutiny is "the most demanding test known to constitutional law." *City of Boerne v. Flores*, 521 U.S. 507, 534 (1997). Neither the Act nor any of its individual provisions can satisfy this standard. The Act also cannot satisfy any other form of heightened scrutiny, such as intermediate scrutiny, because the Act is not "narrowly tailored to serve a significant governmental interest." *Packingham*, 582 U.S. at 105-06 (citation omitted).

**1.  The State lacks a sufficient governmental interest in restricting adults and minors' access to protected speech.**

The Supreme Court has already rejected many interests that Defendant may assert. Defendant lacks a sufficient interest in regulating access to (or requiring censorship of) protected speech.

*Preventing harms to minors.* Although "a State possesses legitimate power to protect children from harm, . . . that does not include a free-floating power to restrict the ideas to which children may be exposed." *Brown*, 564 U.S. at 794 (citation omitted). And the government may not "protect the young from ideas or images that a legislative body thinks unsuitable for them." *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 213-14 (1975). The First Amendment protects all manner of speech, including speech that "promotes" illegal activities, *e.g.*, *Hess v. Indiana*, 414 U.S. 105, 108-09 (1973); or that is "offensive . . . within the presence of . . . children," *Cohen v. California*, 403 U.S. 15, 16 n.1 (1971).

The State must "specifically identify an actual problem in need of solving" to satisfy First

Amendment scrutiny. *Brown*, 564 U.S. at 799 (cleaned up). "[A]mbiguous proof" or "predictive judgment[s] . . . will not suffice." *Id.* at 799-800. A *governmental* solution must also be necessary. *See id.* at 799. Parents have a wealth of options available to oversee and control their minor children online. *See supra* pp.3-4; 47 U.S.C. § 230(d) (notification requirements for parental controls). The Supreme Court has repeatedly endorsed those tools over governmental intervention. *See, e.g.*, *Ashcroft*, 542 U.S. at 667; *United States v. Playboy Ent. Grp.*, 529 U.S. 803, 826 (2000). Whatever "modest gap in concerned parents' control" those tools leave open (if any), filling it "can hardly be a compelling state interest." *Brown*, 564 U.S. at 803. The "government does not have a compelling interest in each marginal percentage point by which its goals are advanced." *Id.* at 803 n.9.

*Parental authority.* The Supreme Court has rejected a governmental interest "in aid of parental authority" to restrict minors' access to protected speech. *Id.* at 802. The Court in *Brown* "note[d]" its "doubts that punishing third parties for conveying protected speech to children *just in case* their parents disapprove of that speech is a proper governmental means of aiding parental authority." *Id.* As the Court explained, accepting that argument "would largely vitiate the rule that 'only in relatively narrow and well-defined circumstances may government bar public dissemination of protected materials to [minors].'" *Id.* (quoting *Erznoznik*, 422 U.S. at 212-13).

### 2. The Act is not properly tailored.

The Act and its operative provisions are not narrowly tailored, let alone the "least restrictive means" of pursuing a compelling interest. *AFP*, 594 U.S. at 607 (citation omitted). Rather, the Act is both "seriously underinclusive" and "seriously overinclusive." *Brown*, 564 U.S. at 805.

### a. The entire Act is improperly tailored.

Several tailoring flaws pervade the Act and all its operative provisions.

*Least restrictive means.* The Act is not the "least restrictive" way to accomplish any governmental interests that the State might assert. *AFP*, 594 U.S. at 607 (citation omitted). Instead of

directly limiting access to speech, Mississippi could give "parents the information needed to engage in active supervision" over children's Internet access. *Playboy*, 529 U.S. at 826. That would require only that the State publicize the diverse supervisory technologies that are widely available. *See supra* pp.3-4. Or the State could "encourage the use of [content] filters . . . by parents to protect minors." *Griffin*, 2023 WL 5660155, at *21 (cleaned up); *see Yost*, 2024 WL 555904, at *13. "It is no response that [these tools] require[] a consumer to take action, or may be inconvenient, or may not [work] perfectly every time." *Playboy*, 529 U.S. at 824. Rather, "if a less restrictive means is available . . . the Government must use it." *Id.* at 815. In fact, the Supreme Court has recognized that "voluntary" self-regulatory efforts are preferable to government intervention. *Brown*, 564 U.S. at 803. Members' existing self-regulation is extensive, and voluntary efforts encompassing forms of content moderation, parental controls, or other tools are already in place. *See supra* pp.3-4.

*Overinclusive.* The Act is also vastly overinclusive—both in the range of protected speech it will affect and the range of regulated websites.

To begin, the Act is overinclusive as to any governmental interest that focuses only on minors. The Act mandates that all users, *adults* included, must undergo age verification to access a broad range of protected speech—including political, religious, and artistic speech—on a broad range of covered websites. Furthermore, because many covered websites may not be able to age-gate, *see* Szabo Decl. ¶ 32, they may not be able to limit the effects of the monitoring-and-censorship requirements to only minors' accounts. As a result, the Act could cause websites to "reduce the adult population . . . to reading only what is fit for children." *Butler v. Michigan*, 352 U.S. 380, 383 (1957). Impeding adults' access to protected speech in an effort to regulate minors' access to speech is enough to render the Act improperly tailored. *See Ashcroft*, 542 U.S. at 667; *Reno*, 521 U.S. at 882.

Even with respect only to minors, the Act is still overinclusive as it requires minors to both verify their ages *and* secure parental consent to engage in protected speech activities. What is more, the Act fails to "take into account juveniles' differing ages and levels of maturity." *Am. Booksellers*, 484 U.S. at 396. Thus, the Act's one-size-fits-all approach unconstitutionally treats all minors at every developmental stage identically. *Id.*; *see Reno*, 521 U.S. at 865-66; Veitch Decl. ¶ 29. Some websites will default to the speech appropriate for their youngest users. *See Bonta*, 2023 WL 6135551, at *15. Others may choose to block minors altogether. *Id.* Both approaches harm minors.

The Act is also overinclusive in the Internet websites it regulates, targeting many websites that disseminate user-generated content generally. The Act does not purport to identify websites that are particularly harmful to minors or even particularly likely to be accessed by minors.

*Underinclusive.* The Act is also underinclusive. For example, it is not clear why the State would impose age verification, parental consent, and monitoring and censorship on covered websites—but not on websites "primarily" dedicated to "[1] news, [2] sports, [3] commerce, [4] online video games," and "[5] career development opportunities." § 3(2)(c)-(d).

### b. The age-verification (§ 4(1)), parental consent (§ 4(2)), and monitoring-and-censorship requirements (§ 6) are improperly tailored for additional, independent reasons.

The tailoring flaws discussed above render the entire Act improperly tailored. Specific operative provisions have even more of their own tailoring flaws.

*Age verification (§ 4(1)).* Age verification is only a means to effectuate the Act's other age-based restrictions, like the parental-consent requirement and the monitoring-and-censorship requirements. Because those other provisions are unconstitutional, age-verification serves no governmental interest whatsoever. *See, e.g.*, *Griffin*, 2023 WL 5660155, at *18-21.

*Parental consent (§ 4(2)).* The parental-consent requirement is not properly tailored. *See Yost*, 2024 WL 555904, at *13; *Griffin*, 2023 WL 5660155, at *18-21. At its core, the Act "do[es]

not enforce *parental* authority . . . ; [it] impose[s] *governmental* authority, subject only to a parental veto." *Brown*, 564 U.S. at 795 n.3. The Act's parental-consent requirement is also underinclusive. If covered websites were indeed "dangerous," it does "not make sense to" allow minors to gain access to the websites "so long as one parent . . . says it's OK." *Griffin*, 2023 WL 5660155, at *18 (cleaned up); *see Yost*, 2024 WL 555904, at *13.

*Monitoring-and-censorship (§ 6).* The Act's monitoring-and-censorship requirements are both over- and underinclusive. They are overinclusive because are a prior restraint "superimposed upon the State's criminal regulation[s]"—which makes the Act itself "largely unnecessary," *Bantam Books*, 372 U.S. at 69; and an improper "prophylaxis-upon-prophylaxis" the First Amendment prohibits, *FEC v. Cruz*, 596 U.S. 289, 306 (2022). Mississippi law already addresses the unlawful conduct and unprotected speech that appears in the Act's categories. *See* Compl. ¶ 135.[10] The government cannot "suppress[]" the speech of a "law-abiding" minor or website "to deter conduct by a non-law-abiding third party." *Bartnicki v. Vopper*, 532 U.S. 514, 529-30 (2001).

Finally, the requirements are underinclusive because they restrict minors' access to certain speech, but (purportedly) not if they "deliberately and independently" seek it out. § 6(2)(a). This exception undermines whatever governmental interest the State could possibly assert. Specifically, § 6(1) restricts minor's access to prohibited speech, but § 6(2)(a) *purportedly* allows minors to "deliberately and independently search[] for" or "specifically request[]" that very speech.

II.     **NetChoice is likely to succeed on the merits of its claim that the Act's central definition of "digital service provider" is unconstitutionally vague.**

The Act's central coverage definition for "digital service providers" is also

---

[10] The State cannot defend the Act by likening it to the criminal context—where words like "promote" and "facilitate" have "longstanding and pervasive" constructions that laws regulating speech lack. *United States v. Hansen*, 599 U.S. 762, 773 (2023).

unconstitutionally vague, leaving many websites unsure whether they must shoulder the Act's burdens. This alone is enough to enjoin the Act's enforcement. *Yost*, 2024 WL 555904, at *13 (concluding coverage definition was unconstitutionally vague); *Griffin*, 2023 WL 5660155, at *13-14 (similar). The Act's vague terms fail to "give fair notice of conduct that is forbidden or required," *Fox*, 567 U.S. at 253, and are "so standardless [as to] authorize[] or encourage[] seriously discriminatory enforcement," *United States v. Williams*, 553 U.S. 285, 304 (2008) (citation omitted). Here, the test for vagueness is heightened because the Act regulates speech. *Fox*, 567 U.S. at 253-54.

First, the Act's content-based coverage exceptions rely on impermissible primary-purpose tests. Specifically, the Act excludes websites that "[*p*]*rimarily* function[] to provide a user with access to" content-based categories of speech such as "news" and "sports" and only "[a]llow[] chat, comment or other interactive functionality that is *incidental* to the digital service." § 3(2)(c) (emphasis added). Yet the Act provides no guidance about when a website crosses either the "primary" or the "incidental" threshold. *Griffin* rejected a similar test as vague, because the "statute neither defines 'primary purpose'—a term critical to determining which entities fall within [the law's] scope—nor provides any guidelines about how to determine a forum's 'primary purpose,' leaving companies to choose between risking unpredictable and arbitrary enforcement . . . and trying to implement the [law's] costly . . . requirements." *Griffin*, 2023 WL 5660155, at *13.

Second, the Act does not define what it means for a website to "allow[] users to socially interact," as compared to other forms of personal interaction. § 3(1)(a). Because most human interaction could be deemed "social," this requirement might mean that any website that allows any form of user interaction may be covered (if it meets the Act's other coverage requirements). As a result, websites are left to guess whether, for example, the Act applies to "business" interactions, which may have a social component.

**III.**    **NetChoice is likely to succeed on the merits of its claim that the Act's monitoring-and-censorship requirements (§ 6) are preempted by 47 U.S.C. § 230.**

The Act's monitoring-and-censorship requirements (§ 6) are preempted by § 230 because they require covered websites to monitor and block third-party content. Members engage in voluntary content moderation efforts already. But the Act threatens them with liability if Defendant disagrees with members' self-regulation or if that self-regulation is not perfect in all cases.

In § 230, Congress granted Internet websites "broad immunity" for "all claims stemming from their *publication of information created by third parties.*" *Free Speech Coal.*, 95 F.4th at 286 (cleaned up). That includes alleged "failure[s] to implement basic safety measures to protect minors." *MySpace*, 528 F.3d at 418-19. Specifically, no "interactive computer service shall be treated as the publisher or speaker of any information provided by" someone else. 47 U.S.C. § 230(c)(1).[11] And websites cannot be held liable on account of "any action voluntarily taken in good faith to restrict access to" speech they or their users "consider[] to be . . . objectionable." *Id.* § 230(c)(2)(a). Congress preempted "inconsistent" state laws, protecting websites from "cause[s] of action" and "liability." *Id.* § 230(e)(3). In so doing, Congress sought to ensure that websites "are not punished for regulating themselves." *Batzel v. Smith*, 333 F.3d 1018, 1040 n.6 (9th Cir. 2003) (Gould, J., concurring in part and dissenting in part).

Here, § 230 preempts the requirement that covered websites "prevent or mitigate . . . minor[s'] exposure to" prohibited third-party speech, in an attempt to "prevent[] or mitigat[e] . . . harms." § 6. Consequently, the Act is an improper attempt to require covered websites to "address certain harmful content" on their services. *MySpace*, 528 F.3d at 420 (citation omitted).

Compliance with this requirement raises additional § 230 problems. It would "necessarily

---

[11] Members operate websites that qualify as "interactive computer service[s]" under 47 U.S.C. § 230(f)(2). *E.g.*, *La'Tiejira v. Facebook, Inc.*, 272 F. Supp. 3d 981, 993 (S.D. Tex. 2017).

require [websites] to monitor third-party content" so that minors are not exposed to prohibited content. *HomeAway.com, Inc. v. City of Santa Monica*, 918 F.3d 676, 682 (9th Cir. 2019). Section 230 "specifically proscribes liability" for "decisions relating to the monitoring" or "screening" "of content." *MySpace*, 528 F.3d at 420 (citation omitted); *La'Tiejira*, 272 F. Supp. 3d at 993 (similar).

This provision likewise would require covered websites to block minors' access to user-generated content. Yet, § 230 protects websites from liability for third-party content that they (purportedly) do not remove. "[T]hat is the point of Section 230: to immunize [websites] for harm caused by unremoved speech." *Free Speech Coal.*, 95 F.4th at 284-85; *see MySpace*, 528 F.3d at 420 ("deletion of content") (citation omitted); *La'Tiejira*, 272 F. Supp. 3d at 993-94 ("[A]ny activity that can be boiled down to deciding whether to exclude material that third parties seek to post online is perforce immune under section 230." (citation omitted)).

Specifically, the Act requires covered websites to "prevent or mitigate . . . minor[s'] exposure to" prohibited third-party content. § 6(1). That means websites must avoid "display[ing]" such content, through "block[ing]," "screen[ing]," or "disallow[ing]" that content. 47 U.S.C. § 230(c), (f)(4). But Congress entrusted decisions about whether and how to restrict the visibility of third-party content exclusively to websites. *See id.* § 230(c); *see id.* § 230(f)(4) (protecting websites' right to "filter, screen, allow, [] disallow," "pick, choose," "display," "organize," and "reorganize . . . content"). At bottom, "publishers . . . filter content," and § 230 preempts liability for "actions quintessentially related to a publisher's role." *Free Speech Coal.*, 95 F.4th at 286 (citation omitted).

## IV. NetChoice meets all the remaining factors for a preliminary injunction.

NetChoice has shown "arguably the most important factor: likelihood of success on the merits." *Netflix, Inc. v. Babin*, 88 F.4th 1080, 1099 (5th Cir. 2023). It meets the other factors too.

The Act will cause NetChoice and its members irreparable harm. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."

*Roman Catholic Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020) (citation omitted). Websites suffer irreparable harm when they are forced to comply with the Act. Paolucci Decl. ¶¶ 10-13, 33, 37. Minor users suffer harm when the Act prevents them from accessing protected speech. Veitch Decl. ¶¶ 41-42. All users suffer harm when they must comply with age verification to access protected speech. Paolucci Decl. ¶¶ 14-15. The Act's large penalties for noncompliance magnify these harms: $10,000 per violation and the specter of criminal liability. *See supra* p.6.

Furthermore, the Act requires covered websites to shoulder steep compliance costs "with no guarantee of eventual recovery." *Ala. Ass'n of Realtors v. HHS*, 594 U.S. 758, 765 (2021). Each website will need to adopt age-verification, parental-consent, and monitoring systems to comply with the Act—at great expense. Veitch Decl. ¶ 33; Pai Decl. ¶ 31. For some websites, these compliance costs are "far in excess of [the] available budget." Paolucci Decl. ¶ 37. Websites that wish to comply with the Act face a steep climb, because "[d]isputes about the identity of an account holder, their age, or the legal relationship between them and the person claiming to be their parent are complex, time-consuming, costly . . . , and unfortunately common." Paolucci Decl. ¶ 36. Despite all that, the Act gave websites only two months to comply, even though its provisions would have required months or years of preparation. Paolucci Decl. ¶ 9; *see* Veitch Decl. ¶ 30.

The final factors—"harm to the opposing party and the public interest"—"merge" in lawsuits against the government. *Nken v. Holder*, 556 U.S. 418, 435 (2009). "Injunctions protecting First Amendment freedoms are always in the public interest." *Opulent Life Church v. City of Holly Springs*, 697 F.3d 279, 298 (5th Cir. 2012) (cleaned up). That is especially true here, where the Act will restrict minors and adults' access to protected speech. Veitch Decl. ¶¶ 34, 41-42.

## Conclusion

Plaintiff respectfully requests that—before the Act takes effect on July 1, 2024—this Court preliminarily enjoin Defendant from enforcing the Act.

Dated: June 7, 2024

Respectfully submitted,

*s/ J. William Manuel*
J. William Manuel (MBN 9891)
Stephen L. Thomas (MBN 8309)
BRADLEY ARANT BOULT CUMMINGS LLP
One Jackson Place
188 E. Capitol Street, Suite 1000
Jackson, MS 39201
Telephone: (601) 948-8000
Facsimile: (601) 948-3000
wmanuel@bradley.com
sthomas@bradley.com

*Attorneys for Plaintiff NetChoice, LLC*