**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**SOUTHERN DIVISION**

|  |  |
|---|---|
| NETCHOICE, LLC,<br><br>     Plaintiff,<br><br>  v.<br><br>LYNN FITCH, in her official capacity as<br>Attorney General of Mississippi,<br><br>     Defendant. | Civil Action No. 1:24-cv-00170-HSO-BWR |

**BRIEF OF *AMICUS CURIAE* ELECTRONIC FRONTIER FOUNDATION IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION AND TEMPORARY RESTRAINING ORDER**

David Greene*
Aaron Mackey*
ELECTRONIC FRONTIER FOUNDATION
815 Eddy Street
San Francisco, CA 94109
Email: davidg@eff.org, amackey@eff.org
Tel. : (415) 436-9333
Fax: (415) 436-9993
*admitted *pro hac vice*

J. Cal Mayo, Jr. (MB No. 8492)
MAYO MALLETTE PLLC
2094 Old Taylor Road, Suite 200
Oxford, MS 38655
Tel: (662) 236-0055
cmayo@mayomallette.com

*Attorneys for Amicus Curiae Electronic Frontier Foundation*

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ................................................................................................ ii

STATEMENT OF IDENTITY AND INTEREST OF AMICUS CURIAE ...................................1

INTRODUCTION ............................................................................................................1

ARGUMENT...................................................................................................................2

I.      UNLIKE IN-PERSON AGE VERIFICATION, ONLINE AGE
        VERIFICATION BURDENS EVERY USER, NOT JUST MINORS. ..........................2

II.     HB 1126 IMPERMISSIBLY BURDENS ADULT USERS BY
        REQUIRING THEM TO VERIFY THEIR AGES BEFORE ACCESSING
        PROTECTED ONLINE SPEECH...........................................................................4

        A.      Online Age Verification Impermissibly Blocks Access To Protected
                Speech For The Millions Of Adults Who Lack The Requisite Proof
                Of Identification. ...................................................................................4

        B.      Online Age Verification Chills Adult Users From Accessing
                Protected Speech By Impermissibly Burdening The Right To Be
                Anonymous Online.................................................................................7

        C.      Online Age Verification Further Chills Adult Users From Accessing
                Protected Speech By Putting Their Most Sensitive Data At Risk Of
                Inadvertent Disclosure, Breach, Or Attack. ...........................................9

III.    THE BURDEN ON ADULT USER RIGHTS IS SIGNIFICANT
        BECAUSE ONLINE SPACES ARE AMONG THE MOST IMPORTANT
        PLACES FOR CORE FIRST AMENDMENT-PROTECTED SPEECH.....................11

IV.     THE PRIVACY PROVISIONS IN HB 1126 ARE INSEPARABLE FROM
        THE CONTENT-BASED AGE VERIFICATION SCHEME AND ARE
        THUS SUBJECT TO STRICT SCRUTINY. ..........................................................14

CONCLUSION..............................................................................................................15

**TABLE OF AUTHORITIES**

*Cases*

*ACA Connects v. Frey*,
  471 F. Supp. 3d 318 (D. Me. 2020) ....................................................................... 1

*ACLU v. Clearview AI, Inc.*,
  No. 2020 CH 4353 (Ill. Cir. Ct. Aug. 27, 2021) ................................................ 15

*ACLU v. Gonzales*,
  478 F. Supp. 2d 775 (E.D. Pa. 2007) ................................................................ 8, 9

*ACLU v. Mukasey,*
  534 F.3d 181 (3d Cir. 2008)................................................................................. 9

*ACLU v. Reno*,
  31 F. Supp. 2d 473 (E.D. Pa. 1999) ..................................................................... 1

*ACLU v. Reno*,
  929 F. Supp. 824 (E.D. Pa. 1996) ........................................................................ 1

*Am. Booksellers Found. for Free Expression v. Sullivan*,
  799 F. Supp. 2d 1078 (D. Alaska 2011) ...................................................... 3, 4, 7

*Bolger v. Youngs Drug Products Corp.*,
  463 U.S. 60 (1983)............................................................................................. 13

*Carey v. Population Servs. Int'l*,
  431 U.S. 678 (1977)........................................................................................... 13

*Cyberspace, Commc'ns, Inc. v. Engler*,
  55 F. Supp. 2d 737, 742 (E.D. Mich. 1999),
  *aff'd and remanded*, 238 F.3d 420 (6th Cir. 2000)............................................. 8

*Denver Area Educ. Telecomms. Consortium v. FCC*,
  518 U.S. 727 (1996)........................................................................................... 13

*FCC v. Pacifica Found.*,
  438 U.S. 726 (1978)........................................................................................... 13

*In re Clearview AI Litig.*,
  585 F. Supp. 3d 1111 (N.D. Ill. 2022) ................................................................. 1

*McIntyre v. Ohio Elections Comm'n*,
  514 U.S. 334 (1995)............................................................................................. 8

*Nat'l Cable & Telecommunications Ass'n v. FCC*,
  555 F.3d 996 (D.C. Cir. 2009)........................................................................... 15

*NetChoice v. Griffin*,
   No. 5:23-CV-05105, 2023 WL 5660155, (W.D. Ark. Aug. 31, 2023).......................................... 8

*Packingham v. North Carolina*,
   582 U.S. 98 (2017)...................................................................................................... 11

*PSINet, Inc, v. Chapman*,
   362 F.3d 227 (4th Cir. 2004) ................................................................................ 4, 8, 9

*PSINet, Inc. v. Chapman*,
   167 F. Supp. 2d 878 (W.D. Va. 2001) ............................................................................ 9

*Reno v. ACLU*,
   521 U.S. 844 (1997)........................................................................................... 2, 11, 13

*Sable Commc'ns v. FCC*,
   492 U.S. 115 (1989).................................................................................................. 13

*Trans Union Corp. v. FTC*,
   245 F.3d 809 (D.C. Cir. 2001) .................................................................................... 14

*Trans Union LLC v. FTC*,
   295 F.3d 42 (D.C. Cir. 2002) ...................................................................................... 14

*Will Co. v. Lee*,
   47 F.4th 917 (9th Cir. 2022) ......................................................................................... 2

**Statutes**

18 U.S.C. §§ 2721 *et seq.*............................................................................................... 10

HIPAA, Pub. L. 104-191 ................................................................................................ 14

Mississippi House Bill 1126 ....................................................................................... *passim*

**Other Authorities**

Aaron Smith & Sono Shah, *Though Not Especially Productive in Passing Bills, the 116th
   Congress Set New Marks for Social Media Use*, Pew Rsch. Ctr. (Jan. 25, 2021) .................... 12

Alex Najibi, *Racial Discrimination in Face Recognition Technology*,
   Harvard Sci. in the News (Oct. 24, 2020)....................................................................... 6

Ammar Ebrahim, *TikTok: 'I Didn't Know Other LGBT Muslims Existed*,'
   BBC, Nov. 28, 2020....................................................................................................... 12

Bennett Cyphers & Gennie Gebhart, *Behind the One-Way Mirror: A Deep Dive Into the
   Technology of Corporate Surveillance*, EFF (Dec. 2, 2019) ...................................................... 8

Bennett Cyphers & Gennie Gebhart, *The Google+ Bug Is More About The Cover-Up Than The Crime*, EFF (Oct. 11, 2018),.................................................................. 10

Bennett Cyphers, Adam Schwartz, & Nathan Sheard, *Face Recognition Isn't Just Face Identification and Verification: It's Also Photo Clustering, Race Analysis, Real-Time Tracking, and More*, EFF (Oct. 7, 2021) .................................................. 6

Board of Governors, U.S. Fed. Reserve, *Economic Well-Being of U.S. Households in 2022* (May 2023)........................................................................................ 7

Brooke Auxier & Monica Anderson, *Social Media Use in 2021*, Pew Rsch. Ctr. (Apr. 7, 2021)........................................................................................ 12

Brooke Auxier, *Social Media Continue to Be Important Political Outlets for Black Americans*, Pew Rsch. Ctr. (Dec. 11, 2020) ..................................... 12

Carrie Back, *How Indigenous Creators Are Using TikTok To Share Their Cultures*, Travel & Leisure, Oct. 21, 2022 ................................................. 12

*Common Sense Census: Media Use by Tweens and Teens, 2021*, Common Sense (2022).......... 12

Fortesa Latifi, *Chronic Illness Influencers on TikTok Are Showing the Reality of Being Sick*, Teen Vogue, Sept. 22, 2022................................................. 12

Frank Landymore, *Twitter Caught Selling Data to Government Spies While Complaining About Surveillance*, Byte, Mar. 28, 2024.............................. 9

Gennie Gebhart, *You Gave Facebook Your Number For Security. They Used It For Ads.*, EFF (Sept. 27, 2018)............................................................ 9

Jackie Snow, *Why Age Verification Is So Difficult for Websites*, Wall St. J., Feb. 27, 2022....................................................................................... 4

Jillian Andres Rothschild *et al.*, *Who Lacks ID in America Today? An Exploration of Voter ID Access, Barriers, and Knowledge*, Univ. Md. Ctr. for Democracy & Civic Engagement (Jan. 2024)........................................................................ 5, 6

Jim Reed, *EE Data Breach 'Led to Stalking'*, BBC, Feb. 7, 2019 .............................................. 11

Jo Yurcaba, *Over 200,000 Trans People Could Face Voting Restrictions Because of State ID Laws*, NBC News, Nov. 1, 2022.............................................. 6

John Paul Brammer, *LGBTQ and Out on Social Media – But Nowhere Else*, NBC News., Oct. 11, 2017 ..................................................................... 12

Kashmir Hill, *Facebook Is Giving Advertisers Access to Your Shadow Contact Information*, Sept. 26, 2018 ........................................................... 10

Lee Brown, *Russian Hackers Post Nude Photos of US Cancer Patients to Dark Web in Sick Extortion Plot*, N.Y. Post, Mar. 8, 2023 .......................................................................... 11

Matt Petronzio, *How Young Native Americans Built and Sustained the #NoDAPL Movement,* Mashable (Dec. 7, 2016) ...................................................................... 12

Michael Hill & Dan Swinhoe, *The 15 Biggest Data Breaches of the 21st Century*, CSO (Nov. 8, 2022) ...................................................................... 10

Michael J. Hanmer & Samuel B. Novey, *Who Lacked Photo ID in 2020?: An Exploration of the American National Election Studies*, Univ. Md. Ctr. for Democracy & Civic Engagement (Mar. 2023) ............................................ 5

Michelle Faverio, *Key Findings About Americans and Data Privacy*, Pew Rsch. Ctr. (Oct. 18, 2023) ...................................................................... 11

Nigel Jones, *10 Reasons to Be Concerned About Facial Recognition Technology*, Priv. Compliance Hub (Aug. 2021) ...................................................................... 6

*Non-U.S. Citizen Information*, Mississippi Dep't of Public Safety .............................................. 5

*Online Age Verification: Balancing Privacy and the Protection of Minors*, CNIL (Sept. 22, 2022) ...................................................................... 4

Press Release, Identity Theft Resource Center, *ITRC 2023 Annual Data Breach Report Reveals Record Number of Compromises; 72 Percent Increase Over Previous High* (Jan. 25, 2024) ...................................................................... 10

Press Release, Identity Theft Resource Center, *ITRC 2023 Consumer Impact Report: Record High Number of ITRC Victims Have Suicidal Thoughts* (Aug. 23, 2023) ............................... 10

Ramona Alaggia & Susan Wang, *"I Never Told Anyone Until the #MeToo Movement": What Can We Learn From Sexual Abuse and Sexual Assault Disclosures Made Through Social Media?*, 103 Child Abuse & Neglect (May 2020) ........................................... 12

Sam Bestvater et al., *Politics on Twitter: One-Third of Tweets from U.S. Adults Are Political*, Pew Rsch. Ctr. (Jun. 16, 2022) ........................................................... 12

Sara Morrison, *This outed priest's story is a warning for everyone about the need for data privacy laws*, Vox, Jul. 21, 2021 ...................................................................... 11

*See* David Gaudet, *ID Under 35: The BARS Program Carding Policy*, BARS Program (May 3, 2016) ...................................................................... 3

Shriya Bhattacharya, *How TikTok Became a 'Gold Mine' For Dancers Looking to Get Discovered and Changed the Way They Make Money*, Insider, Apr. 7, 2023 ......................... 12

Sonia Lin, *Identifying and Addressing the Financial Needs of Immigrants*,
Consumer Fin. Prot. Bureau (Jun. 27, 2022) ................................................................. 7

U.S. Census Bureau, CB24-62, *Quarterly Residential Vacancies and Homeownership,*
*First Quarter 2024* (Apr. 30, 2024) .......................................................................... 7

Veera Korhonen, *U.S. Family Households With Children, By Family Type 1970-2022*,
Statista (Nov. 3, 2023) ........................................................................................ 3

Will Evans, *Amazon's Dark Secret: It Has Failed to Protect Your Data*,
Wired, Nov. 18, 2021........................................................................................... 9

## STATEMENT OF IDENTITY AND INTEREST OF AMICUS CURIAE[1]

The Electronic Frontier Foundation ("EFF") is a non-profit civil liberties organization with more than 30,000 active donors that has worked for over 30 years to ensure that technology supports freedom, justice, and innovation for all people of the world. EFF is dedicated to protecting online users' free expression and privacy rights and has fought for them both in courts and legislatures across the country. EFF has challenged laws that burden all internet users' rights by requiring online services to verify their users' ages. *See, e.g.*, *ACLU v. Reno*, 929 F. Supp. 824, 825 (E.D. Pa. 1996) (serving as a plaintiff challenging the Communications Decency Act); *ACLU v. Reno*, 31 F. Supp. 2d 473, 480 n.3 (E.D. Pa. 1999) (serving as a plaintiff challenging the Child Online Protection Act). EFF has defended the constitutionality of well-crafted consumer data privacy laws. *See, e.g.*, *In re Clearview AI Litig.*, 585 F. Supp. 3d 1111 (N.D. Ill. 2022); *ACA Connects v. Frey*, 471 F. Supp. 3d 318 (D. Me. 2020).

### INTRODUCTION

*Amicus curiae* EFF, representing internet users in Mississippi and throughout the country, writes separately to emphasize how online age restrictions significantly burden the speech and privacy rights of all internet users, not just minors. Such restrictions frustrate everyone's ability to use one of the most expressive mediums of our time—the vast democratic forums of the internet that we all use to create art, share photos with loved ones, organize for political change, and speak. *Amicus* also notes that while the data privacy provisions of this law are not severable from the unconstitutional age-verification regime Mississippi House Bill 1126 imposes, that does

---

[1] Counsel of record for all parties received notice of the intent to file this brief on June 13, 2024, and each party indicated that it did not oppose the filing. No counsel for a party authored this brief in whole or in part, and no such counsel or party made a monetary contribution intended to fund the preparation or submission of this brief. No person other than *amicus curiae*, or its counsel, made a monetary contribution intended to fund its preparation or submission.

not render those provisions independently unconstitutional. Should the law's data privacy provisions appear in a well-crafted comprehensive privacy law that did not require age verification, they would be subject to a different standard and could likely satisfy First Amendment scrutiny.

**ARGUMENT**

**I.      UNLIKE IN-PERSON AGE VERIFICATION, ONLINE AGE VERIFICATION BURDENS EVERY USER, NOT JUST MINORS.**

Unlike in-person age-gates, online age restrictions like Mississippi's require all users to submit, not just momentarily display, data-rich government-issued identification or other proof-of-age, and in some commercially available methods, a photo. *See* Mississippi House Bill 1126 ("HB 1126") § 4(1).

As the Supreme Court has recognized, age verification imposes significant burdens on adults' access to constitutional speech and "discourage[s] users from accessing" the online services that require that verification. *Reno v. ACLU*, 521 U.S. 844, 856 (1997). Internet users are highly sensitive to website access barriers, and age verification is likely to notably reduce adult users' willingness to consume or create protected content on a site.[2]

Although other laws require some form of age verification via a government ID or other proof-of-age to access adult content in physical spaces, there are practical differences that make those disclosures less burdensome or even nonexistent. Online age-verification laws are "dramatically different" from statutes that apply "only to personally directed communication between an adult and a person that the adult knows or should know is a minor." *Am. Booksellers*

---

[2] *See Will Co. v. Lee*, 47 F.4th 917, 924–25 (9th Cir. 2022) ("Research shows that sites lose up to 10% of potential visitors for every additional second a site takes to load, and that 53% of visitors will simply navigate away from a page that takes longer than three seconds to load." (footnotes omitted)).

2

*Found. for Free Expression v. Sullivan*, 799 F. Supp. 2d 1078, 1082 (D. Alaska 2011).

Online age verification is imposed on many, many more users than an in-person ID check and in many, many more situations. Although some laws require ID checks before purchasing certain products, an in-person interaction between a merchant and an adult is often enough to verify that the individual is older than 17. After all, there are usually distinguishing physical differences between young adults and those older than 35.[3] An older adult who forgets their ID at home or lacks an up-to-date government ID is not likely to face the same difficulty in accessing material in a physical store because a visual check by a merchant can confirm they are an adult. There is no online analog to such ephemeral, visual, in-person age checks. And because of the sheer scale of the internet, regulations affecting online content sweep in an enormous number of adults, rather than applying only to those adults who visit particular physical bookstores or other places where they might have access to adult materials. Notably, most U.S. households do not have children under 18, yet these laws, designed to protect minors, still apply in full force to them and burden their online communications.[4]

And even if an adult's age cannot be verified in person via ID or visual check, that adult will only be precluded from buying *adult* content. In contrast, the inability to verify an adult's age online will block their access to *all* content on the given platform—a much more significant and damaging First Amendment burden.

---

[3] *See* David Gaudet, *ID Under 35: The BARS Program Carding Policy*, BARS Program (May 3, 2016), https://www.barsprogram.com/blog/?12310/id-under-35-the-bars-program-carding-policy.

[4] Approximately 60% of U.S. family households do not include children under 18, and this percentage does not even account for the number of *non-family* households without children under 18. *See* Veera Korhonen, *U.S. Family Households With Children, By Family Type 1970-2022*, Statista (Nov. 3, 2023), https://www.statista.com/statistics/242074/percentages-of-us-family-households-with-children-by-type/.

Online age verification is also far more privacy-invasive since it inherently requires the disclosure and collection of personal information to verify an internet user's age. Momentary in-person ID checks do not require adults to upload data-rich identifying documents, biometrics, or other personal information to either the website or a third-party age verifier that might retain them, thereby creating a potentially lasting record of their visit to the establishment. HB 1126 does not specify how digital services should verify users' ages, but even allowing for multiple age-verification methods does not alleviate security risks when privacy experts agree that "there is currently no solution that satisfactorily" provides "sufficiently reliable verification, complete coverage of the population and respect for the protection of individuals' data and privacy and their security."[5]

## II.    HB 1126 IMPERMISSIBLY BURDENS ADULT USERS BY REQUIRING THEM TO VERIFY THEIR AGES BEFORE ACCESSING PROTECTED ONLINE SPEECH.

### A.    Online Age Verification Impermissibly Blocks Access To Protected Speech For The Millions Of Adults Who Lack The Requisite Proof Of Identification.

Age verification requirements "serve as a complete block to adults who wish to access adult material [online] but do not" have the necessary form of identification. *PSINet, Inc, v. Chapman*, 362 F.3d 227, 237 (4th Cir. 2004); *see also Am. Booksellers Found.*, 342 F.3d at 99 (invalidating age-verification requirement that would make "adults who do not have [the necessary form of identification] . . . unable to access those sites").

Under HB 1126, that could include millions of people who do not have a driver's license or other government-issued form of identification. About 15 million adult U.S. citizens do not

---

[5] *Online Age Verification: Balancing Privacy and the Protection of Minors*, CNIL (Sept. 22, 2022), https://www.cnil.fr/en/online-age-verification-balancing-privacy-and-protection-minors; *see also* Jackie Snow, *Why Age Verification Is So Difficult for Websites*, Wall St. J., Feb. 27, 2022, https://www.wsj.com/articles/why-age-verification-is-difficult-for-websites-1645829728.

have a driver's license, while about 2.6 million do not have any form of government-issued photo ID.[6] Estimates show another 21 million adult U.S. citizens do not have a *non-expired* driver's license, and over 34.5 million adult citizens have neither a driver's license nor a state ID card with their current name or address.[7] These numbers do not include non-U.S. citizens who do not have current government-issued identification, including undocumented immigrants and others who are not able to obtain a state ID or driver's license.[8] Mississippi has not specified what will be required for age verification under HB 1126, leaving adults currently in the dark as to whether their documentation suffices to allow them access to constitutionally protected speech.

Certain demographics are also disproportionately burdened when government-issued ID is used in age verification. Black Americans and Hispanic Americans are disproportionately less likely to have current and up-to-date driver's licenses. And 30% of Black Americans do not have a driver's license at all.[9] Young adults are also less likely to have the requisite ID: 41% of U.S. citizens between 18 and 24 do not have an up-to-date driver's license. The same is true for 38%

---

[6] Jillian Andres Rothschild *et al.*, *Who Lacks ID in America Today? An Exploration of Voter ID Access, Barriers, and Knowledge* 2, Univ. Md. Ctr. for Democracy & Civic Engagement (Jan. 2024), https://cdce.umd.edu/sites/cdce.umd.edu/files/pubs/Voter%20ID%202023%20survey%20Key%20Results%20Jan%202024%20%281%29.pdf.

[7] *Id*. at 2, 5; *see also* Michael J. Hanmer & Samuel B. Novey, *Who Lacked Photo ID in 2020?: An Exploration of the American National Election Studies*, at 3, 5, Univ. Md. Ctr. for Democracy & Civic Engagement (Mar. 2023), https://www.voteriders.org/wp-content/uploads/2023/04/CDCE_VoteRiders_ANES2020Report_Spring2023.pdf ("Over 1.3 million voting-age citizens in [Georgia, Indiana, Kansas, Mississippi, Tennessee, and Wisconsin] likely did not have the identification needed to vote in 2020.").

[8] *See Non-U.S. Citizen Information*, Mississippi Dep't of Public Safety, https://www.driverservicebureau.dps.ms.gov/Drivers/Non_Citizen ("A driver license or identification card applicant is required to provide documentation of their legal status in the US.").

[9] Rothschild, *supra* note 7, at 3.

of citizens between the ages of 25 and 29.[10] Americans with disabilities and Americans with lower annual incomes are also less likely to have a current driver's license.[11]

Moreover, government-issued ID is also commonly accompanied by a "liveness" check, in which the age-verification system compares the user's ID photo with a freshly taken photo of the user. But facial recognition technology is error-prone,[12] and adults whose current appearances do not adequately match the photo on their ID may have their ID rejected.[13]

Although HB 1126 does not require the use of government ID to verify age—the law instead requires online services to make "commercially reasonable efforts" to verify users' ages, *see* HB 1126 § 4(1)—online services who choose to do so via government-issued ID are not required to provide alternative means of verification for adults who lack a state ID or driver's license.

Common non-ID-based age verification methods also exclude many adult internet users. Some rely on public or private transactional data and some adults may not have access to the means to verify their age via this method. For example, if a service relied on mortgage documents, it would exclude an enormous amount of adults, as nearly 35% of Americans do not

---

[10] *Id.*

[11] *Id.* at 3–4.

[12] *See* Alex Najibi, *Racial Discrimination in Face Recognition Technology*, Harvard Sci. in the News (Oct. 24, 2020), https://sitn.hms.harvard.edu/flash/2020/racial-discrimination-in-face-recognition-technology/ (also noting that a "growing body of research exposes divergent error rates across demographic groups, with the poorest accuracy consistently found in subjects who are female, Black, and 18-30 years old."); Nigel Jones, *10 Reasons to Be Concerned About Facial Recognition Technology*, Priv. Compliance Hub (Aug. 2021), https://bit.ly/3XXLWbp; Bennett Cyphers, Adam Schwartz, & Nathan Sheard, *Face Recognition Isn't Just Face Identification and Verification: It's Also Photo Clustering, Race Analysis, Real-Time Tracking, and More*, EFF (Oct. 7, 2021), https://www.eff.org/deeplinks/2021/10/face-recognition-isnt-just-face-identification-and-verification.

[13] *See, e.g.*, Jo Yurcaba, *Over 200,000 Trans People Could Face Voting Restrictions Because of State ID Laws*, NBC News, Nov. 1, 2022, https://www.nbcnews.com/nbc-out/out-politics-and-policy/200000-trans-people-face-voting-restrictions-state-id-laws-rcna52853.

own a home.[14] Should credit data be used, close to 20% of U.S. households do not have a credit card.[15] Immigrants, regardless of their legal status, may not be able to obtain credit cards, either.[16]

Online services may also look to data brokers and commercial verification services that purchase and collect massive amounts of private data. Aside from the serious privacy concerns such practices raise, these methods exclude and penalize those Mississippians who care about their privacy and make efforts to minimize the data collected about them.

**B.    Online Age Verification Chills Adult Users From Accessing Protected Speech By Impermissibly Burdening The Right To Be Anonymous Online.**

Even if an adult's age can be reliably and non-intrusively verified, HB 1126's age-verification requirement still impermissibly deters adult users from accessing lawful content by undermining anonymous internet browsing. Age-verification schemes "are not only an additional hassle," but "they also require that website visitors forgo the anonymity otherwise available on the internet." *Am. Booksellers Found.*, 342 F.3d at 99. And as discussed above, a person who submits identifying information online can never be sure whether it will be retained, or how it might be used or disclosed, further undermining anonymity well into the future.

Anonymity is a respected, historic tradition that is "an aspect of the freedom of speech

---

[14] *See* U.S. Census Bureau, CB24-62, *Quarterly Residential Vacancies and Homeownership, First Quarter 2024*, at 5 (Apr. 30, 2024), https://www.census.gov/housing/hvs/files/currenthvspress.pdf.

[15] *See* Board of Governors, U.S. Fed. Reserve, *Economic Well-Being of U.S. Households in 2022*, at 44 (May 2023), https://www.federalreserve.gov/publications/files/2022-report-economic-well-being-us-households-202305.pdf ("Eighty-two percent of adults had a credit card in 2022").

[16] *See* Sonia Lin, *Identifying and Addressing the Financial Needs of Immigrants*, Consumer Fin. Prot. Bureau (Jun. 27, 2022), https://www.consumerfinance.gov/about-us/blog/identifying-and-addressing-the-financial-needs-of-immigrants/ (describing how "many financial institutions have policies and practices in place that effectively exclude immigrants from access to banking services and to credit due to immigration status").

protected by the First Amendment." *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 341–43 (1995). Online anonymity "promotes the robust exchange of ideas and allows individuals to express themselves freely[.]" *In re Anonymous Online Speakers*, 661 F.3d 1168, 1173 (9th Cir. 2011). Preserving anonymity may be essential for users who seek to have "a distinct online identity," *Cyberspace, Commc'ns, Inc. v. Engler*, 55 F. Supp. 2d 737, 742 (E.D. Mich. 1999), *aff'd and remanded*, 238 F.3d 420 (6th Cir. 2000), or who want to discuss "sensitive, personal, controversial, or stigmatized content," *ACLU v. Gonzales*, 478 F. Supp. 2d 775, 806 (E.D. Pa. 2007). Without anonymity, "the stigma associated with the content of [certain] sites may deter adults from visiting them" at all. *PSINet, Inc.*, 362 F.3d at 236; *see also NetChoice v. Griffin*, No. 5:23-CV-05105, 2023 WL 5660155, at *17 (W.D. Ark. Aug. 31, 2023). That chilling effect only underscores the impermissible burden on protected anonymity that Mississippi's statute imposes on its residents.

The threats to anonymity are real and multilayered. All online data is transmitted through a host of intermediaries. This means that when a website shares identifying information with its third-party age-verification vendor, that data is not only transmitted between the website and the vendor, but also between a series of third parties. Under the plain language of HB 1126, those intermediaries are not required to delete users' identifying data and, unlike the digital service providers themselves, they are also not restricted from sharing, disclosing, or selling that sensitive data. *See* HB 1126 § 5(2)(c). Moreover, almost all websites and services host a network of dozens of private, third-party trackers managed by data brokers, advertisers, and other companies that are constantly collecting data about a user's browsing activity.[17] The data is

---

[17] *See* Bennett Cyphers & Gennie Gebhart, *Behind the One-Way Mirror: A Deep Dive Into the Technology of Corporate Surveillance*, EFF (Dec. 2, 2019), https://www.eff.org/wp/behind-the-one-way-mirror.

shared with or sold to additional third parties and used to target behavioral advertisements. None of those entities are required to delete users' personal data under HB 1126, either.

**C.      Online Age Verification Further Chills Adult Users From Accessing Protected Speech By Putting Their Most Sensitive Data At Risk Of Inadvertent Disclosure, Breach, Or Attack.**

Internet users' legitimate privacy and security concerns based on HB 1126's age verification requirement will also deter them from accessing protected First Amendment content. "Requiring Internet users to provide . . . personally identifiable information to access a Web site would significantly deter many users from entering the site, because Internet users are concerned about security on the Internet and . . . afraid of fraud and identity theft[.]" *Gonzales*, 478 F. Supp. 2d at 806*; see also ACLU v. Mukasey,* 534 F.3d 181, 197 (3d Cir. 2008); *PSINet, Inc. v. Chapman*, 167 F. Supp. 2d 878, 889 (W.D. Va. 2001), *aff'd*, 362 F.3d 227 (4th Cir. 2004) ("Fear that cyber-criminals may access their [identifying information] . . . . may chill the willingness of some adults to participate in the 'marketplace of ideas' which adult Web site operators provide.").

In this increasingly digital world, we are well aware that companies amass our sensitive personal information, often to the greatest extent possible. And whereas once we might have expected, or even trusted, these services to make every effort to secure and safeguard our data, we all have experienced, time after time, data breach after data breach. An internet user could reasonably expect that any identity information they are required to submit to a platform will not remain secret, even if the company has good intentions.[18]

---

[18] *See, e.g.*, Frank Landymore, *Twitter Caught Selling Data to Government Spies While Complaining About Surveillance*, Byte, Mar. 28, 2024, https://futurism.com/the-byte/twitter-selling-data-government; Will Evans, *Amazon's Dark Secret: It Has Failed to Protect Your Data*, Wired, Nov. 18, 2021, https://www.wired.com/story/amazon-failed-to-protect-your-data-investigation/; Gennie Gebhart, *You Gave Facebook Your Number For Security. They Used It For Ads.*, EFF (Sept. 27, 2018), https://www.eff.org/deeplinks/2018/09/you-gave-facebook-your-

Today, data breaches are an endemic and ever-increasing part of life. A record 3,205 data breaches occurred in 2023, up 78% from the year prior, and far exceeding the previous record of 1,860 breaches in 2021.[19] These breaches affected over 350 million people—more than the entire population of the United States—and compromised nearly 11% of all publicly traded companies.[20]

The personal data that HB 1126 requires platforms to collect or purchase is extremely sensitive and often immutable.[21] By exposing this information to a vast web of websites and intermediaries, third-party trackers, and data brokers, HB 1126 poses the same concerns to privacy-concerned internet users as it does to the anonymity-minded users described above. HB 1126 increases their risk of being victims of data breaches, which are nearly unavoidable in this digital age. And once that personal data gets into the wrong hands, victims are vulnerable to

---

number-security-they-used-it-ads; Bennett Cyphers & Gennie Gebhart, *The Google+ Bug Is More About The Cover-Up Than The Crime*, EFF (Oct. 11, 2018), https://www.eff.org/deeplinks/2018/10/google-bug-more-about-cover-crime; Kashmir Hill*, Facebook Is Giving Advertisers Access to Your Shadow Contact Information*, Gizmodo, Sept. 26, 2018, https://gizmodo.com/facebook-is-giving-advertisers-access-to-your-shadow-co-1828476051.

[19] Press Release, Identity Theft Resource Center, *ITRC 2023 Annual Data Breach Report Reveals Record Number of Compromises; 72 Percent Increase Over Previous High* (Jan. 25, 2024), https://www.idtheftcenter.org/post/2023-annual-data-breach-report-reveals-record-number-of-compromises-72-percent-increase-over-previous-high; *see also* Michael Hill & Dan Swinhoe, *The 15 Biggest Data Breaches of the 21st Century*, CSO (Nov. 8, 2022), https://www.csoonline.com/article/2130877/the-biggest-data-breaches-of-the-21st-century.html.

[20] ITRC, *supra* note 19; *see also* Press Release, Identity Theft Resource Center, *ITRC 2023 Consumer Impact Report: Record High Number of ITRC Victims Have Suicidal Thoughts* (Aug. 23, 2023), https://www.idtheftcenter.org/post/2023-consumer-impact-report-record-high-number-itrc-victims-suicidal-thoughts/ ("69% of general consumers have been victims of an identity crime more than once").

[21] *See, e.g.*, Driver Privacy Protection Act, 18 U.S.C. §§ 2721 *et seq.*

targeted attacks both online and off.[22] These dangers are serious and legitimate, and users are right to fear them.[23]

### III. THE BURDEN ON ADULT USER RIGHTS IS SIGNIFICANT BECAUSE ONLINE SPACES ARE AMONG THE MOST IMPORTANT PLACES FOR CORE FIRST AMENDMENT-PROTECTED SPEECH.

The burden placed on adult internet users by Mississippi House Bill 1126's age-verification regime is especially significant in light of the internet's dominant role in the exercise of First Amendment rights today. HB 1126's age-verification requirement will burden access to vast parts of the internet, including "perhaps the most powerful mechanisms available to a private citizen to make his or her voice heard," and will have devastating consequences for First Amendment activity. *Packingham v. North Carolina*, 582 U.S. 98, 107 (2017).

The Supreme Court has recognized that the "most important places . . . for the exchange of views" are "the 'vast democratic forums of the Internet' in general . . . and social media in particular." *Id.*, 582 U.S. at 104 (quoting *Reno v. ACLU*, 521 U.S. 844, 868 (1997)). Roughly 70 percent of American adults, 84 percent of teenagers, and 38 percent of children ages 8 to 12 use

---

[22] *See, e.g.*, Jim Reed, *EE Data Breach 'Led to Stalking'*, BBC, Feb. 7, 2019, https://www.bbc.com/news/technology-46896329; Lee Brown, *Russian Hackers Post Nude Photos of US Cancer Patients to Dark Web in Sick Extortion Plot*, N.Y. Post, Mar. 8, 2023, https://nypost.com/2023/03/08/russian-hackers-post-nude-photos-of-us-cancer-patients-to-dark-web/; Sara Morrison, *This Outed Priest's Story Is a Warning for Everyone About the Need for Data Privacy Laws*, Vox, Jul. 21, 2021, https://www.vox.com/recode/22587248/grindr-app-location-data-outed-priest-jeffrey-burrill-pillar-data-harvesting.

[23] *See, e.g.*, Michelle Faverio, *Key Findings About Americans and Data Privacy*, Pew Rsch. Ctr. (Oct. 18, 2023), https://www.research.org/short-reads/2023/10/18/key-findings-about-americans-and-data-privacy/ (76% of U.S. adults have "very little or no trust at all" that leaders of social media companies will not sell their personal data to others without their consent). *See also* Maria Bada & Jason R.C. Nurse, *The Social and Psychological Impact of Cyber-Attacks* (2020), https://arxiv.org/ftp/arxiv/papers/1909/1909.13256.pdf.

social media.[24] They rely on it to share opinions and ideas;[25] participate in social and political

movements;[26] interact with their government representatives;[27] find community and explore

identity;[28] and express themselves creatively.[29] "[S]ocial media users employ these websites to

engage in a wide array of protected First Amendment activity on topics 'as diverse as human

---

[24] Brooke Auxier & Monica Anderson, *Social Media Use in 2021*, Pew Rsch. Ctr. (Apr. 7, 2021), https://www.pewresearch.org/internet/2021/04/07/social-media-use-in-2021; Victoria Rideout et al., *Common Sense Census: Media Use by Tweens and Teens, 2021*, Common Sense, 33 (2022), https://www.commonsensemedia.org/sites/default/files/research/report/8-18-census-integrated-report-final-web_0.pdf.

[25] *See, e.g.*, Sam Bestvater et al., *Politics on Twitter: One-Third of Tweets from U.S. Adults Are Political*, Pew Rsch. Ctr. (Jun. 16, 2022), https://www.pewresearch.org/politics/2022/06/16/politics-on-twitter-one-third-of-tweets-from-u-s-adults-are-political.

[26] *See, e.g.*, Matt Petronzio, *How Young Native Americans Built and Sustained the #NoDAPL Movement,* Mashable (Dec. 7, 2016), https://mashable.com/article/standing-rock-nodapl-youth; Brooke Auxier, *Social Media Continue to Be Important Political Outlets for Black Americans*, Pew Rsch. Ctr. (Dec. 11, 2020), https://www.pewresearch.org/short-reads/2020/12/11/social-media-continue-to-be-important-political-outlets-for-black-americans; Ramona Alaggia & Susan Wang, *"I Never Told Anyone Until the #MeToo Movement": What Can We Learn From Sexual Abuse and Sexual Assault Disclosures Made Through Social Media?*, 103 Child Abuse & Neglect, at 4 (May 2020).

[27] *See, e.g.*, Aaron Smith & Sono Shah, *Though Not Especially Productive in Passing Bills, the 116th Congress Set New Marks for Social Media Use*, Pew Rsch. Ctr. (Jan. 25, 2021), https://www.pewresearch.org/short-reads/2021/01/25/though-not-especially-productive-in-passing-bills-the-116th-congress-set-new-marks-for-social-media-use/.

[28] *See, e.g.*, Ammar Ebrahim, *TikTok: 'I Didn't Know Other LGBT Muslims Existed,*' BBC, Nov. 28, 2020, https://www.bbc.com/news/av/uk-55079954; John Paul Brammer, *LGBTQ and Out on Social Media – But Nowhere Else*, NBC News, Oct. 11, 2017, https://www.nbcnews.com/feature/nbc-out/lgbtq-out-social-media-nowhere-else-n809796; Carrie Back, *How Indigenous Creators Are Using TikTok To Share Their Cultures*, Travel & Leisure, Oct. 21, 2022, https://www.travelandleisure.com/culture-design/how-indigenous-creators-use-tiktok-to-share-their-cultures; Fortesa Latifi, *Chronic Illness Influencers on TikTok Are Showing the Reality of Being Sick*, Teen Vogue, Sept. 22, 2022, https://www.teenvogue.com/story/chronic-illness-influencers-on-tiktok-are-showing-the-reality-of-being-sick.

[29] *See, e.g.*, #drawingtips, Instagram, https://www.instagram.com/explore/tags/drawingtips (last visited Jun. 14, 2024); Shriya Bhattacharya, *How TikTok Became a 'Gold Mine' For Dancers Looking to Get Discovered and Changed the Way They Make Money*, Insider, Apr. 7, 2023, https://www.businessinsider.com/tiktok-changed-dance-industry-professional-dancers-choreography-artists-movement-trends-2023-4?op=1.

thought.'" *Packingham*, 582 U.S. at 105 (quoting *Reno*, 521 U.S. at 852).

And HB 1126 clearly targets speech that is constitutionally protected for adults. Speech which may be considered harmful, indecent, or offensive to some nonetheless remains constitutionally protected. *See Carey v. Population Servs. Int'l*, 431 U.S. 678, 701 (1977) ("[W]here obscenity is not involved, we have consistently held that the fact that protected speech may be offensive to some does not justify its suppression."); *Reno*, 521 U.S. at 874 (quoting *Sable Commc'ns v. FCC*, 492 U.S. 115, 126 (1989)). In *Pacifica*, the Supreme Court admonished that "the fact that society may find speech offensive is not a sufficient reason for suppressing it." *FCC v. Pacifica Found.*, 438 U.S. 726, 745 (1978).

While Mississippi may have an interest in protecting children from harms, its efforts to accomplish that goal cannot be at the expense of the rights of adults to access constitutionally protected speech. After all, "[t]he Government may not 'reduce the adult population . . . to . . . only what is fit for children.'" *Denver Area Educ. Telecomms. Consortium v. FCC*, 518 U.S. 727, 759 (1996) (quoting *Butler v. Michigan*, 352 U.S. 380, 383 (1957)). "'[R]egardless of the strength of the government's interest' in protecting children, '[t]he level of discourse reaching a mailbox simply cannot be limited to that which would be suitable for a sandbox.'" *Reno*, 521 U.S. at 875 (quoting *Bolger v. Youngs Drug Products Corp.*, 463 U.S. 60, 74–75 (1983)). Furthermore, the burdens placed on adult access to constitutionally protected online speech by Mississippi are harmful to the marketplace of ideas. As the Supreme Court did in *Reno*, this Court should "presume that governmental regulation of the content of speech is more likely to interfere with the free exchange of ideas than to encourage it." *Id*. at 885.

13

**IV.    THE PRIVACY PROVISIONS IN HB 1126 ARE INSEPARABLE FROM THE CONTENT-BASED AGE VERIFICATION SCHEME AND ARE THUS SUBJECT TO STRICT SCRUTINY.**

To the extent HB 1126 contains data privacy provisions, those provisions are inextricable from and dependent upon the law's age-verification requirement. Because the statute's privacy provisions apply only to child users, those rules cannot function without verifying *all* users' ages, which is unconstitutional for all the reasons described above. Thus the court should enjoin HB 1126 in its entirety, without addressing the independent constitutionality of its consumer data privacy provisions.

*Amicus* notes, however, that properly drafted, comprehensive data privacy protections, not attached to content-based, speech-infringing, or privacy-undermining schemes, will likely be subject to a less demanding level of scrutiny. In other words, the data collection and use limits in HB 1126 § 5(1) reflect core data minimization principles found in other laws. *See, e.g.*, HIPAA, Pub. L. 104-191. When data minimization principles are enacted in laws that do not otherwise impose unconstitutional age-verification regimes, they are subject to intermediate scrutiny as regulations of commercial speech. *See, e.g.*, *Trans Union Corp. v. FTC* (*Trans Union I*), 245 F.3d 809, 818–19 (D.C. Cir. 2001) (upholding FTC rule under Fair Credit Reporting Act requiring opt-in consent to sell marketing lists); *Trans Union LLC v. FTC* (*Trans Union II*), 295 F.3d 42, 52–53 (D.C. Cir. 2002) (upholding FTC rule under Gramm-Leach-Bliley Act that restricted sharing and use of consumer information).

Moreover, consumer data privacy laws containing data minimization rules can withstand intermediate scrutiny because they advance the substantial state interest of internet users' privacy, data security, free expression, and equal opportunity that are no more restrictive than necessary. *See ACLU v. Clearview AI, Inc.*, No. 2020 CH 4353, 2021 WL 4164452, at *10 (Ill.

14

Cir. Ct. Aug. 27, 2021) (collection minimization advances biometric security); *Nat'l Cable &*

*Telecommunications Ass'n v. FCC*, 555 F.3d 996, 1001–02 (D.C. Cir. 2009) (disclosure

minimization advances call records privacy).

## CONCLUSION

For the reasons stated above, this Court should grant the Plaintiffs' motion and enjoin

enforcement of HB 1126.

June 18, 2024                                                  Respectfully submitted,

**Electronic Frontier Foundation**

*s/J. Cal Mayo, Jr.*
J. Cal Mayo, Jr. (MB No. 8492)
MAYO MALLETTE PLLC
2094 Old Taylor Road, Suite 200
Oxford, MS 38655
Tel: (662) 236-0055
cmayo@mayomallette.com

*s/David Greene*
David Greene*
Aaron Mackey*
ELECTRONIC FRONTIER
FOUNDATION
815 Eddy Street
San Francisco, CA 94109
Tel: (415) 436-9333
davidg@eff.org
amackey@eff.org
*Attorneys for Amicus Curiae*
*admitted *pro hac vice*

15