UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

**NETCHOICE, LLC**                                                    **PLAINTIFF**

**v.**                                                    **No. 1:24-CV-170-HSO-BWR**

**LYNN FITCH, in her official capacity as**
**Attorney General of Mississippi**                        **DEFENDANT**

---

DEFENDANT'S RESPONSE IN OPPOSITION TO PLAINTIFF'S
MOTION FOR PRELIMINARY INJUNCTION AND
TEMPORARY RESTRAINING ORDER

---

## INTRODUCTION

This Court should reject plaintiff NetChoice's attempt to halt central provisions of the Walker Montgomery Protecting Children Online Act, H.B. 1126, the State of Mississippi's targeted effort to address the tragic, life-altering, and life-threatening harms to children that proliferate on interactive social-media platforms. The Act imposes on certain online platforms a few modest duties—age verification, parental consent, and harm-mitigation strategy—to help mitigate the harms to children that those platforms aid, promote, facilitate, and profit from: sex trafficking, sexual abuse, child pornography, targeted harassment, sextortion, incitement to suicide and self-harm, and other harmful and often illegal conduct against children.

NetChoice—a group representing billion-dollar social-media companies that routinely sues to halt States' efforts to protect children from online predators—seeks a preliminary injunction blocking the Act's core provisions in all of their applications, including their application to the life-shattering and illegal harms just mentioned.

This Court should deny relief. NetChoice's claims fail and the relief they seek defies the overriding public interest in protecting children's lives and wellbeing.

NetChoice's merits claims are doomed. Its lead argument is that the Act violates the First Amendment by impermissibly regulating protected speech. Mem. 7-15, 16-22 (Doc. 4). But the Act's challenged provisions do not regulate speech. They regulate the non-expressive conduct of certain online platforms. The age-verification provision requires platforms to "make commercially reasonable efforts to verify" the age of users; the parental-consent provision prohibits a platform from "permit[ting] an account holder who is a known minor to be an account holder unless the known minor has the express consent from a parent or guardian"; and the strategy provision requires a platform, "[i]n relation to a known minor's use of a digital service," to "make commercially reasonable efforts to develop and implement a strategy to prevent or mitigate the known minor's exposure to harmful material and other content that promotes or facilitates" any of several life-altering and life-threatening "harms to minors." Act §§ 4(1), 4(2), 6. All three provisions thus regulate a covered platform's non-expressive conduct—not its (or anyone's) speech. And all these provisions rationally advance the State's interest in protecting children from harms perpetrated online. So NetChoice's First Amendment claim fails. And even if the Act incidentally regulated speech, it would do so permissibly. States are entitled to combat the harmful secondary effects of speech—such as the many harms to minors listed above—and the Act pursues that important goal without unduly curtailing speech. And even if the Act were subject to the highest level of constitutional scrutiny, it would satisfy it. The Act's modest provisions are narrowly tailored to advance the State's compelling interest in protecting children from predatory harms that have ended and shattered lives.

NetChoice also contends that the Act is impermissibly vague (Mem. 15-16, 22-23) and is preempted (Mem. 24-25). Those claims fail too. The Act gives any reasonable person fair notice of who and what it covers and what a platform must do and not do. Its succinct and plain terms address harms that no one is entitled to

inflict. In urging otherwise, NetChoice makes contrived arguments that rest on lawyerly ingenuity—such as the fantastical suggestion that the Act outlaws much of the Western canon and the works of Taylor Swift. No reasonable person could read the Act and seriously think that. The Act also is not preempted by 47 U.S.C. § 230. That provision preempts efforts to hold online platforms liable as speakers or publishers of content that platforms merely host. But section 230 leaves undisturbed States' efforts to require online platforms to take modest measures to combat harms to children that others inflict on their platforms.

All other considerations weigh against injunctive relief. *Contra* Mem. 25-26. The Act serves the public interest by narrowly targeting particular types of harmful online conduct against minors, such as badgering young girls into bulimia, extorting children after obtaining nude photos of them, forcing children into sex-trafficking, pressuring teens into suicide through direct and targeted campaigns, selling drugs to children, and bombarding children with sexual material that drives them into depression and desperation. By contrast, granting any relief to NetChoice—particularly the sweeping facial relief that it seeks—would allow predators to continue terrorizing children. The Court should deny all relief.

## BACKGROUND

The Internet has a dark side. It provides a ready forum for an astonishing array of harmful conduct—particularly conduct that inflicts concrete, life-altering, and at times life-ending harms on children. Sophisticated online platforms host, aid, abet, promote, facilitate, and profit from this harmful conduct. These platforms—some of them billion-dollar operations—allow predators to promote and facilitate sex trafficking, sexual abuse, child pornography, harassment, sextortion, incitement to suicide and self-harm, and other harmful and often illegal conduct against children.

3

Recognizing these harms and concerned for the plight of Mississippi children, the State of Mississippi acted this year to address them. The Legislature was especially moved by the case of Walker Montgomery, a 16-year-old Mississippian who in 2022 fell prey to a sextortion encounter on Instagram: after a predator "catfished" Walker and "demanded money to keep from outing him," the Starkville Academy sophomore took his own life. "Starkville father speaks out on 'sextortion' and his son's suicide," Mississippi Clarion Ledger (Feb. 20, 2023).

Spurred by Walker's plight and by the well-recognized harms that proliferate on interactive online platforms, the Legislature passed and the Governor signed the Walker Montgomery Protecting Children Online Act, H.B. 1126 (2024).

The Act has a targeted scope. It "applies only to" online platforms ("digital service provider[s]") that "[c]onnect[ ] users in a manner that allows users to socially interact with other users on the digital services," "allow[ ] a user to create a" profile that others may be able to see, and "allow[ ] a user to create or post content" that others can view. § 3(1)(a)-(c); *see* § 2(a)-(b) (defining "digital service" and "digital service provider"). The Act thus trains its sights on interactive social-media platforms—platforms that present a particularly strong opportunity for predators to victimize children by letting predators interact with children directly and feeding predators information about those children that makes it easier to prey on them. The Act reaffirms this targeted aim by carving out from its reach many other digital platforms. § 3(2). This carveout includes platforms that, as a whole, do not present the acute dangers that interactive social-media platforms do—such as those that mainly provide "access to news, sports, commerce, [or] online video games" and only "incidental[ly]" offer "interactive" ("chat") functions. § 3(2)(c).

Within that targeted ambit, the Act has three provisions that impose on interactive social-media platforms basic duties to address the irreparable harms to children that proliferate on those platforms.

4

First, the Act requires a covered platform to obtain—and take reasonable measures to verify—the age of those who create an account with the platform. "A digital service provider may not enter into an agreement with a person to create an account with a [covered] digital service provider unless the person has registered the person's age with the digital service provider." § 4(1). "A digital service provider shall make commercially reasonable efforts to verify the age of the person creating an account with a level of certainty appropriate to the risks that arise from the information management practices of the digital service provider." § 4(1).

Second, the Act requires covered platforms to secure parental consent before allowing a known minor to hold an account on the platform. The Act prohibits a covered platform from "permitting an account holder who is a known minor to be an account holder unless the known minor has the express consent from a parent or guardian." § 4(2). The Act provides several "[a]cceptable methods" for obtaining that consent, § 4(2)(a)-(e), and a catchall for "[a]ny other commercially reasonable method of obtaining consent in light of available technology," § 4(2)(f).

Third, the Act requires covered platforms to adopt a strategy to address an array of harms inflicted on minors through interactive social-media platforms. "In relation to a known minor's use of a digital service," the Act says, "a digital service provider shall make commercially reasonable efforts to develop and implement a strategy to prevent or mitigate the known minor's exposure to harmful material and other content that promotes or facilitates" a listed set of "harms to minors." § 6(1). The listed harms include: (a) "[c]onsistent with evidence-informed medical information, the following: self-harm, eating disorders, substance use disorders, and suicidal behaviors"; (b) "[p]atterns of use that indicate or encourage substance abuse or use of illegal drugs"; (c) "[s]talking, physical violence, online bullying, or harassment"; (d) "[g]rooming, trafficking, child pornography, or other sexual exploitation or abuse"; (e) "[i]ncitement of violence"; or (f) "[a]ny other illegal activity."

5

§ 6(1)(a)-(f). Reaffirming the Act's focus on harms stemming from interactive online encounters, the Act adds that a platform's obligation to develop a mitigation strategy does not require it to "prevent or preclude" "[a]ny minor from deliberately and independently searching for, or specifically requesting, content," or "prevent or preclude" the platform or people on it to provide "resources for the prevention or mitigation of the harms" described above. § 6(2).

The Act also provides for enforcement. "[T]he parent or guardian of a known minor affected by [a] violation [of the Act] may bring a cause of action" for declaratory and injunctive relief. § 7(2). And the Attorney General may bring an injunctive action, under the Mississippi Consumer Protection Act, to restrain a violation of the Act. § 8. The Consumer Protection Act also allows for civil monetary penalties and criminal liability. Miss. Code Ann. §§ 75-24-19, -20. The Act takes effect July 1, 2024. § 10.

On June 7, NetChoice, a trade association for Internet companies, filed this lawsuit and moved for a preliminary injunction against enforcement of the Act's age-verification, parental-consent, and strategy provisions. Complaint (Doc. 1); Preliminary-Injunction Motion (Doc. 3); Preliminary-Injunction Memorandum (Doc. 4). In its complaint, NetChoice claims that it has associational standing to sue on behalf of its members (¶¶ 12-13), third-party standing to sue on behalf of its members' current and prospective users (¶ 14), and organizational standing to sue on its own behalf (¶ 15). In moving for injunctive relief, NetChoice invokes the first and second of those grounds. Mem. 7. "For all claims" on which it seeks injunctive relief, "NetChoice raises a facial challenge." Mem. 7. NetChoice contends that the Act's age-verification, parental-consent, and strategy provisions are subject to First Amendment strict scrutiny and cannot satisfy that (or any other) standard (Mem. 7-15, 16-22), that the Act's coverage definition and strategy provision are unconstitutionally vague (Mem. 15-16, 22-23), that the strategy provision is

6

preempted by 47 U.S.C. § 230 (Mem. 24-25), and that the remaining injunctive factors favor facial preliminary relief (Mem. 25-26).

NetChoice does not dispute that the Internet—and interactive social-media platforms in particular—provide a forum for inflicting a wide range of harms, including harms on children. *E.g.*, Szabo Dec. ¶ 10 (Doc. 3-2) (admitting that members should limit publication of expression that is "harmful, objectionable, or simply not conducive to their communities"); Veitch Dec. ¶ 9 (Doc. 3-3) ("Bad actors exploit the Internet ... for purposes of causing harm."). NetChoice also acknowledges the need to address these harms. *E.g.*, Szabo Dec. ¶¶ 10-19 (platforms need to block content "that promotes suicide" and many other harms). NetChoice details some of its members' strategies to address harms, some of which include age verification, parental consent, and efforts to block or moderate material that inflicts real-world harms. *E.g.*, Szabo Dec. ¶¶ 12-19 (listing strategies addressing categories of harm set forth in the Act), 32(b) (indicating that certain members already "have the ability to 'age-gate'"); Veitch Dec. ¶ 13 (at least one member already requires parental consent). Yet NetChoice asks this Court to block the Act's core provisions from taking effect or operating in *any* way—including in ways that could help "prevent or mitigate" the "facilitat[ion]" of "trafficking" in children, "sexual exploitation or abuse" of minors, "child pornography," or "suicid[e]." § 6(1).

## ARGUMENT

NetChoice seeks extraordinary facial preliminary injunctive relief. For each provision on which it seeks that relief, it must show: (1) a substantial likelihood of merits success; (2) a substantial threat of irreparable injury without relief; (3) that the injury without an injunction exceeds the injury that an injunction will cause; and (4) that an injunction will not disserve the public interest. *Big Tyme Investments, LLC v. Edwards*, 985 F.3d 456, 463-64 (5th Cir. 2021). And for facial relief against

any provision, it must show that there is likely "no set of circumstances" where the provision "would be valid"—or (for the First Amendment claims) at least "that a substantial number of" the provision's "applications are unconstitutional, judged in relation to" the provision's "plainly legitimate sweep." *United States v. Stevens*, 559 U.S. 460, 472-73 (2010). NetChoice cannot make the required showing for any of its claims against any provision it challenges—and it particularly cannot do so under the facial standard that, it admits, applies. Mem. 7. This Court should deny all relief. If the Court grants any relief, it should limit that relief based on the extent and scope of NetChoice's demonstrated standing, merits success, and irreparable harm.

## I. NetChoice Is Likely To Lose On The Merits.

NetChoice cannot be granted relief because it is likely to lose on all its claims.

### A. NetChoice Is Likely To Lose On Its First Amendment Claim.

NetChoice principally claims that the Act's age-verification, parental-consent, and strategy provisions are subject to First Amendment strict scrutiny and cannot satisfy that (or any other) standard. Mem. 7-15, 16-22. That claim fails.

#### 1. NetChoice lacks standing.

To have any chance of merits success, NetChoice must have standing. It must show an "injury in fact" that is "fairly traceable" to the Attorney General's conduct and that would likely be "redressed" by a decision for NetChoice. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (ellipses and brackets omitted); *see* U.S. Const. art. III, § 2. NetChoice fails to establish standing to bring a First Amendment claim against any of the provisions on which it seeks injunctive relief.

**Organizational Standing.** NetChoice claims that it has organizational standing—standing "on its own behalf to challenge the Act" because it "has incurred costs and will continue to divert finite resources to address the Act's implications and compliance costs for Internet companies." Complaint ¶ 15. This claim (which

NetChoice does not press in its moving papers) fails. To succeed on that diversion-of-resources theory, NetChoice must show that the Act frustrates its mission and forces it to "divert[ ] significant resources to counteract the defendant's conduct"—thereby "significantly and perceptibly impair[ing] the organization's ability to provide its activities." *NAACP v. City of Kyle*, 626 F.3d 233, 238 (5th Cir. 2010). NetChoice has shown nothing like that. Its complaint makes only the conclusory allegation quoted above. Its only evidence—its general counsel's declaration—repeats that "NetChoice itself has been irreparably harmed as it has incurred costs and will continue to divert finite resources to address the Act's implications for Internet companies." Szabo Dec. ¶ 34 (Doc. 3-2). That generic, conclusory statement fails to show an actual diversion of resources. And NetChoice also fails to show a "significant[ ] ... impair[ment]" of its mission. *City of Kyle*, 626 F.3d at 238.

**Associational Standing.** NetChoice claims associational standing because the Act "regulates some services offered by" NetChoice members. Complaint ¶ 13; *see* Mem. 7. But to have standing to sue as the representative of its members, NetChoice must show (among other things) that "its members would otherwise have standing to sue in their own right." *Ass'n of Am. Physicians & Surgeons, Inc. v. Texas Med. Bd.*, 627 F.3d 547, 550 (5th Cir. 2010). NetChoice flunks that requirement. For all three provisions that it challenges, it presses the claims not of its members but of its members' *users*. For the age-verification provision, it says: "Governments cannot require people"—including minors—"to provide identification or personal information to access protected speech." Complaint ¶ 95. For the parental-consent provision, it says, "governments cannot require minors to secure parental consent as a precondition to accessing and engaging in protected speech." *Id.* ¶ 107. And for the strategy provision, a NetChoice declarant alleges that complying with the provision would be difficult but does not allege that the provision violates the member's (YouTube's) First Amendment rights. The declarant says that compliance "will have

9

clear harms for users as well, who may be denied access to protected and valuable speech." Veitch Dec. ¶ 41. These are all complaints about NetChoice's members' *users*. They do not show standing for NetChoice's members.

The only harms alleged for NetChoice's members are financial. One declarant alleges that age verification and parental consent "will prove costly and difficult for NetChoice members to implement." Szabo Dec. ¶ 31. Another alleges that age verification "is highly complex, human-resource intensive, and time consuming"— and thus costly. Veitch Dec. ¶ 33. And on the strategy provision, the same declarant alleges that members will incur further "unrecoverable compliance costs." *Id.* ¶ 40. Those are not First Amendment harms. They are mere business expenses.

**Third-Party Standing.** NetChoice also argues that it has third-party standing "to assert the First Amendment rights of members' current and prospective users." Complaint ¶ 14; *see* Mem. 7. The Supreme Court disfavors third-party standing, but an exception can apply where "the party asserting the right has a 'close' relationship with the person who possesses the right" and "there is a 'hindrance' to the possessor's ability to protect his own interests." *Vote.Org v. Callanen*, 39 F.4th 297, 303-04 (5th Cir. 2022) (quoting *Kowalski v. Tesmer*, 543 U.S. 125, 130 (2004)).

That exception does not apply here. To start: NetChoice claims that the age-verification and parental-consent provisions will cause users to refrain from opening accounts. Szabo Dec. ¶ 31(d) ("New processes at sign up inevitably affect account holder growth, as cumbersome registration processes can dissuade people from signing up."). But NetChoice has failed to show that it has a "close" relationship with its members' users, so it cannot press this interest for them. *Vote.Org*, 39 F.4th at 303. More: Any relationship that NetChoice conceivably might have with its members' users is beset by a conflict of interest that precludes NetChoice from pressing claims against any of the three challenged provisions. "NetChoice is a national trade association of online businesses ... *minimizing burdens* on businesses."

Szabo Dec. ¶¶ 3-4 (emphasis added). Its interest conflicts with the interests of its members' users in avoiding the life-altering harms too often inflicted on NetChoice members' platforms. *See Elk Grove Unified School Dist. v. Newdow*, 542 U.S. 1, 9, 15 & n.7 (2004). That conflict of interest precludes NetChoice's resort to third-party standing on behalf of its members' users. Last: There is no "hindrance" to users bringing a suit to vindicate their rights. NetChoice's lawsuit rests on the view that the Act violates the First Amendment rights of many persons—minors and adults. NetChoice gives no reason why many such persons could not bring suit themselves to vindicate what many regard as the most important constitutional right.

NetChoice invokes *Virginia v. American Booksellers Association*, 484 U.S. 383 (1988). Complaint ¶ 14; Mem. 7. *American Booksellers* approved third-party standing to bring an overbreadth claim—a claim to vindicate the speech rights of non-parties—when the plaintiff itself has standing. 484 U.S. at 392-93; *see also Secretary of State of Md. v. Joseph H. Munson Co.,* 467 U.S. 947, 956-57 (1984). That does not help NetChoice. Under the overbreadth doctrine, "the plaintiff must establish injury under a particular provision of a regulation that is validly applied to its conduct, then assert a facial challenge, under the overbreadth doctrine, to vindicate the rights of others not before the court under that provision." *National Fed'n of the Blind of Texas, Inc. v. Abbott*, 647 F.3d 202, 210 (5th Cir. 2011) (quotation marks omitted). So NetChoice must establish its own standing to unlock third-party standing under *American Booksellers*. As explained, it has failed to do so. Without its own injury it cannot assert a facial challenge to vindicate the rights of others.

### 2. The Act permissibly regulates conduct—not speech—and is not subject to heightened First Amendment scrutiny.

a. The First Amendment prohibits States from "abridging the freedom of *speech*." U.S. Const. amend. I (emphasis added); *see id.*, amend. XIV. But States are free to comprehensively regulate conduct—particularly conduct that harms minors.

*See, e.g.*, *Ginsberg v. New York*, 390 U.S. 629, 639 (1968). First Amendment protection extends "only to conduct that is inherently expressive." *Rumsfeld v. FAIR*, 547 U.S. 47, 66 (2006). States may otherwise regulate conduct so long as they have a rational basis to do so. *City of Dallas v. Stanglin*, 490 U.S. 19, 23-25 (1989) (applying rational basis review after finding no First Amendment rights were abridged).

The Act regulates conduct in a way that accords with these principles and thus with the First Amendment. The age-verification, parental-consent, and strategy provisions regulate the non-expressive conduct of covered online platforms. Those provisions do not regulate speech or the content of speech that platforms (or others) offer—and so they are not subject to heightened First Amendment scrutiny. Under the age-verification provision, a covered platform must obtain—and "make commercially reasonable efforts to verify"—the age of those who create an account with the platform. § 4(1). Under the parental-consent provision, a covered platform may not "permit[ ]" someone "who is a known minor to be an account holder unless the known minor has the express consent from a parent or guardian." § 4(2). And under the strategy provision, a covered platform must, "[i]n relation to a known minor's use of a digital service," "make commercially reasonable efforts to develop and implement a strategy to prevent or mitigate the known minor's exposure to harmful material and other content that promotes or facilitates" a listed set of tangible, real-world "harms to minors." § 6(1). All three provisions thus regulate a covered platform's non-expressive conduct—not its (or anyone else's) speech. None of these provisions regulates content that digital media platforms may publish. Rather, these provisions regulate *conduct* of covered platforms by saying what a platform "*must do*"—take reasonable steps to mitigate concrete harms to minors—"not what they may or may not *say*." *FAIR*, 547 U.S. at 60 (emphasis in original) (upholding law requiring law schools to give military recruiters equal access to on-campus recruiting

events, reasoning that the law affected "what law schools must *do*—afford equal access to military recruiters—not what they may or may not *say*").

These provisions satisfy the rational-basis standard that applies to regulations of non-expressive conduct. Each provision rationally advances the State's legitimate interest in protecting minors from online harms: each makes it harder for predators to gain access to minors and prey on them online by making it harder for minors to participate in online platforms that are dangerous, making it more likely that parents will oversee and check their minors' activities and protect them, and making it more likely that the platforms themselves will take measures that avert a wide set of harms. All three provisions accordingly satisfy rational-basis review and are valid regulations of non-expressive conduct. *Stanglin*, 490 U.S. at 23-25.

b. NetChoice knows that it has no prospect of success if rational-basis review applies to its First Amendment challenges. So NetChoice devotes 9 pages—more than half its First Amendment briefing—to a raft of arguments for why strict scrutiny applies to its First Amendment challenges to the age-verification, parental-consent, and strategy provisions. Mem. 7-15, 16-18. None of these arguments has merit and none overcomes the straightforward path to upholding the Act set out above.

Starting with the age-verification provision, NetChoice claims that under the First Amendment "governments cannot require people to provide personal information or documentation"—like "identification or credit-card information"—"to access protected speech." Mem. 8-9 (cleaned up). No such rule exists. The reason the Supreme Court applied strict scrutiny in the cases that NetChoice cites is because the challenged laws regulated speech based on its content—not because the challenged laws demanded identification or credit-card information. *See Ashcroft v. ACLU*, 542 U.S. 656, 661-62 (2004) (law criminalized speech based on its sexual content); *Reno v. ACLU*, 521 U.S. 844, 859-60 (1997) (content-based regulation of speech). A requirement for identifying information may be relevant in assessing

13

whether a law subject to strict scrutiny is narrowly tailored to serve its aims—which the laws in *Ashcroft* and *Reno* were not. *Ashcroft*, 542 U.S. at 665-69; *Reno,* 521 U.S. at 874-79. But such a requirement does not alone trigger strict scrutiny. And where, as here, a law regulates non-expressive conduct, those cases do not help NetChoice. More: NetChoice has not shown that age verification under the Act requires disclosing personal or sensitive information, so its arguments misfire on that ground too.

Next, on the parental-consent provision, NetChoice claims that the First Amendment bars a State from "prevent[ing] children from hearing or saying" things "without their parents' prior consent." Mem. 9; *see* Mem. 9-10. NetChoice thus claims that the parental-consent provision "would impose an unconstitutional hurdle between minors" and protected speech. Mem. 10. That argument may work for a law that is a "content-based regulation" of "speech"—because such laws are generally subject to insurmountable strict scrutiny. *Brown v. Entertainment Merchants Ass'n,* 564 U.S. 786, 794 (2011). But again, the Act here is no such law: it regulates the conduct of interactive social-media companies to avert tangible harms; it does not regulate speech based on its content. And there simply is no parental-verification-means-strict-scrutiny rule. *See, e.g., Frazier ex rel. Frazier v. Winn*, 535 F.3d 1279, 1285 (11th Cir. 2008) (upholding, against First Amendment challenge, a Florida law's requirement that public-school students obtain parental permission to be excused from reciting Pledge of Allegiance).

Aiming at the strategy provision, NetChoice makes several arguments, but none has merit. Mem. 10-15. The first group of these arguments proceed from the view that the provision imposes "a governmental mandate not to publish certain ... categories of speech." Mem. 10. NetChoice thus contends that the strategy provision is "a prior restraint" because it "would prohibit covered websites from publishing disfavored speech to minors unless they meet state-imposed requirements." Mem. 11;

14

*see* Mem. 11-12. NetChoice relatedly argues that the strategy provision requires covered platforms to screen and censor the speech that appears on their platforms. Mem. 12. None of this is true. The strategy provision does not ban the publication of speech or regulate speech; it does not command or coerce anyone not to publish (and so is not remotely like the Rhode Island speech-censorship committee condemned in *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 71-72 (1963)); it does not require anyone to censor. Again, the strategy provision does not regulate speech. It "neither limits what" NetChoice members "may say nor requires them to say anything." *FAIR*, 547 U.S. at 60. It regulates conduct, by requiring covered platforms to "make commercially reasonable efforts to develop and implement *a strategy* to prevent or mitigate the known minor's exposure" to material that "promotes or facilitates" several real-world harms. § 6(1) (emphasis added).

NetChoice's next argument against the strategy provision is that it is unduly overbroad because it reaches "a substantial amount of constitutionally protected speech." Mem. 12; *see* Mem. 12-14. This argument has two major flaws. One: "To justify facial invalidation" on an overbreadth challenge, NetChoice must show that the strategy provision's "unconstitutional applications ... [are] realistic, not fanciful, and their number ... [is] substantially disproportionate to the statute's lawful sweep." *United States v. Hansen*, 143 S. Ct. 1932, 1939 (2023). NetChoice cannot show that a statute that reaches and regulates so much harmful, unprotected, and illegal conduct lacks a sufficiently "lawful sweep." Two: NetChoice attributes unconstitutional applications to the strategy provision only by grossly misreading it. The provision calls for a strategy to address material that "promotes" or "facilitates" listed harms. § 6. NetChoice treats those quoted terms as blocking material that merely discusses, addresses, or depicts the subjects listed. But no reasonable person would take the quoted words to have that meaning in the context of a law seeking to combat and avert an array of harms to minors (self-harm, eating disorders, drug abuse, suicide,

15

stalking, physical violence, bullying, harassment, sexual exploitation and abuse, and violence) that flow from a very particular set of targeted, interactive acts perpetrated online. *See infra* Part I-B. The Act obviously imports an immediacy component linked with real-world harm; it does not bar discussion of or engagement with ideas. It is only by adopting a patently unreasonable reading of the strategy provision that NetChoice is able to suggest that it outlaws the Western canon, the Declaration of Independence, and the more recent work of Taylor Swift. Mem. 12-13. Courts adopt fair readings of statutes—not ludicrous ones. So NetChoice's overbreadth argument fails.

NetChoice also briefly suggests that its members must "guess at" what the strategy provision will cover. Mem. 15; *see* Mem. 14-15. But this conclusory argument rests on the patently unreasonable view of the provision refuted just above (and refuted again in Part I-B, in addressing NetChoice's vagueness arguments).

With each of these arguments for strict scrutiny foundering, NetChoice finally turns to more traditional claims for why the three challenged provisions are subject to strict scrutiny—that they are content-based, speaker-based, or viewpoint-based. Mem. 16-18. These arguments fail too. NetChoice contends that the Act's coverage provisions are content-based because they cover websites based on how they allow users to "interact." Mem. 16. But the coverage provisions are not based on the content of speech: they are based on conduct and harm—not speech and expression. The Act covers interactive platforms not because of the speech expressed but because of the acute dangers that interactive online encounters present to children. *Supra* Background. NetChoice's contrary argument is just an exercise in labeling: they label the Act's conduct- and harm-based focus as "content-based," but do nothing to back up that label. Nor is the strategy provision content-based. *Contra* Mem. 17. The provision does not direct websites "to prevent or mitigate ... minor[s'] exposure" to content-based categories of speech. Mem. 17 (quoting § 6(1)). NetChoice contends

16

otherwise by partially quoting the strategy provision, which—as explained—requires *adopting a strategy* to address material that "promotes" or "facilitates" listed *harms*. § 6. NetChoice claims that the Act's strategy provision is viewpoint-based because it "regulate[s] speech that 'promotes' certain social ills." Mem. 17. But sex-trafficking, child sexual abuse, and facilitating suicide are not "viewpoints." They are forms of dangerous and outrageous conduct that the State is entitled to combat. That goes for the strategy provision more broadly: it regulates conduct to address real-world harms—not viewpoints. Last, NetChoice contends that the coverage provision is speaker-based, because it covers platforms based on whether they are interactive social-media platforms. Mem. 17-18. But focusing on the forums where the harms to minors are especially acute—due to the nature of the *conduct* that the forums host— is not a speaker-based distinction. And NetChoice's claim that its members are being singled out as "speakers" is especially ridiculous given that its members routinely argue—in invoking 47 U.S.C. § 230(c) to evade liability in lawsuit after lawsuit—that they are *not* the speakers of the content they host. *Cf.* Part I-B.

### 3.    If intermediate scrutiny applies, the Act satisfies it.

Even if the Act could be said to regulate based to some extent on content, it would be subject at most to intermediate scrutiny and would satisfy that standard.

The First Amendment permits a State to regulate to address the secondary effects of some expressive conduct. *Ward v. Rock Against Racism*, 491 U.S. 781, 798 (1989). Such effects can include "impacts on public health, safety, and welfare." *City of Erie v. Pap's A.M.*, 529 U.S. 277, 291 (2000) (plurality opinion). A State's regulation of those effects is constitutional if it "promote[s] a substantial government interest that would be achieved less effectively absent the regulation" and does not prevent substantially more speech than necessary to achieve the goal. *Ward*, 491 U.S. at 799 (cleaned up). And a State may, under this secondary-effects doctrine, address harms

inflicted on minors. Applying the doctrine in *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41 (1986), the Supreme Court upheld a statute that prohibited adult films from being shown in certain areas. *Id.* at 43. Although the statute drew content-based distinctions based on the regulated business's speech, it did so permissibly. The statute was "aimed not at the content of the films, ... but rather at the secondary effects" of theatres showing those films in the sensitive areas. *Id.* at 47. The Act sought to "prevent crime, protect the city's retail trade, maintain property values," and "the quality of urban life." *Id.* at 48 (cleaned up). The Constitution allows that.

Here too, the challenged provisions permissibly combat harmful secondary effects of (we assume here for this argument) speech. Each provision aims at the most serious of secondary effects: concrete, life-altering, and even life-ending harms to minors—predatory behavior, sex-trafficking, sextortion, facilitation of suicide, and more. These risks are, as the Legislature recognized, especially pronounced on interactive social-media platforms—given the chat and profile features that make them fertile ground for bad actors to victimize the young. § 3. To address the predictable—and well-known—real-world effects that flow from these particular platforms, the Act puts in place some modest regulations. Among other things, the age-verification provision puts a guardrail in place before the young are exposed to predators, the parental-consent provision provides an additional guardrail by promoting parental oversight and involvement, and the strategy provision promotes practices that may avert or mitigate a range of tragic harms. §§ 4(1), 4(2), 6.

NetChoice resists these points only briefly. Citing *Boos v. Barry*, 485 U.S. 312, 321 (1998), it contends that the strategy provision's regulation of speech is "content-based" "even if the State purports to regulate only the *effects* of speech." Mem. 17. *Boos* held that regulations on protests could not be justified by various secondary effects ("congestion," interference with ingress or egress," "visual clutter," or "security") because other, non-expressive conduct caused the same problems and were

18

not regulated—which showed that the regulation was really just shielding an unwilling audience from expression. 475 U.S. at 321. Here, by contrast, the Act is not regulating online platforms because of their content, but is instead regulating in order to combat the harms that the activity on their platforms inflicts on minors. *Cf. Paradigm Media Grp., Inc. v. City of Irving,* No. 3:01-CV-612-R, 2002 WL 1776922, at \*6 (N.D. Tex. July 30, 2002), *aff'd*, 65 F. App'x 509 (5th Cir. 2003) (city's commercial-billboard ban—which provided exceptions for, among other things, advertising structures on the same site as large sports facilities—did not violate First Amendment).

The challenged provisions here satisfy the intermediate scrutiny that applies to regulations of content that aim at that content's secondary effects. The age-verification, parental-consent, and strategy provisions all promote the State's "substantial government interest" (*Ward*, 491 U.S. at 799) in "protecting the physical and psychological well-being of minors" from harmful online conduct commonly perpetrated through the online social-media platforms that the Act covers. *Sable Communications of California, Inc. v. FCC*, 492 U.S. 115, 126 (1989). And those provisions achieve that interest without suppressing substantially more speech than necessary. *Ward*, 491 U.S. at 799. Far from cutting off avenues for covered platforms or others to communicate their messages, the Act requires only modest steps—age verification, parental consent, a harm-mitigation strategy—before allowing minors and others to participate on covered platforms.

### 4. If strict scrutiny applies, the Act satisfies it.

In any event, each challenged provision is "narrowly tailored to serve compelling state interests" in protecting children from online predatory harm, and thus satisfies strict scrutiny. *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015).

19

*First*, the State has a compelling interest in protecting minors from the predatory behavior that is commonplace on the interactive social-media platforms that the Act covers. The interest in "safeguarding the physical and psychological well-being of a minor" is manifest and well-settled. *Maryland v. Craig*, 497 U.S. 836, 852-53 (1990) (quoting *Osborne v. Ohio*, 495 U.S. 103, 109 (1990)). Such platforms host predators who target minors and sexually exploit them, extort them, sell drugs to them, and more. *E.g.*, Surgeon General's Advisory on Social Media and Youth Mental Health 4, https://www.hhs.gov/sites/default/files/sg-youth-mental-health-social-media-advisory.pdf; Nat'l Ctr. for Missing & Exploited Children, CyberTipline 2023 Report, https://www.missingkids.org/cybertiplinedata (reporting over 36 million reports of suspected online child sexual exploitation and over 186,000 reports of online enticement). The National Center for Missing and Exploited Children explains that: "In the recent reports of financial sextortion, teen boys are most often targets. In many cases, perpetrators will impersonate a female who wants to trade pictures. Once the targeted boy sends what the supposed female has asked for, the perpetrator will demand money or threaten to leak the images." CyberTipline 2023 Report. The Center continues: "These scenarios can happen quickly and in some cases, they have resulted in tragic outcomes with children taking their own lives." *Id.* Spurred by Walker Montgomery's plight and cases like these, the Act here seeks to avert these tragic harms to children.

NetChoice does not seriously contend that the State lacks a compelling interest in protecting children from online predators or the many harms that they inflict. NetChoice instead suggests that the Act does little more than exert "a free-floating power to restrict the ideas to which children may be exposed." Mem. 18. But that claim rests on NetChoice's oft-repeated-but-baseless view that the Act is a content-based regulation of speech. That view also underlies NetChoice's suggestion that the Act is "punishing third parties for conveying protected speech to children." Mem. 19.

No. States are entitled to regulate third parties to pursue a compelling interest in protecting children from pervasive predatory conduct. NetChoice last seems to suggest that the harms inflicted through interactive social-media platforms are not "an actual problem in need of solving." Mem. 18; *see* Mem. 18-19. But NetChoice points to nothing to seriously contest the range of harms that continue to proliferate on interactive online platforms—despite whatever NetChoice's members claim to be trying to do about them. NetChoice suggests that the Act is simply (and, NetChoice implies, only) "regulating access to (or requiring censorship of) protected speech." Mem. 18. That NetChoice would take that view—and maintain that the State lacks a compelling interest in combatting the harms listed in the Act—goes a long way to showing why the Act is necessary.

*Second*, the Act is narrowly tailored to protect minors from the harms inflicted by online predators. A narrowly tailored law "actually advances the state's interest," if it "could be replaced by no other regulation that could advance the interest as well with less infringement of speech," and is not so underinclusive as to undermine the Court's confidence in the reason for the statute. *Texas Veterans of Foreign Wars v. Tex. Lottery Comm'n*, 760 F.3d 427, 440 (5th Cir. 2014). A "State need not address all aspects of a problem in one fell swoop," and laws are not unconstitutional because they "conceivably could have restricted even greater amounts of speech in service of their stated interests." *Williams-Yulee v. Florida Bar*, 575 U.S. 433, 449 (2015).

The Act's age-verification and parental-consent provisions achieve compelling interests in a narrowly tailored way. Both provisions impose modest guardrails that have the outsized benefit of helping to avert minors' involvement in online encounters that could inflict life-altering or life-ending harm on them. Age verification and parental consent could not be replaced by any "other regulation that could advance the interest as well with less infringement of speech." *Texas Veterans of Foreign Wars*, 760 F.3d at 440. The Act covers only interactive sites that call for users to create a

21

profile and post material—features that are especially attractive to predators. § 3(1). Age verification and parental consent are mainstay features of our society—in schooling, driving, seeing movies, and much more. The State could not so well achieve its aims with a lighter touch.

The strategy provision achieves the same compelling interests in a narrowly tailored way. All the provision asks of covered platforms is to create a "commercially reasonable" "strategy" designed to "prevent or mitigate" a range of listed harms to minors. § 6. Some NetChoice members may already satisfy the provision. *See supra* Background (covering declarations stating that several members have strategies to address harms). And to the extent that their policies do not combat those harms adequately, they confirm that the Act is needed and that no less tailored measure would adequately achieve the State's interests. For example, NetChoice members commonly accept users' ages or birthdates on the honor system. Paolucci Dec. ¶ 6 (Doc. 3-5). That obviously is not good enough to combat the harms the State is targeting. People "often ... get around [age requirements] by misrepresenting their age." How Do We Know Someone Is Old Enough to Use Our Apps?, Meta (July 27, 2021), https://about.fb.com/news/2021/07/age-verification/ (last visited June 13, 2024). Asking for a commercially reasonable strategy is not too much to ask.

NetChoice's responses are unavailing. NetChoice first claims that the State should instead encourage parents to use "widely available" supervisory technologies or content "filters." Mem. 19-20. But these technologies are already available (as NetChoice emphasizes)—which shows that they are not countering the efforts of predators. NetChoice next contends that the Act is overinclusive because it reaches too much speech. Mem. 20-21. But as explained, the challenged provisions are as narrowly tailored as the State can go to address a problem that is getting worse. Indeed, the Act's sound tailoring is driven home by NetChoice's about-face argument that the Act is actually *underinclusive*. Mem. 21. That argument is just an admission

22

that the Act focuses on the platforms that are most likely to host the harms that the State is trying combat.

NetChoice's remaining "additional, independent" tailoring arguments (Mem. 21 (emphasis omitted); *see* Mem. 21-22) are makeweight arguments that replicate the flaws in arguments already addressed.

## B.    NetChoice Is Likely To Lose On Its Vagueness Claims.

NetChoice also claims that parts of the Act are unconstitutionally vague. Mem. 15-16, 22-23. It says that phrases in the Act's coverage provision (§ 3)—such as "primarily functions" and "socially interact"—leave some NetChoice members unsure whether the Act applies to them. Mem. 22-23. NetChoice also says that the categories of harmful conduct for which covered platforms must adopt a mitigation strategy (§ 6) are vague. Mem. 15.

These arguments fail. The Act is clear about who and what it covers. Indeed, NetChoice has no trouble understanding that the Act covers many of its members (*e.g.*, Mem. 3) and is well aware of the harms, inflicted on its members' platforms, that the Act addresses. *E.g.*, Szabo Dec. ¶¶ 12(c), 15(b) (admitting need for strategies to address social interactions that "celebrate[ ] or promote[ ] suicide" and "content that sexually exploits minors"); Pai Dec. ¶ 15(b) (admitting member was required to report multiple instances of "suspected child sexual abuse material"). And NetChoice has not sought (even as a backup position) a limiting construction of the Act that would clarify anything that it claims to be vague. Any reasonable person can read the Act's succinct provisions and know what they mean—even if NetChoice wishes to pretend otherwise. *E.g.*, Mem. 12-13 (suggesting that the Act would outlaw a Biblical story, works of Shakespeare, and a Carrie Underwood song). NetChoice simply wants to dismantle an Act that may call on its members to do more than stand by as innumerable harms to minors continue to be inflicted on their platforms.

A law gives fair notice—and is not unconstitutionally vague—if it "gives a person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly" and "provides explicit standards for those applying them to avoid arbitrary and discriminatory applications." *Roark & Hardee LP v. City of Austin*, 522 F.3d 533, 551 (5th Cir. 2008) (quotations omitted). But "only a reasonable degree of certainty is required." *Id.* at 552 (quotations and alterations omitted); *see Doe I v. Landry*, 909 F.3d 99, 117 (5th Cir. 2018) ("perfect clarity and precise guidance are not required" to uphold constitutionality of law) (quotations omitted). Because legislative bodies are "[c]ondemned to the use of words," courts "can never expect mathematical certainty from [their] language." *Grayned v. City of Rockford*, 408 U.S. 104, 110 (1972).

The Act's challenged provisions meet these standards. The coverage provision exempts from the Act digital service providers whose service "[p]rimarily functions to provide a user with access to news, sports, commerce, online video games or content primarily generated or selected" by the provider but "[a]lso allows chat, comment or other interactive functionality that is incidental to" the service's primary function. § 3(2)(c)(1)-(2). NetChoice claims confusion about how to determine "when a website crosses either the 'primary' or the 'incidental' threshold." Mem. 23. Its confusion is unfounded. The fair reading of § 3 is that the Act excludes all websites whose main function is not to allow users to communicate with one another but to provide some other service such as news coverage, sports information, online shopping, or video games. And the fact that some of these websites may have a chat function or comment section does not bring them within the Act's scope. The Act's clear focus is online social-media platforms where minors interact with other users and suffer objective, real-world harms as a result of those interactions. NetChoice's members should easily be able to determine whether or not they fall within this exemption.

24

NetChoice further claims that the coverage provision is unconstitutionally vague because it "does not define what it means for a website to 'allow users to socially interact,' as compared to other forms of personal interaction." Mem. 23 (quoting § 3(1)(a)). According to NetChoice, "[b]ecause most human interactions could be deemed 'social,'" it is unclear whether "any website that allows any form of user interaction may be covered," so platforms must "guess" whether the Act "applies to 'business' interactions, which may have a social component." Mem. 23. But no guesswork is needed. The phrase "socially interact" means communication between two or more "users on [a] digital service." § 3(1)(a). A person of ordinary intelligence would understand that the word "socially" was not employed to draw a distinction between personal and business interactions. Indeed, the Act exempts business-oriented websites that "primarily function[ ]" to offer users "career development opportunities," including "[p]rofessional networking" and "[j]ob posting." § 3(2)(d). If the phrase "socially interact" was meant to exclude professional or business interactions, there would have been no need to exempt career development websites. So § 3 provides adequate guidance as to which online platforms are covered.

NetChoice's vagueness claim against the strategy provision fails too. It argues that, because "virtually none of the prohibited topics" in that provision "are defined," determining "whether content falls into one" of those "categories" is inherently "subjective." Mem. 15 (quotations omitted). As a result, NetChoice contends, § 6 does not "provide covered websites sufficient definiteness" to "understand what will give rise to liability" and invites "arbitrary and discriminatory enforcement." *Id.* (quotations omitted).

NetChoice is mistaken. To start, the fact that a statutory term is undefined does not render it impermissibly vague. "[T]here is no constitutional need to define statutory terms that 'are not obscure and are readily understandable by most people.'" *United States v. Beasley*, 2021 WL 96250, at *4 (S.D. Miss. Jan. 11, 2021)

25

(quoting *United States v. Conlan*, 786 F.3d 380, 386 (5th Cir. 2015)). The categories of harm listed in § 6 are neither obscure nor incapable of being understood by a normally intelligent person. And a statute is not vague just because one can imagine hypothetical scenarios in which reasonable people might disagree whether it fits within one of the categories of harm. *See United States v. Williams*, 553 U.S. 285, 305 (2008) (rejecting notion that the "mere fact that close cases can be envisioned renders a statute vague"). And NetChoice's fantastical hypotheticals do not come close to showing what the vagueness doctrine requires. NetChoice suggests that the strategy provision could require platforms to block minors' access to (for example) *Romeo and Juliet* or the Biblical story of Samson because they promote or facilitate suicide, or *The Great Gatsby* and *The Catcher in the Rye* because they promote or facilitate "substance abuse or use of illegal drugs." Mem. 12. This is lawyerly contrivance—not sound legal argument. NetChoice treats § 6's requirement to adopt a strategy addressing material that "promotes" or "facilitates" listed harms as though § 6 instead requires platforms to block material that "discusses," "addresses," or "depicts" the subjects listed. An ordinary person would not take the words "promotes" or "facilitates" to have that meaning in the context of a law seeking to combat and avert an array of harms to minors (self-harm, eating disorders, drug abuse, suicide, stalking, physical violence, bullying, harassment, exploitation and abuse, and violence) that flow from a very particular set of targeted, interactive acts perpetrated online. Instead, such a person would understand that "promotes" and "facilitates" refer to efforts to bring about the harms against minors listed in the strategy provision. *See* New Oxford American Dictionary 1398 (3d ed. 2010) (defining "promote" as "actively encourage"). In other words, they would understand that the Act narrowly targets particular types of harmful online conduct against minors, such as badgering young girls into bulimia, extorting children after obtaining nude photos of them, forcing children into sex-trafficking, pressuring teens into suicide through

26

direct and targeted campaigns, selling drugs to children, and bombarding children with sexual material that drives them into depression and desperation.

NetChoice also argues that "promotes" and "facilitates" are unconstitutionally vague. Mem. 15. It cites *Baggett v. Bullitt*, 377 U.S. 360 (1964), for the proposition that the "'range of activities which are or might be deemed' to 'promote' an idea 'is very wide indeed' and provides no 'ascertainable standard of conduct.'" Mem. 15 (quoting 377 U.S. at 371). But that case involved a Washington statute requiring university employees to take an oath promising to "promote respect for the flag and the institutions of the United States and State of Washington." 377 U.S. at 371. The Act here is not concerned with the promotion or discussion of any ideas. It is concerned with preventing and mitigating certain online conduct that harms minors. A reasonable reader of the statute—rather than a motivated reader seeking litigation advantage—can understand that.

## C.     NetChoice Is Likely To Lose On Its Preemption Claim.

NetChoice argues that 47 U.S.C. § 230 preempts the Act's strategy provision, § 6. Mem. 24-25. It is wrong. Section 230 shields online platforms from liability as speakers or publishers of third-party content that those platforms merely host. Section 230 does not excuse platforms from complying with state laws (like the strategy provision) that require platforms to take steps to help protect children from harmful interactive online conduct.

Titled "Protection for 'Good Samaritan' blocking and screening of offensive material," section 230(c) has two parts. First, subsection (c)(1) says: "No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." Second, subsection (c)(2) grants website "provider[s] or user[s]" immunity from liability "on account of" two sets of actions: "any action voluntarily taken in good faith to restrict

access to or availability" to "obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable" material; and "any action taken to enable or make available to information content providers or others the technical means to restrict access to material."

As construed by courts, section 230(c)'s net effect is that courts may not treat online platforms as publishers of the third-party content they host—including when they engage in good-faith efforts to remove harmful material. *See NetChoice, LLC v. Paxton*, 49 F.4th 439, 466 (5th Cir. 2022) (discussing relationship between two parts of section 230(c)). Section 230(c) thus encourages online platforms to prevent children from being exposed to harmful content. And section 230(e)(3) provides: "No cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section." But section 230 does not preempt all state laws regulating online platforms. It instead provides that "[n]othing in this section shall be construed to prevent any State from enforcing any State law that is consistent with this section." 47 U.S.C. § 230(e)(3). The Fifth Circuit has enforced that plain text to hold that section 230 does not preempt a Texas state law requiring commercial pornographic websites to use age-verification methods to prevent minors from accessing their sites. *Free Speech Coalition, Inc. v. Paxton*, 95 F.4th 263, 266-67, 284-86 (5th Cir. 2024). The Court recognized that section 230 "immunize[s] web service providers for *harm caused* by unremoved speech on their website. *Id.* at 285 (emphasis added). But that immunity did not preempt the Texas law, which "imposes liability purely based on whether plaintiffs comply with the statute, independently of whether the third-party speech that plaintiffs host harms anybody." *Id.*

Section 230 does not preempt the strategy provision here either. The strategy provision imposes liability on covered platforms based solely on whether they comply with that provision, irrespective of whether any user-generated communications that they host harms children. Liability under § 6 of the Act does not turn on harm caused

28

by third-party content; instead, it depends on whether a platform makes "commercially reasonable efforts" to "implement" measures to "prevent or mitigate" harm to children. Holding an online platform liable under § 6 would thus not be "treat[ing it] as the publisher or speaker" of any third-party content it hosts. 47 U.S.C. § 230(c)(1). So section 230(c) does not preempt the strategy provision.

In resisting this conclusion, NetChoice quotes *Free Speech Coalition* for the proposition that, by enacting section 230, "Congress granted Internet websites 'broad immunity' for 'all claims stemming from their publication of information created by third parties.'" Mem. 24 (quoting 95 F.4th at 286; emphasis removed). That language—which *Free Speech Coalition* drew from *Doe v. MySpace, Inc.*, 528 F.3d 413, 418 (5th Cir. 2008)—does not help NetChoice. The online-platform defendant in *MySpace* enjoyed immunity against a negligence claim seeking to hold it liable for harm caused by the publication of third-party content on the platform. *See* 95 F.4th at 285. That is not what the strategy provision does. It demands that covered platforms take steps that avert or mitigate harms—and does not impose liability on them if such harms occur.

NetChoice also contends that the strategy provision is preempted because it requires its members to "block minors' access to user-generated content." Mem. 25. NetChoice cites *MySpace* for the proposition that "Section 230 'specifically proscribes liability' for 'decisions relating to the monitoring' or 'screening' 'of content.'" *Id.* (quoting 528 F.3d at 420). But again, *MySpace*'s holding on section 230's preemptive effect is limited to claims seeking to hold online platforms liable for harm caused by third-party communications. The strategy provision does not do that.

## II.    The Remaining Factors Strongly Disfavor Injunctive Relief.

NetChoice has not established that its members or their users will suffer irreparable injury without a preliminary injunction. It has not shown that anyone

will likely be deprived of a constitutional or statutory right if the Act takes effect. And the remaining injunctive factors—the balance of the equities and the public interest—weigh heavily against a preliminary injunction. The State has a "transcendent interest in protecting the welfare of children." *Ginsberg v. New York*, 390 U.S. 629, 640 (1968) (citation omitted); *see Sable Communications of California v. FCC*, 492 U.S. 115, 126 (1989) (recognizing the State's "compelling interest in protecting the physical and psychological well-being of minors"). Enjoining the Act would undermine the State's efforts to protect children from the severe harms described in the Act. Those harms far outweigh any claimed financial loss that NetChoice's members may incur if they must comply with the Act. And a State suffers irreparable harm any time its laws are enjoined by a federal court. *Abbott v. Perez*, 585 U.S. 579, 602 n.17 (2018) ("the inability to enforce its duly enacted plans clearly inflicts irreparable harm on the State"). The balance of the equities weighs sharply against granting NetChoice's motion.

## III.    If The Court Grants Any Relief, It Should Limit That Relief.

If the Court grants relief, it should limit that relief based on NetChoice's showing of merits success, standing, and irreparable harm.

Well-established principles limit the relief that federal courts may grant. On the merits, "the scope of injunctive relief is dictated by the extent of the violation established," and a "court must narrowly tailor an injunction to remedy the specific action which gives rise to the order." *Green Valley Special Util. Dist. v. City of Schertz*, 969 F.3d 460, 478 n.39 (5th Cir. 2020) (quotation marks omitted). Further, "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Lion Health Servs., Inc. v. Sebelius*, 635 F.3d 693, 703 (5th Cir. 2011) (quotation marks omitted). So NetChoice may be granted relief against a challenged provision only to the extent that it has established that *that*

*provision* likely is unlawful. And because merits success is possible only when a plaintiff has standing, the Court should grant relief only to the extent of NetChoice's showing of standing to challenge each provision at issue. These points are especially important for the strategy provision, which includes many applications to illegal and harmful conduct that NetChoice members have no interest in allowing to proliferate. And all of these points are especially critical given the facial nature of NetChoice's challenges. To obtain facial relief against any provision, NetChoice must show that there is likely "no set of circumstances" where the provision "would be valid"—or at least (for the First Amendment claims) "that a substantial number of" the provision's "applications are unconstitutional, judged in relation to" the provision's "plainly legitimate sweep." *United States v. Stevens*, 559 U.S. 460, 472-73 (2010); *see United States v. Hansen*, 143 S. Ct. 1932, 1939 (2023) ("unconstitutional applications must be realistic, not fanciful, and their number must be substantially disproportionate to the statute's lawful sweep"). Mississippi law's favor for severance also reaffirms these points. Miss. Code Ann. § 1-3-77.

These standards sharply limit any relief that the Court can grant to NetChoice. Although NetChoice should not be granted any relief for the reasons set forth in Parts I and II, it surely should not be granted facial relief against the three challenged provisions. The age-verification, parental-consent, and strategy provisions can all apply in a wide range of ways to help avert or mitigate life-altering and even life-ending harms to minors—the harms recounted in the strategy provision and illustrated throughout this brief. This constitutes a "plainly legitimate sweep" for those provisions. 559 U.S. at 472-73. As for the strategy provision in particular, there is no sound basis for blocking the strategy provision's operation insofar as it helps "prevent or mitigate" the "facilitat[ion]" of (for example) "trafficking" in children, "sexual exploitation or abuse" of minors, "child pornography," or "suicid[e]." § 6(1). There is no First Amendment, due-process, or other right to inflict or help inflict those

31

harms. And NetChoice cannot seriously contend that the public interest is served—or its members would be irreparably harmed—by allowing the Act to help avert tragic, life-altering, and life-threatening harms on children.

## CONCLUSION

The preliminary-injunction motion should be denied.

**RESPECTFULLY SUBMITTED**, this the 18th day of June, 2024.

**LYNN FITCH, in her official capacity as Attorney General of Mississippi,** *Defendant*

**LYNN FITCH**
**Attorney General of Mississippi**

By: */s/ Wilson D. Minor*
WILSON D. MINOR (MSB #102663)
C. LEE LOTT (MSB #10605)
CLAIRE BARKER (MSB #101312)
Special Assistant Attorneys General
Mississippi Attorney General Office
Civil Litigation Division
Post Office Box 220
Jackson, Mississippi 39205-0220
Telephone: (601) 359-6279
Email: wilson.minor@ago.ms.gov
        lee.lott@ago.ms.gov
        claire.barker@ago.ms.gov

**CERTIFICATE OF SERVICE**

I hereby certify that on this day I electronically filed the above pleading or other paper with the Clerk of Court using the ECF system which sent notification to all counsel of record.

This, the 18th day of June, 2024.

$\quad$ */s/Wilson D. Minor* $\quad\quad\quad$
Wilson D. Minor