## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
## SOUTHERN DIVISION

| | |
|---|---|
| NETCHOICE, LLC,<br><br>Plaintiff,<br><br>v.<br><br>LYNN FITCH, in her official capacity as Attorney General of Mississippi,<br><br>Defendant. | Civil Action No. 1:24-cv-00170-HSO-BWR |

## PLAINTIFF NETCHOICE'S REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION AND TEMPORARY RESTRAINING ORDER

**Table of Contents**

Argument .................................................................................................................. 1

   I.   NetChoice is likely to succeed on the merits of its challenges to the Act. ......................... 1

      A.  NetChoice has standing to challenge the Act. ............................................................. 1

      B.  The entire Act and the challenged provisions violate the First Amendment. ............... 3

         1.  The Act and its challenged provisions regulate protected speech and not just conduct—triggering strict scrutiny. ......................................................................... 3

         2.  The Act and the challenged provisions fail First Amendment scrutiny.................. 6

      C.  The Act is unconstitutionally vague. ........................................................................... 8

      D.  Section 6 of the Act is preempted by 47 U.S.C. § 230. ............................................... 8

  II.  The other factors favor injunctive relief. ........................................................................... 9

  III. The Court should enter the preliminary injunction that NetChoice requested. .................. 9

Conclusion ............................................................................................................... 9

Certificate of Service ............................................................................................... 11

Defendant's attempt to defend Mississippi House Bill 1126 (2024) ("Act") rests largely on the premise that "the Act's challenged provisions do not regulate speech"—only "non-expressive conduct." Resp. 2. That flies in the face of the Act's text, binding Supreme Court authority like *Brown*, and decisions from courts nationwide that Defendant wholly ignores. Even a short review of the Act's text confirms that it regulates both covered websites' ability to disseminate protected speech and minors and adults' ability to access and engage in it. Governmental restrictions on accessing "social media" and similar websites "prevent the user from engaging in the legitimate exercise of First Amendment rights." *Packingham v. North Carolina*, 582 U.S. 98, 108 (2017).

Once this becomes clear, little remains of Defendant's argument. For instance, Defendant fails to rebut that covered websites already address potentially harmful content, or that parents have many tools to supervise their minors' online experiences. Nor does Defendant demonstrate that the Act meets the heightened First Amendment scrutiny applicable to content-based regulations of speech, as Defendant simply ignores many tailoring flaws. The Act flunks any form of First Amendment scrutiny and should be enjoined before it can chill speech across the Internet.

## Argument

**I.      NetChoice is likely to succeed on the merits of its challenges to the Act.**

**A.      NetChoice has standing to challenge the Act.**

**NetChoice has associational standing.** NetChoice has standing to sue "on behalf of its members"—that is, covered websites. *Tex. Ass'n of Mfrs. v. U.S. Consumer Prod. Safety Comm'n*, 989 F.3d 368, 377 (5th Cir. 2021) (citation omitted); *see* Mem. 7; Compl. ¶¶ 12-13. Defendant contests only one element of associational standing: that NetChoice members "have standing to sue in their own right." Resp. 9 (citation omitted). Defendant argues that NetChoice "presses the claims not of its members but of its members' *users*." *Id.* Not only is this assertion incorrect, it ignores decisions to the contrary. *E.g.*, *NetChoice v. Yost*, 2024 WL 555904, at *4 (S.D. Ohio Feb.

12, 2024); *NetChoice v. Griffin*, 2023 WL 5660155, at \*9 (W.D. Ark. Aug. 31, 2023).

NetChoice members' websites are the "object" regulated by the Act. *Texas v. EEOC*, 933 F.3d 433, 446 (5th Cir. 2019). The Act directly injures NetChoice's members by imposing "[a]n increased regulatory burden," *id.*, and compliance costs. "Economic harm . . . is a quintessential Article III injury." *Book People, Inc. v. Wong*, 91 F.4th 318, 331 (5th Cir. 2024) (citation omitted). Defendant concedes these "expenses" exist, but says they "are not First Amendment harms." Resp. 10. That argument "conflates the merits of the suit with . . . standing." *OCA-Greater Houston v. Texas*, 867 F.3d 604, 613 (5th Cir. 2017). Regardless, the Act violates members' own First Amendment rights to disseminate protected speech. Mem. 6-7; Compl. ¶¶ 12-13, 19. Limits on users' rights equally infringe members' rights to disseminate speech. Mem. 7-16; Compl. ¶ 59.

**NetChoice has standing to invoke users' rights.** Defendant also says NetChoice lacks standing "to vindicate the speech rights of" its members' users. Resp. 11. But "in the First Amendment context, litigants are permitted to challenge a statute" because "the statute's very existence may cause others not before the court to refrain from constitutionally protected speech." *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 392-93 (1988) (cleaned up). Courts nationwide have held that NetChoice can raise users' rights. *Yost*, 2024 WL 555904, at \*5-6; *NetChoice* v. *Bonta*, 2023 WL 6135551, at \*4 (N.D. Cal. Sept. 18, 2023); *Griffin*, 2023 WL 5660155, at \*10-12. And perhaps the leading case on minors' speech rights was brought by a trade association. *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 789 (2011).

Defendant never disputes that the Act injures users, conceding that users could "bring suit themselves." Resp. 11. Instead, Defendant argues that "NetChoice must establish its own standing" before asserting users' harms. *Id.* But it has, as explained above. Defendant next argues that websites and users have "a conflict of interest." *Id.* at 10. Not so: Both have an interest in

vindicating First Amendment speech rights, as courts have recognized. *See Yost*, 2024 WL 555904, at \*6; *Griffin*, 2023 WL 5660155, at \*10-12. Defendant's cited cases do not involve speech rights.[1]

> **B.      The entire Act and the challenged provisions violate the First Amendment.**

> **1.      The Act and its challenged provisions regulate protected speech and not just conduct—triggering strict scrutiny.**

Defendant stakes her case on the notion that "the Act's challenged provisions do not regulate speech." Resp. 2; *see id.* at 12, 14-16 (similar). But the Act directly restricts users' access to protected speech on certain disfavored websites characterized by their facilitation of user speech, and it further regulates speech based on content, speaker, and viewpoint—triggering strict scrutiny.

**The age-verification provision regulates speech and triggers strict scrutiny.** The age-verification provision (§ 4(1)) regulates protected speech because it "burdens both adults' and minors' access to constitutionally protected speech." *Griffin*, 2023 WL 5660155, at \*18; *see* Mem. 8-9; EFF Br. 2-11. Before anyone can use covered websites to share their political opinions or communicate with a church group—or engage in countless other acts of core speech—they must verify their ages. But the Supreme Court has held that requiring people to provide personal information or documentation to access protected speech unconstitutionally chills speech. *See, e.g.*, *Ashcroft v. ACLU*, 542 U.S. 656, 667 (2004); *Reno v. ACLU*, 521 U.S. 844, 881-82 (1997).

Defendant dismisses this precedent as involving only "content-based" laws. Resp. 13. Although the Act here is content-based, *infra* p.6, chilling access to protected speech (whether all speech or only a subset of it) is a standalone First Amendment injury. Indeed, *Griffin* enjoined a similar age-verification requirement that it assumed was content-neutral. 2023 WL 5660155, at \*16-17 (collecting cases); *see, e.g.*, *ACLU v. Mukasey*, 534 F.3d 181, 197 (3d Cir. 2008) (age-

---

[1] *See Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 17 (2004) ("family law rights"); *Kowalski v. Tesmer*, 543 U.S. 125 (2004) (appellate counsel for indigent criminal defendants); *Vote.Org v. Callanen*, 39 F.4th 297 (5th Cir. 2022) (right to vote), cited at Resp. 10-11.

verification "would chill protected speech and thus . . . fail [] strict scrutiny"). Defendant also argues that the Act's age-verification involves no "personal or sensitive information" but does not explain how that is true. Resp. 14; *see* Paolucci Decl. ¶¶ 10-12. Regardless, age-verification chills speech because users perceive it as a threat to their privacy. EFF Br. 7; *see* Pai Decl. ¶¶ 20-23.

**Parental Consent.** The parental-consent provision (§ 4(2)) also regulates speech, as it "require[s] parental consent for children to access constitutionally protected, non-obscene content." *Yost*, 2024 WL 555904, at \*12; *see* Mem. 9-10. The State has no "power to prevent children from hearing or saying anything *without their parents' prior consent*." *Brown*, 564 U.S. at 795 n.3. Defendant concedes this argument "may work" for a content-based law, Resp. 14, which the entire Act is. But there is no rule allowing the government to restrict minors' access to speech with impunity so long as it does so across-the-board. That is why *Griffin* enjoined a parental-consent requirement it assumed was content-neutral. 2023 WL 5660155, at \*17. Rather than engage *Brown*, Defendant cites the school-speech case *Frazier ex rel. Frazier v. Winn*, 535 F.3d 1279 (11th Cir. 2008), asserting "there simply is no parental-verification-means-strict-scrutiny rule." Resp. 14. *Frazier* involved public-school students' speech, which government traditionally has greater authority to regulate in limited circumstances not relevant here. *See Mahanoy Area Sch. Dist. v. B. L.*, 594 U.S. 180, 187 (2021). Moreover, *Frazier*'s reasoning on the balance between minors' speech rights and parental rights has largely been abrogated by *Brown*. 564 U.S at 795 n.3.

**Monitoring-and-Censorship Requirements.** The monitoring-and-censorship requirements (§ 6) regulate speech because they are unconstitutional prior restraints. They require covered websites to "develop *and implement* a strategy to prevent" known minors' "*exposure to*" certain "content," *i.e.*, speech. § 6 (emphases added); *see* Mem. 10-16. Defendant cannot explain how websites can "implement" such strategies without monitoring and censoring speech on minors'

4

accounts, thereby "prevent[ing] . . . exposure to" the content. § 6. Defendant generally disagrees with NetChoice's interpretation but provides no coherent alternative reading. At times, Defendant simply declares that this "provision does not ban the publication of speech or regulate speech; it does not command or coerce anyone not to publish." Resp. 15. But elsewhere, Defendant acknowledges that covered websites must "address material" or even "block material." *Id.* at 15, 17, 26. More often, Defendant speaks in terms of "address[ing] harms." *Id.* at 2, 4-5; 17-18. Whatever the label, the only way covered websites can comply is to *block or restrict particular content*.

Defendant's response to NetChoice's overbreadth challenge also fails. *Id.* at 15-16. Section 6 is "substantially disproportionate" in many ways. *Id.* at 16 (citation omitted). Section 6's *text* sweeps in vast amounts of speech—not just the conduct that Defendant says the Act is *intended* to reach (and is independently prohibited by state law). *Id.* at 26-27. Defendant accuses NetChoice of "lawyerly ingenuity." *Id.* at 3. But NetChoice's members must read the Act's text in light of its penalties, Mem. 26, and Defendant's suggestions that members' current efforts are insufficient, Resp. 22-23. Thus, NetChoice's members cannot say "we know it when we see it"; they must take the Act at face value. Defendant does not address the various examples NetChoice raised, except to say the Act is not intended to reach some of them. Yet *Weed With Willie* promotes use of illegal drugs, and *Practical Ethics* promotes suicide. These are just a few of countless daily determinations websites would need to make about whether content "promotes or facilitates" social ills under § 6—versus content that merely "discusses, addresses, or depicts" them, *id.* at 15. Worse, Defendant attempts to add an extra-textual "immediacy component" into the Act. *Id.* at 16. That is an implicit concession of just how difficult—and unconstitutional—all this is.

**The entire Act targets websites that facilitate users' speech and discriminates based on content and speaker.** The final way the Act regulates speech is by singling out websites whose

5

"primary purpose" for users "is to engage in speech"—and which Defendant does not dispute "contain vast amounts of constitutionally protected speech." *Griffin*, 2023 WL 5660155, at *16. Specifically, the Act regulates only websites that allow users to "create or post content." § 3(1)(c). But creating and disseminating content is speech. *E.g.*, *Brown*, 564 U.S at 792 n.1.

Moreover, the entire Act is content-based. It covers only websites that let users interact "socially," and it excludes websites with content consisting of "[1] news, [2] sports, [3] commerce, [4] online video games," or "[5] career development opportunities." § 3(1)(a), (2)(c)-(d). Defendant says the Act targets this content "because of the acute dangers that interactive online encounters present to children." Resp. 16. All the same, the Act makes these distinctions based on *content*. Plus, government cannot regulate speech because of its "interactiv[ity]." *Brown*, 564 U.S. at 798.

The Act is also plainly speaker-based. Mem. 17-18. The fact that some websites avail themselves of Congress's protections in § 230 does not alter the constitutional analysis. *Cf.* Resp. 17. Rather, § 230 is designed to reinforce, not undermine, websites' free speech rights.[2]

### 2. The Act and the challenged provisions fail First Amendment scrutiny.

Defendant asserts only one interest to support the Act: "protecting children from online predatory harm." Resp. 19. That is a worthy goal, and one NetChoice's members do much to advance. *See, e.g.*, Mem. 4. But the Act is not remotely tailored to that interest and certainly is not "the least restrictive means" of doing so. *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 607 (2021) (citation omitted). Defendant simply refuses to address many of the Act's tailoring flaws.

Defendant dismisses private alternatives: (1) the great lengths that websites—NetChoice members chief among them—go to address potentially harmful content; and (2) parental tools.

---

[2] Nothing in *Rumsfeld v. FAIR*, 547 U.S. 47 (2006), supports Defendant. That was a case involving a compelled-speech claim concerning an entity that did not engage in the publication and public dissemination of speech. *Id.* at 61-64.

Mem. 19-20. Defendant suggests that, because these do not always perfectly "counter[] the efforts of predators," they are insufficient. Resp. 22. But it is blackletter law that less-restrictive alternatives need not be "perfect." *Ashcroft*, 542 U.S. at 668-69. Imposing a governmental mandate will not make these efforts perfect either. *See* Szabo Decl. ¶¶ 20, 23; Paolucci Decl. ¶¶ 20-21.

Regardless, the entire Act is vastly overinclusive as to this interest. The Act's coverage provisions are "a breathtakingly blunt instrument," *Yost*, 2024 WL 555904, at *12, for regulating the "online social-media platforms" that Defendant interprets the Act to cover, Resp. 24. The Act's coverage provisions extend far beyond "social-media" to general-interest forums, niche discussion boards, and other websites such as NetChoice member Dreamwidth. *See, e.g.*, Paolucci Decl. ¶ 9.

The other challenged provisions are also overinclusive. Age verification burdens *adults* as well as minors. EFF Br. 2-11. Parental-consent requirements block minors from accessing *all* protected speech on covered websites—not just the potential "online encounters" Defendant raises. Resp. 21. Likewise, the monitoring-and-censorship requirements reach speech "promot[ing]" *any* "illegal activity." § 6(1)(f). That sweeps far beyond any claimed "predatory conduct" that Defendant says the Act aims at. Resp. 21. Finally, Defendant's emphasis on potential "predatory harm," Resp. 19, is foreclosed by *Packingham*'s holding that the First Amendment prohibits barring convicted predators from "social media" websites, 582 U.S. at 108. Instead, States must use narrower means like "prohibit[ing] a sex offender from engaging in conduct that often presages a sexual crime." *Id.* at 107. If the First Amendment prohibits barring actual *sex offenders* from websites, laws burdening innocent users' access to those same websites cannot be properly tailored.

The entire Act is also underinclusive for multiple reasons. For instance, Defendant does not explain how it makes sense to allow minors to access a supposedly predatory environment if they just search for it, § 6(2), or "so long as one parent . . . says it's OK," *Brown*, 564 U.S. at 802.

7

Defendant invokes the "secondary-effects" doctrine, Resp. 17-19, which applies only to "zoning ordinances," *Ass'n of Club Execs. of Dallas, Inc. v. City of Dallas*, 83 F.4th 958, 969 (5th Cir. 2023) (citation omitted). The Act is not even analogous to zoning ordinances. Even if it were, States "may not reduce secondary effects simply by reducing speech in the same proportion." *Id.* Yet the Act does just that—targeting access to and dissemination of speech, not just its effects.

**C.      The Act is unconstitutionally vague.**

NetChoice's vagueness claims are also likely to succeed. Defendant provides no clarity to the Act's vague terms. As one example, Defendant ignores the Act's text, which requires websites to "implement a strategy to prevent a known minor's exposure to . . . content that promotes" certain harms. § 6(1). Speech laws turning on the word "promote" are unconstitutionally vague. *Baggett v. Bullitt*, 377 U.S. 360, 371 (1964). Defendant dismisses *Baggett*, arguing that the Act "is not concerned with the promotion or discussion of any ideas." Resp. 27. But promoting, for example, curfew evasions or other "illegal activity" is promoting an idea. § 6(1)(f); *see* Mem. 13-14.

**D.      Section 6 of the Act is preempted by 47 U.S.C. § 230.**

47 U.S.C. § 230 preempts the Act's monitoring-and-censorship requirements, because federal law forbids States from imposing liability based on websites' alleged "failure[s] to implement basic safety measures" or based on websites' "decisions relating to the monitoring" or "screening" "of content." *Doe v. MySpace, Inc.*, 528 F.3d 413, 419-20 (5th Cir. 2008) (citation omitted).

Defendant says that § 230 does not prohibit liability that is "purely based on whether plaintiffs comply with [a state] statute" or "does not turn on harm caused." Resp. 28 (citation omitted). But the statute expressly preempts "liability . . . under any State or local law that is inconsistent with" § 230. 47 U.S.C. § 230(e)(3). According to Defendant, however, States could just as easily require websites to develop and implement a strategy to prevent users' exposure to defamatory content and penalize websites for failing to "comply." Resp. 28. Section 230 would preempt that,

just as it preempts § 6 of the Act. Defendant also misreads *Free Speech Coalition, Inc. v. Paxton*, 95 F.4th 263 (5th Cir. 2024). There, complying with the statute meant implementing "age verification" for users of pornographic websites—which has nothing to do with monitoring or removing content. *Id.* at 285. Here, complying with § 6 means monitoring and blocking content. That falls in the heartland of § 230's protections, as websites "cannot be held liable for harmful communications that they fail to remove." *Id.* "Failing to remove content" under § 230 and "failing to prevent exposure to content" under the Act are the same thing. And both are preempted. Mem. 24-25.

## II.     The other factors favor injunctive relief.

Defendant does not dispute that constitutional injuries are irreparable. Resp. 29-30. Nor does Defendant dispute members' irreparable harm of unrecoverable "business expenses." Resp. 10. That leaves only the balance of interest and equities. These factors favor NetChoice, because "[i]njunctions protecting First Amendment freedoms are always in the public interest." *Opulent Life Church v. City of Holly Springs*, 697 F.3d 279, 298 (5th Cir. 2012) (citation omitted).

## III.     The Court should enter the preliminary injunction that NetChoice requested.

Defendant asks the Court to tailor any injunction based on whether NetChoice is likely to succeed in its challenge to "the three challenged provisions" (§§ 4(1), 4(2), and 6). Resp. 31. This request ignores that the entire Act is unconstitutional because of its content-based, speaker-based, and vague central coverage definitions. *See* Mem. 16-18. Defendant's request also treats the challenged provisions as severable. But the Act's provisions are interdependent, as they all relate to known minors. For example, the parental-consent and monitoring-and-censorship requirements depend on the age-verification requirement. Therefore, the Court should enjoin Defendant from enforcing the entire Act and each of the challenged provisions in full.

## Conclusion

Plaintiff respectfully requests injunctive relief before the Act takes effect on July 1, 2024.

Dated: June 21, 2024

Respectfully submitted,

_s/ J. William Manuel_
J. William Manuel (MBN. 9891)
Stephen L. Thomas (MBN 8309)
BRADLEY ARANT BOULT CUMMINGS
    LLP
One Jackson Place
188 E. Capitol Street, Suite 1000
Jackson, MS 39201
Telephone: (601) 948-8000
Facsimile: (601) 948-3000
wmanuel@bradley.com
sthomas@bradley.com

Jared B. Magnuson*
Lehotsky Keller Cohn LLP
3280 Peachtree Road NE
Atlanta, GA 30305
(512) 693-8350
jared@lkcfirm.com

Joshua P. Morrow*
Lehotsky Keller Cohn LLP
408 W. 11th Street, 5th Floor
Austin, TX 78701
(512) 693-8350
josh@lkcfirm.com

Steven P. Lehotsky*
Scott A. Keller*
Jeremy Evan Maltz*
Lehotsky Keller Cohn LLP
200 Massachusetts Avenue, NW, Suite 700
Washington, DC 20001
(512) 693-8350
steve@lkcfirm.com
scott@lkcfirm.com
jeremy@lkcfirm.com

_*Admitted Pro Hac Vice_

_Attorneys for Plaintiff NetChoice, LLC_

10

**Certificate of Service**

I hereby certify that on June 21, 2024, a true and correct copy of the foregoing Reply was electronically filed with the Clerk of Court using the CM/ECF system which will send notification to all counsel of record.

*s/ J. William Manuel*
J. William Manuel (MBN. 9891)

11