**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION**

NETCHOICE, LLC,

*Plaintiff,*

v.

LYNN FITCH, in her official capacity as
Attorney General of Mississippi,

*Defendant.*

Civil Action No. 1:24-cv-00170-HSO-BWR

**DECLARATION OF BARTLETT CLELAND IN SUPPORT
OF PLAINTIFF NETCHOICE'S MOTION FOR
<u>TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION</u>**

I, Bartlett Cleland, declare as follows:

1.     I am the General Counsel and Director of Strategic Initiatives of Plaintiff NetChoice. As such, I draft and deliver legislative testimony, regulatory comments, and position papers in support of NetChoice's objectives, as well as represent NetChoice in public forums, at industry events, and in meetings with government officials and agencies. My role at NetChoice and my previous experience—which includes being a known thought leader, writer, and speaker on all issues of innovation, communications, and technology, having spent twenty-six years in the technology and innovation public policy space—has also made me familiar with NetChoice members and other websites, applications, and digital services more broadly.[1]

2.     I submit this declaration in support of Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction. I am over the age of 18 and am competent to make the statements herein. I have personal knowledge of the facts set forth in this declaration and, if called and sworn as a witness, could and would competently testify to them.

## I.     About NetChoice.

3.     NetChoice is a national trade association of online businesses that share the goal of promoting free speech and free enterprise on the Internet. NetChoice is a 501(c)(6) nonprofit organization. As our website explains, NetChoice "works to make the Internet safe for free enterprise and free expression" and engages at the local, state, national, and international levels to ensure a bright digital future.[2] In particular, we are dedicated to preserving the Internet as a vibrant marketplace for communication, commerce, and the exchange of ideas.

---

[1] This Declaration will refer to all digital services regulated by Mississippi House Bill 1126 (2024) as "covered *websites*" unless necessary to distinguish among different kinds of digital services. Similarly, this Declaration will use "members" to refer to NetChoice members with services regulated by the Act, unless otherwise noted.

[2] NetChoice, Home, https://perma.cc/7TK7-RSKH.

4.     For over two decades, NetChoice has worked to promote online speech and commerce and to increase consumer access and options through the Internet, while minimizing burdens on businesses to help make the Internet more accessible and useful for both businesses and consumers. Our members include a broad array of popular online services, including: Airbnb, Alibaba.com, Amazon.com, AOL, Dreamwidth, Duolingo, Earnin, eBay, Etsy, Expedia, Fluid Truck, Google, Hims&Hers, HomeAway, Hotels.com, Lyft, Meta, Netflix, Nextdoor, OfferUp, Orbitz, PayPal, Pindrop, Pinterest, PrizePicks, Reddit, Snap Inc., StubHub, Swimply, TravelTech, Travelocity, Trivago, Turo, VRBO, VSBLTY, Waymo, Wing, X (formerly known as Twitter), Yahoo!, and YouTube. NetChoice, About Us, https://perma.cc/XKB6-PVSJ.

5.     NetChoice has over two decades of experience advocating for online businesses and for the principles of free speech and free enterprise on the Internet. That experience, combined with the practical applications of the law and declarations submitted by our members, leads us to conclude that Mississippi House Bill 1126 (2024) ("Act"), were Defendant permitted to enforce it, would irreparably harm our members and those who interact with members' websites.

## II.     NetChoice members' websites are full of valuable expression and communities that provide people—minors and adults alike—with profound benefits.

6.     NetChoice members' websites publish, disseminate, display, compile, create, curate, and distribute a wide range of valuable and protected expression to their users. They disseminate content (text, audio, graphics, and video) that facilitates their users' ability to practice their religious beliefs, engage in political discourse, seek cross-cultural dialogue, supplement their education, learn new skills, and simply interact socially. Thus limitations on websites limit the dissemination of a vast range of protected speech.

7.     Because covered websites disseminate such a broad array of protected speech, users employ the covered websites to communicate in a wide variety of ways:

- **Socially.** At core, the Act singles out websites defined by their dissemination and facilitation of user-created speech, "[c]onnect[ing] users in a manner that allows users to socially interact with other users on the digital service" and "[a]llow[ing] a user to create or post content that can be viewed by other users of the digital service" Act § 3(1).

- **Demonstratively.** Covered members allow their users to showcase their creative, artistic, and athletic talents to audiences of their choosing—ranging from users' closest friends to the websites' broader community of potential billions. Examples abound. Websites disseminate users' artistic works, such as paintings or student films. They disseminate creative writing or citizen journalism. And they disseminate athletic highlights from high school athletes.

- **Informatively.** Covered members can be a valuable source of news for their users. Users can access everything spanning front-page news from the Nation's oldest journalistic institutions to student journalism relevant to their local school.

- **Politically.** Covered members also disseminate political speech, allowing their users to participate in public discussion or raise awareness about social causes. Public officials, thought leaders, and citizen activists all use members' services to spread their messages and interact with the public.

- **Educationally.** Covered members disseminate a vast amount of educational material. For instance, university professors can upload lectures on everything from accounting to oceanography. Creators upload step-by-step help guides to solve math problems or change tires.

8. In addition to all of those opportunities (and more), NetChoice member websites offer their users the ability to participate in different communities. On Dreamwidth, users can share

3

their creative writing and read the works of others. On Facebook, users can create communities with other like-minded users for many purposes, including by taking part in religious services. On Instagram, users can share vacation pictures and short informative videos. On Nextdoor, users can connect with their neighbors, including by sharing local news and requesting to borrow tools. On Pinterest, users can discover ideas for recipes, style, home decor, motivation, and more. On Reddit, users can create and lead their own communities, on all manner of subjects. On X, users can engage with their elected representatives and the political, cultural, and social topics of the day. And on YouTube, users can watch documentaries, in addition to all manner of educational, informative, and entertaining content.

**III.    Parents have many tools to oversee and control their minor children online, and NetChoice members go to great lengths to protect minors.**

9.    Parents and guardians have many overlapping and complementary choices to oversee and control their minor children's use of the Internet, including controlling whether their minor children have access to Internet-connected devices in the first place. And there are resources that collect many of these tools in one place for parents. Internet Matters, Parental Control Guides, https://perma.cc/VM8B-65K3 ("Internet Matters, Parental Control Guides").

a.    **Network-Level Restrictions.** Many, if not most, cell service and broadband Internet providers have designed and advertised tools for parents to block Internet access altogether, to block certain apps, sites, and contacts from their children's phones, and to restrict screen time on their children's devices. *See, e.g.*, Internet Matters, Parental Control Guides (collecting parental-control guides for "broadband & mobile networks"); Verizon, Verizon Family, https://perma.cc/AV3V-N7HC; AT&T, Secure Family, https://perma.cc/QP5R-U5J4; T-Mobile, Family Controls and Privacy, https://perma.cc/2FE5-67PN; Comcast Xfinity, Set Up Parental Controls for the Internet, https://perma.cc/44TQ-JLBL. Similarly, there is much publicly

4

accessible information about the many wireless routers that offer parental control settings parents can use to block specific online services, limit the time that their children spend on the Internet, set individualized content filters, and monitor the online services their children visit. *See, e.g.*, Netgear, Circle Smart Parental Controls, https://perma.cc/APV2-XDRN; tp-link, How to Configure Parental Controls on the Wi-Fi Routers (Case 1), https://perma.cc/3GQ9-TJQL.

b.      **Device-Level Restrictions.** Many devices themselves contain ways parents can restrict their use. *See* Internet Matters, Parental Control Guides (collecting parental-control guides for "devices"). Many of the most popular mobile phone and tablet manufacturers like Apple, Google, Microsoft, and Samsung publicize the ways they allow parents to limit screen time across their devices and provide parents with tools to control what applications their children can use, set age-related restrictions on those applications, filter content, and control privacy settings. *See, e.g.*, Apple, Use Parental Controls on Your Child's iPhone and iPad, https://perma.cc/L6VP-GW47; Google, Family Link, Help Keep Your Family Safer Online, https://perma.cc/7EUE-CD6Q; Microsoft, Getting Started with Microsoft Family Safety, https://perma.cc/7UXF-BV92; Samsung, Parental Controls Available on Your Galaxy Phone or Tablet, https://perma.cc/9EUV-4Z7T. There are also many third-party applications parents can install on their children's devices to monitor their activity, set limits on screen time, and filter content—as publicized in mainstream publications. *See, e.g.,* Alyson Behr, *The Best Parental Control Apps in 2025, Tested By Our Editors*, CNN underscored (Jan. 2, 2025), https://perma.cc/Q3SF-TBNF.

c.      **Browser-Level Restrictions.** There are also parental controls on Internet browsers that allow parents to control what online services their children may access. *See, e.g.*, Internet Matters, Parental Control Guides (collecting parental-control guides for browsers); Mozilla, Block and Unblock Websites with Parental Controls on Firefox, https://perma.cc/XY8T-ZT9S. Some

browsers offer a "kids mode" or allow parents to see what online services their children are accessing the most. *See* Google, Safety Center, https://perma.cc/Z7R6-73FW; Microsoft, Learn More About Kids Mode in Microsoft Edge, https://perma.cc/YH7C-X9L9. Third-party software and browser extensions are also widely available to reinforce these tools. *See, e.g.*, Kim Key, *The Best Parental Control Software for 2025*, PCMag (Nov. 15, 2024), https://perma.cc/2LBP-TNL7. Browsers also provide all users with "some control over the information websites collect." FTC, How Websites and Apps Collect and Use Your Information, https://perma.cc/63KN-FZUR.

d.      **App-Level Restrictions.** NetChoice members have developed their own tools that allow parents to set further restrictions on their minor children's use of the websites. Internet Matters, Parental Control Guides (collecting parental-control guides for "social media" and "entertainment and search engines"). In addition to the steps described above, Meta has developed its "Family Center," which provides for parental supervision on Instagram. Meta, Family Center, https://perma.cc/4P4W-BY2G. Using these tools, parents can, among other things, (1) see their minor children's followers and who their minor children are following; (2) see how long the minor spends on Instagram; and (3) set time limits and scheduled breaks. *Id.* YouTube offers similar features, such as, *e.g.*, a "supervised experience" for teens, allowing parents (1) to receive email notifications when a teen uploads a video or starts a livestream; (2) to gain insights into their teen's channel activity (such as uploads, comments, and subscriptions); and (3) an option to link accounts between a parent and teen. YouTube, My Family, https://perma.cc/5UJ6-P3UY. Pinterest, likewise, provides parents of minors "under 16" the ability to "set[] up a 4-digit passcode" that "lock[s] certain settings related to account management, privacy and data, and social permissions on [a] teen's Pinterest account." Pinterest, Resources for Parents and Caregivers of Teens, https://perma.cc/C75X-XUHY ("Pinterest Parent Resources"). And for teenaged users, Snapchat

provides parents and guardians the "Family Center." *See* Snapchat Support, What is Family Center, https://perma.cc/VMM6-4BE7.

10.    NetChoice members take the safety of all users seriously and place a special emphasis on minors' safety, including through the following means:

a.    **Limiting access by age.** All NetChoice members prohibit minors younger than 13 from accessing their main services, and the services that are regulated by the Act. Some members, however, offer separate experiences for users under 13 geared for that specific age group, which are not at issue in this case.

b.    **Minor-Specific Policies.** Some NetChoice members have policies or practices specifically for minors' accounts on their websites. Instagram, for instance, states that it has "Instagram Teen Accounts . . . that are automatically set to more protective teen safety settings" for minor teenagers. *See* Instagram, About Instagram Teen Accounts, https://perma.cc/P6QM-TYSM. Similarly, YouTube publicizes that it has multiple "features to support teen well-being," such as "[t]ake-a-break notifications," "[b]edtime reminders," auto-play being disabled by default, and limitations on the "recommendation of select types of content that can be problematic if viewed in repetition." YouTube, Choices for Every Family, https://perma.cc/29CJ-CJ57.[3]

11.    Any minor-specific policies and parental tools exist alongside the websites' generally applicable "content-moderation" policies. NetChoice members have chosen to balance disseminating large amounts of user-created expression while also limiting publication of speech that NetChoice members consider harmful, objectionable, or simply not conducive to their communities. NetChoice members publish and enforce varied content-moderation policies that address the

---

[3] This Declaration cites portions of NetChoice members' policies. Those policies are lengthy and nuanced (and otherwise publicly available), so this Declaration does not purport to fully summarize the policies.

publication of such prohibited content. Based on NetChoice's research, the "rate of violative content removed from platforms and the level at which it is removed prior to being seen by users makes clear companies are successfully prioritizing the safety of their users." NetChoice, By the Numbers: What Content Social Media Removes and Why 13 (2021), https://perma.cc/7E63-ECRT ("By the Numbers"). Members' content moderation affects both what is available on the website to those looking for it (*e.g.*, through search) *and* what shows up in users' feeds or on users' homepages.

12. To that end, NetChoice's members already have policies in place to block or limit the publication of content that the Act regulates.

13. The Act restricts expression that "promotes or facilitates[,] . . . [c]onsistent with evidence-informed medical information, the following: self-harm, eating disorders, substance use disorders, and suicidal behaviors." Act § 6(1)(a). NetChoice's members already have policies about this prohibited speech, sometimes in nearly identical terms:

    **a. Dreamwidth:** Dreamwidth **does not allow** "Content that is harmful, threatening, abusive, hateful, invasive to the privacy and publicity rights of any person, or that violates any applicable local, state, national, or international law, including any regulation having the force of law." Dreamwidth, Terms of Service, https://perma.cc/G39R-LTR6.

    **b. Meta (Facebook and Instagram):** Meta **prohibits** speech that "intentionally or unintentionally celebrate[s] or promote[s] suicide, self-injury or eating disorders." Meta Transparency Center, Suicide, Self-Injury, and Eating Disorders, https://perma.cc/G9EL-VR7J. But Meta does "allow people to discuss these topics because [Meta] want[s] [its] services to be a space where people can share their experiences, raise awareness about these issues, and seek support from one another." *Id.* Thus, Meta **prohibits** "[c]ontent that promotes, encourages, coordinates, or provides instructions for suicide, self-injury, or eating disorders." *Id.* But Meta may allow "content that depicts older instances of self-harm such as healed cuts or other non-graphic self-injury imagery in a self-injury, suicide or recovery context" (although sometimes this content appears behind "sensitivity screen[s]"). *Id.*

    **c. Nextdoor:** Nextdoor has resources available for suicide and self-harm prevention. Nextdoor Help Center, Suicide & Self-Harm Prevention, https://perma.cc/33JM-75AT?type=image.

**d. Pinterest:** Pinterest **prohibits** "content that displays, rationalizes or encourages suicide, self-injury, [or] eating disorders." Pinterest, Community Guidelines, https://perma.cc/73Z6-KMDD. Accordingly, Pinterest expressly **prohibits**: "self-harm instructions," "suicidal thinking and quotes," "graphic or otherwise triggering imagery or descriptions of self-harm," "promotion of self-harm," "images of accessories used to self-harm," "negative self-talk and insensitive humor about self-harming behavior," and "suicide pacts, challenges and hoaxes," among other things. *Id.*

**e. Reddit:** Reddit **prohibits** "[p]ost[s] containing imagery or text that incites, glorifies, or encourages self-harm or suicide." Reddit, Do Not Post Violative Content, https://perma.cc/J2LE-9JVA ("Reddit, Violative Content").

**f. Snap:** Snap **prohibits** "the glorification of self-harm, including the promotion of self-injury, suicide, or eating disorders." Snap Privacy and Safety Hub, Community Guidelines, https://perma.cc/A4SB-Y8MK; *see* Snap Privacy and Safety Hub, Threats, Violence, & Harm, https://perma.cc/H4VT-G2V7 (noting that Snap **prohibits** "content . . . that encourages or glorifies self-harm, such as suicide, self-mutilation, or eating disorders").

**g. X:** X prohibits "promot[ing] or encourage[ing] suicide or self-harm," including "eating disorders" and "sharing information, strategies, methods or instructions that would assist people to engage in self-harm and suicide." X, X Help Center: Suicide and Self-Harm Policy, https://perma.cc/SKD8-YS5Y.

**h. YouTube:** YouTube **does not allow** "content on YouTube that promotes suicide, self-harm, or eating disorders, that is intended to shock or disgust, or that poses a considerable risk to viewers." YouTube Help, Suicide, Self-Harm, and Eating Disorders Policy, https://perma.cc/Z83H-WNAG.

14.    The Act restricts expression that "promotes or facilitates . . . [p]atterns of use that indicate or encourage substance abuse or use of illegal drugs." Act § 6(1)(b). NetChoice's members already have policies concerning substance use and abuse:

**a. Dreamwidth:** Dreamwidth **does not allow** "Content that is harmful, threatening, abusive, hateful, invasive to the privacy and publicity rights of any person, or that violates any applicable local, state, national, or international law, including any regulation having the force of law." Dreamwidth, Terms of Service, https://perma.cc/G39R-LTR6.

**b. Meta (Facebook and Instagram):** Meta **prohibits** various kinds of content related to substance use, including content that "[c]oordinates or promotes (by which we mean speaks positively about, encourages the use of, or provides instructions to use or make) non-medical drugs." Meta Transparency Center, Restricted Goods and Services, https://perma.cc/A9XS-4EBW. Meta also **prohibits** content that "[a]dmits to personal use without acknowledgment of or reference to recovery, treatment, or other assistance to combat usage," but even with such an acknowledgement or reference, this content "may not speak positively about, encourage use of, coordinate or provide instructions to make or use non-medical drugs." *Id.*

**c. Nextdoor:** Nextdoor **prohibits** "purchase, trade, sale or distribution" of "[a]lcohol, including homebrews," "[d]rug paraphernalia," "[m]arijuana and CBD," "[p]rescription drugs and prescription medical devices," "[t]obacco," and "[o]ther controlled substances." Nextdoor Help Center, List of Prohibited Goods and Services, https://perma.cc/58HR-H482?type=image. Nextdoor also **prohibits** "[s]elling, soliciting, or offering any illegal goods or services." Nextdoor Help Center, Do Not Engage in Harmful Activity, https://perma.cc/Q8FP-CD4E?type=image.

**d. Pinterest:** Pinterest **prohibits** "content that displays, rationalizes or encourages . . . substance abuse." Pinterest, Community Guidelines, https://perma.cc/73Z6-KMDD. Pinterest also **prohibits** "trading or selling . . . products or substances that can cause harm when used, altered or manufactured irresponsibly," including "alcohol, tobacco, drugs . . . including chemical precursors and pill presses, punches and dies." *Id.*

**e. Reddit:** Reddit **prohibits** "depictions" of "the maltreatment of minors," including content "encouraging or forcing a child to use drugs, ingest a dangerous substance or engage in a dangerous challenge." Reddit, Do Not Share Content Depicting or Promoting Neglect, Physical, or Emotional Abuse Against Minors, https://perma.cc/TH86-3FWD. In addition, Reddit **prohibits** "posting illegal content or soliciting or facilitating illegal or prohibited transactions." Reddit, Reddit Rules, https://perma.cc/RNQ3-8RZU.

**f. Snap:** Snap **prohibits** "promoting, facilitating, or participating in criminal activity, such as buying, selling, exchanging, or facilitating sales of illegal or regulated drugs." Snap Privacy and Safety Hub, Community Guidelines, https://perma.cc/A4SB-Y8MK.

**g. X:** X **prohibits** "selling, buying, or facilitating transactions in illegal goods or services," including "drugs and controlled substances." X, X Help Center: Illegal or Certain Regulated Goods or Services, https://perma.cc/3JNZ-PB2L. And for advertisers specifically, "X prohibits the promotion of drugs and drug paraphernalia." X Business, Drugs and Drug Paraphernalia, https://perma.cc/Z8SM-3MYE.

**h. YouTube:** YouTube **prohibits** various kinds of speech related to substance abuse. YouTube **prohibits** (1) "non-educational" "displays of hard drug use"; (2) "making hard drugs"; (3) "minors using alcohol or drugs"; (4) "selling hard drugs"; and (5) "selling soft drugs." YouTube Help, Illegal or Regulated Goods or Services Policies, https://perma.cc/J5DW-7K7Z. Likewise, YouTube **prohibits** "content instructing how to purchase drugs on the dark web" and "content that promotes a product that contains drugs, nicotine, or a controlled substance." *Id.* Additionally, YouTube **prohibits** expression that "aims to directly sell, link to, or facilitate access to" "alcohol," "controlled narcotics and other drugs," "nicotine, including vaping products," and "pharmaceuticals without a prescription." *Id.*

15. The Act restricts expression that "promotes or facilitates . . . [s]talking, physical violence, online bullying, or harassment." Act § 6(1)(c). NetChoice's members already have policies about stalking, bullying, and harassment:

**a. Dreamwidth:** Dreamwidth **does not allow** "Content that is harmful, threatening, abusive, hateful, invasive to the privacy and publicity rights of any person, or that violates any applicable local, state, national, or international law, including any regulation having the force of law." Dreamwidth, Terms of Service, https://perma.cc/G39R-LTR6.

**b. Meta (Facebook and Instagram):** Meta **prohibits** "bullying and harassment," using a sophisticated, multi-tier policy that covers everything from "making threats and releasing personally identifiable information, to "sending threatening messages and making unwanted malicious contact," to "content that's meant to degrade or shame." Meta Transparency Center, Bullying and Harassment, https://perma.cc/6DVS-LFDZ. These "policies provide heightened protection for anyone under the age 18, regardless of user status." *Id.*

**c. Nextdoor:** Nextdoor **prohibits** "[a]ttacking, berating, bullying, belittling, insulting, harassing, threatening, trolling, or swearing at others or their views," as well as "public shaming." Nextdoor Help Center, Be Respectful to Your Neighbors, https://perma.cc/H86Q-RM3S?type=image. Nextdoor also **prohibits** "[t]hreatening someone and/or their pet's safety," "[p]osting comments that encourage violence against others," and "[t]hreatening someone's privacy or security." Nextdoor Help Center, Do Not Engage in Harmful Activity, https://perma.cc/KMF7-EN2T?type=image.

**d. Pinterest:** Pinterest **prohibits** content that "insult[s], hurt[s] or antagonize[s] individuals or groups of people," including "criticisms involving name-calling, profanity and other insulting language or imagery." Pinterest, Community Guidelines, https://perma.cc/73Z6-KMDD. Pinterest also **prohibits** "harassing content or behavior" in messages. *Id.*

**e. Reddit:** Reddit "**do[es] not tolerate** the harassment, threatening, or bullying of people on [its] site; nor do[es] [it] tolerate communities dedicated to this behavior." Reddit, Do Not Threaten, Harass, or Bully, https://perma.cc/64J7-FP7L.

**f. Snap:** Snap **prohibits** all "bullying or harassment," including "all forms of sexual harassment," such as "sending unwanted sexually explicit, suggestive, or nude images to other users." Snap Privacy and Safety Hub, Community Guidelines, https://perma.cc/A4SB-Y8MK.

**g. X:** X **prohibits** "target[ing] others with abuse or harassment, or encourag[ing] other people to do so." X, X Help Center: Abuse and Harassment, https://perma.cc/9DQZ-A4Z2.

**h. YouTube:** YouTube **prohibits** expression that "threaten[s] someone's physical safety" or "targets someone with prolonged insults or slurs based on their physical traits or protected group status." YouTube Help, Harassment & Cyberbullying Policies, https://perma.cc/DWQ7-HFM3. In particular, YouTube **prohibits** expression "uploaded with the intent to shame, deceive or insult a minor." *Id.* YouTube also prohibits "content that promotes violence or hatred against individuals or groups based on" certain attributes. YouTube Help, Hate Speech Policy, https://perma.cc/N7N3-UCLL.

16.     The Act restricts expression that "promotes or facilitates . . . [g]rooming, traffick-

ing, child pornography, or other sexual exploitation or abuse." Act § 6(1)(d). NetChoice's mem-

bers already have policies about this content.

**a. Dreamwidth:** Dreamwidth **does not allow** "Content that is harmful, threatening, abusive, hateful, invasive to the privacy and publicity rights of any person, or that violates any applicable local, state, national, or international law, including any regulation having the force of law." Dreamwidth, Terms of Service, https://perma.cc/G39R-LTR6. Dreamwidth's policies also require users to agree that "[i]f Content is deemed illegal by any law having jurisdiction over" a user, the user "agree[s] that [Dreamwidth] may submit any necessary information to the proper authorities." *Id.*

**b. Meta (Facebook and Instagram):** Meta **prohibits** a vast range of "content or activity that sexually exploits or endangers children," including: "[c]hild sexual exploitation," "[s]olicitation," "[i]nappropriate interactions with children," "[e]xploitative intimate imagery and sextortion," "[s]exualization of children," "[c]hild nudity," and "[n]on-sexual child abuse." Meta Transparency Center, Child Sexual Exploitation, Abuse, and Nudity, https://perma.cc/FYH9-UHPN. Meta also prohibits "content that praises, supports, promotes, advocates for, provides instructions for or encourages participation in non-sexual child abuse." *Id.*

**c. Nextdoor:** Nextdoor's policies against off-topic and sexual content **prohibit** the kind of content covered by this requirement. *See, e.g.*, Nextdoor Help Center, Do Not Engage in Harmful Activity, https://perma.cc/9C8S-2UQW ("No graphic, violent, sexually explicit, or adult content."). Notably, Nextdoor has relatively few instances of CSAM. In 2023, for instance, Nextdoor made only six reports to the National Center for Missing & Exploited Children. *See* Nextdoor, Transparency Report 2023 at 9, https://perma.cc/AP53-BTH4.

**d. Pinterest:** Pinterest **prohibits** "child sexual exploitation of any kind" and "enforce[s] a strict, zero-tolerance policy for any content—including imagery, video, or text— or accounts that might exploit or endanger minors." Pinterest, Community Guidelines, https://perma.cc/73Z6-KMDD. "Pinterest prohibits not just illegal child sexual abuse material (CSAM), but goes a step further to prohibit any content that contributes to the sexualization of minors, including in imagery and text. We also work closely with the National Center for Missing and Exploited Children (NCMEC) to combat this type of activity, and report content violations as required under the law." *Id.* Accordingly, Pinterest "remove[s]": (1) "Illegal child sexual abuse material"; (2) "Sexualization or sexual exploitation of minors, like grooming, sexual remarks or inappropriate imagery–including in the form of cartoons and anime"; (3) "Nude and sexual imagery involving minors"; (4) "Content that facilitates unsolicited contact with minors, such as email addresses, phone numbers and physical addresses, to prevent contact intending to start an exploitative relationship"; (5) "Comments on imagery of minors that are inappropriate or sexualized"; and (6) "The intentional misuse of content depicting minors that is otherwise non-violating. For example, we will deactivate users who save otherwise non-violating content into collections or in other contexts that suggest the intent is sexualization of minors." *Id.*

**e. Reddit:** Reddit "**prohibits** any sexual or suggestive content, and predatory or inappropriate behavior, involving minors (i.e., people under 18 years old) or someone who appears to be a minor." Reddit, Do Not Share Sexual or Suggestive Content Involving Minors, or Engage in any Predatory or Inappropriate Behavior with Minors, https://perma.cc/R3VZ-Y27H.

**f. Snap:** Snap **prohibits** "any activity that involves sexual exploitation or abuse of a minor, including sharing child sexual exploitation or abuse imagery, grooming, or sexual extortion (sextortion), or the sexualization of children." Snap Privacy and Safety Hub, Community Guidelines, https://perma.cc/A4SB-Y8MK. Snap "report[s] all identified instances of child sexual exploitation to authorities, including attempts to engage in such conduct." *Id.*; *see also* Snap Privacy and Safety Hub, Illegal or Regulated Activities, https://perma.cc/J9YV-MXQM (noting that Snap **prohibits** "promoting or facilitating any form of exploitation, including human trafficking or sex trafficking").

**g. X:** X has "**zero tolerance** towards any material that features or promotes child sexual exploitation." X, X Help Center: Child Sexual Exploitation Policy, https://perma.cc/GEJ3-BT7T. X includes a long list of enumerated examples of this policy, which is better summarized by what it does *not* include: "Discussions related to child sexual exploitation are permitted, provided they don't normalise, promote or glorify child sexual exploitation **in any way**." *Id.*

**h. YouTube:** YouTube **prohibits** all "sexually explicit content featuring minors and content that sexually exploits minors." YouTube Help, Child Safety Policy, https://perma.cc/Q4PQ-GP7M. YouTube "report[s] content containing child sexual abuse imagery to the National Center for Missing and Exploited Children, who work with global law enforcement agencies." *Id.*

17.    The Act restricts expression that "promotes or facilitates . . . [i]ncitement of violence." Act § 6(1)(e). NetChoice members have policies addressing content inciting or otherwise encouraging violence:

**a. Dreamwidth:** Dreamwidth **does not allow** "Content that is harmful, threatening, abusive, hateful, invasive to the privacy and publicity rights of any person, or that violates any applicable local, state, national, or international law, including any regulation having the force of law." Dreamwidth, Terms of Service, https://perma.cc/G39R-LTR6.

**b. Meta (Facebook and Instagram):** Meta **prohibits** "language that incites or facilitates violence and credible threats to public or personal safety." Meta Transparency Center, Violence and Incitement, https://perma.cc/TDK5-JZ5F. Meta's policies also contain "[a]dditional protections for . . . [a]ll [c]hildren" and for "persons or groups based on their protected characteristic(s)." *Id.*

**c. Nextdoor:** Nextdoor **prohibits** "[t]hreatening someone and/or their pet's safety," "[p]osting comments that encourage violence against others," and "[t]hreatening someone's

13

privacy or security." Nextdoor Help Center, Do Not Engage in Harmful Activity, https://perma.cc/Q8FP-CD4E?type=image.

**d. Pinterest:** Pinterest **prohibits** "threats or language that glorifies violence," "false or misleading content that encourages turning individuals, groups of people, places or organizations into targets of . . . physical violence," "content that shows the use of violence," "and "content and accounts that encourage, praise, promote, or provide aid to dangerous actors or groups and their activities." Pinterest, Community Guidelines, https://perma.cc/73Z6-KMDD.

**e. Reddit:** Reddit prohibits "content that encourages, glorifies, incites, or calls for violence or physical harm against an individual." Reddit, Do Not Post Violent Content, https://perma.cc/ZDH8-TCTE.

**f. Snap:** Snap **prohibits** "[e]ncouraging or engaging in violent or dangerous behavior." Snap Privacy and Safety Hub, Threats, Violence, & Harm, https://perma.cc/H4VT-G2V7. Snap also **prohibits** "content that glorifies, or risks inciting, violent or harmful behavior toward people or animals." *Id.*

**g. X:** X **prohibits** "[i]nciting, promoting or encouraging others to commit acts of violence or harm, including encouraging others to hurt themselves or inciting others to commit atrocity crimes such as crimes against humanity, war crimes or genocide." X, X Help Center: Violent Content, https://perma.cc/B5QF-NAMF.

**h. YouTube:** YouTube **prohibits** content that "incit[es] others to commit violent acts against individuals or a defined group of people." YouTube Help, Violent or Graphic Content Policies, https://perma.cc/7S8N-VY9G. YouTube also prohibits "content that promotes violence or hatred against individuals or groups based on" certain attributes. YouTube Help, Hate Speech Policy, https://perma.cc/N7N3-UCLL.

18.    The Act restricts expression that "promotes or facilitates . . . [a]ny other illegal conduct." Act § 6(1)(f). NetChoice members have policies addressing content about illegal conduct. Of note, NetChoice members operate across the United States and internationally, and what may be legal in one jurisdiction may be illegal in another. In addition to the content encompassed by the policies above, NetChoice members have various policies that address content involving illegal conduct:

**a. Dreamwidth:** Dreamwidth **does not allow** "Content . . . that violates any applicable local, state, national, or international law, including any regulation having the force of law." Dreamwidth, Terms of Service, https://perma.cc/G39R-LTR6.

**b. Meta (Facebook and Instagram):** Facebook's "Community Standards" **prohibit** a range of content related to illegal activity, including "[c]oordinating [h]arm and [p]romoting

14

"[c]rime," "[f]raud, [s]cams, and [d]eceptive [p]ractices," and "[s]exual [e]xploitation" of adults and children. Meta Transparency Center, Facebook Community Standards, https://perma.cc/7NLZ-Q5EF. Instagram **prohibits** "[i]llegal [c]ontent" including content that "support[s] or prais[es] terrorism, organized crime, or hate groups," among other things. Instagram Community Guidelines FAQs, https://perma.cc/TMD6-H3K6. In general, Meta also has a policy of **restricting** reported content that "goes against local law." Meta Transparency Center, How We Assess Reports of Content Violating Local Law, https://perma.cc/2SEU-S9JQ. Meta also **prohibits** ads that do not "comply with the laws in their jurisdiction," or "sell illegal or unsafe substances." Meta Transparency Center, Introduction to the Advertising Standards, https://perma.cc/57G9-C3UF.

c. **Nextdoor:** Nextdoor's community guidelines **prohibit** various forms of illegal activity, including specific prohibitions against threats, fraud and "[s]elling, soliciting, or offering any illegal goods or services, even if they do not explicitly appear on the prohibited list." Nextdoor Help Center, Do Not Engage in Harmful Activity, https://perma.cc/Q8FP-CD4E?type=image; *see* Nextdoor Help Center, Reasons for Reporting Content, https://perma.cc/CH24-QC3A (similar).

d. **Pinterest:** Pinterest **prohibits** "content and accounts that encourage, praise, [or] promote" various illegal enterprises, including "terrorist organizations[,] gangs and other criminal organizations." Pinterest, Community Guidelines, https://perma.cc/73Z6-KMDD. Pinterest also **prohibits** various kinds of specific illegal activities, such as "exploitation of people or animals" and "other illegal commercial exploitation." *Id.* Pinterest's community guidelines state that users are **not allowed** to "do anything or post any content that violates laws or regulations." *Id.*; *see id.* ("Be sure to follow all relevant laws and regulations.").

e. **Snap:** Snap users are **not allowed** to "use Snapchat for any illegal activity." Snap Privacy and Safety Hub, Illegal or Regulated Activities, https://perma.cc/J9YV-MXQM. Accordingly, Snap **prohibits** "promoting, facilitating, or participating in criminal activity, such as buying, selling, exchanging, or facilitating sales of illegal or regulated drugs, contraband (such as child sexual abuse or exploitation imagery), weapons, or counterfeit goods or documents." *Id.* Snap also **prohibits** "the illegal promotion of regulated goods or industries, including unauthorized promotion of gambling, tobacco products, and alcohol." *Id.*

f. **Reddit:** Reddit users must "[k]eep it legal" and **may not** "post[] illegal content or solicit[] or facilitat[e] illegal or prohibited transactions." Reddit, Reddit Rules, https://perma.cc/RNQ3-8RZU.

g. **X:** X's policies **prohibit** users from "us[ing] our service for any unlawful purpose or in furtherance of illegal activities." X, X Help Center: The X Rules, https://perma.cc/5CPH-46ZE. "This includes selling, buying, or facilitating transactions in illegal goods or services, as well as certain types of regulated goods or services." *Id.*; *see also* X, X Help Center: Illegal or Certain Regulated Goods or Services, https://perma.cc/3JNZ-PB2L.

h. **YouTube:** YouTube **prohibits** "content that encourages dangerous or illegal activities that risk serious physical harm or death." YouTube Help, Harmful or Dangerous Content Policy, https://perma.cc/72R6-Q7SZ. YouTube also prohibits "content intended to sell certain

15

regulated goods and services," such as "stolen credit cards," "controlled narcotics and other drugs," "explosives," and "counterfeit documents," among many other things. YouTube Help, Illegal or Regulated Goods or Services Policies, https://perma.cc/J5DW-7K7Z.

19. The Act restricts "[h]armful Material." Act § 6(1). Even if not classified as "obscenity for minors" or "harmful material," NetChoice's members already have policies in place to prohibit publishing obscenity to minors or all users:

a. **Dreamwidth:** Dreamwidth **does not allow** "Content that is harmful, threatening, abusive, hateful, invasive to the privacy and publicity rights of any person, or that violates any applicable local, state, national, or international law, including any regulation having the force of law." Dreamwidth, Terms of Service, https://perma.cc/G39R-LTR6. Although Dreamwidth allows adult content, it allows users to set age restriction filters marking posts as "Adult Content," which cannot be accessed by persons who are under 18 years old. Dreamwidth, How Do I Set Age Restriction Filters on My Journal or Entry?, https://perma.cc/88N6-AM9A. Dreamwidth also allows users to utilize a "Safe Search Filter" and settings requiring a confirmation notice before displaying adult content. Dreamwidth, What Is "Adult Content"? How Can I Keep From Seeing It?, https://perma.cc/82WS-TVGR.

b. **Meta (Facebook and Instagram):** Meta **prohibits** "[i]magery . . . of adult nudity" and "[i]magery of adult sexual activity," including even "[i]mplicit sexual activity or stimulation." Meta Transparency Center, Adult Nudity and Sexual Activity, https://perma.cc/9GV8-CAVB. For other content, such as "[r]eal-world art, where [i]magery depicts . . . sexual activity," Meta **restricts** content by "limit[ing] the ability to view the content to adults, ages 18 and older." *Id.*

c. **Nextdoor:** Nextdoor **prohibits** "sexually explicit or suggestive content," "adult content," "photos that contain nudity," and "any content that facilitates, encourages, or coordinates commercial sexual services." Nextdoor Help Center, Do Not Engage in Harmful Activity, https://perma.cc/Q8FP-CD4E?type=image. Nextdoor also **prohibits** "[s]exual content," including "[a]dult toys or products," "[p]ornography," and "[p]rostitution or escort services." Nextdoor Help Center, List of Prohibited Goods and Services, https://perma.cc/58HR-H482?type=image.

d. **Pinterest:** Pinterest **prohibits** "adult content, including pornography and most nudity." Pinterest, Community Guidelines, https://perma.cc/73Z6-KMDD. Consequently, Pinterest "remove[s] or limit[s] the distribution of mature and explicit content," including "nudity"; "sexualized content, even if the people are clothed or partially clothed"; "graphic depictions of sexual activity in imagery or text"; and "fetish imagery." *Id.* Pinterest does not prohibit all nudity, however. *See id.* "For instance, nudity in paintings and sculptures and in science and historical contexts is okay. Content about breastfeeding and mastectomies is also allowed." *Id.*

e. **Reddit:** Reddit limits any "content reserved for mature/18+ audiences (e.g. sexually explicit)" to those 18 years or older. Reddit, Moderator Code of Conduct, https://perma.cc/8H87-C6LT.

16

**f. Snap:** Snap **prohibits** "promoting, distributing, or sharing pornographic content, as well as commercial activities that relate to pornography or sexual interactions (whether online or offline)." Snap Privacy and Safety Hub, Community Guidelines, https://perma.cc/A4SB-Y8MK. But "breastfeeding and other depictions of nudity in non-sexual contexts are generally permitted." *Id.*

**g. X:** X **restricts** users' ability to "share . . . adult nudity or sexual behavior," requiring that such material be "properly labeled and not prominently displayed" in "highly visible places such as profile photos or banners" or "live video." X, X Help Center: Adult Content, https://perma.cc/C2XJ-7Q9N. Though X permits adult users to view nudity and even pornographic content, it restricts minors' access to such material. *Id.*; *see also* X, X Help Center: Notices on X and What They Mean, https://perma.cc/7XRC-ZP96. Moreover, X **prohibits** all "[n]on-consensual nudity," "[p]romoting or soliciting sexual services," "[c]hild sexual exploitation," "[v]iolent sexual conduct," "[u]nwanted sexual content & graphic objectification," and "[b]estiality and necrophilia." X, X Help Center: Adult Content, https://perma.cc/C2XJ-7Q9N.

**h. YouTube:** YouTube **prohibits** "explicit content meant to be sexually gratifying," including the "depiction of clothed or unclothed genitals, breasts, or buttocks that are meant for sexual gratification." YouTube Help, Nudity and Sexual Content Policy, https://perma.cc/7HVY-MMZW. YouTube also prohibits "pornography, the depiction of sexual acts, or fetishes that are meant for sexual gratification." *Id.*

20.    NetChoice's members also have policies against other forms of harmful, objectionable, or just off-topic speech:

**a. Dreamwidth:** Dreamwidth **does not allow** "Content that is harmful, threatening, abusive, hateful, invasive to the privacy and publicity rights of any person, or that violates any applicable local, state, national, or international law, including any regulation having the force of law." Dreamwidth, Terms of Service, https://perma.cc/G39R-LTR6. Dreamwidth's policies also require users to agree that "[i]f Content is deemed illegal by any law having jurisdiction over" a user, the user "agree[s] that [Dreamwidth] may submit any necessary information to the proper authorities." *Id.* Moreover, Dreamwidth has the "right" in its "sole discretion, to remove . . . any Content from the service." *Id.*

**b. Meta (Facebook and Instagram):** Among other things, Meta **prohibits** hate speech. Meta Transparency Center, Hate Conduct, https://perma.cc/GWT8-MNFY. As part of this broad prohibition, Meta prohibits the use of slurs—though Meta "recognize[s]" there are situations in which slurs may be permissible because "people sometimes share content that includes slurs or someone else's speech in order to condemn the speech or report on it" and slurs can be "used self-referentially or in an empowering way." *Id.*

**c. Nextdoor:** Among other things, Nextdoor **prohibits** "racist behavior, discrimination, and hate speech of any kind." Nextdoor Help Center, Policies to Prevent Racism & Discrimination, https://perma.cc/L98B-WGU2?type=image. More generally, "Nextdoor is intended primarily for neighbors to share community-related information," which means that "[d]iscussions about personal interests in the main newsfeed should be limited unless they are

17

directly related to the neighborhood." Nextdoor Help Center, What Should I Post About on Nextdoor?, https://perma.cc/5E7Q-5TLC?type=image.

     **d. Pinterest:** Among other things, Pinterest **prohibits** "hateful content [and] the people and groups that promote hateful activities," "content that shows the use of violence," "irresponsible and harmful animal tourism or otherwise exploitative practices like organized animal fighting," and "harmful pranks or challenges that risk imminent physical harm or extreme emotional distress, especially if showing or encouraging the participation of minors." Pinterest, Community Guidelines, https://perma.cc/73Z6-KMDD.

     **e. Reddit:** Among other things, under Reddit's community-led approach to content moderation, Reddit's policies require users to "[p]ost authentic content into communities where you have a personal interest, and do not cheat or engage in content manipulation (including spamming, vote manipulation, ban evasion, or subscriber fraud) or otherwise interfere with or disrupt Reddit communities." Reddit, Reddit Rules, https://perma.cc/RNQ3-8RZU. That allows individual communities to moderate content for, *e.g.*, being off topic or low effort.

     **f. Snap:** Among other things, Snap **prohibits** "fraud and other deceptive practices" and "spreading false information that causes harm or is malicious, such as denying the existence of tragic events, unsubstantiated medical claims, undermining the integrity of civic processes, or manipulating content for false or misleading purposes." Snap Privacy and Safety Hub, Community Guidelines, https://perma.cc/A4SB-Y8MK; *see* Snap Privacy and Safety Hub, Harmful False or Deceptive Information, https://perma.cc/T2NB-NLEZ (similar).

     **g. X:** Among other things, X **prohibits** (1) various kinds of "hateful conduct," X, X Help Center: Hateful Conduct, https://perma.cc/TT9D-9E38; (2) "hoping for others to die, suffer illnesses, tragic incidents, or experience other physically harmful consequences," X, X Help Center: Violent Content, https://perma.cc/B5QF-NAMF; and (3) "Posts that include manifestos or other similar material produced by perpetrators [of violent acts] . . . , even if the context is not abusive," X, X Help Center: Perpetrators of Violent Attacks, https://perma.cc/WX9Y-6BB2.

     **h. YouTube:** Among other things, YouTube has policies that **prohibit** and otherwise address (1) "vulgar language," YouTube Help, Vulgar Language Policy, https://perma.cc/N9T5-8BHA; (2) "hate speech," YouTube Help, Hate Speech Policy, https://perma.cc/N7N3-UCLL; and (3) "violent or gory content intended to shock or disgust viewers," YouTube Help, Violent or Graphic Content Policies, https://perma.cc/7S8N-VY9G.

    21.    All of that said, content moderation is very difficult to do perfectly, especially at the scale of many of NetChoice's members. There are literally countless pieces of content on the Internet, and not all content is suitable for all audiences on all websites in all contexts. Thus, content moderation requires the removal of objectionable content from members' websites. NetChoice has produced a report detailing members' successes in moderating the vast scope of objectionable

and harmful content that specific member companies have blocked or removed from their web-sites. *See* By the Numbers.

22.    For instance, in just a six-month span from July to December 2020, Facebook (≈5.7 billion), Instagram (≈65.3 million), Pinterest (≈2.1 million), Snapchat (≈5.5 million), YouTube (≈17.2 million), and X (≈4.5 million) removed approximately 5.9 *billion* posts. *See id.*at 2. Nearly half of those removals (approximately 2.9 billion removals) were for spam. *See id.* at 4.

23.    Members work to remove violative content quickly before many (if any) users see the content. *See id.* at 13. "Platforms enable users to report posts and accounts, but social media companies acknowledge that taking down content is not sufficient if the content in question reaches a wide audience prior to removal. Because of this, companies report not only the number of posts removed but also the degree to which they were seen prior to removal. While platforms enable users to report posts and accounts, the aim of limiting exposure requires that a combination of artificial intelligence and human reviewers take down violating content as quickly as possible after it was posted. . . . This proactive approach to removal mitigates the threat of spam, violent, or otherwise offensive content being spread beyond the account responsible for the original post." *Id.* at 5. NetChoice's members have been largely successful, especially for the most harmful con-tent. *See id.* at 5-6. For example, on Facebook, "[t]he proactive rate for severe violations such as child sexual exploitation, terrorist organizations, and violent or graphic content were all 99-100%." That means this content was "found or flagged by Facebook prior to being reported by users." *Id.*

24.    Regardless of the scale of the websites, content moderation is often difficult for multiple reasons. For example, websites disseminate different forms of content that raise their own content-moderation difficulties. These different forms of content include text, audio, and video. Furthermore, content moderation often requires contextual determinations. Whether a given piece

19

of content violates a website's policies can turn on a complicated interaction between the intent of the user, the content itself, the social and cultural context, the context on the service, and the effect on the reader. Further complicating this task is that many members operate worldwide, and thus must take into account different languages and cultures. Consequently, overreliance on automated systems of content moderation may result in overinclusive removal of content that may not violate websites' policies. Alternatively, removing—or restricting access to—too little violative content may make the websites less hospitable to users and advertisers. Finally, malicious actors always attempt to find ways to avoid moderation to upload violative content; so websites must constantly innovate.

## IV.    The Act's effect on NetChoice members and the Internet.

25.    I understand that the Act was signed into law on April 30, 2024, and that the Act took effect July 1, 2024.

26.    I understand this Court preliminarily enjoined Defendant's enforcement of the Act against NetChoice and its members on July 1, 2024.

27.    I understand Defendant can enforce the Act against NetChoice and its members beginning May 8, 2025, when the Fifth Circuit's appellate mandate issues.

28.    I understand that the Act regulates "digital service provider[s]." Act § 3. A "digital service" is "a website, an application, a program, or software that collects or processes personal identifying information with Internet connectivity." Act § 2(a). A "digital service provider" is any "person who: (i) [o]wns or operates a digital service; (ii) [d]etermines the purpose of collecting and processing the personal identifying information of users of the digital service; and (iii) [d]etermines the means used to collect and process [such] information of users of the digital service." Act § 2(b).

20

29.    I understand the Act only applies to a digital service that:

(a) Connects users in a manner that allows users to socially interact with other users on the digital service;

(b) Allows a user to create a public, semi-public or private profile for purposes of signing into and using the digital service; and

(c) Allows a user to create or post content that can be viewed by other users of the digital service, including sharing content on:

(i) A message board;

(ii) A chat room; or

(iii) A landing page, video channel or main feed that presents to a user content created and posted by other users.

Act § 3(1).

30.    According to these definitions, the Act covers at least the following NetChoice members: (1) Dreamwidth; (2) Meta, which owns and operates Facebook and Instagram; (3) Nextdoor; (4) Pinterest; (5) Reddit; (6) Snap Inc., which owns and operates Snapchat; (7) X; and (8) YouTube.

31.    Each of these covered NetChoice members meets the Act's coverage criteria in Sections 2 and 3(1) and does not qualify for an exception in Section 3(2).

32.    Each of these covered NetChoice members allows its account holders to upload and publicly post content (whether to all other users or to specified groups of account holders). Other account holders may then view that content and react to it, comment on it, or share it with others.

33.    Each of these covered NetChoice members permits its account holders to engage in a wide variety of protected speech activities, subject to each website's unique content moderation policy.

34.    NetChoice covered members' users access the covered websites to engage in protected speech activities, including speaking to others and viewing content created by others.

21

35.     On these websites, the "interactive functionality" is not "incidental to" the service—the interactive functionality is the point of the service. *Cf.* § 3(2)(d).

36.     In other words, each covered NetChoice member's website is what is commonly referred to as a "social media" website.

37.     Each covered NetChoice member requires people to create an account to access some or all of the protected speech and speech-facilitating functions on its service.

38.     Based on its definitions, the Act also regulates other "message board[s]" and online forums, § 3(1), on the Internet. People use such websites for myriad purposes including art, education, gaming, general interest, information gathering, professional activities, research, political engagement, and participation in religious services and communities.

39.     Much like NetChoice members, these websites allow their account holders to upload and publicly post content (whether to all other users or to specified groups of account holders). Other account holders may then view that content and react to it, comment on it, or share it with others. As a result, users and account holders can engage in a wide variety of protected speech activities on the websites.

40.     Conversely, under the Act's definitions, a wide variety of other kinds of websites are not regulated by the Act, including: (1) internet home pages; (2) search engines; (3) educational websites; (4) online shopping; (5) generative AI; (6) news and sports websites; (7) streaming services; (8) banking services; (9) professional networking websites; (10) general information websites; (11) online gaming; and (12) email and direct messaging, among others.

41.     Accordingly, the Act does not regulate most of NetChoice's members' services, including those belonging to: Airbnb, Alibaba.com, Amazon.com, AOL, Duolingo, Earnin, eBay, Etsy, Expedia, Fluid Truck, Hims&Hers, HomeAway, Hotels.com, Lyft, Netflix, OfferUp, Orbitz,

22

PayPal, Pindrop, PrizePicks, StubHub, Swimply, TravelTech, Travelocity, Trivago, Turo, VRBO, VSBLTY, Waymo, Wing, and Yahoo!.

42.     The Act's requirements are burdensome, will make it more difficult for NetChoice members to provide their websites to minors and adults, and will burden minors and adults' access to highly valuable and protected speech.

43.     The compliance burdens are made all the more difficult by the fact that the Legislature gave regulated companies only two months to comply with the Act's requirements. The systems that the Act requires covered websites to adopt will take many covered websites much longer than two months to research, design, develop, test, and implement at scale.

44.     The Fifth Circuit's vacatur gave covered websites even less time, providing only three weeks to come into compliance after the Act's enforcement was enjoined for nearly a year.

45.     **Parental consent and age verification (Act § 4).** The Act's requirement that covered websites may not permit minors to be "account holder[s]" on their services without "express consent from a parent or guardian" will prove costly and difficult for NetChoice members to implement. Act § 4(2). This parental-consent requirement will impede minors and adults' access to protected speech. The Act further requires that covered websites "shall make commercially reasonable efforts to verify the age of the person creating an account with a level of certainty appropriate to the risks that arise from the information management practices of the digital service provider." Act § 4(1). This requirement to "verify . . . age[s]" will likewise impede minors and adults' access to valuable and protected speech. *Id.* On most members' covered services—as on many other covered websites—having an account is necessary to access either some or all of the protected speech and functionality on the service. Accordingly, each of these requirements burdens

23

access to protected speech. These requirements also pose at least four major hurdles for covered websites.

    a.      Most websites do not have compliance mechanisms in place to process parental consent or to "verify . . . age[s]." *Id.* Designing and maintaining comprehensive and foolproof systems to comply with the Act will be extremely costly, time-consuming, and resource-intensive.

    b.      As part of implementing mechanisms to comply with the Act, covered websites will be required to obtain and store sensitive personal identifying information about minors and their parents or guardians. This will significantly amplify the risks of data security breaches, necessitating even more investment in heightened cybersecurity measures.

    c.      Verifying a genuine parent-child relationship will require covered websites to identify both the minor and the parent (or guardian), just as "verify[ing] . . . age[s]" will require covered websites to identify the account holder. *Id.* It is impossible to do any of this without significantly infringing the privacy rights of both minors and parents (or guardians). As just one example of the many difficulties in securing parental consent, the law does not account for situations in which a person's status as a parent (or guardian) is opaque or disputed.

    d.      New processes at sign up inevitably affect account holder growth, as cumbersome registration processes can dissuade people from signing up. Any decline in account holder sign-ups or current accounts will have a ripple effect on companies' advertising revenues, brand partnerships, and overall vitality. And of course, decline in usage means that fewer people avail themselves of the valuable speech available on the websites.

46.    **Monitoring and censorship (Act § 6).** The Act's requirement for covered websites to "make commercially reasonable efforts to develop and implement a strategy to prevent or

mitigate the known minor's exposure to" certain prohibited categories of speech, Act § 6, will be difficult to comply with and will chill dissemination of speech.

   a.    Members enforce policies designed to address the same broad categories of harmful and objectionable speech that the Act seeks to regulate. But there is no guarantee that members' understanding and enforcement of their own policies will match Defendant's understanding of the Act's requirements. That is especially true because both private content moderation and the Act require subjective determinations for which there will be areas of disagreement. While members have the flexibility to take into account contextual considerations in individual cases, the Act is written in more absolute terms. The Act's plain terms seem to require websites to "prevent . . . exposure" not only to protected speech, but also to valuable works of art, literature, and pop culture that are suitable for at least some minors. Uncertainty about how broadly the Act extends—and how Defendant will interpret the Act—may spur members to engage in over-inclusive moderation that would block valuable content from all users.

   b.    My understanding is that not all covered websites have the ability to "age-gate," meaning that they are unable to separate the content available on adults' accounts from content available on minors' accounts. Therefore, for these websites, the restrictions on what content they may disseminate to minors will apply equally to adults. In other words, the Act would require those websites to block protected works of art, literature, and pop culture for adults as well, and to disseminate only a single, constrained range of speech to everyone.

   c.    The Act's two exceptions are little help. Specifically, the Act provides that "[n]othing in" the monitoring-and-censorship requirement "shall be construed to require a digital service provider to prevent or preclude": "(a) Any minor from deliberately and independently searching for, or specifically requesting, content; or (b) The digital service provider or individuals

25

on the digital service from providing resources for the prevention or mitigation of the [enumerated] harms . . . , including evidence-informed information and clinical resources." Act § 6(2). This will only create more compliance hurdles for covered websites, as they must figure out how to simultaneously "prevent exposure to" particular speech while also allowing minors to seek out that speech. Further complicating matters, the Act does not explain what it means for minors to "deliberately and independently search[]" for prohibited speech. Nor does the Act explain what kinds of results websites are allowed to provide in response to a search. Instead, the Act says only that websites are not required to prevent the search itself. Furthermore, members cannot be sure that Defendant will agree that particular authorities are appropriate "resources for the prevention or mitigation." In this way, the Act also implies a false dichotomy between content that promotes certain activities versus content that helps prevents or mitigate that activity. Communication is not that simple. Much content is neutral toward a topic—neither promoting nor preventing it. For fear of massive liability, many websites will likely engage in overinclusive content moderation.

47.    NetChoice members would be irreparably harmed if they were required to comply with the Act's burdensome requirements. For one thing, the Act's extremely broad and vague proscriptions make perfect compliance unobtainable for most websites. Any website that even attempts to comply with the Act will incur substantial, unrecoverable costs in reconfiguring their service. All websites face significant uncertainty about their compliance with the Act given the Act's many ambiguities. NetChoice members' account holders and users (both minors and adults, current and prospective) will also suffer irreparable harms, as the Act will place burdens on their access to protected and valuable speech. Moreover, the Act directly requires websites to stop providing their current range of services and content to their current range of users and account holders, and it forces that same result indirectly through its threats of civil and criminal liability.

26

48.    NetChoice member Nextdoor has barred minors from creating accounts on its service in two States where enforcement of similar laws was not enjoined prior to those laws' effective dates. Accordingly, Nextdoor's Member Agreement now states: "[I]ndividuals who are under the age of 18 are not permitted to create an account starting on September 1, 2024, if they are residents of the State of Texas, and starting on January 1, 2025, if they are residents of the State of Tennessee." Nextdoor, Member Agreement, https://perma.cc/5ZR6-KR2X.

*    *    *

49.    If Defendant is permitted to enforce the Act against NetChoice's regulated members, NetChoice's mission to protect free speech and free enterprise online would be directly and substantially hurt—as would its affected member companies and their minor and adult account holders and users (both current and prospective).

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct to the best of my knowledge.

Executed on May 5, 2025, in Washington DC.


_____

Bartlett Cleland

27