**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION**

| | |
|---|---|
| NETCHOICE, LLC,<br><br>*Plaintiff*,<br><br>v.<br><br>LYNN FITCH, in her official capacity as<br>Attorney General of Mississippi,<br><br>*Defendant*. | Civil Action No. 1:24-CV-00170-HSO-BWR |

**PLAINTIFF NETCHOICE'S MEMORANDUM IN SUPPORT OF MOTION FOR
TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

## Table of Authorities

**Page(s)**

**Cases**

*A.B. v. Salesforce, Inc.*,
  123 F.4th 788 (5th Cir. 2024) ......................................................................2, 26, 27

*ACLU v. Mukasey*,
  534 F.3d 181 (3d Cir. 2008) ................................................................................7

*Ala. Ass'n of Realtors v. HHS*,
  594 U.S. 758 (2021) .........................................................................................27

*Alexander v. United States*,
  509 U.S. 544 (1993) .........................................................................................11

*Am. Booksellers Found. v. Dean*,
  342 F.3d 96 (2d Cir. 2003) ..................................................................................7

*Ams. for Prosperity Found. v. Bonta*,
  594 U.S. 595 (2021) ...............................................................................16, 18, 21

*Ashcroft v. ACLU*,
  542 U.S. 656 (2004) ..................................................................................2, 8, 17

*Ashcroft v. Free Speech Coal.*,
  535 U.S. 234 (2002) ....................................................................................12, 24

*Baggett v. Bullitt*,
  377 U.S. 360 (1964) .........................................................................................14

*Bantam Books, Inc. v. Sullivan*,
  372 U.S. 58 (1963) .....................................................................................11, 20

*Barr v. Am. Ass'n of Pol. Consultants*,
  591 U.S. 610 (2020) .........................................................................................15

*Book People, Inc. v. Wong*,
  91 F.4th 318 (5th Cir. 2024) .........................................................................13, 27

*Boos v. Barry*,
  485 U.S. 312 (1988) .........................................................................................15

*Brandenburg v. Ohio*,
  395 U.S. 444 (1969) .........................................................................................13

*Brown v. Ent. Merchs. Ass'n*,
    564 U.S. 786 (2011)............................................................2, 7, 9, 10, 12, 17, 18, 19, 20, 24

*City of Houston v. Hill*,
    482 U.S. 451 (1987)........................................................................................11, 14

*City of LA v. Patel*,
    576 U.S. 409 (2015)................................................................................................23

*Comput. & Commc'n Indus. Ass'n v. Paxton*,
    747 F. Supp. 3d 1011 (W.D. Tex. 2024).........................................2, 8, 11, 12, 13, 14, 15, 19

*Doe v. Grindr Inc.*,
    128 F.4th 1148 (9th Cir. 2025) ..............................................................................26

*Doe v. MySpace, Inc.*,
    528 F.3d 413 (5th Cir. 2008) .............................................................................2, 26

*Erznoznik v. City of Jacksonville*,
    422 U.S. 205 (1975).......................................................................................7, 17, 18

*FCC v. Fox Television Stations, Inc.*,
    567 U.S. 239 (2012)....................................................................................14, 25

*FEC v. Cruz*,
    596 U.S. 289 (2022)........................................................................................7, 20

*Free Speech Coalition, Inc. v. Paxton*,
    95 F.4th 263 (5th Cir. 2024) .................................................................................8, 24

*Grayned v. City of Rockford*,
    408 U.S. 104 (1972)............................................................................................14

*HomeAway.com, Inc. v. City of Santa Monica*,
    918 F.3d 676 (9th Cir. 2019) ...............................................................................26

*John Doe No. 1 v. Reed*,
    561 U.S. 186 (2010)............................................................................................24

*Kolender v. Lawson*,
    461 U.S. 352 (1983)............................................................................................14

*La'Tiejira v. Facebook, Inc.*,
    272 F. Supp. 3d 981 (S.D. Tex. 2017) .....................................................................26

*M.P. by & through Pinckney v. Meta Platforms Inc.*,
    127 F.4th 516 (4th Cir. 2025) ...............................................................................26

*Minneapolis Star & Tribune Co. v. Minn. Commn'r of Revenue*,
    460 U.S. 575 (1983)............................................................................................8

*Moody v. NetChoice, LLC*,
    603 U.S. 707 (2024)..............................................3, 5, 6, 10, 21, 22, 23, 24, 25

*Nat'l Press Photographers Ass'n v. McCraw*,
    90 F.4th 770 (5th Cir. 2024) ............................................................................25

*Nat'l Rifle Ass'n of Am. v. Vullo*,
    602 U.S. 175 (2024)..........................................................................................11

*Neb. Press Ass'n v. Stuart*,
    427 U.S. 539 (1976)..........................................................................................11

*NetChoice, L.L.C. v. Fitch*,
    2024 WL 4416151 (5th Cir. Sept. 26, 2024) ............................................8, 11, 21

*NetChoice, L.L.C. v. Fitch*,
    2025 WL 1135279 (5th Cir. Apr. 17, 2025) ....................................1, 6, 22, 23, 24

*NetChoice, LLC v. Bonta*,
    113 F.4th 1101 (9th Cir. 2024) ...................................................................11, 18

*NetChoice, LLC v. Bonta*,
    2025 WL 807961 (N.D. Cal. Mar. 13, 2025)................................................2, 8, 16

*NetChoice, LLC v. Griffin*,
    2023 WL 5660155 (W.D. Ark. Aug. 31, 2023)..........................................10, 20

*NetChoice, LLC v. Griffin*,
    2025 WL 978607 (W.D. Ark. Mar. 31, 2025)
    ....................................................2, 3, 7, 8, 9, 15, 18, 19, 20, 21, 23, 25

*NetChoice, LLC v. Reyes*,
    748 F. Supp. 3d 1105 (D. Utah 2024)....................................................2, 8, 9, 16, 19

*NetChoice, LLC v. Yost*,
    2025 WL 1137485 (S.D. Ohio Apr. 16, 2025) ............................2, 9, 15, 18, 20, 23

*Netflix, Inc. v. Babin*,
    88 F.4th 1080 (5th Cir. 2023) ........................................................................27

*Newsome v. Fairley*,
    2018 WL 4635688 (S.D. Miss. Sept. 27, 2018)........................................................6

*Nken v. Holder*,
    556 U.S. 418 (2009)..........................................................................................27

*Packingham v. North Carolina*,
  582 U.S. 98 (2017) .............................................1, 7, 15, 17, 21, 22, 23, 24, 25

*Reed v. Town of Gilbert*,
  576 U.S. 155 (2015) ......................................................................................15

*Reno v. ACLU*,
  521 U.S. 844 (1997) ..................................................................2, 7, 8, 14, 20

*Republican Party of Minn. v. White*,
  536 U.S. 765 (2002) ......................................................................................19

*Roman Catholic Diocese of Brooklyn v. Cuomo*,
  592 U.S. 14 (2020) ........................................................................................27

*Smith v. California*,
  361 U.S. 147 (1959) ......................................................................................11

*Sorrell v. IMS Health Inc.*,
  564 U.S. 552 (2011) ........................................................................14, 15, 19

*Texans for Free Enter. v. Tex. Ethics Comm'n*,
  732 F.3d 535 (5th Cir. 2013) .........................................................................6

*Turner Broad. Sys. v. FCC*,
  512 U.S. 622 (1994) ......................................................................................16

*United States v. Hansen*,
  599 U.S. 762 (2023) ......................................................................................20

*United States v. Playboy Ent. Grp., Inc.*,
  529 U.S. 803 (2000) ........................................................................14, 17, 18

*Virginia v. Am. Booksellers Ass'n, Inc.*,
  484 U.S. 383 (1988) ........................................................................13, 20

*X Corp. v. Bonta*,
  116 F.4th 888 (9th Cir. 2024) ...............................................................21, 23

**Statutes**

47 U.S.C. § 230 ..................................................................................2, 25, 26, 27

Miss. Code § 11-77-3(d) .........................................................................................5

Miss. Code §§ 75-24-9, -19, -20 .............................................................................5

Miss. HB 1126, R.S. 2024 § 2 ...............................................................4, 5, 13, 14, 25

Miss. HB 1126, R.S. 2024 § 3 ....................................................................4, 15, 16, 19, 22, 25

Miss. HB 1126, R.S. 2024 § 4 ..........................................1, 2, 4, 5, 7, 8, 9, 10, 16, 19, 20

Miss. HB 1126, R.S. 2024 § 5 ................................................................................16

Miss. HB 1126, R.S. 2024 § 6 ..............................2, 5, 10, 11, 12, 13, 14, 15, 16, 19, 20, 25, 26

Miss. HB 1126, R.S. 2024 § 8 ..................................................................................5

**Other Authorities**

*13 Reasons Why* (2017-20) ....................................................................................12

The Beatles, *Lucy in the Sky with Diamonds* (1967) ....................................................12

Peter Singer, *Practical Ethics* (3d ed. 2011).................................................................12

The Police, *Every Breath You Take* (1983) ................................................................12

Stalking – Fiction, Barnes & Noble, https://perma.cc/VX92-257V ...............................12

Sylvia Plath, *The Bell Jar* (1963).............................................................................12

The Weeknd, *Can't Feel My Face* (2015) ..................................................................12

## Table of Contents

Introduction ............................................................................................................. 1

Background .............................................................................................................. 2

    A. Factual background ......................................................................................... 2

        1. NetChoice-member websites disseminate protected speech ................................. 2

        2. Parents have many tools to oversee how their children use the Internet. ............... 3

    B. Mississippi House Bill 1126 ............................................................................ 4

    C. Procedural history ............................................................................................ 5

Argument ................................................................................................................. 6

    I. NetChoice is likely to succeed on the merits of both its facial and as-applied claims that the Act violates the First Amendment—and that the Act's monitoring-and-censorship requirements also violate the Due Process Clause ........................................... 6

        A. The Act's requirements trigger First Amendment strict scrutiny, and the monitoring-and-censorship requirements also violate due process. ........................... 6

            1. The Act's age-verification requirements to access protected speech for both minors and adults violate the First Amendment (§ 4(1)). ...................................... 7

            2. The Act's parental-consent requirement for minors to access protected speech violates the First Amendment (§ 4(2)). .................................................. 9

            3. The Act's monitoring-and-censorship requirements violate the First Amendment and the Due Process Clause (§ 6). ...................................................... 10

            4. The Act triggers strict scrutiny as a content-based regulation. .......................... 14

        B. The Act fails strict scrutiny and any other form of heightened First Amendment scrutiny ............................................................................................ 16

            1. The State lacks a sufficient governmental interest in restricting adults' and minors' access to protected speech. .................................................... 17

            2. The Act is not properly tailored. ............................................................... 18

                a. The entire Act is improperly tailored. ..................................................... 18

                b. The age-verification (§ 4(1)), parental consent (§ 4(2)), and monitoring-and-censorship requirements (§ 6) are improperly tailored for additional, independent reasons. ..................................................... 19

        C. The Act is unconstitutional both (1) facially; and (2) as applied to NetChoice's covered members. ........................................................................... 21

            1. The Act is facially unconstitutional. ......................................................... 21

            2. The Act is unconstitutional as applied to covered NetChoice members. ............ 24

    II. NetChoice is likely to succeed on the merits of its claim that the Act's central definition of "digital service provider" is unconstitutionally vague. ................................. 25

III. NetChoice is likely to succeed on the merits of its claim that the Act's monitoring-and-censorship requirements (§ 6) are preempted by 47 U.S.C. § 230. .......................... 25

IV. NetChoice meets all the remaining factors for a preliminary injunction. ........................ 27

Conclusion .................................................................................................................. 27

**Introduction**

This Court already correctly concluded, on the merits, that Defendant's enforcement of Mississippi House Bill 1126 ("Act") would violate foundational constitutional principles by restricting minors' and adults' access to protected speech. ECF 30. Now this case is on remand from the Fifth Circuit to "resolve" a "factual inquiry" in the *facial*-challenge analysis that this Court "understandably" did not resolve: "It must determine to whom the Act applies[,] the activities it regulates, and then weigh violative applications of the Act against non-violative applications." *NetChoice, L.L.C. v. Fitch*, 2025 WL 1135279, at *6 (5th Cir. Apr. 17, 2025). That analysis is straightforward. The Act impedes access to the kinds of "social media" websites that the Supreme Court has held users have a right to "access." *Packingham v. North Carolina*, 582 U.S. 98, 106 (2017). And the Act simply does not regulate services such as "Uber, Google Maps, DraftKings, [or] Microsoft Teams." *Fitch*, 2025 WL 1135279, at *6. Regardless, Plaintiff has now added *as-applied* claims for NetChoice's members, which obviate examination of the Act's entire coverage. Under both the *Moody*-informed facial and as-applied analyses, Plaintiff is entitled to immediate relief temporarily restraining and preliminarily enjoining the challenged portions of the Act.

Plaintiff has been forced to seek expedited relief because Defendant would not agree to stay enforcement. And Defendant can immediately begin enforcing the Act on May 9, 2025, when the Fifth Circuit's appellate mandate issues. Thus, members would be put to the choice of having to comply with unconstitutional infringements on their and their users' speech—where compliance can be "far in excess of [the] available budget," ECF 3-5 ¶ 37—or risk immediate enforcement.

This Court need not break new ground to again enjoin enforcement of the Act. The Act would stifle protected speech based on a vague and content-based central coverage definition, thus violating the First Amendment and federal law:

- The Act's age-verification requirement, § 4(1), unconstitutionally restricts access to

protected speech for both minors and adults. *E.g.*, *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 795 n.3 (2011) (age-gating protected speech triggers First Amendment scrutiny); *Ashcroft v. ACLU*, 542 U.S. 656, 667 (2004) (invalidating age-verification requirement); *Reno v. ACLU*, 521 U.S. 844, 881-82 (1997) (same); *NetChoice, LLC v. Griffin*, 2025 WL 978607, at *13, *17 (W.D. Ark. Mar. 31, 2025) ("*Griffin II*"); *NetChoice, LLC v. Reyes*, 748 F. Supp. 3d 1105, 1129 n.169 (D. Utah 2024); *NetChoice, LLC v. Bonta*, 2025 WL 807961 at *15 (N.D. Cal. Mar. 13, 2025).

- The Act's parental-consent requirement, § 4(2), infringes minors' right to access and engage in protected speech "*without their parents' prior consent*." *Brown*, 564 U.S. at 795 n.3; *see NetChoice, LLC v. Yost*, 2025 WL 1137485, at *20, *24 (S.D. Ohio Apr. 16, 2025) (permanently enjoining parental-consent requirement); *Griffin II*, 2025 WL 978607 at *13, *17 (same); *Reyes*, 748 F. Supp. 3d at 1126 & n.135 (similar).

- The Act's requirement that covered websites monitor and censor certain vague and subjective categories of protected speech on minors' accounts (§ 6) is an unconstitutional prior restraint. The State cannot replace private websites' voluntary content moderation—choices about whether and how to disseminate speech—with a mandate to censor speech based on its content or based on its viewpoint. *See Comput. & Commc'n Indus. Ass'n v. Paxton*, 747 F. Supp. 3d 1011, 1037-38 (W.D. Tex. 2024) ("*CCIA*"). The Act's monitoring-and-censorship requirements are also preempted by 47 U.S.C. § 230 ("§ 230"). *A.B. v. Salesforce, Inc.*, 123 F.4th 788, 794 (5th Cir. 2024); *Doe v. MySpace, Inc.*, 528 F.3d 413, 418-20 (5th Cir. 2008) (citation omitted).

Nothing has changed in the past year requiring this Court to revisit its previous merits conclusions that the Act's central coverage definition is content-based, ECF 30 at 18-23, and that the Act fails strict scrutiny, ECF 30 at 23-32. Likewise, the Act's central coverage definition remains unconstitutionally vague. ECF 30 at 32-35.

Accordingly, whether under the facial-challenge analysis required by *Moody* and the Fifth Circuit or based on Plaintiff's narrower *as-applied* claims, this Court should again preliminarily enjoin Defendant's enforcement of the Act's challenged provisions.

## Background

### A.    Factual background

#### 1.    NetChoice-member websites disseminate protected speech.

NetChoice is an Internet trade association. Based on the Act's definitions, it regulates some services offered by NetChoice members: (1) Dreamwidth; (2) Meta (Facebook and Instagram);

(3) Nextdoor; (4) Pinterest; (5) Reddit, (6) Snap Inc. (Snapchat); (7) X; and (8) YouTube. Cleland Decl. ¶ 30. These websites "engage[] in expression" by "display[ing]," "compil[ing,] and cu-rat[ing]," protected speech (text, audio, images, and video) "created by others." *Moody v. NetChoice, LLC*, 603 U.S. 707, 716-17, 728 (2024); Cleland Decl. ¶¶ 6-8. On these services, users must have an account to access some or all of the protected speech and speech-enabling functions. Cleland Decl. ¶ 37. Thus, creating accounts allows users to consume and engage in a wide variety of protected expression. ECF 30 at 5; Cleland Decl. ¶ 33; ECF 3-4 ¶ 5; ¶ ECF 3-5 ¶ 5.

### 2.    Parents have many tools to oversee how their children use the Internet.

"[P]arents may rightly decide to regulate their child's use of social media—including re-stricting the amount of time they spend on it, the content they may access, or even those they chat with. And many tools exist to help parents with this endeavor." *Griffin II*, 2025 WL 978607, at *3.

To start, parents can control minors' access to *devices*. Cleland Decl. ¶ 9. Not all devices are internet-enabled. And devices come with parental-control options, including the ability to lock or limit specific apps, limit content, limit access to only approved websites, and set overall or time-of-day usage limits. *Id.* Parents can also control the *networks* that minors use. Wireless routers allow parents to manage which network a minor connects to and to set up rules defining which internet websites minors can use (and at what times). *Id.* ¶ 9.a. Many internet service providers offer similar controls. *Id.* Parents can also control *software*. Web browsers offer parental controls. *Id.* ¶ 9.c. And third-party parental control software is available for many devices. *Id.* ¶ 9.d.

In addition, many members have developed their own suite of parental controls and other protections for minors on their services. *E.g.*, *id.* ¶ 10; ECF 3-3 ¶¶ 12-17. These controls supple-ment the resources that members spend crafting and enforcing "content moderation" policies. *E.g.*, Cleland Decl. ¶ 11; *Griffin II*, 2025 WL 978607, at *3 (collecting evidence). These policies address nudity and sexual content, self-harm, substance abuse, harassment and bullying, and child

exploitation—among other things. Cleland Decl. ¶¶ 12-20; ECF 3-3 ¶¶ 19-20; ECF 3-4 ¶¶ 10-14; ECF 3-5 ¶¶ 16-19, 22, 27-32. Members' content moderation is effective. Cleland Decl. ¶ 21.

**B.      Mississippi House Bill 1126**

**Content-based "digital service provider" definition. §§ 2(a)-(b), 3.** The Act regulates "digital service provider[s]": any entity that "(i) Owns or operates a digital service [that is, 'a website, an application, a program, or software']; (ii) Determines the purpose of collecting and processing the personal identifying information of users . . . ; and (iii) Determines the means used to collect and process the personal identifying information of users." § 2(a)-(b). But the Act applies only to "digital services" that meet certain content-based criteria—namely, services that (§ 3(1)):

> (a) Connect[] users in a manner that allows users to socially interact with other users on the digital service; (b) Allow[] a user to create a public, semi-public or private profile for purposes of signing into and using the digital service; and (c) Allow[] a user to create or post content that can be viewed by other users of the digital service, including sharing content on: (i) A message board; (ii) A chat room; or (iii) A landing page, video channel or main feed that presents to a user content created and posted by other users.

> The Act also excludes many content-based "digital services" (§ 3(2)), including:

> (c) A digital service . . . that: (i) Primarily functions to provide a user with access to news, sports, commerce, online video games or content primarily generated or selected by the digital service provider; and (ii) Allows chat, comment or other interactive functionality that is incidental to the digital service; or

> (d) A digital service . . . that primarily functions to provide a user with access to career development opportunities, including: (i) Professional networking; (ii) Job skills; (iii) Learning certifications; (iv) Job posting; and (v) Application services.

The Act contains other exceptions for other employment services, "e-mail or direct messaging services," internet service providers, search engines, and cloud providers. § 3(2)(a)-(b), (3).

**Age verification. § 4(1).** Covered websites "shall make commercially reasonable efforts to verify the age of the person creating an account with a level of certainty appropriate to the risks that arise from the information management practices of the digital service provider." § 4(1).

**Parental consent § 4(2).** Covered websites "shall not permit an account holder who is a

known minor to be an account holder unless the known minor has the express consent from a parent." § 4(2). A "known minor" is any unemancipated minor "who the [covered website] knows to be a minor." § 2(d). The Act enumerates five "[a]cceptable methods of obtaining express consent" and a sixth catch-all category for "[a]ny other commercially reasonable" method. § 4(2).

**Monitoring and censorship. § 6(1).** Covered websites "shall make commercially reasonable efforts to develop and implement a strategy to prevent or mitigate [] known minor[s'] exposure to harmful material and other content that promotes or facilitates the[se] harms to minors":

> (a) Consistent with evidence-informed medical information, the following: self-harm, eating disorders, substance use disorders, and suicidal behaviors;
> (b) Patterns of use that indicate or encourage substance abuse or use of illegal drugs;
> (c) Stalking, physical violence, online bullying, or harassment;
> (d) Grooming, trafficking, child pornography, or other sexual exploitation or abuse;
> (e) Incitement of violence; or
> (f) Any other illegal activity.

§ 6(1). "Harmful material" is obscenity for minors. § 2(c) (referencing Miss. Code § 11-77-3(d)).

This provision contains two exceptions. "Nothing in" the Act "shall be construed . . . to prevent": "(a) Any minor from deliberately and independently searching for, or specifically requesting, content; or (b) . . . providing resources for the prevention or mitigation of the harms described [above], including evidence-informed information and clinical resources." § 6(2).

**Enforcement and penalties.** The Act designates violations as "unfair or deceptive trade practices." § 8. Defendant has the authority to seek injunctive relief, civil monetary penalties of up to $10,000 per violation, and even criminal liability. Miss. Code §§ 75-24-9, -19, -20.

## C.    Procedural history

The Act was signed into law on April 30, 2024, and took effect on July 1, 2024. ECF 3 at 1. NetChoice sued and moved for a preliminary injunction on June 7, 2024. *Id.*

On July 1, 2024, two things happened. First, the Supreme Court decided *Moody.* Second, this Court granted NetChoice's motion, concluding that NetChoice was likely to succeed on the

merits of its First Amendment and vagueness challenges. *See* ECF 30.

On appeal, the Fifth Circuit vacated this Court's preliminary injunction. "[U]nderstandly," this Court could not "apply *Moody*['s]" First Amendment facial-challenge analysis "in the manner now required." *Fitch*, 2025 WL 1135279, at *6. After all, this Court released its decision on the same day as *Moody*. Now on remand, only "a factual inquiry remains for" this Court "to resolve: It must determine to whom the Act applies[,] the activities it regulates, and then weigh violative applications of the Act against non-violative applications." *Id.* The Fifth Circuit also confirmed that NetChoice has associational standing to assert its members' rights and prudential standing to raise the rights of its members' users. *Id.* at *2-4.

On remand, NetChoice filed an amended complaint that, among other things, clarifies NetChoice also raises an as-applied challenge to the Act. Am. Compl. ¶¶ 3, 86-87, 129.

## Argument

NetChoice is entitled to a temporary restraining order and preliminary injunction for the same reasons that this Court earlier gave in granting NetChoice a preliminary injunction. ECF 30. NetChoice can demonstrate: (1) a "substantial likelihood of success on the merits"; (2) a "substantial threat of irreparable injury"; (3) that the equities favor an injunction; and (4) that the injunction "serve[s] the public interest." *Texans for Free Enter. v. Tex. Ethics Comm'n*, 732 F.3d 535, 537 (5th Cir. 2013) (citation omitted); *Newsome v. Fairley*, 2018 WL 4635688, at *2 (S.D. Miss. Sept. 27, 2018) (standard is the same for temporary restraining orders).

I.   **NetChoice is likely to succeed on the merits of both its facial and as-applied claims that the Act violates the First Amendment—and that the Act's monitoring-and-censorship requirements also violate the Due Process Clause.**

   A.   **The Act's requirements trigger First Amendment strict scrutiny, and the monitoring-and-censorship requirements also violate due process.**

As this Court recognized, the Act's speech regulations trigger First Amendment strict

scrutiny. They all affect covered *websites'* "freedom of speech" and their *users'* "right to receive information and ideas." ECF 30 at 16-17 (citation omitted). Those rights are no less forceful when asserted by minors, because "minors are entitled to a significant measure of First Amendment protection." *Id.* at 17 n.4 (quoting *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 212-13 (1975)). Regardless, "[w]hen the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions." *FEC v. Cruz*, 596 U.S. 289, 305 (2022) (citation omitted).

**1.    The Act's age-verification requirements to access protected speech for both minors and adults violate the First Amendment (§ 4(1)).**

The Act violates the First Amendment by requiring all users—adults and minors—to "verify" their "age[s]" to "creat[e] an account" on covered websites. § 4(1). Heightened First Amendment scrutiny applies when government age-gates protected speech. *Brown*, 564 U.S. at 795 n.3.

The Act's "age-verification requirement . . . is maximally burdensome." *Griffin II*, 2025 WL 978607, at *13; *see* ECF 25 at 9-11. It will deter adults and minors "from speaking or receiving protected speech on social media." *Griffin II*, 2025 WL 978607, at *8; ECF 3-4 ¶¶ 20-33. Minors and adults would need to provide documentation before, *e.g.*, discussing their faith in religious forums, "petition[ing] their elected representatives" on X, "shar[ing] vacation photos" on Facebook, looking for work around the neighborhood on Nextdoor, or learning how to solve math problems on YouTube. *Packingham*, 582 U.S. at 104.

The First Amendment does not tolerate this burden to access protected speech. Age verification unlawfully bars access to speech entirely for those unwilling or unable to provide the requisite documentation. *E.g.*, *Reno*, 521 U.S. at 856; ECF 3-3 ¶ 34. And even those who are willing to comply with the requirements must "forgo the anonymity otherwise available on the internet." *Griffin II*, 2025 WL 978607, at *8 (quoting *Am. Booksellers Found. v. Dean*, 342 F.3d 96, 99 (2d Cir. 2003)); *ACLU v. Mukasey*, 534 F.3d 181, 197 (3d Cir. 2008) (similar). The Supreme Court has

held that requiring adults or minors to provide personal information or documentation—such as "identif[ication]" or "credit card information"—burdens access to speech. *Ashcroft*, 542 U.S. at 667; *Reno*, 521 U.S. at 882. And under the Act, covered websites must place *all* content behind an age-verification system. § 4(1). That is much broader than the law held unconstitutional in *Ashcroft*, which was limited to regulating "sexually explicit materials." 542 U.S. at 659.[2]

Just recently, *Griffin II* permanently enjoined enforcement of Arkansas's similar age-verification requirement, concluding it "burdens social media access for all [users]—both adults and minors whose parents would allow them to use social media." 2025 WL 978607, at *8. "Requiring" users "to produce state-approved documentation to prove their age and/or submit to biometric age-verification testing imposes significant burdens on adult access to constitutionally protected speech and discourages users from accessing the regulated sites." *Id.* (cleaned up). Other courts have likewise enjoined enforcement of such requirements. *E.g.*, *Reyes*, 748 F. Supp. 3d at 1129 n.169; *see Bonta*, 2025 WL 807961, at *15.

The Act's requirement for "commercially reasonable" age verification, § 4(1), does not alter the constitutional analysis. *See* NetChoice Br., *NetChoice, L.L.C. v. Fitch*, 2024 WL 4416151, at *25-27 (5th Cir. Sept. 26, 2024) ("NetChoice Br."). Any form of age-verification would unconstitutionally restrict *users' access* to speech, which alone sustains this challenge. Regardless, governments cannot restrict speech simply because a publisher can afford it. *E.g.*, *Minneapolis Star & Tribune Co. v. Minn. Comm'n of Revenue*, 460 U.S. 575, 592 (1983); *Griffin II*, 2025 WL 978607,

---

[2] The Fifth Circuit's *Free Speech Coalition, Inc. v. Paxton* decision considered age-verification requirements for "pornographic websites," which disseminate speech *unprotected* for minors. 95 F.4th 263, 266, 273 (5th Cir. 2024), *petition for cert. granted* 144 S. Ct. 2714 (July 2, 2024). *Paxton* held that "regulations of the distribution *to minors* of materials obscene *for minors* are subject only to rational-basis review." *Id.* at 269. The Act here regulates minors' access to speech that is *protected* for minors—not speech that they have no First Amendment right to view.

at *14. So even moderate burdens on *websites'* speech is enough to find the Act unconstitutional.

> **2.    The Act's parental-consent requirement for minors to access protected speech violates the First Amendment (§ 4(2)).**

The Act also violates the First Amendment by requiring minors to secure parental consent before becoming "an account holder"—*i.e.*, before accessing protected speech on covered websites. § 4(2). Heightened First Amendment scrutiny applies when governments age-gate protected speech. *Brown*, 564 U.S. at 795 n.3; *see Yost*, 2025 WL 1137485, at *20.

Minors have the "right to speak or be spoken to without their parents' consent," and "the state" lacks "power to prevent children from hearing or saying anything *without their parents' prior consent*." *Brown*, 564 U.S. at 795 n.3. *Brown* invalidated a law prohibiting the sale or rental of "violent video games" to minors, while permitting minors to play such games with parental consent. *Id.* at 802. Any other result would allow States to require parental consent to attend "political rall[ies]" or "religious" services. *Id.* at 795 n.3. The Court rejected that idea. *Id.*

Since *Brown*, courts have repeatedly enjoined enforcement of parental-consent requirements for minors to access social media. "Minors, who cannot vote for the lawmakers that represent them, can use social media to make their voices heard on issues that affect them, like school shootings and school choice." *Griffin II*, 2025 WL 978607, *13. *Griffin* recently enjoined enforcement of a nearly identical requirement in Arkansas. *Id.* at *8. The same is true in Ohio, *Yost*, 2025 WL 1137485, at *24 (permanent injunction), and Utah, *Reyes*, 748 F. Supp. 3d at 1126 & n.135.

This Act's materially identical parental-consent requirement violates the First Amendment for the same reasons. It would erect a major hurdle between minors and protected speech—"foreclos[ing] access to social media for those minors whose parents do not consent." *Griffin II*, 2025 WL 978607, at *8. Under the Act, minors who wish to exchange information about their religious or political views could not do so unless their parents approve. That problem is exacerbated

because the Act does not account for verifying a parent-child relationship for purposes of processing parental consent. ECF 30 at 29-30. And "[d]isputes about the identity of an account holder, their age, or the legal relationship between them and the person claiming to be their parent are complex, time-consuming, costly . . . , and unfortunately common." ECF 3-5 ¶ 36. *Griffin I* credited the *State's* expert testimony that "the biggest challenge you have with parental consent is actually establishing . . . the parental relationship." *NetChoice, LLC v. Griffin*, 2023 WL 5660155, at *4 (W.D. Ark. Aug. 31, 2023). These difficulties are compounded when, *e.g.*, families are nontraditional (such as foster families), families have different last names, parents disagree about consent, minors are unsafe at home, or parental rights are terminated. *See* Cleland Decl. ¶ 45.c. Facing liability, covered websites are likely to "err on the side of caution and require detailed proof." *Griffin I*, 2023 WL 5660155, at *15. Thus, "parents and guardians who otherwise would have freely given consent . . . will be dissuaded by the red tape," "driving them to refuse consent— which will unnecessarily burden minors' access to constitutionally protected speech." *Id.*

As discussed above, the Act's provision allowing for "commercially reasonable" parental-consent mechanisms does not alter the analysis, § 4(2)(f). Regardless of what parental-consent requires *websites* to do, it unconstitutionally burdens *minor users'* rights. Plainly, *Brown* would not have come out differently had California asked for "commercially reasonable" parental consent. Similarly, any parental-consent requirement would burden websites' ability to disseminate speech.

### 3.    The Act's monitoring-and-censorship requirements violate the First Amendment and the Due Process Clause (§ 6).

The requirement that websites "implement a strategy to prevent or mitigate . . . exposure to" vaguely defined categories of speech violates the First Amendment and Due Process Clause. § 6. It imposes a prior restraint on disseminating protected speech. Even if not prior a restraint, it violates websites' right to "control the content that will appear to users." *Moody*, 603 U.S. at 736.

And it unconstitutionally "deputizes private actors into censoring speech." *NetChoice, LLC v. Bonta*, 113 F.4th 1101, 1121 (9th Cir. 2024). The Western District of Texas preliminarily enjoined enforcement of a nearly identical requirement. *CCIA*, 747 F. Supp. 3d at 1036-38, 1040-42.

**a.** Prior restraints are the "least tolerable infringement on First Amendment rights." *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 558-59 (1976) (citation omitted); *see* NetChoice Br. at *42-45. And requiring websites to monitor all content they disseminate to satisfy the State's standards will unconstitutionally chill speech. *Smith v. California*, 361 U.S. 147, 153-54 (1959).

By requiring covered websites to "implement" a "strategy" to "prevent . . . minor[s'] exposure" to prohibited speech, § 6(1), the Act compels websites to prohibit dissemination of speech before the government has proven that the speech may lawfully be suppressed. *See Alexander v. United States*, 509 U.S. 544, 550 (1993). The Act's express requirements to censor are more than mere "informal" governmental "coercion, persuasion, and intimidation." *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67 (1963). Just as the government cannot censor this speech "directly," it cannot "coerce" websites to suppress "speech on [its] behalf." *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 190 (2024). Worse, the law's effects cannot be limited to minors. Websites lacking "age-gates"—where adults and minors are presented with different content—can comply only by preventing prohibited content from reaching *anyone*. Cleland Decl. ¶ 46.b; ECF 30 at 27-28.

**b.** The monitoring-and-censorship provision reaches "a substantial amount of constitutionally protected speech[,]" rendering it substantially overbroad and "facially invalid." *City of Houston v. Hill*, 482 U.S. 451, 458 (1987). The State may not enact "statute[s] patently capable of many unconstitutional applications, threatening those who validly exercise their rights of free expression." *Smith*, 361 U.S. at 151. In the Act, "[t]erms like 'promoting,' . . .'substance abuse,' 'harassment,' and 'grooming' are undefined, despite their potential wide breadth and politically

11

charged nature." *CCIA*, 747 F. Supp. 3d at 1036. As a result, below and in Plaintiff's Amended Complaint (at ¶ 80) are examples of protected speech that the Act could reach.

A host of works of literature and philosophy "promote[] or facilitate[] . . . [s]elf-harm, eating disorders, substance use disorders, and suicidal behaviors." § 6(1)(a). Examples include Sylvia Plath's *The Bell Jar* (1963) and television series like *13 Reasons Why* (2017-2020). The Act also captures discussions about assisted suicide for those with terminal illnesses in online support groups. *Cf.* Peter Singer, *Practical Ethics* (3d ed. 2011).

Popular culture is replete with protected speech that "promotes or facilitates . . . substance abuse or use of illegal drugs." § 6(1)(b). Examples include The Weeknd's Kids'-Choice-Award-nominated *Can't Feel My Face* (2015) and The Beatles' *Lucy in the Sky with Diamonds* (1967). The Act also reaches support-group discussions about using drugs to address illnesses.

Similarly, many protected works of art "promote[] or facilitate[] . . . [s]talking, physical violence, online bullying, or harassment." § 6(1)(c). Examples include The Police's *Every Breath You Take* (1983) and entire categories at large bookstores (*e.g.*, Stalking – Fiction, Barnes & Noble, https://perma.cc/VX92-257V).

Members work tirelessly to detect and block content that "promotes or facilitates . . . [g]rooming, trafficking, child pornography, or other sexual exploitation or abuse." § 6(1)(d); *see* Cleland Decl. ¶ 16; ECF 3-3 ¶ 19. Yet even "teenage sexual activity and the sexual abuse of children" has "inspired countless literary works" such as "Romeo and Juliet" and the movie "American Beauty." *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 247-48 (2002)

Many works of art, literature, and political expression, and pop culture "promote[] or facilitate[] . . . [i]ncitement of violence." § 6(1)(e). Concerns about minors' exposure to violent video games led to the Supreme Court's decision in *Brown*. 564 U.S. at 794. Short of actual

incitement to "imminent lawless action [that] is likely to incite or produce such action," such speech is fully protected by the First Amendment. *Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969).

Countless forms of protected speech could "promote[] or facilitate[] . . . [a]ny other illegal activity." § 6(1)(f); *see* Am. Compl. ¶ 80. For instance literature discussing civil disobedience as a form of democratic protest could promote illegal activity.

The "harmful material" (§ 2(c)) category does not distinguish speech that is obscene to children versus teenagers. *Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 396 (1988).

The Act's exceptions to § 6's requirements raise more questions and do not cure the Act's overbreadth. They permit: (1) minors to "deliberately and independently search[] for, or specifically request[]" speech; and (2) "resources for the prevention or mitigation of the harms" described above. § 6(2). It is unclear how websites must verify and prove that a minor deliberately sought out such content, or whether content qualifies for these exceptions.

**c.** As a result, covered websites will need to align their content moderation with the State's requirements. Yet members cannot be sure that any of their current policies will satisfy how Defendant will interpret the Act. ECF 3-3 ¶¶ 39-40; ECF 3-5 ¶¶ 19-26. These determinations require "contextual analyses, weighing and balancing many factors." *Book People, Inc. v. Wong*, 91 F.4th 318, 340 (5th Cir. 2024); ECF 3-3 ¶ 21; ECF 3-5 ¶ 24. Given the sheer volume of speech, covered websites will be required to simply guess at Defendant's subjective determinations for potentially *billions* of individual pieces of speech. *CCIA*, 747 F. Supp. 3d at 1040; ECF 3-3 ¶ 22.

**d.** Further complicating that problem, the Act's requirements are "simply too vague." *CCIA*, 747 F. Supp. 3d at 1036. They "are vague because both the verbs (promotes . . . and facilitates) and the objects of those verbs (e.g., stalking, bullying, substance abuse, and grooming) are broad and undefined." *Id.* So they cannot provide covered websites "sufficient definiteness" to

ensure "that ordinary people can understand" what will give rise to liability. *Kolender v. Lawson*, 461 U.S. 352, 357 (1983). Rather, they risk "arbitrary or discriminatory" enforcement. *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012). For example, a key consideration under the Act is whether content "promotes" certain social ills. § 6(1). The Supreme Court held to be vague a law that hinged on the word "promote" "because of vagueness." *Baggett v. Bullitt*, 377 U.S. 360, 371 (1964). As the Court explained, the "range of activities which are or might be deemed" to "promote" an idea "is very wide indeed" and provides no "ascertainable standard of conduct." *Id.*; *see CCIA*, 747 F. Supp. 3d at 1040. The Act's parallel usage of "facilitates" is no better. § 6(1).

These problems are exacerbated by the nature of websites' content-moderation policies and decisions, where context, intent, and other factors are relevant to whether content "promotes or facilitates" something. Cleland Decl. ¶¶ 21, 24; ECF 3-3 ¶¶ 20-21. And these websites publish various forms of media in many languages and reflecting cultures worldwide. So all too often, whether content falls into one of the Act's prohibited categories will be a matter of perception— and "completely subjective." *Grayned v. City of Rockford*, 408 U.S. 104, 113 (1972). These vague prohibitions "effectively grant[] [the State] the discretion to [assign liability] selectively on the basis of the content of the speech." *Hill*, 482 U.S. at 465 n.15; *see Reno*, 521 U.S. at 870 (similar).

### 4.    The Act triggers strict scrutiny as a content-based regulation.

The challenged provisions trigger strict scrutiny in additional ways. This Court correctly concluded that the Act's central coverage provisions (§§ 2(a)-(b)) are content-based, subjecting all of the Act's speech regulations to strict scrutiny. ECF 30 at 18-23. "Government's content-based burdens must satisfy the same rigorous scrutiny as its content-based bans." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 566 (2011) (citing *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 812 (2000)). The Act's coverage definition is also speaker-based, which independently triggers height-ened scrutiny. Even if strict scrutiny did not apply, governmental restrictions on "access to" social

14

media websites raise heightened First Amendment scrutiny. *Packingham*, 582 U.S. at 105.

*Content-based distinctions.* "Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if" they satisfy "strict scrutiny." *Reed v. Town of Gilbert*, 576 U.S. 155, 163-64 (2015).

The Act's coverage provisions are content-based, rendering all of the Act's operative pro-visions content-based. ECF 30 at 18-23. A "website . . . , an enforcement official, a court, or a jury applying the Act, cannot determine whether the website is regulated without looking to the content posted on that website." *Griffin II*, 2025 WL 978607, at *9. The Act covers websites based on allowing users to interact "socially." § 3(1)(a). It thus excludes websites that allow users to interact "professionally," and those that do not allow interaction. The Act expressly excludes websites that "[p]rimarily function[] to provide a user with access to [1] news, [2] sports, [3] commerce, [4] online video games," and "[5] career development opportunities." § 3(2)(c)-(d). These distinc-tions are based on "subject matter"—and thus "content." *Reed*, 576 U.S. at 163; *see Barr v. Am. Ass'n of Pol. Consultants*, 591 U.S. 610, 621 (2020) (controlling plurality op.). "The elevation of news, sports, commerce, and provider-generated content . . . is a content-based regulation." *CCIA*, 747 F. Supp. 3d at 1032; *see Yost*, 2025 WL 1137485, at *18; *Griffin II*, 2025 WL 978607, at *9.

The Act's monitoring-and-censorship requirements (§ 6) are doubly content-based because they "identify discrete categories of speech and single them out to be filtered and blocked." *CCIA*, 747 F. Supp. 3d at 1036. These categories are content-based even if the State purports to regulate only the *effects* of speech. *Boos v. Barry*, 485 U.S. 312, 321 (1988).[3]

---

[3] The Act's monitoring-and-censorship requirements are also viewpoint-based: they regu-late speech that "promotes" certain social ills, § 6(1), while expressly exempting speech that covers the same subject matter but focuses on "prevention or mitigation," § 6(2). The Supreme Court has held that a law is directly "aimed at a particular viewpoint" if it forbids "promot[ing]." *Sorrell*,

*Speaker-based.* The Act is also subject to heightened scrutiny because its central coverage definition is speaker-based. Laws "present serious First Amendment concerns" when they "discriminate . . . among different speakers within a single medium." *Turner Broad. Sys. v. FCC*, 512 U.S. 622, 659 (1994). Such speaker-based laws are "always subject to at least some degree of heightened First Amendment scrutiny." *Id.* at 640-41 (citation omitted); *see* ECF 30 at 19.

Among all the websites that would otherwise qualify as "digital services," the Act applies only to those websites that allow users to "socially interact" and that disseminate user-generated content. § 3(1). It also includes further speaker-based exceptions. § 3(2).

Because the Act's central coverage definition is content-based, so too is each provision of the Act regulating speech that depends on this coverage definition. ECF 30 at 19. "[I]f a statute's gateway coverage definition is content-based, the statute as a whole is subject to strict scrutiny because the coverage definition applies in all applications of the statute." *Bonta*, 2025 WL 807961, at *12; *see Reyes*, 2024 WL 4135626, at *8. The following speech regulations each depend on this coverage definition and are thus content-based: age verification, § 4(1), parental consent, § 4(2), information use and collection, § 5, and monitoring and censorship, § 6.

## B.     The Act fails strict scrutiny and any other form of heightened First Amendment scrutiny.

Because the Act triggers strict scrutiny, it is presumptively unconstitutional and Defendant must show that the State has "[1] adopt[ed] the least restrictive means of [2] achieving a compelling state interest." *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 607 (2021) ("*AFP*") (cleaned up). Defendant must show "that the Act's differentiation among digital service providers and the content they convey, along with the age and parental-consent requirements, further a

---

564 U.S. at 565. For example, the Act's restriction on content that "promotes . . . substance abuse" targets the (highly objectionable but protected) viewpoint that substance abuse is good.

compelling governmental interest and are narrowly tailored to that end." ECF 30 at 24. This Court correctly concluded that Defendant cannot carry that burden. *Id.* at 23-32. The Act also cannot satisfy any other form of heightened scrutiny, because the Act is not "narrowly tailored to serve a significant governmental interest." *Packingham*, 582 U.S. at 105-06 (citation omitted).

### 1. The State lacks a sufficient governmental interest in restricting adults' and minors' access to protected speech.

To satisfy First Amendment scrutiny, Mississippi must "specifically identify an actual problem in need of solving." *Brown*, 564 U.S. at 799 (cleaned up). "[A]mbiguous proof will not suffice." *Id.* at 800. Nor will a government's mere "predictive judgment[s]" about harm. *Id.* at 799. Further, the problem identified must require a *governmental* solution, as compared to a *private* one. Here, Mississippi lacks a sufficient interest in regulating access to protected speech.

*Preventing harms to minors.* Although, "a State possesses legitimate power to protect children from harm, . . . that does not include a free-floating power to restrict the ideas to which children may be exposed." *Id.* at 794. And the government may not "protect the young from ideas or images that a legislative body thinks unsuitable." *Erznoznik*, 422 U.S. at 213.

Here, parents have many means of overseeing their minor children online. *See supra* pp.3-4. Those are precisely the kinds of private tools that the Supreme Court has endorsed over governmental intervention. *See, e.g., Ashcroft*, 542 U.S. at 667; *Playboy*, 529 U.S. at 826. Whatever "modest gap in concerned parents' control" those tools leave open (if any), filling it "can hardly be a compelling state interest." *Brown*, 564 U.S. at 803.

*Parental authority.* The Supreme Court has rejected a governmental interest "in aid of parental authority" to restrict minors' access to protected speech. *Id.* at 802. The Court in *Brown* "note[d]" its "doubts that punishing third parties for conveying protected speech to children *just in case* their parents disapprove of that speech is a proper governmental means of aiding parental

17

authority." *Id.* Accepting that argument "would largely vitiate the rule that 'only in relatively narrow and well-defined circumstances may government bar public dissemination of protected materials to [minors].'" *Id.* (quoting *Erznoznik*, 422 U.S. at 212-13).

### 2.    The Act is not properly tailored.

Regardless, the Act is not narrowly tailored, let alone the "least restrictive means" of pursuing any interest. *AFP*, 594 U.S. at 607 (citation omitted). Rather, the Act "is either overinclusive or underinclusive, or both, for achieving the asserted governmental interest." ECF 30 at 31.

### a.   The entire Act is improperly tailored.

Several tailoring flaws pervade the Act and all its operative provisions.

*Least restrictive means.* None of the Act's speech restrictions is the "least restrictive" way to accomplish any legitimate governmental ends. *AFP*, 594 U.S. at 607 (citation omitted). Parents already have many options to oversee their children online. *See* ECF 30 at 25-26. "Most minors cannot access social media without a parent-funded device and internet connection, and parents who care about the matter have many tools at their disposal to restrict and monitor their children's internet use." *Griffin II*, 2025 WL 978607, at *14 (quoting *Brown*, 564 U.S. at 803); *see Bonta*, 113 F.4th at 1121; *Yost*, 2025 WL 1137485, at *22; *see supra* pp.3-4. Mississippi could give "parents the information needed to engage in active supervision" over internet access. *Playboy*, 529 U.S. at 826. And "[i]t is no response that [these tools] require[] a consumer to take action, or may be inconvenient, or may not go perfectly every time." *Id.* at 824.

Furthermore, members' self-regulation is extensive, as covered websites already engage in content moderation and provide parental controls and other tools. *See supra* pp.3-4. The Supreme Court has recognized that "voluntary" self-regulatory efforts are preferable to government intervention. *Brown*, 564 U.S. at 803 (crediting video game industry's self-regulation).

*Overinclusive.* The Act also is vastly overinclusive. The Act does not purport to identify

websites that are harmful to minors or even particularly likely to be accessed by minors. *See* ECF 3-4 ¶¶ 17-18; ECF 3-5 ¶ 6. And for the websites it regulates, the Act restricts users' access to *all* speech on those websites, including core protected speech. So the Act "not only hinders adults' ability to speak and receive protected speech online, it excludes minors whose parents do not consent (or cannot prove their consent) from the vast democratic forums of the Internet," and its fully protected speech. *Griffin II*, 2025 WL 978607, at *13 (citation omitted).

*Underinclusive.* The Act's coverage is also "seriously underinclusive." *Brown*, 564 U.S. at 805; *see* ECF 30 at 28-31. The Act's central coverage definition and its many exclusions create gaps in the State's regulatory regime. *Sorrell*, 564 U.S. at 573 (governmental regulation requires "coherent policy" (citation omitted)); *see, e.g.*, *Griffin II*, 2025 WL 978607, at *11-12; *Reyes*, 2024 WL 4135626, at *15; *CCIA*, 2024 WL 4051786, at *16. If the State is attempting to regulate particular online interactions by minors, that will be ineffective. For example, the Act restricts minor users from using covered websites to engage in conversations about sports but does not do so for *the same conversation* that takes place on websites "primarily" dedicated to "[1] news, [2] sports, [3] commerce, [4] online video games," and "[5] career development opportunities." § 3(2)(c)-(d). That is to say nothing of exempting the same content if "deliberately and independently search[ed] for, or specifically request[ed]," by minors. § 6(2). A "law cannot be regarded as protecting an interest of the highest order . . . when it leaves appreciable damage to that supposedly vital interest unprohibited." *Republican Party of Minn. v. White*, 536 U.S. 765, 780 (2002) (cleaned up).

> **b.    The age-verification (§ 4(1)), parental consent (§ 4(2)), and monitoring-and-censorship requirements (§ 6) are improperly tailored for additional, independent reasons.**

Specific provisions have still more tailoring flaws.

*Age verification (§ 4(1)).* Age verification is only a means to effectuate the Act's other age-based restrictions, like the parental-consent requirement and the monitoring-and-censorship

19

requirements. Because those other provisions are unlawful, age-verification serves no governmental interest whatsoever. *See, e.g.*, *Griffin I*, 2023 WL 5660155, at *18-21. Moreover, "[t]his burdens adults' First Amendment rights, and that alone makes it overinclusive." ECF 30 at 27.

*Parental consent (§ 4(2))*. The parental-consent requirement is improperly tailored. If covered websites are genuinely "dangerous," it is unclear why the State would allow minors to access them "so long as one parent . . . says it's OK." *Brown*, 564 U.S. at 802; *see* ECF 30 at 25-26; *Yost*, 2025 WL 1137485, at *21; *Griffin II*, 2025 WL 978607, at *10. Furthermore, the Act fails to "take into account juveniles' differing ages and levels of maturity." *Am. Booksellers*, 484 U.S. at 396. The Act unlawfully requires parental consent for all minors at every developmental stage—from websites' youngest users to 17-year-olds. *Id.*; *see Reno*, 521 U.S. at 865-66; *see* ECF 30 at 28.

*Monitoring-and-censorship (§ 6)*. The Act's monitoring-and-censorship requirements are likewise both over- and underinclusive. They are overinclusive as a prior restraint "superimposed upon the State's criminal regulation[s]"—making the Act "largely unnecessary," *Bantam Books*, 372 U.S. at 69; and an improper "prophylaxis-upon-prophylaxis" the First Amendment prohibits, *Cruz*, 596 U.S. at 306. Mississippi law already addresses the unlawful conduct and unprotected speech that may fall within a subset of the Act's overbroad categories. *See* Am. Compl. ¶ 191.[4]

Finally, the requirements are underinclusive because they restrict minors' access to certain speech, but (purportedly) not if they "deliberately and independently" seek it out. § 6(2)(a). This exception undermines any governmental interest the State could possibly assert. ECF 30 at 31.

---

[4] The State cannot defend the Act by likening it to the criminal context—where words like "promote" and "facilitate" have "longstanding and pervasive" constructions that laws regulating speech lack. *United States v. Hansen*, 599 U.S. 762, 773 (2023).

**C.    The Act is unconstitutional both (1) facially; and (2) as applied to NetChoice's covered members.**

**1.    The Act is facially unconstitutional.**

This Court correctly already correctly held that "a substantial number of" the Act's "applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." ECF 30 at 18 (quoting *AFP*, 594 U.S. at 615; citing *Moody*, 603 U.S. at 721-26). A "content-based restriction, insufficiently tailored to target a compelling government interest, is presumptively unconstitutional in all applications." *Griffin II*, 2025 WL 978607, at *14.

**a.** This inquiry "first" asks what "actors" and "activities" the Act regulates. *Moody*, 603 U.S. at 724. Here, the Act targets an identifiable set of "actors" (social media websites) and "activities" (access to those websites and those websites' dissemination of protected speech). *Id.*

The "kinds of websites and apps" that the Act regulates are the kinds of "social media" websites discussed by the Supreme Court in *Packingham* and *Moody*. *Moody*, 603 U.S. at 718, 724. "[U]sers employ these websites to engage in a wide array of protected First Amendment activity on topics as diverse as human thought." *Packingham*, 582 U.S. at 105 (citation omitted). So *Packingham* held the First Amendment protects people's right to "access" these websites free from governmental restraint. *Id.* at 108. Otherwise, such restrictions on access would "prevent the user from engaging in the legitimate exercise of First Amendment rights." *Id.* That is because these "kinds" of websites (1) "allow users to upload content . . . to share with others"; and (2) allow those "viewing the content . . . [to] react to it, comment on it, or share it." *Moody*, 603 U.S. at 719.

Defendant agrees and has steadfastly argued that the "Act has a targeted scope": The "Act's clear focus is online social-media platforms." ECF 26 at 4, 24. And because the Act targets "social media" websites, this Court "need not speculate" about "hypothetical or imaginary cases." *X Corp. v. Bonta*, 116 F.4th 888, 899 (9th Cir. 2024) (cleaned up); *see* NetChoice Br. at *23-24.

If there were any doubt, the Act expressly excludes the types of services discussed in both *Moody* and *Fitch*, including most NetChoice members' services. Specifically:

- the Act's exclusion of "email" and "direct messaging services," § 3(2)(a), excludes "email" and "direct messaging," *Moody*, 603 U.S. at 725, including email services like "Google Mail" and direct messaging services like "Microsoft Teams" and "Google Meet," *Fitch*, 2025 WL 1135279, at *6, and Yahoo! Mail, Cleland Decl. ¶ 41;

- the Act's exclusion of "commerce," § 3(2)(c), excludes "online marketplace[s] like Etsy," "payment service[s] like Venmo," *Moody*, 603 U.S. at 725, along with Airbnb, Alibaba.com, Amazon.com, EarnIn, eBay, Etsy, Expedia, FluidTruck, Hims&Hers, HomeAway, Hotels.com, Lyft, Offerup, Orbitz, PayPal, Pindrop, StubHub, Swimply, Travel Tech, Travelocity, Trivago, Turo, VRBO, VSBLTY, Waymo, and Wing, *see* Cleland Decl. ¶ 41;

- the Act's exclusion of websites with "content primarily generated or selected by the digital service provider," § 3(2)(c)(ii), excludes "ride-sharing service[s] like Uber," *Moody*, 603 U.S. at 725; "Google Maps," "DraftKings," *Fitch*, 2025 WL 1135279, at *6, Duolingo, Lyft, and Netflix, Cleland Decl. ¶ 41; and

- in addition, "DraftKings," *Fitch*, 2025 WL 1135279, at *6, and PrizePicks, Cleland Decl. ¶ 41, also "primarily function[] to provide a user with access to . . . sports[ and] commerce, § 3(2)(c)(i).

Accordingly, this case is unlike both *Moody*, where it was unclear "what [] the laws have to say," about other "kinds of" services "beyond [] social-media." 603 U.S. at 718, 725.

If Defendant attempts to leverage the Act's vagueness (discussed below at p.25), that vagueness is a First Amendment vice. For instance, even if the Act applied to services like Google Maps, the Act would be unconstitutional. Same with the edge questions that the Fifth Circuit raised—such as whether the Act regulates certain services that "allow[ users] to socially interact . . . *through messages*." *Fitch*, 2025 WL 1135279, at *6 (emphasis added).[5] The Supreme Court has held it "is enough . . . that the law applies" to prevent "access" to social networking sites." *Packingham*, 582 U.S. at 106 (cleaned up). Laws that "bar access" to both "social media websites"

---

[5] Defendant has never tried to justify requiring age verification and parental consent for teenagers to make video calls and exchange messages on a service like Microsoft Teams.

*and* "websites" like "Washingtonpost.com[] and Webmd.com" raise First Amendment problems. *Id.* All such websites engage in, and facilitate, protected speech activities. Reading the Act to regulate *more* services where users "speak and listen, and then, after reflection, speak and listen once more," *id.* at 104, would only magnify the Act's constitutional harms.

**b.** "[N]ext," this Court must compare the Act's unconstitutional applications to any constitutional ones, asking whether the former "substantially outweigh" the latter. *Moody*, 603 U.S. at 723-24. That inquiry here is straightforward "from the face of the law": All aspects of the Act's speech regulations, "in every application to a covered social media company, raise the same First Amendment issues." *X*, 116 F.4th at 899 (citation omitted).

That is especially true from the perspective of users, whose First Amendment rights the Fifth Circuit held NetChoice has standing to "assert." *Fitch*, 2025 WL 1135279, at *4. No "factual development would help illuminate the scope of users' First Amendment interest in accessing regulated platforms." *Griffin II*, 2025 WL 978607, at *7. There is "no dispute that users engage in protected speech on all the platforms that are arguably within the Act's proscription" and "the Act imposes a platform-wide burden on users' right to engage in that speech," which does not "differ between the platforms." *Id.* "By barring access to all content on regulated platforms . . . the Act is unconstitutional in all conceivable applications." *Id.* at *14; *see Yost*, 2025 WL 1137485, at *14 (similar). In other words, whenever the Act would operate to bar a user from access to a covered website—"actual applications of the statute" where "the law is a restriction," *City of LA v. Patel*, 576 U.S. 409, 418-19 (2015)—the Act it is unconstitutional.

That too makes this case unlike *Moody*, where the Court concluded the parties had not adequately argued about how the First Amendment's protections for editorial discretion might apply to non-social media services. *Moody*, 603 U.S. at 725-26. Here, cases like *Packingham* and

*Brown* stand for the straightforward proposition that governments cannot restrict access to pro-tected speech without satisfying heightened First Amendment scrutiny. *See supra* pp.7-10. And more cases than it would be possible to cite hold that the government cannot outright prohibit overbroad content-based categories of speech—whether that speech can purportedly be found on social media websites or in conversations at the local hardware store.

So even if there are a handful of regulated websites that disseminate speech that the State can lawfully regulate, *e.g.*, *Free Speech*, 95 F.4th at 266, 273, such websites' existence does not defeat facial relief. That is why the First Amendment's "less demanding" facial-challenge analysis asks whether a "law's unconstitutional applications *substantially outweigh* its constitutional ones." *Moody*, 603 U.S. at 723-24 (emphasis added). The State cannot impose overbroad restrictions fail-ing heightened First Amendment scrutiny and point to scattered, potentially constitutional appli-cations to defeat relief. If the State wants to target websites that, *e.g.*, disseminate large amounts of unprotected speech, it should enact laws tailored to do *only* that.

Similarly, if covered websites have varying abilities to comply with the Act, *see Fitch*, WL 1135279, at *6, that should not alter the analysis for the reasons explained at pp.8-10. Burdening access to protected speech through either age verification or parental consent imposes a burden on *users'* rights, regardless of whether a website can afford it. And the government cannot compel the overbroad censorship of protected speech, regardless of a company's ability to foot the cost.

### 2.    The Act is unconstitutional as applied to covered NetChoice members.

The Act is unconstitutional as applied to covered members' services: Dreamwidth, Face-book, Instagram, Nextdoor, Pinterest, Reddit, Snapchat, X, and YouTube. *John Doe No. 1 v. Reed*, 561 U.S. 186, 194 (2010) (analyzing challenge "to the extent of [the] reach" defined by plaintiff).

These services are precisely the kinds of—if not *the*—"social media" websites discussed by the Supreme Court in *Moody* and *Packingham* and explained above. *See* Cleland Decl. ¶¶ 32-

39; ECF 3-2 ¶ 22. In fact, multiple members' services have been discussed by the Court as examples of such services, including "Facebook," "Twitter" (now X), and "YouTube." *Packingham*, 582 U.S. at 99. Likewise, members' websites (including "Facebook" and "YouTube") are the kinds of websites the Court held "engage[] in expression" by "mak[ing] choices about what third-party speech to display and how to display it." *Moody*, 603 U.S. at 716.

## II. NetChoice is likely to succeed on the merits of its claim that the Act's central definition of "digital service provider" is unconstitutionally vague.

This Court correctly concluded that the Act's "digital service provider" definition is unconstitutionally vague. §§ 2(a)-(b), 3; ECF 30 at 32-35. Laws must "give fair notice of conduct that is forbidden or required." *Fox*, 567 U.S. at 253. "[V]agueness may be grounds for a pre-enforcement challenge" if a law "chills protected speech," even if not vague in every application. *Nat'l Press Photographers Ass'n v. McCraw*, 90 F.4th 770, 782 n.32 (5th Cir. 2024).

Determining whether the Act applies requires identifying how a website "primarily functions." § 3(2)(c). *Griffin* enjoined as unconstitutionally vague a law relying on similar terms. 2025 WL 978607, at *15-16. Here too, key coverage terms are undefined, even though that phrase is "critical to determining which entities fall within [the Act]'s scope." *Id.* at *15. For example, many people use LinkedIn for "[p]rofessional networking," § 3(2)(d), but many others use it for social interaction. So "[c]ompanies must choose between risking unpredictable and arbitrary enforcement . . . and implementing the Act's costly . . . requirements." *Griffin II*, 2025 WL 978607, at *16. This "ambiguity renders a law unconstitutional." *Id.*

## III. NetChoice is likely to succeed on the merits of its claim that the Act's monitoring-and-censorship requirements (§ 6) are preempted by 47 U.S.C. § 230.

The Act's monitoring-and-censorship requirements (§ 6) are also preempted by § 230 because they require covered websites to monitor and block third-party content.

Under § 230, no "interactive computer service shall be treated as the publisher or speaker

of any information provided by" someone else. 47 U.S.C. § 230(c)(1).[6] And websites may take "any action voluntarily taken in good faith to restrict access to" speech that they or their users "consider[] to be . . . objectionable." *Id.* § 230(c)(2)(A). Congress preempted "inconsistent" state laws, protecting websites from "cause[s] of action" and "liability." *Id.* § 230(e)(3).

As a result, websites have "broad immunity" for "all claims stemming from their *publication of information created by third parties*." *Salesforce, Inc.*, 123 F.4th at 794 (cleaned up). This precludes States from penalizing websites for disseminating or exercising "editorial functions" over third-party content, such as "decisions relating to the monitoring, screening, and deletion of content." *Id.* at 793, 798 (citation omitted); *M.P. by & through Pinckney v. Meta Platforms Inc.*, 127 F.4th 516, 526 (4th Cir. 2025) ("acts of arranging and sorting content"). That includes alleged "failure[s] to implement basic safety measures to protect minors." *MySpace*, 528 F.3d at 418-19.

Here, § 230 preempts § 6's requirement that covered websites "prevent or mitigate . . . minor[s'] exposure to" prohibited third-party speech. § 6. That is an improper attempt to treat covered websites as the "publishers" of third-party content on their services and to direct them to "address certain harmful content." *MySpace*, 528 F.3d at 420 (citation omitted).

Section 6 also violates § 230 because it requires covered websites to "monitor third-party content." *HomeAway.com, Inc. v. City of Santa Monica*, 918 F.3d 676, 682 (9th Cir. 2019). Yet § 230 protects' "decisions relating to the monitoring" and "screening" of third-party content, including the decision to not monitor such content or to monitor it in a manner distinct from how a particular State would prefer. *Salesforce*, 123 F.4th at 793 (citation omitted); *Doe v. Grindr Inc.*, 128 F.4th 1148, 1153 (9th Cir. 2025) ("monitor third-party content"). Similarly, § 230 protects

---

[6] Members operate websites that qualify as "interactive computer service[s]" under 47 U.S.C. § 230(f)(2). *E.g.*, *La'Tiejira v. Facebook, Inc.*, 272 F. Supp. 3d 981, 993 (S.D. Tex. 2017).

websites from liability for third-party content that they (purportedly) do not moderate.

Section 6 likewise would require covered websites to block or otherwise restrict minors' access to ("exposure to") user-generated content. But Congress entrusted decisions about whether and how to restrict the visibility of third-party content exclusively to websites. *See* 47 U.S.C. §§ 230(c), § 230(f)(4); *see Salesforce*, 123 F.4th at 793. Section 6 is therefore preempted.

## IV.    NetChoice meets all the remaining factors for a preliminary injunction.

NetChoice has shown "arguably the most important factor: likelihood of success." *Netflix, Inc. v. Babin*, 88 F.4th 1080, 1099 (5th Cir. 2023). It meets the other factors too. ECF 30 at 35-37.

The Act will cause NetChoice's members and their users irreparable harm. "The loss of First Amendment freedoms . . . unquestionably constitutes irreparable injury." *Roman Catholic Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020) (citation omitted). Furthermore, the Act imposes compliance costs "with no guarantee of eventual recovery." *Ala. Ass'n of Realtors v. HHS*, 594 U.S. 758, 765 (2021). Each website must adopt age-verification, parental-consent, and monitoring systems. ECF 3-3 ¶ 33; ECF 3-4 ¶ 31. For some websites, these compliance costs are "far in excess of [the] available budget." ECF 3-5 ¶ 37. Some members have stopped serving minors when other States' laws were not enjoined before they became effective. Cleland Decl. ¶ 48.

The final factors—"harm to the opposing party and the public interest"—"merge" in lawsuits against the government. *Nken v. Holder*, 556 U.S. 418, 435 (2009). "[I]njunctions protecting First Amendment freedoms are always in the public interest" and "the State and the public won't be injured by an injunction of a statute that likely violates the First Amendment." *Book People, Inc. v. Wong*, 91 F.4th 318, 341 (5th Cir. 2024) (citation omitted).

## Conclusion

Plaintiff respectfully requests an immediate temporary restraining order and eventually a preliminary injunction preventing Defendant's enforcement of the Act.

Dated: May 5, 2025

Jared B Magnuson*
LEHOTSKY KELLER COHN LLP
3280 Peachtree Road NE
Atlanta, GA 30305
(512) 693-8350
jared@lkcfirm.com

Joshua P. Morrow*
LEHOTSKY KELLER COHN LLP
408 W. 11th Street, 5th Floor
Austin, TX 78701
(512) 693-8350
josh@lkcfirm.com

Respectfully submitted,

*/s/ J. William Manuel*
J. William Manuel (MBN. 9891)
Stephen L. Thomas (MBN 8309)
BRADLEY ARANT BOULT CUMMINGS LLP
One Jackson Place
188 E. Capitol Street, Suite 1000
Jackson, MS 39201
Telephone: (601) 948-8000
Facsimile: (601) 948-3000
wmanuel@bradley.com
sthomas@bradley.com

Steven P. Lehotsky*
Scott A. Keller*
Jeremy Evan Maltz*
LEHOTSKY KELLER COHN LLP
200 Massachusetts Avenue, NW, Suite 700
Washington, DC 20001
(512) 693-8350
steve@lkcfirm.com
scott@lkcfirm.com
jeremy@lkcfirm.com

*admitted pro hac vice*

*Attorneys for Plaintiff NetChoice, LLC*

28

**Certificate of Service**

I hereby certify that on May 5, 2025, a true and correct copy of the foregoing was electronically filed with the Clerk of Court using the CM/ECF system which will send notification to all counsel of record.

*/s/ J. William Manuel*
J. William Manuel (MBN. 9891)