## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF MISSISSIPPI
## SOUTHERN DIVISION

**NETCHOICE, LLC**                                                    **PLAINTIFF**

**v.**                                               **No. 1:24-CV-170-HSO-BWR**

**LYNN FITCH, in her official capacity as**
**Attorney General of Mississippi**                          **DEFENDANT**

---

### DEFENDANT'S RESPONSE IN OPPOSITION TO PLAINTIFF'S
### MOTION FOR TEMPORARY RESTRAINING ORDER
### AND PRELIMINARY INJUNCTION

---

### INTRODUCTION

NetChoice's new preliminary-injunction motion (Dkts. 49, 50) asks this Court to defy the Fifth Circuit's mandate. NetChoice has not made the showing the Fifth Circuit required and cannot be granted any relief—facial or as applied.

Last year this Court granted an injunction facially blocking (for NetChoice members) a Mississippi law that protects children by requiring certain online platforms to take "commercially reasonable" actions to verify age, obtain parental consent, and adopt a strategy to mitigate harms to children on those platforms—sex trafficking, child pornography, targeted harassment, sextortion, incitement to suicide, and more. H.B. 1126 §§ 4(1), 4(2), 6. The Fifth Circuit vacated that injunction and remanded with directions to apply the demanding analysis that governs facial claims, *NetChoice, LLC v. Fitch*, 134 F.4th 799 (2025), including by applying two decisions setting forth a plaintiff's fact-heavy facial burden: *Moody v. NetChoice, LLC*, 603 U.S. 707 (2024), and *NetChoice, LLC v. Paxton*, 121 F.4th 494 (5th Cir. 2024). Because NetChoice seeks facial relief against Mississippi's law, the Fifth Circuit ruled, it faces a steep climb: first, it must establish "the law's scope" by showing "what activities and what actors are regulated, and whether the law regulates or prohibits

those actors from conducting those activities"; and second, it must establish "which of the law['s] applications" violate the Constitution and show that they "substantially outweigh" constitutional applications. *Fitch*, 134 F.4th at 807-08. That means that NetChoice must—based on a "factual" presentation—identify *every* platform covered by the law, *id.* at 808-09, show the "'commercially reasonable efforts'" the law requires of *each* platform and thus "each" platform's "unique regulatory burden," *id.* at 809, establish for each platform which burdens "intru[de] on" First Amendment rights, *Paxton*, 121 F.4th at 499, and show—in light of "every hypothetical application" of the law—that the invalid applications dominate, *id.* at 498. This "heavy burden" (*id.* at 497) is the "price" of challenging a law "as a whole." *Moody*, 603 U.S. at 744.

NetChoice has done nothing like that. It has instead recycled the arguments it already made and relied on facts that were before this Court last year. Far from trying to carry its "heavy burden" "to develop a factual record" addressing "every hypothetical application" of each provision it challenges, *Paxton*, 121 F.4th at 497, 498, 500, NetChoice urges this Court to deem Mississippi's law "unconstitutional in all conceivable applications" based on "the face of the law"—without "factual development." Mem. 23 (Dkt. 50).

NetChoice's defiance of the Fifth Circuit's decision requires this Court to reject facial relief. Any other disposition would violate the Fifth Circuit's mandate. But NetChoice's failure goes deeper: Because NetChoice has not made a factual presentation showing how the Act applies to—and burdens—*even one platform*, the Court cannot award as-applied relief either. NetChoice has not established what *any* covered platform must do under *any* challenged provision or explained (for any platform) what would constitute "commercially reasonable" actions to verify age, obtain parental consent, or adopt a harm-mitigation strategy. So NetChoice has not shown that the Act is unlawful in even one application. To put its failings concretely:

- NetChoice claims that the age-verification provision burdens speech because it requires users "to provide documentation" before speaking. Mem. 7-9. But that provision does not require documentation. And modern methods (unlike the 1990s methods that NetChoice alludes to) can verify age by relying on a user's selfie, voice, or hand gestures. NetChoice knows this: it represents platforms (like Instagram and Facebook) that verify age without documentation. So to get relief, NetChoice must address whether age-verification methods that its members already use would burden speech; whether other platforms could reasonably adopt voice, hand, or similar methods; whether those methods intrude on speech rights; whether any platform cannot afford to adopt those methods; and more. NetChoice has done none of that. How could this Court grant relief even for just Instagram on this provision when Instagram already verifies users' ages, it does not require documentation to do so, and NetChoice has not shown how this provision would burden Instagram or its users?

- NetChoice claims that the parental-consent provision burdens users' speech. Mem. 9-10. But NetChoice has not said what "commercially reasonable" parental-consent mechanisms any platform could adopt and has not made a factual presentation on why options listed in the law—such as a phone call or an email—burden speech. Instead, NetChoice claims that the provision is burdensome because it requires "verifying" the "parent-child relationship." *Ibid.* But as this Court recognized, Op. 29-30 (Dkt. 30), the Act does not require verifying parental relationships. How could this Court grant relief even for just NetChoice member Nextdoor on this provision when NetChoice has not presented facts showing a burden on speech from having parents (of Nextdoor's relatively few minor users) make a phone call or respond to an email?

- NetChoice claims that the strategy provision violates the First Amendment because it requires platforms to "monitor[ ]" and "censor[ ]." Mem. 10-13, 15. That provision requires no such thing: it requires "commercially reasonable efforts" to adopt a "strategy" to "prevent *or mitigate*" exposure to listed harms. § 6 (emphasis added). For some platforms, a "commercially reasonable" strategy might be making available a list of resources for minors victimized by sex trafficking, sexual abuse, and other listed harms. Such a strategy could "mitigate" minors' exposure to those harms without monitoring or censoring any content. How could this Court grant relief for *any* NetChoice member on this provision when NetChoice has not shown whether it would be "commercially reasonable"—and a violation of First Amendment rights—for any platform to make available such a list of resources?

NetChoice's other claims fail too. Its vagueness claims fail—facially and as applied—because NetChoice *admits* that it knows whether the Act covers all 40 of its members and has not identified even one close call on the Act's coverage or requirements. NetChoice's preemption claim against the strategy provision fails

because that provision does not "treat[ ]" any platform "as the publisher or speaker of any information provided by" a third party or impose "liab[ility]" for blocking or screening content. 47 U.S.C. § 230(c). NetChoice's contrary argument rests on a brazen misreading of the strategy position that the Fifth Circuit has now foreclosed.

The Court should deny all relief. To do so, the Court does not need to rule that the Act is valid in all applications or foreclose future as-applied claims. The Court needs to rule only that NetChoice has not carried its burden to show any invalid applications—let alone many. NetChoice's shortfalls warrant such a ruling.

## BACKGROUND

**Factual Background.** Last year Mississippi enacted the Walker Montgomery Protecting Children Online Act, H.B. 1126 (Dkt. 1-1), to address harms to children online. The Act "applies only to" online platforms that "[c]onnect[ ] users in a manner that allows users to socially interact with other users," "[a]llow[ ] a user to create a" profile that others may be able to see, and "[a]llow[ ] a user to create or post content" that others can view. § 3(1)(a)-(c); *see* § 2(a)-(b). The Act thus regulates the interactive social-media platforms that let predators interact with children and feed those predators information about those children. The Act reaffirms this targeted aim by carving out many other online platforms. § 3(2). This carveout includes platforms that generally do not present the dangers that interactive social-media platforms do— such as those that mainly provide "access to news, sports, commerce, [or] online video games" and only "incidental[ly]" offer "interactive" ("chat") functions. § 3(2)(c).

The Act imposes on covered platforms three duties to address harms to children. *First*, platforms must register—and make "commercially reasonable efforts to verify"—the age of those who create an account with the platform. § 4(1). *Second*, platforms must secure, through a "commercially reasonable" method, "express consent from a parent or guardian" before allowing a known minor to hold an account.

§ 4(2). The Act lists several "[a]cceptable methods" of consent, including filling out a form, making a phone call, or responding to an email, § 4(2)(a)-(e), and adds a catchall for "[a]ny other commercially reasonable method" "in light of available technology," § 4(2)(f). *Third*, platforms must make "commercially reasonable efforts" to adopt a strategy to address certain harms. § 6(1). "In relation to a known minor's use of a digital service," a platform "shall make commercially reasonable efforts to develop and implement a strategy to prevent or mitigate the known minor's exposure to harmful material and other content that promotes or facilitates" listed "harms to minors." § 6(1). Those harms are: "[c]onsistent with evidence-informed medical information, the following: self-harm, eating disorders, substance use disorders, and suicidal behaviors"; "[p]atterns of use that indicate or encourage substance abuse or use of illegal drugs"; "[s]talking, physical violence, online bullying, or harassment"; "[g]rooming, trafficking, child pornography, or other sexual exploitation or abuse"; "[i]ncitement of violence"; or "[a]ny other illegal activity." § 6(1)(a)-(f). Nothing in this strategy provision "shall be construed to require" a platform "to prevent or preclude": "[a]ny minor from deliberately and independently searching for, or specifically requesting, content"; or the platform or those on it "from providing resources for the prevention or mitigation of the" listed harms, "including evidence-informed information and clinical resources." § 6(2)(a)-(b).

The Act took effect July 1, 2024. § 10. It provides for private enforcement by an affected minor's parents, § 7(2), and for enforcement by the Attorney General, § 8. State law allows, for knowing and willful violations, civil monetary penalties and criminal liability. Miss. Code Ann. §§ 75-24-19, -20.

**Procedural Background.** On June 7, 2024, NetChoice, LLC filed this suit challenging sections 1-8 of the Act. Complaint (Dkt. 1). NetChoice is a "trade association for Internet companies" (*id.* ¶ 10) that had 37 members when this suit was filed. *See* NetChoice, About Us, https://perma.cc/3LLE-2M9J (June 3, 2024).

NetChoice alleged that, "[b]ased on the Act's definitions," the Act covers and regulates the following NetChoice members: Google (which operates YouTube); Meta (which operates Facebook and Instagram); X (formerly Twitter); Snap Inc. (which operates Snapchat); Pinterest; Nextdoor; and Dreamwidth. Complaint ¶ 13. NetChoice conceded that the Act "does not regulate all NetChoice members." *Ibid.*

Invoking the rights of its members and their users, Complaint ¶¶ 11-14, NetChoice brought three sets of only "facial" claims (*id.* ¶ 58) and sought declaratory and injunctive relief. *Id.* ¶¶ 157-68 & pp. 37-38. *First*, NetChoice claimed that the Act's age-verification, parental-consent, and strategy provisions violate the First Amendment (applied to States through the Fourteenth Amendment). *Id.* ¶¶ 60-82, 93-140 (Counts I, III-V). NetChoice claimed that the Act's age-verification provision regulates users' access to speech, is subject to strict scrutiny, and fails that standard. *Id.* ¶¶ 93-103. NetChoice claimed that the parental-consent provision regulates minor users' access to speech, is subject to strict scrutiny, and fails that standard. *Id.* ¶¶ 104-14. And NetChoice claimed that the strategy provision is a prior restraint of members' and users' speech, is a content-based regulation of speech, and is a viewpoint-based regulation of speech; is subject to heightened scrutiny; and fails heightened scrutiny. *Id.* ¶¶ 115-40. In an overarching count, NetChoice claimed that the Act's coverage definition is content-based and speaker-based, that the three core operative provisions (and entire Act) are thus subject to strict scrutiny, and that no provision can satisfy that standard. *Id.* ¶¶ 60-82; *see id.* ¶¶ 98, 109, 120. *Second*, NetChoice claimed that the Act's coverage definition and strategy provision are unconstitutionally vague. *Id.* ¶¶ 83-92, 141-47 (Counts II, VI). NetChoice said that the coverage definition relies on terms ("socially interact," "[p]rimarily function[ ]," "incidental to") whose meaning "[m]any websites will have no way of knowing." *Id.* ¶¶ 86-90. And NetChoice said that the strategy provision does not make clear what it covers and what it requires of platforms. *Id.* ¶¶ 142-46. *Third*, NetChoice claimed

that the strategy provision is preempted by federal law. *Id.* ¶¶ 148-56 (Count VII). NetChoice contended that, in conflict with 47 U.S.C. § 230, the strategy provision "would permit lawsuits and impose liability on covered websites for failing to monitor, screen, filter, or otherwise censor third-party content." *Id.* ¶ 155.

NetChoice moved for a preliminary injunction. Dkts. 3, 4. It submitted declarations from its then-general counsel and officials with YouTube, Nextdoor, and Dreamwidth. Those declarations describe covered members' policies and practices for protecting minors on their platforms. Szabo Dec. ¶¶ 11-19 (Dkt. 3-2) (addressing seven members); Veitch Dec. ¶¶ 16-28 (Dkt. 3-3) (YouTube); Pai Dec. ¶¶ 5-19 (Dkt. 3-4) (Nextdoor); Paolucci Dec. ¶¶ 16-21 (Dkt. 3-5) (Dreamwidth). The declarations claim that complying with the Act would be hard, costly, and damaging for covered members. Szabo Dec. ¶¶ 28-33; Veitch Dec. ¶¶ 29-42; Pai Dec. ¶¶ 20-33; Paolucci Dec. ¶¶ 9-15, 22-26, 33-37. One member (Dreamwidth) claims that the costs of complying with the Act may force it to shut down. Paolucci Dec. ¶¶ 34, 35, 37.

In opposing an injunction, the State emphasized that NetChoice had not carried its burden for facial relief. State Response 3, 7-8, 30-31 (Dkt. 26).

On July 1, 2024, this Court granted a preliminary injunction barring the Act's enforcement against "NetChoice ... and its members." Op. 39-40 (Dkt. 30). After ruling that NetChoice has standing "to bring claims on behalf of both its members and its members' Mississippi users," Op. 16; *see* Op. 10-16, the Court held that NetChoice will likely win on its facial First Amendment claim (Op. 16-32) and facial vagueness claim (Op. 32-35). The Court did not reach the preemption claim. Op. 38 n.7.

On the First Amendment claim: This Court ruled that the Act's coverage definition "makes the Act content-based, and therefore subject to strict scrutiny." Op. 21; *see* Op. 16-23. As noted, the Act covers platforms that (among other things) allow users to "socially interact," but excludes platforms that "[p]rimarily function[ ]" to provide users with access to "news, sports, commerce, [or] online video games."

7

§ 3(1)(a), (2)(c)(i); *see* Op. 20. According to the Court, this coverage definition draws a "content-based distinction" based on "the message a speaker conveys" ("i.e., news and sports") or the speech's "function or purpose" ("i.e., providing news and sports"). Op. 20-21. Because the Act "regulates content," the Court ruled, "strict scrutiny applies." Op. 23. The Court rejected the State's argument that the Act is subject to rational-basis review because it regulates platforms' non-expressive conduct, not speech. Op. 21-23. The Court did not assess how the challenged provisions work in all applications or how the Act's phrase "commercially reasonable" shapes those applications.

The Court ruled that the Act likely fails strict scrutiny because it "is likely not narrowly tailored" to protect minors online. Op. 25; *see* Op. 23-32. The Court "accept[ed] as true the Attorney General's position that safeguarding the physical and psychological wellbeing of minors online is a compelling interest." Op. 25. But the Court ruled that the Act is likely "overinclusive or underinclusive, or both, for achieving" that interest in "a substantial number, if not all, ... applications." Op. 31. The Act is likely overinclusive, the Court said, because: the age-verification provision aims to protect minors yet it applies to all users and so "burdens adults' First Amendment rights" (Op. 27); the parental-consent provision requires all minors to obtain consent even though some parents will not "care whether" their children "create such accounts" (Op. 28); and the strategy provision could, by spurring overly broad content-blocking, prevent all users from accessing "valuable content" (Op. 27-28). The Court thought that the Act is likely underinclusive because (among other things) the parental-consent provision "requires only one parent or guardian's consent" and does not "require verifying" the parental or guardian relationship. Op. 29-30; *see also* Op. 28-31. The Court did not assess the challenged provisions on an application-by-application basis or compare lawful to unlawful applications.

On the vagueness claim: This Court ruled that the Act's "central coverage definition" is "impermissibly vague in all of its applications." Op. 32, 34; *see* Op. 32-

35. As noted, the Act excludes from its coverage any platform that "*[p]rimarily functions* to provide a user with access to news, sports, commerce, online video games or content primarily generated or selected by the" platform and that "[a]llows chat, comment or other interactive functionality that is *incidental to* the digital service." § 3(2)(c)(i)-(ii) (emphases added). The Court faulted that definition as "overly indefinite" because it does not say how to determine "how a digital service 'primarily' functions" or when "interactive functionality" is "'incidental.'" Op. 35. The Court added that, while the Act applies only to platforms that allow users to "socially interact," § 3(1)(a), it "does not explicate what constitutes 'social' interaction ... , as opposed to other interactions." Op. 35. Although NetChoice admitted that the Act covers several named members and does not cover other members, the Court did not address how those admissions affect NetChoice's claim that the coverage definition is facially vague or is vague for any covered platforms that are not NetChoice members.

The Court held that the other injunctive factors support relief. Op. 35-37. On irreparable harm, the Court said that the Act will cause a "loss" of "First Amendment freedoms" and put members at risk of unrecoverable compliance costs—which, according to NetChoice member Dreamwidth, "may threaten the very existence of its business." Op. 36 (citing Paolucci Dec. p. 20). Noting that "[i]njunctions protecting First Amendment freedoms are always in the public interest," the Court ruled that, given its merits rulings, an injunction "is in the public interest" here. Op. 37.

The day this Court issued its decision, the Supreme Court decided *Moody v. NetChoice, LLC*, 603 U.S. 707 (2024). *Moody* vacated two lower-court decisions (including a Fifth Circuit decision in *NetChoice, LLC v. Paxton*) because, in addressing facial claims against two social-media laws, the lower courts failed to "perform[ ]" the required "facial analysis." *Id.* at 726. *Moody* emphasized that facial claims are "hard to win" and that courts must undertake a rigorous "inquiry" to assess whether a plaintiff has "carr[ied]" the demanding "burden" that governs those claims.

9

*Id.* at 718, 723, 744. First, a court must "assess the state law['s] scope" by "determin[ing]" the law's "full set of applications." *Id.* at 718, 724. Second, the court must "decide which of the law['s] applications" (if any) "violate" the Constitution and "compare" the law's "constitutionally impermissible and permissible" applications. *Id.* at 725, 726. On that last step, a facial First Amendment claim can succeed "only if the law's unconstitutional applications substantially outweigh its constitutional ones." *Id.* at 724. For other facial claims, a plaintiff must show that "no set of circumstances exists under which the law would be valid" or that "the law lacks a plainly legitimate sweep." *Id.* at 723 (cleaned up). A court must assess whether the plaintiff has made the required showings for each challenged provision. *E.g.*, *id.* at 724-26, 727 n.3 (using provision-by-provision analysis). This considerable burden is the "price" of challenging a law "as a whole." *Id.* at 744. And a court must hold a plaintiff to its burden rather than "disregard the requisite inquiry." *Ibid.*

NetChoice immediately filed a notice with this Court claiming that *Moody* "confirms" that "facial relief is appropriate in this case." Notice 2 (Dkt. 31).

The State appealed and moved this Court to stay the injunction pending appeal, arguing that under *Moody* "NetChoice has fallen far short of meeting the high bar that applies to facial challenges." Stay Mem. 3 (Dkt. 34). In opposing a stay, NetChoice said that "*Moody* requires no more" than what the preliminary-injunction order did. Stay Opp. 3 (Dkt. 36). This Court denied a stay. Dkt. 40.

On appeal, the State argued that the preliminary-injunction order should be vacated because this Court did not perform the facial analysis that *Moody* requires. State Br. 31-34 (CA5 Dkt. 42). NetChoice maintained that the order "complied with *Moody*'s facial-challenge framework." NetChoice Br. 22 (CA5 Dkt. 46); *id.* at 22-27.

After the appeal was briefed, the Fifth Circuit decided *NetChoice, LLC v. Paxton*, 121 F.4th 494 (5th Cir. 2024), on remand from the Supreme Court. In *Paxton*, as here, NetChoice brought a facial First Amendment challenge to a state law that

regulates social-media platforms. The district court granted a preliminary injunction. The Fifth Circuit vacated the injunction. The Supreme Court vacated that decision because (as noted) the Fifth Circuit did not "properly consider[ ] the facial nature of NetChoice's challenge." *Moody*, 603 U.S. at 717. On remand in *Paxton*, the Fifth Circuit ruled that NetChoice had not met its "heavy burden" "to develop a factual record" to support its facial claim and remanded for "thorough discovery." 121 F.4th at 497, 500. The court explained that in a "First Amendment facial challenge" a district court must "determine every hypothetical application of the challenged law" and faulted NetChoice for not developing a factual record to allow that determination. *Id.* at 498; *see id.* at 498-99. Then, for "every hypothetical application," the district court must determine—based on "factual development" by NetChoice—"whether there is an intrusion on" First Amendment rights. *Id.* at 498, 499; *see id.* at 499-500.

The State filed a letter advising the Fifth Circuit that "*Paxton* confirms that the preliminary injunction in this case cannot stand and that NetChoice cannot obtain such relief without developing an extensive factual record." State Letter 1 (CA5 Dkt. 89-1). NetChoice maintained that *Paxton* "provides no support for reversing the preliminary injunction" and that "[n]o record development" could "change" the facial analysis. NetChoice Letter 1-2 (CA5 Dkt. 91).

On April 17, 2025, the Fifth Circuit issued a published opinion vacating this Court's preliminary-injunction order. *NetChoice, LLC v. Fitch*, 134 F.4th 799 (5th Cir. 2025). The court ruled that NetChoice has standing to assert the rights of its members and their users. *Id.* at 803-07. But the court vacated the injunction and remanded for this Court to perform the analysis required by *Moody* and *Paxton*. *Id.* at 807-09. The court of appeals ruled that this Court did "not determin[e] the full scope of actors regulated by the Act and the activities it regulates," as *Moody* requires. *Id.* at 809. On actors: This Court "did not determine" whether the Act applies to (for example) "Uber, Google Maps, DraftKings, Microsoft Teams, Reddit, Pinterest, or X." *Id.* at

808. Each actor, the court ruled, requires its own inquiry. *See id.* at 808-09 (highlighting coverage questions for Uber, Microsoft Teams, and Google Mail). Yet this Court "did not determine whether the Act applies to any of these actors, among many others." *Id.* at 809. On activities: This Court "did not determine the 'commercially reasonable efforts,' as used in the Act, or the Act's requirements for each [covered platform], requirements likely to be different with each [covered platform] facing a unique regulatory burden." *Ibid.* This activities inquiry, the court ruled, requires a factual assessment for each covered platform for each provision that NetChoice challenges. "Some" platforms, the court observed, "may not need to devote additional resources to prevent known minors from holding an account without express parental consent, verify the age of anyone seeking to create an account, or implement a strategy to mitigate minors' exposure to certain content." *Ibid.* "For other" platforms, "these requirements may reach beyond their resources." *Ibid.* But "[w]ithout a factual analysis determining the commercially reasonable effort demanded of each individual [covered platform]," this Court "could not 'decide which of the law['s] applications violate the First Amendment, and ... measure them against the rest'" or "determine whether 'the law's unconstitutional applications substantially outweigh its constitutional ones.'" *Ibid.* (quoting *Moody*, 603 U.S. at 725, then *Paxton*, 121 F.4th at 498). Because this Court "did not" "determine" as a "factual" matter "to whom the Act applies" or "the activities it regulates" and "then weigh violative applications of the Act against non-violative applications," the Court's ruling that NetChoice is likely to succeed on the merits "cannot now stand." *Ibid.*

On May 5, NetChoice filed an amended complaint. Dkt. 48. That complaint largely mirrors the original complaint: it brings the same claims, Amended Complaint ¶¶ 93-131, 142-97 (First Amendment: Counts I, III-V); *id.* ¶¶ 132-41, 198-205 (vagueness: Counts II, VI); *id.* ¶¶ 206-15 (preemption: Count VII), and again seeks injunctive and declaratory relief, *id.* ¶¶ 216-27 & pp. 46-47. The new complaint adds

allegations that "the Act is unconstitutional as applied to NetChoice members and their services regulated by the Act." *Id.* ¶ 3; *see id.* ¶¶ 86-87, 129. Like the original complaint, the amended complaint alleges that, "[b]ased on the Act's" definitions, the Act regulates "some services offered by" listed NetChoice members and "does not regulate all NetChoice members." *Id.* ¶ 15. NetChoice lists the same covered members as in the original complaint except it has added Reddit and now lists YouTube rather than Google as a member. *Ibid.* NetChoice alleges that at "minimum" "the Act is invalid to the extent it regulates 'social media' websites, including as applied to Plaintiff's members' regulated services identified in ¶ 14." *Id.* ¶ 87. The amended complaint does not—in paragraph 14 or anywhere else—describe those services.

NetChoice now moves for a TRO and preliminary injunction. Mot. (Dkt. 49); Mem. (Dkt. 50). That motion rests on four declarations: the three member declarations filed with NetChoice's first preliminary-injunction motion, *see* Mot. 3, and a declaration from NetChoice's current general counsel, Bartlett Cleland, Dkt. 49-1. The 26.5-page Cleland declaration largely repeats the 23.5-page declaration by Carl Szabo (NetChoice's previous general counsel) filed with NetChoice's first injunction motion. The Cleland declaration adds: some bullet points describing how "users employ ... covered websites to communicate," Cleland Dec. ¶ 7; allegations about how Reddit (a new member) protects minors on its platform, *see id.* ¶¶ 13-20; and more allegations on why the Act covers certain members and not others, *compare id.* ¶¶ 28-41 *with* Szabo Dec. ¶¶ 25-27. NetChoice—which now has 40 members, Cleland Dec. ¶ 4—identifies 8 members that are covered and 32 that are not. *Id.* ¶¶ 30, 41 (addressing all members but Google); Mem. 22 (addressing Google).

Nothing in NetChoice's new complaint, new briefing, or declarations (new or old) says what any platform must in fact do under each challenged provision or what would constitute "commercially reasonable" actions to verify age, obtain parental consent, or adopt a harm-mitigation strategy for any platform. §§ 4(1), 4(2), 6.

13

## ARGUMENT

NetChoice must show: "(1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable harm if the injunction is not granted; (3) that the threatened injury outweighs any harm that the injunction might cause to the defendant; and (4) that the injunction will not disserve the public interest." *Willey v. Harris County District Attorney*, 27 F.4th 1125, 1129 (5th Cir. 2022). NetChoice has not made the required showing for any claim against any provision. It has made no genuine effort to comply with the Fifth Circuit's mandate on facial relief. So at most this Court could grant relief against specific applications to named NetChoice members for which NetChoice has established likely merits success and irreparable harm. But NetChoice has not created a record that would allow even that relief. The Court has no option but to deny its motion in full.

## I.    NetChoice Is Likely To Lose On The Merits.

NetChoice cannot be granted relief because it is likely to lose on all its claims.

### A.    NetChoice Is Likely To Lose On Its First Amendment Claims.

NetChoice claims that the Act's age-verification, parental-consent, and strategy provisions are subject to First Amendment strict scrutiny and fail that (or any other heightened) standard. Mem. 6-13, 14-25. It continues to claim that those provisions are facially invalid, Mem. 21-24, and now briefly argues that they are invalid as applied to covered NetChoice members, Mem. 24-25. Its arguments fail.

#### 1.    NetChoice Has Not Carried Its Facial Burden.

Start with NetChoice's facial First Amendment claims.

1. For a facial claim, "[t]he first step is to define the law's scope." *NetChoice, LLC v. Fitch*, 134 F.4th 799, 807 (5th Cir. 2025). "That is, the court must determine what activities and what actors are regulated, and whether the law regulates or prohibits those actors from conducting those activities." *Ibid.*

On "actors": The Act regulates certain online platforms—those that "[c]onnect[ ] users in a manner that allows users to socially interact," "[a]llow[ ] a user to create a" profile that others may be able to see, and "[a]llow[ ] a user to create or post content" that others can view. § 3(1)(a)-(c). The Act carves out many other online platforms that, in the Legislature's judgment, do not present the dangers that interactive platforms do—such as platforms that "[p]rimarily function[ ] to provide ... access to" certain non-interactive material and only "incidental[ly]" offer "interactive functionality." § 3(2)(c)(i)-(ii); *see* § 3(2). NetChoice says that the Act covers "Dreamwidth, Facebook, Instagram, Nextdoor, Pinterest, Reddit, Snapchat, X, and YouTube." Mem. 24. NetChoice says that the Act does not cover "most" of its members' "services" and does not regulate 32 of its 40 members. Cleland Dec. ¶ 41; Mem. 22.

On "activities": The Act regulates the non-expressive conduct of covered platforms by imposing three modest duties—to make "commercially reasonable" efforts to verify age, obtain parental consent, and adopt a harm-mitigation strategy. §§ 4(1), 4(2), 6. By requiring only "commercially reasonable" efforts, the Act does not demand perfect, cost-prohibitive, or *even effective* efforts. It requires that a platform exercise minimally reasonable care given its resources. Put differently: The Act *does not require* age verification. It requires "commercially reasonable efforts" to verify age. § 4(1). For some platforms that may mean no more than asking someone's age, because anything more is cost-prohibitive. Some platforms already ask for more. Paolucci Dec. ¶ 6 (Dreamwidth "collect[s] a date of birth from all users at registration"). And some platforms already verify age. *E.g.*, Confirming your age on Instagram, https://bit.ly/4keM2H0. The Act *deems* parental consent to be given by any of several easy means—a phone call, an email response, or any other "commercially reasonable method"—without more. § 4(2). There is no need to verify the parental relationship. Op. 29-30 ("none of the options" "require[s] verifying" that relationship). Some platforms already require more to create an account. Pai Dec.

¶¶ 4-5 (Nextdoor requires "real names and addresses" and uses mailings to verify required information). And the Act *does not require* any platform to prevent harm or to monitor, screen, alter, block, or remove content. It requires only "commercially reasonable efforts" to adopt a harm-mitigation "strategy." § 6. NetChoice says that its members have policies addressing online harms. Mem. 3-4; Cleland Dec. ¶¶ 12-20.

NetChoice claims that it has satisfied step 1 of the facial analysis by saying that the Act covers "social media websites," listing covered members, and listing members (and a few non-members) that are not covered. Mem. 21-23, 24. That is a start. But it falls well short of what the Fifth Circuit required.

Start with "actors." *Fitch*, 134 F.4th at 807. NetChoice must identify *every* covered actor—NetChoice members *and non-members*. *See id.* at 809 ("The district court did not"—as *Moody* "require[s]"—"determine whether the Act applies to any of these actors [Uber, Google Maps, DraftKings, Microsoft Teams, Reddit, Pinterest, or X], *among many others*.") (emphasis added). Because NetChoice seeks facial relief, it must develop a factual record allowing this Court to "determine *every* hypothetical application of the challenged law." *Paxton*, 121 F.4th at 498 (emphasis added). Yet NetChoice has not identified all covered non-members, even though it has conceded that the Act "covers many other websites"—perhaps "countless websites"—besides its members. Szabo Dec. ¶ 27. So it has not created the required record.

Now take "activities." *Fitch*, 134 F.4th at 807. Even as it seeks facial injunctive relief for a second time and after a Supreme Court decision and two Fifth Circuit decisions making its burden clear, NetChoice has still not "develop[ed] a factual record" showing the Act's *actual applications* to *even one covered platform*. *Paxton*, 121 F.4th at 500. NetChoice has refused to identify "the 'commercially reasonable efforts'" the Act requires for *any* platform, even though the Fifth Circuit deemed that showing necessary *in this case*. *Fitch*, 134 F.4th at 809. NetChoice has never (for example) said what would constitute "commercially reasonable" age-verification

efforts for Facebook, Instagram, or Dreamwidth. Yet this Court must know that information to comply with the Fifth Circuit's mandate: The answer shapes what each of those platforms must do under the age-verification provision—and this Court must know that so it can determine whether and how those actions will affect First Amendment rights and thus "whether there is an intrusion on" those rights on each platform. *Paxton*, 121 F.4th at 499. Some platforms may need to do more on age verification than they do now, but some platforms may not—either because they lack the resources to reasonably do more or because they already do what the Act requires of them. *Fitch*, 134 F.4th at 809. And the answers may be quite different for different platforms. Dreamwidth lacks the resources of Facebook, so what is "commercially reasonable" for it may differ from what it is for Facebook. *See ibid.* Or take Instagram: it already verifies users' ages. *See* Confirming your age on Instagram, *supra*. To obtain relief against the age-verification provision for Instagram, then, NetChoice would need to make a "factual" presentation showing how that provision will affect Instagram's actions—and how those actions will affect speech—when Instagram already verifies ages. *Fitch*, 134 F.4th at 809. NetChoice has not addressed these points—or many other facts the Fifth Circuit required it to develop on each provision.

2. "The second step" in the facial analysis is "to decide" which of the challenged provisions' "applications violate the First Amendment" and then "measure them against the rest." *Fitch*, 134 F.4th at 807-08. Based on all NetChoice has presented, the Court must rule that the answer is that none—or very few—of the Act's applications abridge the "freedom of speech." U.S. Const. amend. I. A sound analysis of the Act's application dooms any claim that any provision's "unconstitutional applications substantially outweigh its constitutional ones." *Moody*, 603 U.S. at 724.

a. The age-verification, parental-consent, and strategy provisions "regulate[ ]" covered platforms' non-expressive "conduct, not speech." *Rumsfeld v. FAIR*, 547 U.S. 47, 60 (2006). Those provisions require covered platforms to make "commercially

reasonable" efforts to verify age, obtain parental consent, and adopt a harm-mitigation strategy. §§ 4(1), 4(2), 6. Each provision says what a platform "must *do*"—take reasonable steps to mitigate concrete harms to minors—"not what they [or others] may or may not *say*." *FAIR*, 547 U.S. at 60. None of these provisions "limits" platforms' "power" to "control the content that will appear to users," "alters ... platforms' choices about the views they will, and will not, convey," "force[s] a private speaker ... to convey views it disapprove[s]," or intrudes on "expressive choices." *Moody*, 603 U.S. at 736, 737, 742, 740.

NetChoice says that the age-verification and parental-consent provisions violate the First Amendment because they burden access to speech. Mem. 7-10. But again, NetChoice has not developed facts showing what those provisions require any covered platform to do, so this Court has no "factual" basis for ruling that those provisions burden speech. *Fitch*, 134 F.4th at 809. All this Court can go on is the face of those provisions. And on their face, they do not regulate speech: they regulate platforms' non-expressive conduct. The Supreme Court endorsed that understanding in *City of Dallas v. Stanglin*, 490 U.S. 19 (1989), which rejected a First Amendment challenge to a law restricting certain dance halls to persons aged 14-18. *Id.* at 20-21. That law limited access to speech: adults could not access speech that occurred in those dance halls (talking, dancing, music) and minors could not access the speech of adults. *See id.* at 24-25. But the Supreme Court rejected the view that the law burdened First Amendment activity or triggered heightened scrutiny. *Id.* at 25. "[C]oming together to engage in recreational dancing" is not inherently expressive and so—no matter the First Amendment speech occurring in dance halls—the age restriction regulated non-expressive conduct rather than speech. *Ibid.*; *see FAIR*, 547 U.S. at 66 (First Amendment protection extends "only to conduct that is inherently expressive"). So too with covered platforms. Although covered platforms host some speech, they also host illegal and harmful activity—sex trafficking, child

pornography, sexual abuse, and more. A State can regulate online platforms' conduct to address those evils. *Cf. Stanglin*, 490 U.S. at 25-28. These points distinguish *Brown v. Entertainment Merchants Ass'n*, 564 U.S. 786 (2011), which struck down a law that barred selling or renting video games (speech) to minors because of the games' violent content. *Id.* at 799-805. That law targeted—and barred access to—lawful, protected speech. *Id.* at 790-99. The Act here, by contrast, does not target (or bar) such speech and instead targets a forum—the Internet—that is filled with illegal, harmful, and unprotected conduct that States *can* regulate. *Contra* Mem. 7, 9 (relying on *Brown*).

NetChoice says that the strategy provision violates covered platforms' First Amendment "right to 'control the content that will appear to users.'" Mem. 10; *see* Mem. 10-13, 15. NetChoice claims that this provision imposes "monitoring-and-censorship" requirements on platforms, Mem. 11—requirements to "screen[ ]," "filter[ ]," and "block[ ]" speech, Mem. 15, 26. That claim is wrong and has no basis in the provision's text. The strategy provision requires platforms to make "commercially reasonable efforts" to adopt a "strategy" to address certain harms—by "prevent[ing] *or* mitigat[ing]" exposure to those harms. § 6 (emphasis added). A platform can satisfy that provision by making efforts to *mitigate* the damage to minors from sex trafficking, sexual abuse, and other listed harms. *Mitigation* can thus occur *after* a user is harmed. The provision thus does not regulate speech, restrict platforms' content choices, or require monitoring, blocking, altering, or removing any content. Nor does the provision regulate speech based on "viewpoint." Mem. 15 n.3. It regulates platforms' non-expressive conduct to address harms. Indeed, the Fifth Circuit agreed with the State that the provision requires only "commercially reasonable efforts" to "implement a *strategy* to *mitigate* minors' exposure to certain content," foreclosing NetChoice's "monitoring-and-censorship" litigating position that it reasserts here. *Fitch*, 134 F.4th at 809 (emphases added); *id.* at 803 (same); *cf.* NetChoice CA5 Br. 2 (describing an appellate "explication" of the law as "binding

authority"). NetChoice's reliance on *CCIA v. Paxton*, 747 F. Supp. 3d 1011 (W.D. Tex. 2024), is thus misplaced. NetChoice claims that *CCIA* blocked a requirement "nearly identical" to that imposed by the strategy provision. Mem. 11. But unlike the strategy provision, the Texas law in that case *expressly requires* "blocking" and "monitoring" content. 747 F. Supp. 3d at 1023 (quoting statute), 1036-38.

b. Because each challenged provision on its face regulates non-expressive conduct—and NetChoice has offered no "factual development" to provide a basis for concluding that those provisions do otherwise, *Paxton*, 121 F.4th at 499—rational-basis review applies. *Stanglin*, 490 U.S. at 25. The Act satisfies that standard. Each challenged provision rationally advances the State's legitimate interest in protecting minors from online harms. Each makes it harder for predators to prey on minors online by making it harder for minors to participate in dangerous online platforms, likelier that parents will oversee minors' online activities, and likelier that platforms will take measures to avert harms. The Act's applications are at least overwhelmingly "legitimate." *Moody*, 603 U.S. at 744. Applying the age-verification and parental-consent provisions to platforms that already make (or could readily make) commercially reasonable efforts to verify age or obtain parental consent, for example, does not burden those platforms' expressive activity. *Fitch*, 134 F.4th at 809. And applying the strategy provision to platforms that already have or could readily adopt a harm-mitigation strategy that does not burden speech—or already satisfy that provision through an existing policy—also poses no First Amendment problem. *Ibid.*

NetChoice suggests that, in comparing valid to invalid applications, the Court should not count applications that do not burden speech because in those applications the Act is not "a restriction." Mem. 23. That argument is an effort to evade the facial burden and is foreclosed by the Fifth Circuit's decision in this case. *Fitch*, 134 F.4th at 809 (counting such applications in the facial analysis). When a covered platform can comply with the Act in a way that does not burden speech, the Act is still "a

restriction"—it just does not violate the First Amendment. The Court must count all such applications and weigh them against NetChoice on the facial analysis. *See ibid.*

Even if the Act did regulate based to some extent on content—or might otherwise trigger heightened scrutiny—it would be subject at most to intermediate scrutiny and would satisfy that standard. The First Amendment permits a State to regulate to address the secondary effects of some expressive conduct. *See Ward v. Rock Against Racism*, 491 U.S. 781, 791-92 (1989); *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 47-49 (1986). Such effects include "impacts on public health, safety, and welfare." *Doe I v. Landry*, 909 F.3d 99, 109 (5th Cir. 2018). A law addressing those effects is constitutional if it "promotes a substantial government interest that would be achieved less effectively absent the regulation" and does not "burden substantially more speech than is necessary" to further that interest. *Ward*, 491 U.S. at 799. Applying these principles in *City of Renton*, the Supreme Court upheld an ordinance that barred adult movie theaters from locating in residential and other sensitive areas. 475 U.S. at 43, 54-55. Although the ordinance treated theaters differently based on the films they offered, the ordinance was "aimed not at the *content* of the films ... , but rather at the *secondary effects*" of adult theaters "on the surrounding community." *Id.* at 47. The ordinance sought to "prevent crime, protect the city's retail trade, maintain property values," and preserve "the quality of urban life." *Id.* at 48. And the ordinance left adult theaters with "a reasonable opportunity" to operate. *Id.* at 54. So the ordinance satisfied the First Amendment: it was "designed to serve a substantial governmental interest" and "allow[ed] for reasonable alternative avenues of communication." *Id.* at 50.

Here too, the challenged provisions permissibly combat harmful secondary effects of speech. Each provision aims at serious secondary effects: concrete, life-altering, and even life-ending harms to minors—sex-trafficking, sextortion, facilitation of suicide, and more. These risks are, as the Legislature recognized,

especially pronounced on interactive social-media platforms—given the chat and profile features that make them fertile ground for bad actors to victimize the young. § 3. To address the predictable—and well-known—real-world effects that flow from these platforms, the Act imposes modest regulations. Among other things, the age-verification provision puts a guardrail in place before minors are exposed to predators, the parental-consent provision provides an additional guardrail by promoting parental oversight and involvement, and the strategy provision promotes practices that may avert or mitigate a range of tragic harms. §§ 4(1), 4(2), 6. Each provision thus promotes the State's "substantial government interest" (*Ward*, 491 U.S. at 799) in "protecting the physical and psychological well-being of minors" from harmful online conduct commonly perpetrated through the online social-media platforms that the Act covers. *Sable Communications of California, Inc. v. FCC*, 492 U.S. 115, 126 (1989); *see* Social Media and Youth Mental Health: The U.S. Surgeon General's Advisory 9 (2023), https://bit.ly/471Daz1 (describing some of the minor-targeting "predatory behaviors and interactions" on "social media platforms"). And each provision will further that interest without "burden[ing] substantially more speech than is necessary." *Ward*, 491 U.S. at 799. Far from cutting off avenues for covered platforms or others to communicate their messages, the Act requires only modest steps—on age verification, parental consent, and a harm-mitigation strategy—that will allow communication to flow freely. At the least, NetChoice has not compiled any "factual" record to overcome these points. *Fitch*, 134 F.4th at 809.

NetChoice claims that the inquiry at step 2 is "straightforward" "from the face of the law," that "[n]o factual development" is needed to conduct that step, and that the Court can plow ahead and deem the Act "unconstitutional in all conceivable applications." Mem. 23 (cleaned up); *see* Mem. 23-24. Every part of that claim defies the Fifth Circuit's mandate. The Fifth Circuit directed this Court to undertake "a factual analysis determining the commercially reasonable effort demanded of each

individual" covered platform, determine the "unique regulatory burden" for "each" covered platform, and then (based on its "factual analysis") "decide which of the law['s] applications violate the First Amendment, and ... measure them against the rest." *Fitch*, 134 F.4th at 809. Rather than develop facts that would enable this Court to make those determinations, NetChoice has proceeded on its unsupported assertion that the challenged provisions "in all conceivable applications" "restrict" and "burden" speech. Mem. 23, 24. *Moody*, *Paxton*, and *Fitch* bar NetChoice from relying on that bare assertion. Under *Moody*, NetChoice has a "heavy burden" "to develop a factual record" to support its facial claims, *Paxton*, 121 F.4th at 497, 500: it must present a "factual" record showing the "unique regulatory burden" the Act imposes on every covered platform and how that burden affects speech rights, *Fitch*, 134 F.4th at 809. Rather than do that, NetChoice has chosen to stand on its view that the Act's "commercially reasonable" limitation "does not alter the constitutional analysis." Mem. 8; *see* Mem. 10, 24. It has preserved that argument for Supreme Court review. But the Fifth Circuit rejected that argument in this case, so this Court must reject it too. And NetChoice gets nothing from the district-court cases that it cites: it does not show that any of those cases does what *Fitch* and *Paxton* require.

To be more concrete, consider some of what NetChoice must show—yet has not even tried to address—to establish that the Act is invalid even in *some* applications:

- NetChoice claims that the age-verification provision burdens speech because it requires users "to provide documentation" before speaking. Mem. 7; *see* Mem. 7-9. But that provision does not require documentation, § 4(1), and today age verification does not require documentation. NetChoice knows this: it represents covered platforms that verify age without documentation. *See* How does video selfie age verification work on Instagram?, https://bit.ly/4jclTYB (video-selfie age-verification option that uses AI to estimate age, "can't identify specific people," takes "minutes," and "delete[s] the image"); How video selfie age verification works on Facebook Dating, https://bit.ly/43j4mIa (same). Other modern methods (unlike the 1990s methods to which NetChoice alludes) rely on a user's hand gestures or voice to assess age. Brief of Age Verification Providers Association 6-7, *Free Speech Coalition, Inc. v. Paxton*, S. Ct. 23-1122.

Such methods do not require providing PII or "forgo[ing] ... anonymity." Mem. 7. At step 2, NetChoice must address (among many other things) whether using age-verification methods that its members already use would burden speech; whether other covered platforms could reasonably adopt voice, hand, or similar age-verification methods; whether those methods intrude on speech rights; and whether any covered platform cannot afford—and so does not need—to adopt selfie, voice, hand, or similar methods. It has done none of that.

- NetChoice claims that the parental-consent provision burdens users' speech. Mem. 9-10. But NetChoice has not said what "commercially reasonable" parental-consent mechanisms (§ 4(2)(f)) any covered platform could adopt and has not presented evidence showing (for example) that making a phone call or responding to an email (§ 4(2)(b), (e)) would burden speech. NetChoice represents elite tech giants: it *must* know the available parental-consent methods. Instead of confronting these points, NetChoice continues to claim that the provision is burdensome because it requires "verifying" the "parent-child relationship." Mem. 9-10. But as this Court recognized, Op. 29-30—and the State has confirmed, *e.g.*, State CA5 Br. 35—the Act does not require verifying parental relationships. § 4(2).

- NetChoice claims that the strategy provision violates the First Amendment because it requires members to "monitor[ ]" and "censor[ ]." Mem. 10-13, 15. But that provision requires only "commercially reasonable efforts" to adopt a "strategy" to "prevent *or mitigate*" exposure to listed harms. § 6 (emphasis added). For some platforms, such a strategy might be making available a list of resources for minors victimized by sex trafficking, harassment, and other listed harms. Such a strategy could "mitigate" minors' exposure to those harms without monitoring or blocking any content. NetChoice has not addressed whether that (or any other) strategy would be commercially reasonable for any platform and how such a strategy could burden speech.

NetChoice has refused to present "factual" material showing the "'commercially reasonable efforts'" the Act requires of each covered platform, *Fitch*, 134 F.4th at 809, establishing "each" platform's "unique regulatory burden," *ibid.*, and showing whether that burden "intru[des] on" First Amendment rights for each platform, *Paxton*, 121 F.4th at 499. NetChoice never even cites *Paxton* and ignores most of *Fitch*. Granting NetChoice relief would defy the Fifth Circuit's mandate.

One more point: This Court's injunction barred the Act's enforcement only against "NetChoice ... and its members." Op. 39-40. So for 10 months the State has been able to enforce the Act against covered platforms that are not NetChoice

members. In that time, none of those "countless" other platforms (Szabo Dec. ¶ 27) has sued to block the Act. Yet NetChoice asks this Court to award facial relief—relief extending to those many platforms that have seen no reason to file suit for themselves. That makes no sense.

3. This Court previously ruled (and NetChoice again argues, Mem. 14-16) that the Act is subject to strict scrutiny because its coverage definition draws a "facial[ly]" "content-based distinction" based on "the message a speaker conveys" ("i.e., news and sports") or the speech's "function or purpose" ("i.e., providing news and sports"). Op. 20-21; *see* Op. 16-23. The Court should rule differently now, for two independent reasons. First, that ruling does not survive the Fifth Circuit's decision in this case. The Fifth Circuit ruled that facial analysis must proceed application by application—which is incompatible with NetChoice's position that the Act can (without any factual development) be deemed to be subject to (and to fail) strict scrutiny across the board. *Fitch*, 134 F.4th at 807-09. If the coverage definition rendered every application of the Act a First Amendment violation, then there would have been no reason for the Fifth Circuit to require this Court to "determine," through "a factual analysis," "the 'commercially reasonable efforts'" "require[d]" for "each" covered platform. *Id.* at 809. Second, this Court's earlier ruling misreads the coverage definition. That definition distinguishes between platforms based on their *functions* and thus based on the harmful *conduct* that they host—whether a platform allows users to "socially interact," "create ... profile[s]," and "post content," § 3(1)(a)-(c), or instead "[p]rimarily functions to provide ... access to" certain non-interactive material and only "incidental[ly]" offers "interactive functionality," § 3(2)(c)(i)-(ii). Coverage turns on where *harmful conduct* toward minors online is most likely: the interactive social-media platforms that allow predators to interact with and harm children. Coverage is not based on content or speaker. It does not turn on the ideas discussed, the

messages conveyed, or who speaks. *Contra* Mem. 14, 16 (claiming that the coverage definition makes the Act a speaker-based regulation of speech).

In declining to apply rational-basis review, this Court distinguished *City of Dallas v. Stanglin*, 490 U.S. 19 (1989), on the ground that users of NetChoice members' platforms (unlike the dancers in *Stanglin*) "take positions on and engage with others" in "political, social, economic, educational, religious, and cultural" activities. Op. 22-23. But again, none of the Act's provisions regulates the content that platforms may publish or restricts anyone's speech: the provisions regulate non-expressive conduct only, so rational-basis review applies. That is especially clear for the age-verification and parental-consent provisions, which NetChoice has never shown to restrict platforms' speech. It is also true for the strategy provision, which appears to present a closer call only because NetChoice misreads that provision. Again, after the Fifth Circuit's decision in this case, this Court cannot conclude otherwise—at least not without a serious "factual" showing by NetChoice that the Act actually burdens speech. *Fitch*, 134 F.4th at 809. NetChoice has refused to make that showing. And even if the Act affected some expression that occurs on those platforms, it also regulates huge amounts of harmful conduct hosted on those platforms. The Act thus regulates lots of conduct that the First Amendment does *not* protect. The Act has a dominant legitimate sweep and NetChoice's facial claims fail.

The only basis this Court gave for applying strict scrutiny was its view of the Act's coverage definition. Op. 16-23. Because rational-basis review applies, any arguably underinclusive or overinclusive features (Op. 23-32; Mem. 18-20) are irrelevant. Rational-basis review allows such features. *Stanglin*, 490 U.S. at 26-27 (rational-basis review allows for "rough"—even "illogical"—"accommodations"). NetChoice has never disputed that the Act's provisions satisfy rational-basis review.

Even if strict scrutiny did apply—or did apply to some parts of the Act— NetChoice cannot be granted facial relief, for at least two independent reasons.

*Contra* Mem. 16-24. One: NetChoice has not made a showing of the Act's constitutionality on an application-by-application basis. Even as the Supreme Court in *Moody* faulted the Texas law before it in certain applications, *see* 603 U.S. at 718-19, 741-43, the Court emphasized that "[n]othing" it "said" "addresses any of the law['s] other applications, which may or may not share the First Amendment problems" the Court identified, *id.* at 727. That logic applies here and is reinforced by the application-by-application approach mandated by *Paxton*, 121 F.4th at 498-500, and *Fitch*, 134 F.4th at 807-09. So even if strict scrutiny applied in some applications, NetChoice's failure to make an application-by-application merits showing is fatal. Again, *Moody* held that heightened scrutiny applied, 603 U.S. at 740, yet it still remanded to allow the lower court to conduct the required inquiry, *id.* at 726, 743-45.

Two: This Court has credited the State's position that it has a "compelling interest" in "safeguarding the physical and psychological wellbeing of minors online," and faulted the Act only because it "is likely not narrowly tailored" to achieving that interest. Op. 25; *see* Op. 23-32. The Court was right to credit the State's compelling interest. *Contra* Mem. 17-18. But this Court's tailoring assessment rested on the misreading of the Act that NetChoice pressed—and still presses. Mem. 18-20. As examples: This Court said that the age-verification provision "burdens adults' First Amendment rights" (Op. 27)—but that does not appreciate how easily that provision can be satisfied, *see Fitch*, 134 F.4th at 809; *supra* pp. 15, 17. The Court said that the parental-consent provision requires all minors to obtain consent even though some parents will not "care whether" their children "create [online] accounts" (Op. 28)—but that does not show that the provision is *facially* invalid, particularly when most parents *will* care that predators may victimize their children online. And the Court said that the strategy provision could, by spurring overly broad content-blocking, prevent all users from accessing "valuable content" (Op. 27-28)—but that view rests

on the erroneous NetChoice-peddled claim that the provision requires platforms to block content.

4. Last: NetChoice apparently seeks relief against sections 1-8 of the Act. Mot. 3 & n.1. But it gives zero basis for blocking most of those sections. Section 1 states the Act's title, section 2 defines terms, and section 3 defines coverage: none is a substantive or enforcement provision and none plausibly violates anyone's rights. Section 5 limits covered platforms' use and collection of minors' sensitive information. NetChoice says that the coverage definition renders section 5 "content-based." Mem. 16. But NetChoice develops no argument (and its reply brief is too late to develop any argument) that section 5 regulates speech or infringes any right. Section 7 provides a limited private right of action. NetChoice has not sued anyone who could bring such an action, so the Court cannot block enforcement of that provision.

### 2.    NetChoice Has Not Carried Its As-Applied Burden.

Now take NetChoice's as-applied First Amendment claims.

NetChoice makes a less-than-half-page argument for as-applied relief. Mem. 24-25. The basic problem with this argument is the same as with its facial argument: NetChoice has not made a *factual* showing of how any provision applies to even one platform—let alone a showing that any application *in fact* intrudes on speech rights. An as-applied claim does not relieve a plaintiff of that burden: such a claim at most eliminates the need to show "the Act's entire coverage" and to show that most of that coverage violates the First Amendment. Mem. 1. To state the obvious, a litigant cannot be granted as-applied relief against a law if it does not show that any application of the law is invalid.

As explained, NetChoice has not made the factual case to sustain even one as-applied challenge. *E.g.*, *supra* pp. 22-24. It is not enough to say that the Act covers "social media" websites, Mem. 24, or make broad arguments that are untethered from

any application to any covered member, Mem. 7-13, 14-20. To grant as-applied relief for any NetChoice member, this Court must know what "commercially reasonable efforts" the Act requires of *that member* on age verification, parental consent, and a harm-mitigation strategy and whether requiring those efforts would in fact "violate the First Amendment." *Fitch*, 134 F.4th at 809. NetChoice has not made the "factual" presentation that would allow those determinations for even one member. *Ibid.*

Again, consider it more concretely: How could the Court grant as-applied relief to Instagram on the age-verification provision when Instagram already verifies age and NetChoice has not shown how that provision would burden speech? How could the Court grant as-applied relief to Nextdoor on the parental-consent provision when NetChoice has not shown a burden on speech from requiring parents (of Nextdoor's relatively few minor users, Pai Dec. ¶¶ 16-19) to fill out a form, make a phone call, or respond to an email, § 4(2)(a), (b), (e)? How could the Court grant as-applied relief to any NetChoice member on the strategy provision when NetChoice has not shown whether it would be "commercially reasonable"—and a violation of First Amendment rights—for any member to provide a list of resources to minors victimized by sex trafficking, sexual abuse, harassment, and other listed harms? The Court cannot grant any of that relief because NetChoice has not addressed any of these points.

NetChoice asks this Court in effect to reinstate the blanket relief for covered members that the Fifth Circuit vacated. But it has not carried its burden or built the record that would enable the Court to rule that the Act violates the First Amendment in even one application. The Court has no choice but to deny as-applied relief.

## B. NetChoice Is Likely To Lose On Its Vagueness Claims.

1. NetChoice contends, Mem. 25—and this Court previously ruled—that the Act's "central coverage definition" is "impermissibly vague in all of its applications." Op. 32, 34; *see* Op. 32-35. This Court should now reject this argument. *See Fitch*, 134

F.4th at 808 ("The[ ] failure[ ]" to account for "NetChoice's admission that the Act covers seven but not all of its members" "show[s] that the district court failed to assess 'how [the] law works in all of its applications.'").

A law is unduly vague if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited" or "is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008); U.S. Const. amend. XIV, § 1 (guaranteeing "due process of law"). To be facially vague, a law must be "impermissibly vague in all of its applications." *McClelland v. Katy Independent School District*, 63 F.4th 996, 1013 (5th Cir. 2023); Op. 34.

The Act's coverage definition is not vague. The Act applies to certain platforms that "[c]onnect[ ] users in a manner that allows users to *socially interact* with other users." § 3(1)(a) (emphasis added). And the Act does not apply to any platform that "*[p]rimarily functions* to provide a user with access to news, sports, commerce, online video games or content primarily generated or selected by the" platform itself and "[a]llows ... interactive functionality that is *incidental* to the digital service." § 3(2)(c)(i)-(ii) (emphases added). The coverage definition thus uses plain terms that are "readily understandable by most people." *United States v. Conlan*, 786 F.3d 380, 386 (5th Cir. 2015). In context the phrase *socially interact* means communication between two or more "users on [a] digital service." § 3(1)(a). The word *socially* does not distinguish social from (for example) professional interactions. § 3(1)(a); *contra* Op. 35. Rather, the word distinguishes interactions *between users* (covered by the Act) from interactions *with content* (not covered). "[A]ll literature" (for example) "is interactive." *Brown v. Entertainment Merchants Ass'n*, 564 U.S. 786, 798 (2011). The phrase *socially interact* insures that the Act does not cover such interactions *with content*. This is reinforced by the Act's structure, which shows that the Act's focus is on platforms with a dominant "interactive" feature, § 3(1), (2)(c)(ii), where minors

encounter predators who are more likely to harm them, §§ 4, 6. The terms *primarily* and *incidental* also are plain, objective terms that do not involve "wholly subjective judgments without statutory definitions, narrowing context, or settled legal meanings." *Williams*, 553 U.S. at 306. Identifying a platform's primary and incidental functions turns on the platform's objective features, not on others' subjective motivations. *Compare NetChoice, LLC v. Griffin*, No. 5:23-CV-05105, 2023 WL 5660155, at *2, *13-*14 (W.D. Ark. Aug. 31, 2023) (faulting coverage definition that turned on platform *users'* subjective "primary *purpose*") (emphasis added).

Anyone can read the coverage definition, look at a platform's features, and know whether the Act applies. Indeed, NetChoice has done that and concedes that based on "the Act's definitions" it knows whether the Act applies to all 40 of its members. Cleland Dec. ¶¶ 30-31, 40-41; Mem. 2-3, 22. This Court previously suggested that the Act is vague because it does not say how to determine "how a digital service 'primarily' functions" or "when a website permits ... interactive functionality that is merely 'incidental.'" Op. 35. That cannot now be a basis for blocking the Act—in any application—when the only plaintiff before the Court knows whether the Act applies to every platform that it represents and has not pointed to even one platform that presents a close call.

These points doom any facial or as-applied claim. NetChoice's concessions about the Act's coverage (and non-coverage) of its 40 members admit that the Act has clear and definite—*non-vague*—applications. So the Act is not "impermissibly vague in all of its applications." *McClelland*, 63 F.4th at 1013. Where, as here, a law's "application" to the challengers "is plain," a court must reject a facial vagueness challenge that relies on "uncertainty about" the law's application "in other situations." *Young v. American Mini Theatres, Inc.*, 427 U.S. 50, 61 (1976); *see Doe I v. Landry*, 909 F.3d 99, 117 (5th Cir. 2018). And NetChoice has not developed any as-applied claim. To the contrary, it admits that it knows whether the Act applies to

*every one of its members* and does not identify one platform that presents a hard call. It cites LinkedIn (which NetChoice does not claim to represent), but the Act squarely excludes LinkedIn from coverage because (as NetChoice does not contest) it "primarily functions to provide a user with access to career development opportunities," § 3(2)(d)—even if some people "use it for social interaction," Mem. 25. If there are edge cases where certain platforms must "guess as to whether the Act applies," Op. 35, those cases should await an as-applied claim that a litigant (with standing to bring the claim) has properly developed.

2. NetChoice argues that the strategy provision is vague because it turns on the words "promotes" and "facilitates" and uses undefined terms. Mem. 13-14. This argument fails. That provision ties its requirements to specific harms that flow from targeted, interactive acts perpetrated online, § 6, so statutory "context" provides the clarity that a word like "promotes" might lack "[w]hen taken in isolation." *Williams*, 553 U.S. at 294 (relying on "context" to construe the word "promotes"). The provision is thus unlike the hopelessly capacious statute condemned in *Baggett v. Bullitt*, 377 U.S. 360 (1964), which required taking an oath to "promote respect" for the flag and government institutions. *Id.* at 361-62, 371. And a law does not need to define terms— like "physical violence," "trafficking," or "child pornography," § 6—that "are not obscure." *Conlan*, 786 F.3d at 386. Any edge cases requiring "context"-dependent analyses (Mem. 14) might support as-applied challenges, but not facial invalidation. Yet here too, NetChoice has not identified even one vague application for any identified member. So the Court cannot grant any as-applied relief.

## C.    NetChoice Is Likely To Lose On Its Preemption Claim.

NetChoice claims that 47 U.S.C. § 230 preempts the strategy provision. Mem. 25-27. This claim fails. The strategy provision does not "treat[ ]" any online platform "as the publisher or speaker of any information provided by" a third party—or impose

"liab[ility]" for good-faith blocking or screening of material—and so it comports with section 230. 47 U.S.C. § 230(c). Although section 230 "immunize[s]" platforms from liability "for harm caused by unremoved speech on their website[s]," it does not immunize platforms when liability is imposed "independently of whether the third-party speech that [platforms] host harms anybody." *Free Speech Coalition, Inc. v. Paxton*, 95 F.4th 263, 285 (5th Cir. 2024), *cert. granted*, 144 S. Ct. 2714 (2024) (granting review on a different issue). The Fifth Circuit has accordingly held that section 230 does not preempt a Texas law requiring commercial pornographic websites to use age-verification methods to prevent minors from accessing their sites. *Id.* at 266-67, 284-86. Liability under that law is based on "compl[iance] with" that age-verification provision, not on harm from third-party content. *Id.* at 285. Under that holding, section 230 does not preempt the strategy provision here. That provision imposes liability based on whether a covered platform "compl[ies] with" the Act by making commercially reasonable efforts to adopt a harm-mitigation strategy—not based on whether third-party content "harms anybody." *Ibid.*

NetChoice invokes language drawn from *Doe v. MySpace, Inc.*, 528 F.3d 413, 418-20 (5th Cir. 2008). Mem. 26. But MySpace enjoyed immunity where a negligence claim sought to hold it liable for harm caused by third-party content it hosted. *Free Speech Coalition*, 95 F.4th at 285. The strategy provision imposes liability for failing to adopt a strategy—not for harm from third-party content. And again, the provision does not require platforms to "monitor," "screen[ ]," "delet[e]," or "block" content, Mem. 26, 27—so NetChoice gets nothing from claims that it requires those things.

NetChoice has failed to show that there is "no set of circumstances" in which the strategy provision is valid. *Moody*, 603 U.S. at 723. It has not shown even one preempted application—again, its preemption claim rests on the demonstrably erroneous pretense that the strategy provision imposes monitoring-and-censorship requirements—so the Court cannot award any as-applied relief.

## II.    The Remaining Factors Strongly Disfavor Injunctive Relief.

The equities favor the State. *Contra* Mem. 27. An injunction would irreparably harm the State and its citizens. Enjoining enforcement of a "duly enacted [state law] clearly inflicts irreparable harm on the State." *Abbott v. Perez*, 585 U.S. 579, 602 n.17 (2018). The harm is especially severe here because the Act serves the powerful public interest in protecting children. *See Sable Communications of California, Inc. v. FCC*, 492 U.S. 115, 126 (1989). This Court has acknowledged "the seriousness of the issue" and "accept[ed]" that "safeguarding the physical and psychological wellbeing of minors online is a compelling interest." Op. 25, 39. "Social-media platforms" "create ... unprecedented dangers." *Moody*, 603 U.S. at 716. An injunction would thwart the State's efforts to protect children against grave dangers.

In previously ruling otherwise, this Court relied on its merits ruling. Op. 36, 37. Given the Fifth Circuit's decision in this case and the merits arguments above, the Court should rule differently on the merits now and so should also rule differently on the equities. On irreparable harm, this Court also relied on compliance costs. Op. 36-37. Dreamwidth claims, for example, that the costs of complying with the Act "threaten[ ] [its] ability to continue operating." Paolucci Dec. ¶ 35. That claim disregards that the Act requires only "commercially reasonable" efforts—not cost-prohibitive ones—based on the particular platform's resources. NetChoice's other declarations are shot through with similar errors. The declarations baselessly suggest (to take a few examples) that the age-verification and parental-consent provisions will require "comprehensive and foolproof systems" and "cumbersome registration processes" (Cleland Dec. ¶¶ 45a, 45d), that the age-verification provision will require using facial recognition and demanding government IDs (Veitch Dec. ¶ 32), that the parental-consent provision will require expertise in family law (Paolucci Dec. ¶ 35), and that the strategy provision requires blocking content (Cleland Dec. ¶¶ 46a, 46b). The Act requires only the reasonable efforts that any responsible platform would

already make—and that some NetChoice members may already make. This Court should reevaluate the equities—particularly given the Fifth Circuit's recognition that the Act requires only "commercially reasonable efforts" and imposes on each platform a "unique regulatory burden." *Fitch*, 134 F.4th at 809.

Any relief must be sharply limited. The Court should not award relief beyond any application that NetChoice has shown is invalid—and even then, the Court should limit its ruling to the specific applications of challenged provisions for named NetChoice members who have shown irreparable harm. Injunctions must be "tailored to redress the plaintiff's particular injury," *Gill v. Whitford*, 585 U.S. 48, 73 (2018), and must be no broader than "necessary to provide complete relief to the plaintiff[ ]," *Madsen v. Women's Health Center, Inc.*, 512 U.S. 753, 765 (1994). "The purpose of a preliminary injunction is always to prevent irreparable injury." *Canal Authority of State of Florida v. Callaway*, 489 F.2d 567, 576 (5th Cir. 1974). And any relief cannot bar enforcement by non-party private actors. § 7(2); *see* Fed. R. Civ. P. 65(d)(2).

## CONCLUSION

The TRO and preliminary-injunction motion should be denied.

Respectfully submitted.

<div style="margin-left:40%">

LYNN FITCH
 Attorney General

By: */s/ Wilson D. Minor*
SCOTT G. STEWART (MSB #106359)
 Solicitor General
WILSON D. MINOR (MSB #102663)
 Special Assistant Attorney General
Mississippi Attorney General's Office
P.O. Box 220
Jackson, Mississippi 39205-0220
Telephone: (601) 359-6279
Email: wilson.minor@ago.ms.gov

</div>

**CERTIFICATE OF SERVICE**

I hereby certify that on this day I electronically filed the above paper with the Clerk of Court using the ECF system which sent notification to all counsel of record.

This, the 19th day of May, 2025.

*/s/ Wilson D. Minor*
Wilson D. Minor