# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
# SOUTHERN DIVISION

| | |
|---|---|
| NETCHOICE, LLC,<br><br>Plaintiff,<br><br>v.<br><br>LYNN FITCH, in her official capacity as Attorney General of Mississippi,<br><br>Defendant. | Civil Action No. 1:24-cv-00170-HSO-BWR |

**PLAINTIFF NETCHOICE'S REPLY IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

**Table of Contents**

Argument ............................................................................................................................................. 1

    I.   The Act's speech regulations are facially invalid. ............................................................... 1

        A.  Defendant misconstrues what the facial-challenge analysis requires. .......................... 1

        B.  The relevant "actors" and "activities" can be determined on the law's face and the factual record. ................................................................................................................. 3

        C.  The Act's unconstitutional applications are substantial, judged in relation to any hypothetical constitutional applications. ...................................................................... 5

    II.  The Act's speech regulations are invalid as applied to NetChoice's members. .................. 7

    III. The Act's central coverage definition is unconstitutionally vague. ..................................... 7

    IV. Section 6 of the Act is preempted by 47 U.S.C. § 230. ....................................................... 8

    V.  The other factors favor injunctive relief. ............................................................................ 8

Conclusion ........................................................................................................................................... 8

Mississippi House Bill 1126's (2024) speech regulations are unconstitutional as applied to NetChoice's regulated members—and facially unconstitutional under the standard reaffirmed in *Moody v. NetChoice, LLC*, 603 U.S. 707 (2024). The Fifth Circuit remanded the case to give this Court the opportunity to "resolve" a "factual inquiry" the Court "understandably" could not "conduct" a year ago. *NetChoice, L.L.C. v. Fitch*, 134 F.4th 799, 809 (5th Cir. 2025). Defendant's arguments about how to apply that standard here would make it impossible for litigants to prevail in even the most routine First Amendment challenges. That is not what the Supreme Court or Fifth Circuit requires. Regardless, Defendant's arguments about the facial-challenge standard are wholly irrelevant to the additional as-applied claims NetChoice has now raised after remand.[1]

**I.    The Act's speech regulations are facially invalid.**

    **A.    Defendant misconstrues what the facial-challenge analysis requires.**

Defendant asks this Court to apply *Moody* and Fifth Circuit precedent in a way unmoored from First Amendment facial-challenge precedent. According to Defendant, a First Amendment facial challenge requires a granular census of every individual speech service possibly covered by a governmental speech restriction: "NetChoice must—based on a 'factual' presentation—identify *every platform covered by the law*[.]" Resp.2 (citations omitted; emphases added).

That is not the law, and *Moody*'s reaffirmation of the preexisting First Amendment facial-challenge standard never held otherwise. *Moody*, 603 U.S. at 723 (citing existing standard). *Moody* directed courts to identify "kinds of" websites—that is, categories—for which a different First Amendment analysis "might apply" based on the First Amendment merits arguments raised. *Id.* at 718. NetChoice has done just that. Mem.21-22. Defendant's view of the First Amendment facial-

---

[1] NetChoice incorporates by reference arguments previously raised in its initial memorandum and reply in support of its motion for preliminary injunction, ECF 4, 27, and its memorandum in support of its renewed motion, ECF 50. NetChoice also uses the same shorthand conventions.

challenge standard would make facial challenges virtually impossible. Yet this unique standard is supposed to be "less demanding" than the traditional facial-challenge standard. *Moody*, 603 U.S. at 723. In practice, Defendant's articulation of the facial-challenge standard is similar to the "no set of circumstances" test that applies outside of the unique First Amendment context. *Id.* Furthermore, Defendant's proffered analysis would encourage governments to pass poorly drafted, poorly tailored restrictions on speech to insulate them from facial challenges. That is precisely what the First Amendment facial-challenge standard is designed to prevent. *Id.*

*Moody*, *Fitch*, and *NetChoice, LLC v. Paxton*, 121 F.4th 494 (5th Cir. 2024), do not hold that every First Amendment case will be fact-intensive. *Contra* Resp.2. Rather, courts must identify the "pertinent facts" to the constitutional merits analysis. *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 618 (2021) ("*AFP*"). Each kind of speech regulation will have different "pertinent facts." *Id.* When those facts "are the same across the board," facial relief is proper. *Id.* Thus, Defendant errs in arguing that the facial-challenge analysis is necessarily fact-intensive and granular.

Under Defendant's view, this Court could not hold facially unconstitutional a law requiring websites to use "commercially reasonable" measures to avoid publishing speech critical of politicians. Litigants would need to catalog every website on the Internet, which would be outstripped immediately after filing, as new websites emerge every day. And for every website, litigants would need to determine what "commercial reasonableness" would require, with the possibility that Defendant says every actor has a different "commercially reasonable" requirement. The First Amendment requires no such thing to declare a content-based regulation of speech facially unconstitutional. *E.g.*, *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 802 (2011). The same is true here.

The nature of the internet does not change this analysis. The Supreme Court has held multiple times that there is no "basis for qualifying the level of First Amendment scrutiny that should be applied to" the internet. *Reno v. ACLU*, 521 U.S. 844, 870 (1997); *see Moody*, 603 U.S. at 719.

### B. The relevant "actors" and "activities" can be determined on the law's face and the factual record.

This Court can determine "to whom the Act applies [and] the activities it regulates" on the face of the law and with the facts in the record. *Fitch*, 134 F.4th at 809. Defendant *still* does not dispute the range of "actors" NetChoice says are covered by the Act. Resp.15.

**1.** For the relevant "actors," NetChoice has identified its covered members and the "other *kinds of* websites" the Act "might apply to." *Moody*, 603 U.S. at 718 (emphasis added); Mem.21-22. NetChoice has likewise identified other "kinds of" websites that are *not* regulated by the Act, including those identified by the Fifth Circuit. Mem.21-22; *Fitch*, 134 F.4th at 808-09.

Defendant asserts that NetChoice must identify "*every* covered actor" on the internet. Resp.16 (citation omitted). Such a census is impossible given the breadth and vagueness of the Act's coverage definition and the nature of the internet. It would be no more possible if the Act applied to bookstores instead. More importantly, it is not what *Moody* or the Fifth Circuit requires; "[e]ach actor" does not "require[ ] its own inquiry." Resp.12. If the State outright banned all social media, the facial-challenge standard would not require what Defendant says is necessary. Rather, NetChoice must identify—and the Court need only consider—the "other kinds of websites and apps" that the Act "might apply to." *Moody*, 603 U.S. at 718.

**2.** As for "activities," *id.*, the Act regulates users' access to protected speech on covered websites and those websites' dissemination of protected speech. Mem.21. The Act's age-verification provision requires minors and adults to provide documentation or biometric information, Resp.3, 23, to access protected speech on covered websites, Mem.7. The parental-consent

3

provision requires minors to obtain parental consent before becoming an account holder to access protected speech on covered websites. Mem.9. And the monitoring-and-censorship requirements "deputize[ ] private actors into censoring speech." *NetChoice, LLC v. Bonta*, 113 F.4th 1101, 1121 (9th Cir. 2024); Mem.10-14. A law *restricting* protected speech is presumptively unconstitutional. *FEC v. Cruz*, 596 U.S. 289, 305 (2022).

This Act's unique restrictions on access to speech distinguish this case from *Moody* and *Paxton*. Mississippi's law *restricts* speech dissemination and access—rather than by "intru[ding] on protected editorial discretion." *Paxton*, 121 F.4th at 499. Editorial discretion rights are *potentially* more nuanced among online services than users' fundamental right to access protected speech and limitations on governments telling private actors to block speech. *Id.*

Defendant faults NetChoice for not identifying how the "activities" apply to covered websites, asserting that NetChoice must show what is "commercially reasonable" for each application of the Act to a covered website. Resp.16-17. This argument has multiple flaws.

First, it does not matter under the First Amendment how "commercially reasonable" a speech restriction might be. The Act burdens *users*' rights to access speech, whatever form they take. *See* Mem.8, 10, 13. And the Fifth Circuit held that NetChoice can assert users' rights. *Fitch*, 134 F.4th at 806. Whether a website can afford to facilitate the government's speech restrictions is no solace to the users whose access to speech is restricted.

Second, even if a covered website already purportedly verifies, *e.g.*, age, the Act still imposes a *governmental* restriction on speech access. A website implementing its own policy is not the same as the State imposing its preferred policy. For instance, a law prohibiting all criticism of politicians would be facially unconstitutional, even though some newspapers' editorial policies forbid criticism of politicians. *E.g.*, *Miami Herald Pub. Co. v. Tornillo*, 418 U.S. 241, 258 (1974).

4

Third, Defendant's "attempt[ ] to leverage the Act's vagueness," Mem.22, only makes this worse. If Defendant does not know which websites "may need to do more on age verification" and which "may not," Resp.17, covered websites cannot know if they are compliant. The result will be websites implementing more robust measures to avoid liability, chilling protected speech.

    **C.    The Act's unconstitutional applications are substantial, judged in relation to any hypothetical constitutional applications.**

This Court should conclude again that "a substantial number of" the Act's "applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." ECF 30 at 17-18 (quoting *AFP*, 594 U.S. at 615; citing *Moody*, 603 U.S. at 721-26). This Court has already rejected Defendant's merits arguments here, that "none—or very few—of the Act's applications abridge the 'freedom of speech.'" Resp.17. Defendant's tailoring arguments similarly fail. Resp.26-27.

Defendant's entire analysis depends on insisting that the Act regulates conduct, not speech. Resp.17, 18-19. This Court rejected that argument. ECF 30 at 23. And for good reason. This argument is foreclosed by *Packingham* (among others), which held the First Amendment protects people's right to "access" social media websites free from governmental restraint. 582 U.S. at 108. Thus, rational basis scrutiny does not apply.

Instead, strict scrutiny applies. Defendant wrongly asserts that, at maximum, intermediate scrutiny should apply. Yet this Court has already correctly concluded that the Act discriminates based on content, triggering strict scrutiny. ECF 30 at 21. And for each of the Act's speech regulations, the Act "is either overinclusive or underinclusive, or both." ECF 30 at 31.

As to age-verification, it does not matter whether a website must obtain documents or some other biometric information. Resp.23-24. The First Amendment harm is the same—the collection of personally identifying information, which deters users and chills speech. Mem.7-8; ECF 30 at 34-35.

5

As to parental consent, the State may not infringe *users'* rights. Mem.9-10. That constitutional burden "is true in every case." *AFP*, 594 U.S. at 618; Mem.25. It does not matter that compliance may require "making a phone call or responding to an email." Resp.24. *Brown* would not have come out differently had California asked for "commercially reasonable" parental consent via phone calls or emails. In fact, California law likely imposed fewer burdens for minors and parents, yet was held facially unconstitutional all the same. *Brown*, 564 U.S. at 802.

As to the Act's monitoring-and-censorship requirements, Defendant continues to avoid the Act's plain text. Defendant emphasizes the "mitigate" language to argue this requirement does not burden speech and could include, for example, an after-the-fact list of resources to address the listed harms. Resp.19, 24. Yet Section 6 expressly requires websites to "implement" a government-mandated "strategy" that must "prevent or mitigate . . . *exposure*." § 6(1). And the Act's exception to § 6 says that websites need not "prevent or preclude" certain preferred "content." § 6(2). Thus, covered websites must "prevent or preclude" other content or this exemption would be unnecessary. Separately, if websites need only have a "mitigation strategy" available, Resp.2, it is hard to see how this provision advances any governmental interest.

Moreover, it does not matter what "commercially reasonable" steps a website takes, because even informal, indirect "coerc[ing]" of protected speech is unconstitutional. *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 190 (2024). Nor does "commercial reasonableness" solve the vagueness of the content categories the State seeks to censor. Mem.13-16. And taking Defendant's alternative of providing a "list" of resources, that would also run afoul of the First Amendment as a form of compelled speech. *E.g.*, *X Corp. v. Bonta*, 116 F.4th 888, 901 (9th Cir. 2024). In any event, the State could easily provide whatever list through its own government speech.

## II. The Act's speech regulations are invalid as applied to NetChoice's members.

Although the Act's speech regulations are facially invalid, this Court can now declare the Act unconstitutional as applied to NetChoice's covered members. Mem.24-25. Defendant argues that NetChoice has not made a factual showing "of how any provision applies to even one platform." Resp.28. That is wrong. NetChoice identified its covered members and why they are covered under the Act. ECF 48 ¶¶ 14, 45-65; Mem.2-3, 21. NetChoice has provided three member declarations from Google, Nextdoor, and Dreamwidth discussing how the Act applies to their respective services. *See* ECF 3-3 to 3-5. NetChoice has also explained how the Act applies to its covered members, both in its own declaration, ECF 49-1, and its pleadings, ECF 48 ¶¶ 66-83; Mem.7-18.

Defendant only criticizes NetChoice's factual presentation of the Act's burdens based on Defendant's own flawed understanding of the statute. Resp.34-35. But Defendant has failed to identify how any particular member should comply with the Act's purported sliding scale approach. Defendant also has not said that any covered members comply with the Act's speech restrictions. At core, Defendant is saying that as-applied relief is improper because Defendant has discretion to determine what is "commercially reasonable" from case to case. But just as that is improper for the facial challenge, it is improper here.

Defendant finally wonders "[h]ow" the Court can "grant as-applied relief." Rep.29. Easily. The Court can enjoin Defendant's enforcement of the Act's speech restrictions against covered members. ECF 48 ¶ 14. Defendant attempts to confuse this analysis by discussing members' private self-regulatory efforts. None of that is relevant to whether the *government* can impose its own unconstitutional requirements on top of private efforts. *See supra* p.4.

## III. The Act's central coverage definition is unconstitutionally vague.

This Court correctly determined that the Act's coverage definition is "impermissibly

7

vague." ECF 30 at 34. NetChoice need not show that it is "vague in all of its applications." Resp.30 (citation omitted). "[V]agueness may be grounds for a pre-enforcement challenge insofar as [a law] chills protected speech under the First Amendment"—even if the law is not vague in every case. *Nat'l Press Photographers Ass'n v. McCraw*, 90 F.4th 770, 782 & n.32 (5th Cir. 2024).

### IV. Section 6 of the Act is preempted by 47 U.S.C. § 230.

47 U.S.C. § 230 preempts the Act's monitoring-and-censorship requirements. States cannot penalize websites for disseminating or exercising "editorial functions" over third-party content, such as "decisions relating to [ ] monitoring, screening, and deletion." *A.B. v. Salesforce, Inc.*, 123 F.4th 788, 793, 798 (5th Cir. 2024) (cleaned up). NetChoice has already responded to the same arguments Defendant raises on this issue. ECF 27 at 8-9. Tellingly, Defendant, does not even acknowledge the Fifth Circuit's intervening *Salesforce* decision. *See* Mem.25-27.

### V. The other factors favor injunctive relief.

Defendant does not dispute that constitutional injuries are irreparable. Instead, Defendant falls back on its argument that the Act "requires only 'commercially reasonable' efforts." Resp.34. But even under that standard, the Act still imposes nonrecoverable compliance costs. The Act forces covered members to over-comply, taking precautionary steps to ensure they cannot be penalized for what Defendant deems is insufficiently "reasonable." On the equites, "[i]njunctions protecting First Amendment freedoms are always in the public interest." *Opulent Life Church v. City of Holly Springs*, 697 F.3d 279, 298 (5th Cir. 2012) (citation omitted).

### Conclusion

Plaintiff respectfully requests injunctive relief as soon as practicable.

| | |
|---|---|
| Dated: May 23, 2025 | Respectfully submitted, |
| | |
| | */s/ J. William Manuel* |
| | J. William Manuel (MBN. 9891) |
| | Stephen L. Thomas (MBN 8309) |
| | BRADLEY ARANT BOULT CUMMINGS LLP |
| | One Jackson Place |
| | 188 E. Capitol Street, Suite 1000 |
| | Jackson, MS 39201 |
| | Telephone: (601) 948-8000 |
| | Facsimile: (601) 948-3000 |
| | wmanuel@bradley.com |
| | sthomas@bradley.com |
| | |
| Jared B. Magnuson* | Steven P. Lehotsky* |
| Lehotsky Keller Cohn LLP | Scott A. Keller* |
| 3280 Peachtree Road NE | Jeremy Evan Maltz* |
| Atlanta, GA 30305 | Lehotsky Keller Cohn LLP |
| (512) 693-8350 | 200 Massachusetts Avenue, NW, Suite 700 |
| jared@lkcfirm.com | Washington, DC 20001 |
| | (512) 693-8350 |
| Joshua P. Morrow* | steve@lkcfirm.com |
| Lehotsky Keller Cohn LLP | scott@lkcfirm.com |
| 408 W. 11th Street, 5th Floor | jeremy@lkcfirm.com |
| Austin, TX 78701 | |
| (512) 693-8350 | |
| josh@lkcfirm.com | |
| | ***Admitted Pro Hac Vice** |

*Attorneys for Plaintiff NetChoice, LLC*

9

**Certificate of Service**

      I hereby certify that on May 23, 2025, a true and correct copy of the foregoing Reply was electronically filed with the Clerk of Court using the CM/ECF system which will send notification to all counsel of record.

                                                        */s/ J. William Manuel*
                                                        J. William Manuel (MBN. 9891)