## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **NETCHOICE, LLC** | § | **PLAINTIFF** |
| | § | |
| | § | |
| **v.** | § | **Civil No. 1:24-cv-170-HSO-BWR** |
| | § | |
| | § | |
| **LYNN FITCH,** | § | |
| *in her official capacity as* | § | |
| *Attorney General of Mississippi* | § | **DEFENDANT** |

### MEMORANDUM OPINION AND ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF NETCHOICE, LLC'S MOTION [49] FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Plaintiff NetChoice, LLC seeks to enjoin Sections 1 through 8 of Mississippi House Bill 1126 ("H.B. 1126" or the "Act"), which was signed into law on April 30, 2024, and originally set to take effect on July 1, 2024. *See* Mot. [49]. NetChoice asks this Court to preliminarily enjoin Defendant Lynn Fitch, in her official capacity as Mississippi Attorney General, from taking any action to enforce the challenged portions of H.B. 1126. *See id.*; Mem. [50]. The Attorney General opposes the Motion [49]. *See* Resp. [54].

After consideration of the record and relevant legal authority, including the Fifth Circuit's prior opinion in this case and the United States Supreme Court's decision in *Moody v. NetChoice, LLC*, 603 U.S. 707 (2024), and because the Court finds the Act unconstitutional as applied to certain of Plaintiff NetChoice, LLC's members, a preliminary injunction should issue pending final disposition of this

case on the merits.    Mississippi Attorney General Lynn Fitch and her agents,

employees, and all persons acting under her direction or control, will be

preliminarily enjoined from enforcing Sections 1-8 of Mississippi House Bill 1126

against Plaintiff NetChoice, LLC's eight covered members: (1) Dreamwidth; (2)

Meta, which owns and operates Facebook and Instagram; (3) Nextdoor; (4)

Pinterest; (5) Reddit; (6) Snap Inc., which owns and operates Snapchat; (7) X; and

(8) YouTube.

## I.    BACKGROUND

A.    NetChoice

Plaintiff NetChoice, LLC ("NetChoice" or "Plaintiff") is a nonprofit trade

association for internet companies.    Am. Compl. [48] at 5.    Its Amended

Complaint [48] asserts that H.B. 1126 regulates some services offered by the

following of its members: (1) Dreamwidth; (2) Meta, which owns and operates

Facebook and Instagram; (3) Nextdoor; (4) Pinterest; (5) Reddit; (6) Snap Inc.,

which owns and operates Snapchat; (7) X; and (8) YouTube.    *Id.*    According to

NetChoice's General Counsel and Director of Strategic Initiatives Bartlett Cleland

("Cleland"), its members' websites "publish, disseminate, display, compile, create,

curate, and distribute a wide range of valuable and protected expression to their

users," and "disseminate content (text, audio, graphics, and video) that facilitates

their users' ability to practice their religious beliefs, engage in political discourse,

seek cross-cultural dialogue, supplement their education, learn new skills, and

simply interact socially."    Ex. [49-1] at 3.

Cleland's Declaration states that the Act covers at least eight of NetChoice's members which are known as "social media" websites whose "interactive functionality is the point of the service." *Id.* at 23. Each allows its account holders to upload and publicly post content, which other account holders may then view and react to, comment on, or share with others. *Id.* at 22. According to Cleland, users of these social media websites "engage in protected speech activities, including speaking to others and viewing content created by others." *Id.* He opines that the Act's burdensome requirements "will make it more difficult for NetChoice members to provide their websites to minors and adults, and will burden minors and adults' access to highly valuable and protected speech." *Id.* at 24.

B.   Mississippi H.B. 1126

Sections 1-8 of H.B. 1126 provide in relevant part as follows:

SECTION 3. (1) This act applies only to a digital service provider who provides a digital service that:
(a)   Connects users in a manner that allows users to socially interact with other users on the digital service;
(b)   Allows a user to create a public, semi-public or private profile for purposes of signing into and using the digital service; and
(c)   Allows a user to create or post content that can be viewed by other users of the digital service, including sharing content on:
   (i)    A message board;
   (ii)   A chat room; or
   (iii)  A landing page, video channel or main feed that presents to a user content created and posted by other users.

Ex. [1-1] at 3-4 (Miss. H.B. 1126, § 3(1)).

The Act does not apply to a digital service provider that "processes or maintains user data in connection with the employment, promotion, reassignment or retention of the user as an employee or independent contractor, to the extent that

the user's data is processed or maintained for that purpose." *Id.* at 4 (Miss. H.B. 1126, § 3(2)(a)). Nor does the Act apply to a provider's service that "facilitates e-mail or direct messaging services, if the digital service facilitates only those services," primarily functions to provide a user with access to certain career development opportunities, or primarily functions "to provide a user with access to news, sports, commerce, online video games or content primarily generated or selected by the digital service provider" and "[a]llows chat, comment or other interactive functionality that is incidental to the digital service." *Id.* at 4-5 (Miss. H.B. 1126, § 3(2)(b)-(c)).

Under Section 4,

(1) A digital service provider may not enter into an agreement with a person to create an account with a digital service unless the person has registered the person's age with the digital service provider. A digital service provider shall make commercially reasonable efforts to verify the age of the person creating an account . . . .
(2) A digital service provider shall not permit an account holder who is a known minor to be an account holder unless the known minor has the express consent from a parent or guardian . . . .

*Id.* at 5-7 (Miss. H.B. 1126, § 4).

Section 6 states that for a "known minor's use of a digital service, a digital service provider shall make commercially reasonable efforts to develop and implement a strategy to prevent or mitigate the known minor's exposure to harmful material and other content that promotes or facilitates" certain specified harms. *Id.* at 8 (Miss. H.B. 1126, § 6(1)). These harms are identified in subsection (1) and include self-harm, eating disorders, substance use disorders, suicidal behaviors, stalking, grooming, incitement of violence, and any other illegal activities. *Id.*

4

But

> [n]othing in subsection (1) shall be construed to require a digital service provider to prevent or preclude:
>
> (a)    Any minor from deliberately and independently searching for, or specifically requesting, content . . . .

*Id.* at 8-9 (Miss. H.B. 1126, § 6(2)(a)).

In sum, Section 4(1) of H.B. 1126 requires all users, adults and minors alike, to verify their age before they may open an account with a covered digital service provider (the "age-verification requirement"), while Section 4(2) requires consent from a parent before a known minor may create an account (the "parental-consent requirement").    *Id.*    Section 5 imposes a limitation on the collection of data by covered digital service providers that enter into an agreement with a known minor for access to a digital service (the "data-collection limitation"), and Section 6 requires those digital service providers to make commercially reasonable efforts to develop and implement a strategy to prevent or mitigate the known minor's exposure to harmful material and other content that promotes or facilitates certain harms to minors (the "prevention-or-mitigation requirement").[1]    *See id.*    But Section 6(2) does not require digital service providers to prevent or preclude minors with accounts from "deliberately and independently searching for, or specifically requesting, content."    *Id.*

Section 7 of the Act sets forth civil remedies permitting a parent or guardian of a known minor affected by a violation of the Act to bring a cause of action for a

---

[1]  Plaintiff refers to this as a monitoring-and-censorship requirement, *see* Am. Compl. [48] at 19, while Defendant refers to it as the strategy provision, *see* Resp. [54] at 19-20.

declaratory judgment or an injunction, and Section 8 classifies violations of the Act as unfair methods of competition and unfair or deceptive trade practices or acts under Mississippi Code § 75-24-5, for which an action for injunctive relief may be brought by the Mississippi Attorney General.   *See id.* at 9-12; Miss. Code Ann. §§ 75-24-5, 75-24-9.   Finally, a knowing and willful violation of Section 75-24-5, including a violation of H.B. 1126, can subject a person to criminal penalties.   *See* Miss. Code Ann. § 75-24-20.

C.    Procedural History

NetChoice initiated this lawsuit on June 7, 2024, by filing a Complaint [1] for Declaratory and Injunctive Relief, which raised First Amendment facial challenges to the Act's central coverage definition (Count I), age-verification requirement (Count III), parental-consent requirement (Count IV), and prevention-or-mitigation requirement (Count V).   Alternatively, the Complaint alleged that the Act is overbroad, *see* Compl. [1] at 18-22, 25-33 (Counts I, III, IV, V), and that its central coverage definition of a digital service provider is unconstitutionally vague and violates principles of free speech and due process, *id.* at 23-24, 33-34 (Count II, VI). The Complaint [1] further claimed that 47 U.S.C. § 230 preempts the monitoring-and-censorship requirements in Section 6.   Compl. [1] at 35-36 (Count VII).

NetChoice sought a preliminary injunction, *see* Mot. [3], which the Court granted after a hearing on grounds that NetChoice had shown a substantial likelihood of success on the merits of its claim that the Act was facially unconstitutional under the First Amendment, *see* Order [30].   The Court

preliminarily enjoined Defendant from enforcing H.B. 1126 against NetChoice and its members, pending final disposition of the case.   *Id.* at 39-40.

On appeal, the Fifth Circuit determined that NetChoice had satisfied constitutional and prudential standing requirements.   *See* Op. [51] at 4-9; *NetChoice, L.L.C. v. Fitch*, 134 F.4th 799, 804-807 (5th Cir. 2025).   On the merits, it noted that this Court had not been able to apply the framework recently announced by the Supreme Court in *Moody* to NetChoice's First Amendment facial challenge because of the timing of that opinion.   *See Fitch*, 134 F.4th at 807-09. Accordingly, the Court of Appeals vacated the injunction and remanded for this Court to determine "to whom the Act applies [and] the activities it regulates, and then weigh violative applications of the Act against non-violative applications," as required by *Moody* and a recent Fifth Circuit decision, *NetChoice, L.L.C. v. Paxton*, 121 F.4th 494 (5th Cir. 2024).   *Fitch*, 134 F.4th at 809.

D.   Plaintiff's Amended Complaint [48]

On remand, NetChoice opted to file an Amended Complaint [48], which reurges its First Amendment facial challenge to Sections 1 through 8 of the Act and adds a challenge to these provisions as applied to its regulated members and their services.   *See* Am. Compl. [48] at 5, 23-30, 32-42 (challenging all speech regulations relying on central coverage definition (Count I), the age-verification requirement (Count III), the parental-consent requirement (Count IV), and the prevention-or-mitigation requirement (Count V)).   Alternatively, the Amended Complaint [48] asserts that the Act's central coverage definition of a digital service provider and its

prevention-or-mitigation requirement are unconstitutionally vague and violate principles of free speech and due process.    *See id.* at 30-32, 42-43 (Counts II and VI).    The Amended Complaint [48] further alleges that 47 U.S.C. § 230 preempts the monitoring-and-censorship requirements in Section 6.    *See* Am. Compl. [48] at 43-45 (Count VII).    Plaintiff seeks to enjoin Defendant from enforcing the Act, *see id.* at 45 (Count VIII), and a declaration that each of its challenged provisions is unconstitutional, *see id.* at 45-46 (Count IX).

E.    Plaintiff's Motion [49] for Temporary Restraining Order and Preliminary Injunction

NetChoice's renewed Motion [49] for Temporary Restraining Order and Preliminary Injunction contends that "[u]nder either (1) the *Moody*-informed facial challenge analysis or (2) the added as-applied claims, NetChoice is entitled to immediate relief," Mot. [49] at 1, and that nothing has changed since the Court's earlier ruling to undermine its previous merits conclusions, *id.* at 2.    NetChoice supports its Motion [49] with the newly submitted Cleland Declaration [49-1] and previously-submitted Declarations from Alexandra Veitch [3-3], Gautham Pai, [3-4], and Denise Paolucci, [3-5].    *Id.* at 3.

The Attorney General responds that NetChoice has not made the required showing to obtain injunctive relief as to any claim.    Resp. [54] at 14.    First, she insists that NetChoice is likely to lose on the merits of its facial and as-applied First Amendment claims, as well as on its vagueness and preemption claims.    *See id.* at 14-33.    And the Attorney General contends that the remaining factors strongly disfavor injunctive relief.    *See id.* at 34-35.

NetChoice replies that the Attorney General misconstrues what the facial-challenge analysis requires, and that her suggested analysis would make facial challenges virtually impossible.   *See* Reply [56] at 3-5.   It contends that the Court can determine to whom the Act applies and which activities it regulates based on the face of the law and the facts in the record, and it attempts to distinguish the text of the Act from the laws at issue in *Moody* and prior Fifth Circuit caselaw.   *Id.* at 5-6.   NetChoice maintains that the challenged provisions discriminate based on content, triggering strict scrutiny, and that the Act has a substantial number of applications that abridge free speech when judged in relation to any hypothetical constitutional applications.   *Id.* at 7.   NetChoice also argues that the Act's speech regulations are unconstitutional as applied to its covered members, that its central coverage definition is unconstitutionally vague, and that Section 6 is preempted by 47 U.S.C. § 230.   *See id.* at 9-10.   Finally, NetChoice states that the other relevant factors under Federal Rule of Civil Procedure 65(a) also favor injunctive relief.   *Id.* at 10.[2]

## II.   DISCUSSION

This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343. A preliminary injunction under Rule 65(a) requires the moving party to establish four factors:

> (1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not issued, (3) that the threatened injury if the injunction is denied outweighs any harm that

---

[2]   The Court conferred with the parties, and all concurred that another hearing was unnecessary.   *See* Min. Entry, May 13, 2025.

will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest.

*Mock v. Garland*, 75 F.4th 563, 577 (5th Cir. 2023) (quotation omitted).   When the government is the opposing party, the last two factors merge.   *Id.* (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)).

The movant bears the burden of persuasion on all requirements.   *Id.* at 587. The Supreme Court has noted that "a preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion."   *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (emphasis in original) (quotation omitted).

A.    NetChoice's Standing

The first question is whether NetChoice has standing to maintain its current claims.    As this Court originally determined, and the Fifth Circuit confirmed, NetChoice satisfied the requirements of associational and prudential standing to pursue the claims in its original Complaint [1].    *See Fitch*, 134 F.4th at 804-07. The Court finds that the filing of the Amended Complaint [48] has not changed this result.    *See id.*

As for the new, as-applied First Amendment claims, *see* Am. Compl. [48], "there must be some evidence that a rule would be applied to the plaintiff in order for that plaintiff to bring an as-applied challenge," *Speech First, Inc. v. Fenves*, 979 F.3d 319, 335 (5th Cir. 2020), *as revised* (Oct. 30, 2020) (quotation and alterations omitted).    NetChoice meets this requirement by presenting evidence that the Act covers at least eight of its members: (1) Dreamwidth; (2) Meta, which owns and

operates Facebook and Instagram; (3) Nextdoor; (4) Pinterest; (5) Reddit; (6) Snap Inc., which owns and operates Snapchat; (7) X; and (8) YouTube.    Decl. [49-1] at 22. NetChoice has also submitted member declarations from YouTube (which is owned and operated by Google Inc.), Nextdoor, and Dreamwidth discussing how the Act applies to their respective services.    *See* Ex. [3-3]; Ex. [3-4]; Ex. [3-5].

NetChoice has therefore presented some evidence that the Act would apply to its members; this is sufficient to support its standing to pursue an as-applied challenge.    *See Speech First, Inc.*, 979 F.3d at 335.

B.    <u>Relevant First Amendment Principles</u>

"[T]he First Amendment provides in relevant part that 'Congress shall make no law . . . abridging the freedom of speech,'" and "the Fourteenth Amendment makes the First Amendment's Free Speech Clause applicable against the States." *Manhattan Cmty. Access Corp. v. Halleck*, 587 U.S. 802, 808 (2019).    The First Amendment protects both freedom of speech as well as the "right to receive information and ideas, regardless of their social worth."    *Stanley v. Georgia*, 394 U.S. 557, 564 (1969).    "[T]he right to receive ideas follows ineluctably from the *sender's* First Amendment right to send them" and "is a necessary predicate to the *recipient's* meaningful exercise of his own rights of speech, press, and political freedom."    *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 867 (1982) (plurality opinion) (emphasis in original).[3]    "As a general matter,

_____

[3]  H.B. 1126's primary focus is minors.    But "minors are entitled to a significant measure of First Amendment protection, and only in relatively narrow and well-defined circumstances may government bar public dissemination of protected materials to them." *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 212-13 (1975) (citation omitted).    "No doubt

the First Amendment means that government has no power to restrict expression
because of its message, its ideas, its subject matter, or its content." *United States
v. Stevens*, 559 U.S. 460, 468 (2010) (quotation and alteration omitted).

"The distinction between a facial and as applied challenge goes to the breadth
of the remedy employed by the Court." *Turtle Island Foods, S.P.C. v. Strain*, 65
F.4th 211, 218-19 (5th Cir. 2023) (quotation and alterations omitted). Because a
facial challenge is "really just a claim that the law or policy at issue is
unconstitutional in all its applications," the Supreme Court has stated that
"classifying a lawsuit as facial or as-applied affects the extent to which the
invalidity of the challenged law must be demonstrated and the corresponding
breadth of the remedy." *Bucklew v. Precythe*, 587 U.S. 119, 138 (2019) (quotation
omitted). But "it does not speak at all to the substantive rule of law necessary to
establish a constitutional violation." *Id.* "When a litigant brings both as-applied
and facial challenges, [courts] generally decide the as-applied challenge first
because it is the narrower consideration." *Buchanan v. Alexander*, 919 F.3d 847,
852 (5th Cir. 2019). "Although as-applied challenges are generally favored as a
matter of judicial restraint because they result in a narrow remedy, a developed
factual record is essential." *Justice v. Hosemann*, 771 F.3d 285, 292 (5th Cir.

---

a State possesses legitimate power to protect children from harm, but that does not include
a free-floating power to restrict the ideas to which children may be exposed." *Brown v.
Ent. Merchants Ass'n*, 564 U.S. 786, 794 (2011) (citations omitted). "Speech that is neither
obscene as to youths nor subject to some other legitimate proscription cannot be suppressed
solely to protect the young from ideas or images that a legislative body thinks unsuitable
for them." *Id.* at 795 (quoting *Erznoznik*, 422 U.S. at 213-14).

2014).   "Particularized facts are what allow a court to issue a narrowly tailored and circumscribed remedy."   *Id.*

Accordingly, the Court turns first to NetChoice's challenge to Sections 1 through 8 of the Act, as applied to its eight covered members and their services. *See* Am. Compl. [48] at 5, 23-30, 32-42 (challenging all speech regulations relying on central coverage definition in Count I, the age-verification requirement in Count III, the parental-consent requirement in Count IV, and the prevention-or-mitigation requirement in Count V).

C.    NetChoice's As-Applied Challenge

1.    The Parties' Arguments

A threshold issue is whether the challenged provisions are subject to First Amendment scrutiny.   NetChoice maintains that "[t]he Act is unconstitutional as applied to covered members' services: Dreamwidth, Facebook, Instagram, Nextdoor, Pinterest, Reddit, Snapchat, X, and YouTube."   Mem. [50] at 32.   The Attorney General responds that "[t]he basic problem with this argument is the same as with its facial argument: NetChoice has not made a *factual* showing of how any provision applies to even one platform—let alone a showing that any application *in fact* intrudes on speech rights."   Mem. [54] at 28 (emphasis in original).   NetChoice replies that it "has provided three member declarations from Google, Nextdoor, and Dreamwidth discussing how the Act applies to their respective services" and "has also explained how the Act applies to its covered members, both in its own declaration, ECF 49-1, and its pleadings."   Reply [56] at 9.   The Court concurs

13

with NetChoice that, based on its evidentiary submissions at this stage of the case, it has made a sufficient factual showing that the Act applies to the aforementioned members.

2.   Analysis

a.   *Whether the Act is Subject to First Amendment Scrutiny*

"Laws that directly regulate expressive conduct can, but do not necessarily, trigger" First Amendment scrutiny. *TikTok Inc. v. Garland*, 145 S. Ct. 57, 65 (2025). The Supreme Court has also applied First Amendment scrutiny in cases involving governmental regulation of conduct that carries an expressive element, and to "some statutes which, although directed at activity with no expressive component, impose a disproportionate burden upon those engaged in protected First Amendment activities." *Id.* (quotation omitted).

If a challenged provision is subject to the First Amendment, the Court must then determine the appropriate level of scrutiny to apply. *See id.* at 66-67. Content-based laws, meaning those that target speech based on its communicative content, are subject to strict scrutiny, and "are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Id.* at 67 (quotation omitted). "[T]he First Amendment, subject only to narrow and well-understood exceptions, does not countenance governmental control over the content of messages expressed by private individuals." *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 641 (1994).

Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message

14

> expressed. This commonsense meaning of the phrase "content based" requires a court to consider whether a regulation of speech on its face draws distinctions based on the message a speaker conveys. Some facial distinctions based on a message are obvious, defining regulated speech by particular subject matter, and others are more subtle, defining regulated speech by its function or purpose. Both are distinctions drawn based on the message a speaker conveys, and, therefore, are subject to strict scrutiny.

*Reed v. Town of Gilbert*, 576 U.S. 155, 163-64 (2015) (citations and quotations omitted).

"A law that is content based on its face is subject to strict scrutiny regardless of the government's benign motive, content-neutral justification, or lack of animus toward the ideas contained in the regulated speech." *Id.* at 165 (quotation omitted). Moreover, "[b]ecause speech restrictions based on the identity of the speaker are all too often simply a means to control content, [the Supreme Court has] insisted that laws favoring some speakers over others demand strict scrutiny when the legislature's speaker preference reflects a content preference." *Id.* at 170 (quotations omitted); *see also TikTok Inc.*, 145 S. Ct. at 67 (discussing the two forms of content-based speech regulation: (1) a law that is content-based on its face because it applies to particular speech because of the topic discussed or the idea or message expressed, and (2) a facially content-neutral law that is nonetheless treated as a content-based regulation of speech because it cannot be justified without reference to the content of the regulated speech or was adopted by the government because of disagreement with the message the speech conveys).

"Content-neutral laws, in contrast, are subject to an intermediate level of scrutiny because in most cases they pose a less substantial risk of excising certain

ideas or viewpoints from the public dialogue." *TikTok Inc.*, 145 S. Ct. at 67 (quotation omitted). Under this standard, a court will sustain a content-neutral law "if it advances important governmental interests unrelated to the suppression of free speech and does not burden substantially more speech than necessary to further those interests." *Id.* (quotation omitted).

Here, at least some provisions of the Act, particularly Sections 4 and 5, limit access to the websites of NetChoice's covered members and directly regulate expressive conduct, implicating the First Amendment as to those covered members. *See id.*; Ex. [1-1] (Miss. H.B. 1126).[4]

H.B. 1126 applies to any service offered by the covered digital service provider that:

> (a)    Connects users in a manner that allows users to socially interact with other users on the digital service;
>
> (b)    Allows a user to create a public, semi-public or private profile for purposes of signing into and using the digital service; and
>
> (c)    Allows a user to create or post content that can be viewed by other users of the digital service, including sharing content on:
>
> > (i)    A message board;
> >
> > (ii)    A chat room; or
> >
> > (iii)    A landing page, video channel or main feed that presents to a user content created and posted by other users.

Ex. [1-1] at 3-4 (Miss. H.B. 1126, § 3). But the Act does not apply to certain things, including a digital service that "[p]rimarily functions to provide a user with access

---

[4] The Court recognizes that some sections of the Act may not be subject to First Amendment scrutiny. For instance, Section 1 simply sets forth the title of the Act, and Section 2 defines certain terms. But the parties have not addressed whether, for an as-applied challenge, the Court must consider each provision separately. *But see, e.g., Space Expl. Techs. Corp. v. Nat'l Lab. Rels. Bd.*, 741 F. Supp. 3d 630, 638 (W.D. Tex. 2024) (holding that it was premature at preliminary injunction stage to consider whether severance of unconstitutional portions of the statute was possible).

to news, sports, commerce, online video games or content primarily generated or selected by the digital service provider." *Id.* at 4 (Miss. H.B. 1126, § 3(2)(c)(i)).

In *Turner Broadcasting*, the Supreme Court considered statutory provisions that required all cable television systems to devote some of their channels to the transmission of local broadcast television stations, and found that because the provisions were "based only upon the manner in which speakers transmit their messages to viewers, and not upon the messages they carry," they were not content-based and were subject only to an intermediate level of scrutiny.   512 U.S. at 645; *see id.* at 626, 661-62.   But H.B. 1126 does not apply to all digital service providers, and specifically excludes from its reach certain providers based upon the primary purpose or subject matter of their service.   *See* Ex. [1-1] at 3-5 (Miss. H.B. 1126, §§ 3(1), 3(2)(c)).

"Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed," *Reed*, 576 U.S. at 163, which is precisely what H.B. 1126 does, *see* Ex. [1-1] at 3-5 (Miss. H.B. 1126, §§ 3(1), 3(2)(c)).   The Act's content-based distinction is inherent in its definition of "digital service provider," which outlines the scope of the Act's coverage.   *See id.*   The Act covers some digital service providers based upon their primary function or the content they convey, while specifically excluding others based upon the nature of the speech they communicate.   *See id.*   Essentially, H.B. 1126 treats or classifies digital service providers differently based upon the nature of the material they disseminate, whether it is "social interaction," *id.* at 3 (Miss.

H.B. 1126, § 3(1)(a)), as opposed to "news, sports, commerce, [or] online video games," *id.* at 4 (Sec. 3(2)(c)(i)).   Even if this could be considered a speaker-based distinction, the Supreme Court has held that "laws favoring some speakers over others demand strict scrutiny when the legislature's speaker preference reflects a content preference."   *Reed*, 576 U.S. at 170.

Section 3(2)(c)(i) can thus be viewed as either drawing a facial distinction based on the message the digital service provider conveys (i.e., news and sports versus social interaction), or a more subtle content-based restriction defining regulated speech by its function or purpose (i.e., providing news and sports as opposed to facilitating social interaction).   *See* Ex. [1-1] at 3 (Sec. 3(2)(c)(i)); *Reed*, 576 U.S. at 163.   Either way, "[b]oth are distinctions drawn based on the message a speaker conveys."   *Reed*, 576 U.S. at 163-64.   And it is of no moment that there is no express restriction on a particular viewpoint, as "[t]he First Amendment's hostility to content-based regulation extends not only to restrictions on particular viewpoints, but also to prohibition of public discussion of an entire topic."   *Id.* at 169 (quotation omitted).   Nor is the State's motive relevant, as "[a] law that is content based on its face is subject to strict scrutiny regardless of the government's benign motive, content-neutral justification, or lack of animus toward the ideas contained in the regulated speech."   *Id.* at 165 (quotation omitted).   The facial distinctions H.B. 1126 draws based on the message a particular digital service provider conveys, or the more subtle content-based restrictions based upon the

18

speech's function or purpose, render the Act content-based, and therefore subject to strict scrutiny.    *See id.*

The Attorney General argues that H.B. 1126 regulates not speech but non-expressive conduct, which the State may regulate if it has a rational basis for doing so.    *See* Resp. [54] at 15, 17-20, 26 (citing *City of Dallas v. Stanglin*, 490 U.S. 19, 23-25 (1989)).    The Court is not persuaded that H.B. 1126 merely regulates non-expressive conduct, and *Stanglin*, upon which the Attorney General relies, is distinguishable.    *See id.*    In *Stanglin*, the "city of Dallas adopted an ordinance restricting admission to certain dance halls to persons between the ages of 14 and 18," *Stanglin*, 490 U.S. at 20, and limiting their operating hours to 1 p.m. to midnight, when school was not in session, *id.* at 22.    "[T]he owner of one of these 'teenage' dance halls, sued to contest the constitutional validity of the ordinance." *Id.* at 20.    "The Texas Court of Appeals held that the ordinance violated the First Amendment right of persons between the ages of 14 and 18 to associate with persons outside that age group."    *Id.* at 20-21.

The United States Supreme Court reversed.    *Id.* at 21.    It reasoned that the ordinance restricted attendance at teenage dance halls "to minors between the ages of 14 and 18 and certain excepted adults.    It thus limits the minors' ability to dance with adults who may not attend, and it limits the opportunity of such adults to dance with minors."    *Id.* at 24.    The Supreme Court recognized that such opportunities for dance-hall patrons "might be described as 'associational' in common parlance, but they simply [did] not involve the sort of expressive

association that the First Amendment has been held to protect."   *Id.* at 24.   "There

[was] no suggestion that these patrons '[took] positions on public questions' or

perform[ed] any of the other similar activities described in *Board of Directors of*

*Rotary International v. Rotary Club of Duarte*, 481 U.S. 537, 548, 107 S.Ct. 1940,

1947, 95 L.Ed.2d 474 (1987)," *id.* at 25, including the "right to associate with others

in pursuit of a wide variety of political, social, economic, educational, religious, and

cultural ends," *Duarte*, 481 U.S. at 548.

Unlike *Stanglin*, at this stage of the proceeding there is competent evidence

in this case that NetChoice's covered members' websites include users who take

positions on, and engage with others in pursuit of, the type of "political, social,

economic, educational, religious, and cultural" activities described in *Duarte*.   *Id.*;

*see also, e.g.,* Ex. [49-1] at 3 ("NetChoice members' websites publish, disseminate,

display, compile, create, curate, and distribute a wide range of valuable and

protected expression to their users.   They disseminate content (text, audio,

graphics, and video) that facilitates their users' ability to practice their religious

beliefs, engage in political discourse, seek cross-cultural dialogue, supplement their

education, learn new skills, and simply interact socially.").   The argument that the

Act is conduct-based or that *Stanglin* somehow controls is not persuasive.   Because

H.B. 1126 regulates content, strict scrutiny applies.   *See Reed*, 576 U.S. at 163-64.

*b.*     *Whether NetChoice Has Shown a Substantial Likelihood of Success on the*
        *Merits*

The Attorney General contends that the State has a compelling interest in

safeguarding the physical and psychological wellbeing of minors online, and that

the Act is narrowly tailored to achieve that interest given "how easily" the age

verification requirement can be satisfied.    Resp. [54] at 27.    The Court accepts as

true the Attorney General's position that safeguarding the physical and

psychological wellbeing of minors online is a compelling interest.    *See id.*; *see also,*

*e.g., Sable Commc'ns of California, Inc. v. F.C.C.*, 492 U.S. 115, 126 (1989)

(recognizing that "there is a compelling interest in protecting the physical and

psychological well-being of minors").

The State "may serve this legitimate interest, but to withstand constitutional

scrutiny, it must do so by narrowly drawn regulations designed to serve those

interests without unnecessarily interfering with First Amendment freedoms."

*Sable Commc'ns of California, Inc.*, 492 U.S. at 126 (quotation omitted).    "It is not

enough to show that the Government's ends are compelling; the means must be

carefully tailored to achieve those ends."    *Id.*    When the ends "affect First

Amendment rights they must be pursued by means that are neither seriously

underinclusive nor seriously overinclusive."    *Brown v. Ent. Merchants Ass'n*, 564

U.S. 786, 805 (2011).    "If a less restrictive alternative would serve the

Government's purpose, the legislature must use that alternative."    *United States v.*

*Playboy Ent. Grp., Inc.*, 529 U.S. 803, 813 (2000).

So, the question here is whether, as applied to NetChoice's covered members,

the Act is sufficiently narrowly tailored to promote the State's compelling interest.

*See id.*; *Sable Commc'ns of California, Inc.*, 492 U.S. at 126; *TikTok Inc.*, 145 S. Ct.

at 70.    NetChoice has carried its burden of showing that the Act, as applied to at

least eight of its members, is likely not narrowly tailored to achieve the interests identified by the Attorney General. Based upon the definitions in Sections 2 and 3, including the definition of a covered digital service provider, Section 4 precludes such digital service providers which do not primarily provide certain content (career development opportunities, news, sports, commerce, and online video games) from allowing a user to create an account without registering his or her age, and it requires covered digital service providers to "make commercially reasonable efforts to verify the age of the person creating an account with a level of certainty appropriate to the risks that arise from the information management practices of the digital service provider." Ex. [1-1] at 6 (Miss. H.B. 1126, § 4). Any known minors must then obtain parental consent to open an account with a covered member. *Id.* at 6-7.

NetChoice has presented evidence that minors' parents and guardians already have many tools at their disposal to monitor and control their children's online access, including network-, device-, browser-, and app-level restrictions. *See* Decl. [49-1] at 5-8. And Cleland's Declaration [49-1] reflects that NetChoice's members take measures to protect minors, including by prohibiting minors younger than 13 from accessing their main services, and by having minor-specific policies or practices. *Id.* at 8-9.

The Southern District of Ohio has addressed a similar law and found that NetChoice had shown a likelihood of success on the merits of its claim that foreclosing minors under 18 years old from accessing all content on social media

websites, like the ones H.B. 1126 purports to cover, absent affirmative parental consent was overbroad and therefore unconstitutional.    *NetChoice, LLC v. Yost*, 716 F. Supp. 3d 539, 559 (S.D. Ohio 2024).    The district court there determined that such an approach was also "an untargeted one, as parents must only give one-time approval for the creation of an account . . . ."    *Id.*

In addressing legislation prohibiting minors from purchasing violent video games, the Supreme Court in *Brown* held that is doubtful that "punishing third parties for conveying protected speech to children just in case their parents disapprove of that speech is a proper governmental means of aiding parental authority."    *Brown*, 564 U.S. at 802.    In *Brown,* as here, there were already a series of preexisting protections offered by the plaintiffs to assist parents.    *Id*. at 803; *see also, e.g.,* Ex. [49-1] at 5-6 (averring that "there is much publicly accessible information about the many wireless routers that offer parental control settings parents can use to block specific online services, limit the time that their children spend on the Internet, set individualized content filters, and monitor the online services their children visit").    The Supreme Court concluded that the legislation at issue in *Brown* was "seriously underinclusive," not only because it excluded portrayals of violence other than video games, but also because it permitted a parental veto.    *Brown*, 564 U.S. at 805.    It further held the legislation was overinclusive because it enforced a governmental speech restriction, subject to parental veto.    *Id*. at 804.    "And the overbreadth in achieving one goal [was] not cured by the underbreadth in achieving the other."    *Id*. at 805.

Here, the Attorney General has not shown that the alternative suggested by NetChoice, the private tools currently available for parents to monitor their children online, *see* Mem. [50] at 25, would be insufficient to secure the State's objective of protecting children, *see, e.g., Brown*, 564 U.S. at 804-05; *see also United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 813 (2000) (for content-based regulations subject to strict scrutiny, "[i]f a less restrictive alternative would serve the Government's purpose, the legislature must use that alternative"); Ex. [49-1] at 5-19 (discussing existing tools parents can use to oversee and control their minor children's online access and some NetChoice members' current policies that block or limit the publication to minors of content that the Act regulates).

In short, NetChoice has carried its burden of demonstrating that there are a number of supervisory technologies available for parents to monitor their children that the State could publicize.   *See* Ex. [49-1] at 5-7.   Yet, the Act requires all users (both adults and minors) to verify their ages before creating an account to access a broad range of protected speech on a broad range of covered websites. This burdens the First Amendment rights of adults using the websites of Netchoice's covered members, which makes it seriously overinclusive.[5]   But NetChoice has also presented persuasive evidence that "[u]ncertainty about how broadly the Act extends—and how Defendant will interpret the Act—may spur

---

[5]  Minors also have a "significant measure of First Amendment protection," and the State may bar public dissemination of protected materials to minors "only in relatively narrow and well-defined circumstances."   *Erznoznik*, 422 U.S. at 212-13.   The State does not have a "free-floating power to restrict the ideas to which children may be exposed."   *Brown*, 564 U.S. at 794.

members to engage in over-inclusive moderation that would block valuable content from all users," and that not all covered websites have the ability to "age-gate," meaning that "they are unable to separate the content available on adults' accounts from content available on minors' accounts." Ex. [49-1] at 26. This likewise renders H.B. 1126 overinclusive.

The Act also requires all minors under the age of eighteen, regardless of age and level of maturity, to secure parental consent to engage in protected speech activities on a broad range of covered websites, which represents a one-size-fits-all approach to all children from birth to age 17 years and 364-days old. H.B. 1126 is thus overinclusive as to Netchoice's covered members to the extent it is intended as an aid to parental authority beyond the resources for monitoring children's internet activity NetChoice has already identified, because not all children forbidden by the Act to create accounts on their own have parents who will care whether they create such accounts. *See Brown*, 564 U.S. at 789, 804 (holding the state act purporting to aid parental authority by prohibiting the sale or rental of "violent video games" to minors "vastly overinclusive" because "[n]ot all of the children who are forbidden to purchase violent video games on their own have parents who *care* whether they purchase violent video games" (emphasis in original)).

*Brown* found that the statute in that case was also underinclusive:

[t]he Act is also seriously underinclusive in another respect . . . leav[ing] this dangerous, mind-altering material in the hands of children so long as one parent (or even an aunt or uncle) says it's OK. And there are not even any requirements as to how this parental or avuncular relationship is to be verified; apparently the child's or putative parent's, aunt's, or uncle's say-so suffices.

25

*Brown*, 564 U.S. at 802.

     H.B. 1126 similarly requires only one parent or guardian's consent to create an account with a covered member's website, and it does not explain how the parent or guardian relationship is to be verified. *See* Ex. [1-1] at 5-7 (Miss. H.B. 1126, § 4). Section 4(2) states that "[a]cceptable methods of obtaining express consent of a parent or guardian include any of the following" and references examples contained in subsections (a) through (f). *See* Sec. 4(2) ("A digital service provider shall not permit an account holder who is a known minor to be an account holder unless the known minor has the express consent from a parent or guardian."). Only options (d) and (e) mention confirming the identity of the purported parent or guardian, but none of the options, not even options (d) and (e), require verifying that the person who represents himself or herself as the minor's parent or guardian is in fact the parent or guardian. *See* Sec. 4(2)(d)-(e) (discussing collecting information and confirming the identity of the parent or guardian, but not how to verify parental relationship or guardian status). This makes H.B. 1126 underinclusive as applied to NetChoice's covered members. *See Brown*, 564 U.S. at 802.

     Finally, Section 6 of H.B. 1126 requires covered Netchoice members "to develop and implement a strategy to prevent or mitigate the known minor's exposure to harmful material and other content that promotes or facilitates" certain harms to minors, Sec. 6(1), but then states that it shall not be construed to require a provider to prevent or preclude "[a]ny minor from deliberately and independently searching for, or specifically requesting, content," Sec. 6(2)(a). Permitting minors

who have presumably obtained parental consent to view otherwise-proscribed content on covered websites, simply because they initiated it by "searching for" or "requesting" it, would not seem to serve the State's compelling interest in protecting minors from the predatory behavior online.   H.B. 1126 is underinclusive in this respect as well.

In summary, the record as a whole supports the conclusion that NetChoice has shown that the Act is not narrowly tailored to achieve the State's desired result. NetChoice has demonstrated a substantial likelihood of success on its claim that, as applied to its covered members, H.B. 1126 is either overinclusive or underinclusive, or both, for achieving the State's asserted interest in protecting minors from predatory behavior online.   *See Americans for Prosperity Found.*, 594 U.S. at 615; *Brown*, 564 U.S. at 805; *Moody,* 2024 WL 3237685, at *8.   As such, the Act is likely not sufficiently narrowly tailored to survive strict scrutiny as applied to at least eight of NetChoice's members: (1) Dreamwidth; (2) Meta, which owns and operates Facebook and Instagram; (3) Nextdoor; (4) Pinterest; (5) Reddit; (6) Snap Inc., which owns and operates Snapchat; (7) X; and (8) YouTube.

Even if, as the Attorney General asserts, the Act were deemed content neutral and subject to intermediate scrutiny, the result would not change.   A court will sustain a content-neutral law "if it advances important governmental interests unrelated to the suppression of free speech and does not burden substantially more speech than necessary to further those interests."   *TikTok Inc.*, 145 S. Ct. at 67 (quotation omitted).   To be sufficiently tailored to survive intermediate scrutiny, "a

regulation need not be the least speech-restrictive means of advancing the Government's interests." *Id.* at 70 (quotation omitted). "Rather, the standard is satisfied so long as the regulation promotes a substantial government interest that would be achieved less effectively absent the regulation and does not burden substantially more speech than is necessary to further that interest." *Id.* (quotations omitted); *see also Packingham v. North Carolina*, 582 U.S. 98, 105-06 (2017) (holding that "to survive intermediate scrutiny, a law must be narrowly tailored to serve a significant governmental interest" (quotation omitted)). "While not as exacting as strict scrutiny, intermediate scrutiny is no gimme for the government: Intermediate scrutiny is still tough scrutiny, not a judicial rubber stamp." *Hines v. Pardue*, 117 F.4th 769, 779 (5th Cir. 2024) (quotations and alteration omitted).

Again accepting as true the Attorney General's position that safeguarding the physical and psychological wellbeing of minors online is an important governmental interest, it does not appear that the chosen method for advancing this interest can be said to be unrelated to the suppression of speech, at least as it applies to NetChoice's covered members. *See id.*; *Moody*, 603 U.S. at 740. But even if it were found to be unrelated to suppression of speech, for the reasons the Court has already discussed, the Act nevertheless burdens substantially more speech than is necessary for the State to accomplish its goals. *See TikTok Inc.*, 145 S. Ct. at 70.

For example, Section 4 precludes minors under 18 years old from accessing all content on social media websites, absent affirmative parental consent, regardless

of whether the content concerns or negatively affects minors' physical and psychological wellbeing.  *See* Sec. 4(2).   Section 6 states that "a digital service provider shall make commercially reasonable efforts to develop and implement a strategy to prevent or mitigate the known minor's exposure to harmful material and other content that promotes or facilitates" certain specified harms.  Sec. 6(1).   But NetChoice has presented evidence, including Cleland's Declaration [49-1], that the plain terms of the Act seem to require prevention of exposure "not only to protected speech, but also to valuable works of art, literature, and pop culture that are suitable for at least some minors," Ex. [49-1] at 26, as those works may be construed as promoting or facilitating some of the specified harms, such as self-harm, eating disorders, substance use disorders, suicidal behaviors, stalking, grooming, incitement of violence, and any other illegal activities, *see id.*; Sec. 6(1).   And Cleland opines that uncertainty about how broadly the Act extends and how the Attorney General will interpret and enforce it "may spur members to engage in over-inclusive moderation."   Ex. [49-1] at 26.   Thus, as applied to NetChoice's covered members, the Act likely burdens substantially more speech than is necessary for the State to safeguard the physical and psychological wellbeing of minors online.   *See id.*; *TikTok Inc.*, 145 S. Ct. at 70.

Simply put, the Act is not sufficiently narrowly tailored to serve the State's interests even under intermediate scrutiny.   *See Packingham*, 582 U.S. at 105-06.

NetChoice has shown a substantial likelihood of success on the merits of its as-applied claim.    *See id.*; *TikTok Inc.*, 145 S. Ct. at 70; *Moody*, 603 U.S. at 740.[6]

c.    *Irreparability of Harm*

The Court turns next to whether NetChoice's covered members or their users will suffer irreparable harm absent an injunction.    "In general, a harm is irreparable where there is no adequate remedy at law, such as monetary damages." *Janvey v. Alguire*, 647 F.3d 585, 600 (5th Cir. 2011).    But the mere fact that monetary damages may be available does not always mean that a remedy is adequate.    *See id.*

"When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary."    *Book People, Inc. v. Wong*, 91 F.4th 318, 340-41 (5th Cir. 2024) (quotation omitted).    And the Supreme Court has held that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."    *Elrod v. Burns*, 427 U.S. 347, 373 (1976).    Here, one potential consequence of knowingly violating the Act includes criminal liability, *see* Sec. 8(2)(q) (making violating the Act an unfair and deceptive trade practice under Section 75-24-5); Miss. Code Ann. § 75-24-20(a) ("Any person who, knowingly and willfully, violates any provision of Section 75-24-5, shall be guilty of a misdemeanor, and upon conviction shall be fined up to One Thousand Dollars ($1,000.00)."), and with respect to compliance

---

[6]    Because NetChoice has shown a substantial likelihood of success on the merits on at least some of its claims, the Court need not consider its remaining preemption claim.    *See* Am. Compl. [48] at 43-45.

costs, covered digital service providers may suffer irreparable harm by outlaying financial resources to comply "with no guarantee of eventual recovery" from the State if the Court ultimately enters judgment in their favor, *Alabama Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 594 U.S. 758, 765 (2021).    Indeed, at least one of NetChoice's members has presented evidence that the alleged financial injury may threaten the very existence of its business.    *See* Ex. [3-5] at 22 (averring that "the Act threatens [Dreamwidth's] ability to continue operating").    The Fifth Circuit has found an injury to be irreparable when compliance costs were likely unrecoverable against a federal agency because it enjoyed sovereign immunity. *See Wages & White Lion Invs., L.L.C. v. United States Food & Drug Admin.*, 16 F.4th 1130, 1142 (5th Cir. 2021).    The Court finds this factor weighs in favor of granting a preliminary injunction.

### d.    Balance of Equities and the Public Interest

The last two factors merge where, as here, the government is the opposing party.    *Nken*, 556 U.S. at 435.    And "injunctions protecting First Amendment freedoms are always in the public interest."    *Texans for Free Enter. v. Texas Ethics Comm'n*, 732 F.3d 535, 539 (5th Cir. 2013).    Because the Court has found that NetChoice has shown a substantial likelihood of success on the merits of its claims, the Court finds that an injunction is in the public interest.    *See id.*; *see also, e.g., Book People, Inc.*, 91 F.4th at 341 ("Because Plaintiffs are likely to succeed on the merits of their First Amendment claim, the State and the public won't be injured by an injunction of a statute that likely violates the First Amendment.").    In sum,

NetChoice has shown that all four factors under Rule 65 favor the entry of a preliminary injunction on its as-applied challenge to Sections 1 through 8 of the Act.

D.   NetChoice's Facial Challenge

Because NetChoice has shown a substantial likelihood of success on the merits of its as-applied claim, the Court need not reach its facial challenge to the constitutionality of the Act.   *See, e.g., United States v. Jubert*, No. 24-60199, 2025 WL 1577013, at *2 (5th Cir. June 4, 2025) (holding that a court turns to a facially overbroad challenge "only if it is determined that the statute would be valid as applied" (quoting *Buchanan*, 919 F.3d at 854)).   The Court is certainly mindful of the Fifth Circuit's mandate remanding this matter for this Court to address the facial challenge under the framework announced in *Moody*.   But the procedural posture of this case changed when, following remand, NetChoice filed an Amended Complaint [48] adding, for the first time, an as-applied challenge to the Act.   *See* Am. Compl. [48].   Earlier, before both this Court and the Fifth Circuit, and "[a]s in *Moody*, NetChoice chose to bring a facial challenge 'and that decision [came] at a cost.'"   *Fitch*, 134 F.4th at 807 (quoting *Moody*, 603 U.S. at 723).   NetChoice apparently heeded the Fifth Circuit's advice and added an as-applied challenge on remand.   *See* Am. Compl. [48].

Given this altered procedural posture, the Fifth Circuit has been clear that a district court should "generally decide the as-applied challenge first because it is the narrower consideration."   *Buchanan*, 919 F.3d at 852.   And the Supreme Court has explained that, "although the occasional case requires us to entertain a facial

challenge in order to vindicate a party's right not to be bound by an unconstitutional statute, we neither want nor need to provide relief to nonparties when a narrower remedy will fully protect the litigants." *United States v. Nat'l Treasury Emps. Union*, 513 U.S. 454, 477-78 (1995).   Given the foregoing guidance from the Supreme Court and the Fifth Circuit, and because the Court has determined NetChoice has a substantial likelihood of success on the merits of its newly-added as-applied challenge to the Act, it need not reach the facial challenge in order to fully protect the litigants, and it will refrain from doing so in order to avoid "unnecessary adjudication of constitutional issues." *Id.* at 478.

E.   <u>Whether the Court Should Require Security</u>

Rule 65(c) states that a court may issue a preliminary injunction "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."   Fed. R. Civ. P. 65(c).   "[T]he amount of security required pursuant to Rule 65(c) is a matter for the discretion of the trial court," and the district court "may elect to require no security at all."   *Kaepa, Inc. v. Achilles Corp.*, 76 F.3d 624, 628 (5th Cir. 1996).

In this case, neither party has raised the issue of security, and Defendant likely will not incur any significant monetary damage as a result of a preliminary injunction, which ensures that the constitutional rights of NetChoice's covered members are protected.   Therefore, the Court finds that security is not necessary in this case.   *See id.*   Other courts have reached the same conclusion under similar

circumstances.    *See, e.g., Thomas v. Varnado*, 511 F. Supp. 3d 761, 766 (E.D. La. 2020) (holding that, because neither the school board nor superintendent was likely to incur any significant monetary damages as a result of the preliminary injunction and because the plaintiff was a minor student, it would issue an injunction without security); *Gbalazeh v. City of Dallas*, No. 3:18-CV-0076-N, 2019 WL 2616668, at *2 (N.D. Tex. June 25, 2019) ("The Court exercises its discretion under Federal Rule of Civil Procedure 65(c) to waive the bond requirement, as Plaintiffs are engaged in 'public-interest litigation' to protect their constitutional rights." (quoting *City of Atlanta v. Metro. Atlanta Rapid Transit Auth.*, 636 F.2d 1084 (5th Cir. 1981)).

### III.    CONCLUSION

Because Plaintiff NetChoice, LLC, has carried its burden of demonstrating a substantial likelihood of success on the merits of its claim that the Act is unconstitutional under a First Amendment as-applied challenge as to certain of its members, the Court will grant the Motion for a Preliminary Injunction without requiring security.

**IT IS, THEREFORE, ORDERED AND ADJUDGED** that, Plaintiff NetChoice, LLC's Motion [49] for Temporary Restraining Order and Preliminary Injunction is **GRANTED IN PART**, to the extent it seeks a preliminary injunction as to its eight covered members: (1) Dreamwidth; (2) Meta, which owns and operates Facebook and Instagram; (3) Nextdoor; (4) Pinterest; (5) Reddit; (6) Snap

Inc., which owns and operates Snapchat; (7) X; and (8) YouTube.    The Motion [49] is **DENIED IN PART** as moot, to the extent it seeks a temporary restraining order.

 **IT IS, FURTHER, ORDERED AND ADJUDGED** that, Defendant Mississippi Attorney General Lynn Fitch and her agents, employees, and all persons acting under her direction or control, are **PRELIMINARILY ENJOINED** under Federal Rule of Civil Procedure 65(a) from enforcing Sections 1 through 8 of Mississippi House Bill 1126 against Plaintiff NetChoice, LLC's eight covered members: (1) Dreamwidth; (2) Meta, which owns and operates Facebook and Instagram; (3) Nextdoor; (4) Pinterest; (5) Reddit; (6) Snap Inc., which owns and operates Snapchat; (7) X; and (8) YouTube, pending a final disposition of this case on its merits.

 **SO ORDERED AND ADJUDGED**, this the 18th day of June, 2025.

_s/ Halil Suleyman Ozerden_
HALIL SULEYMAN OZERDEN
CHIEF UNITED STATES DISTRICT JUDGE